~~SECRET//NOFORN~~

Filed with Classified
Information Security Officer
CISO _AMGuerreroRandall_
Date _08/16/2019_

Oral Argument: Not Yet Scheduled
19-5079

# In the United States Court of Appeals for the District of Columbia Circuit

**ABDULSALAM ALI ABDULRAHMAN AL-HELA,**
*Petitioner-Appellant,*

v.

**DONALD J. TRUMP**, et al.,
*Respondents-Appellees.*

On appeal from the United States District Court
for the District of Columbia, Civil Action No. 05-1048,
Hon. Royce C. Lamberth, District Judge

## Brief of Petitioner-Appellant

David H. Remes
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508 phone

S. William Livingston
Brian E. Foster
Andrew D. Garrahan
Covington & Burling LLP
One City Center
850 10th Street NW
Washington, DC 20001
(202) 662-6000 phone
(202) 662-6291 facsimile

August 16, 2019

*Counsel for Petitioner-Appellant*

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*Parties and amici.* The Petitioner in the district court, and the Appellant in this Court, is Abdulsalam Ali Abdulrahman al-Hela. The Respondents in the district court, and the Appellees in this Court, are Donald J. Trump, President of the United States; Dr. Mark T. Esper, Secretary of Defense; Rear Admiral Timothy C. Kuehhas, U.S. Navy, Commander, Joint Task Force-GTMO; and Colonel Steven G. Yamashita, U.S. Army, Commander, Joint Detention Group, Guantanamo Bay. There have been no intervenors or amici in the district court or in this Court.

*Rulings under review.* The rulings at issue in the appeal are the order and memorandum opinion issued by Judge Royce C. Lamberth dated January 28, 2019, JA 116-98; the order and memorandum opinion issued by Judge Lamberth dated May 12, 2016, JA 199-205; and the order issued by Judge Lamberth dated November 19, 2014, JA 206-07.

*Related cases.* The case on review, D.D.C. Civil Action No. 05-1048, was previously before this court in *Barack Obama v. Abdulsalam al-Hela*, Case No. 05-5230, and in *Abdulsalam al-Hela v. Barack Obama*, Case No. 08-5268. Counsel for appellant are not aware of any other additional related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

## TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases.........................................i

Table of Contents ...............................................................................................ii

Table of Authorities..........................................................................................iv

Glossary ...........................................................................................................viii

Introduction ..........................................................................................................1

Statement of Jurisdiction ....................................................................................3

Statement of Issues Presented for Review...........................................................4

Pertinent Statutes ................................................................................................6

Statement of the Case .........................................................................................8

Statement of Facts .............................................................................................10

    A.     Early Life...........................................................................................10

    B.     Deportation of Foreign Arabs..........................................................12

    C.     ██████████████████████.................................13

    D.     Abduction, Rendition, and Torture...................................................13

Summary of the Argument .................................................................................16

Standard of Review ...........................................................................................21

Argument ...........................................................................................................22

I.    The Court Erred in Holding that the United States May Detain Abdulsalam for Providing "Substantial Support" to al Qaeda or its "Associated Forces." ..........................................................................................22

    A.     The District Court's "Substantial Support" Legal Analysis Was Defective.................................................................................................22

        1.    Involvement in "Hostilities" as a Prerequisite for a Finding of "Substantial Support"...........................................................................23

ii

~~SECRET//NOFORN~~

SECRET//NOFORN

2. "Support" Provided Before or Unrelated to 9/11 ..........................26

3. "Support" Provided Before Capture .............................................27

4. Law of War Detention of Civilians for Providing "Substantial Support"..........................................................................................29

B. The "Travel Facilitation" and "Attacks and Plots" Allegations Do Not Involve Activities Constituting "Substantial Support." ......................31

1. The Travel Facilitation Allegations .........................................31

2. The Embassy Bomb Plot Allegations .......................................37

3. Activity Not Involving "Substantial Support" ..........................43

C. The District Court Erred in Finding EIJ and AAIA to be "Associated Forces." ........................................................................46

1. The Legal Definition of "Associated Force" ..............................47

2. AAIA ....................................................................................51

3. EIJ .......................................................................................56

II. Abdulsalam's Prolonged Detention without Charge or Trial is Not Permitted by the AUMF and Violates the Due Process Clause. .................60

1. AUMF....................................................................................60

2. Due Process Clause ................................................................65

III. Abdulsalam Was Denied the "Meaningful" Hearing Required by *Boumediene* and His Procedural Due Process Rights Were Violated. .........68

Conclusion .............................................................................................75

SECRET//NOFORN

~~SECRET//NOFORN~~

## TABLE OF AUTHORITIES

**Cases**

*Al Alwi v. Obama*, 653 F.3d 11 (D.C. Cir. 2011) .........................................49

*Al Ginco v. Obama*, 626 F. Supp. 2d 123 (D.D.C. 2009) .........................28

*Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009) .........................73

*Al Rabiah v. United States*, 658 F. Supp. 2d 11 (D.D.C. 2009) ............48, 71

*Al Rabiah v. United States*, Civ. Action 02-828(CKK), Classified Slip. Op. (D.D.C. Sept. 17, 2009).........................................72

*Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010) ...........................24, 60

*Al-Bahlul v. Obama*, 767 F.3d 1 (D.C. Cir. 2017).........................66

*Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010)......16, 21, 22, 24, 25, 26

*Ali v. Obama*, 736 F.3d 542 (D.C. Cir. 2013) .........................24, 50, 61, 62

*Ali v. Trump*, 18-5297, 2019 WL 850757 (D.C. Cir. Feb. 22, 2019) ...........68

*Almerfedi v. Obama*, 654 F.3d 1 (D.C. Cir. 2011).........................66

*Barhoumi v. Obama*, 609 F.3d 416 (D.C. Cir. 2010) .........................50

*Basardh v. Obama*, 612 F. Supp. 2d 30 (D.D.C. 2009).........................60

*Bensayah v. Obama*, 610 F.3d 718 (D.C. Cir. 2010).........................33

*Boumediene v. Bush*, 553 U.S. 723 (2008).............3, 5, 8, 20, 65, 66, 67, 68

*Brown v. Allen*, 344 U.S. 443 (1953) .........................67

*Clifford v. United States*, 136 F.3d 144 (D.C. Cir. 1998) .........................71

*Gardner v. Florida*, 430 U.S. 349 (1977) .........................73

*Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009) .........................25

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).........................61, 62, 64, 66

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

*Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009)................................47, 48

*Hussain v. Obama*, 134 S. Ct. 1621 (2014)...............................................60

*Hussain v. Obama*, 718 F.3d 964 (D.C. Cir. 2013).....................................24

*In re Eisenberg*, 654 F.2d 1107 (5th Cir. Unit B Sept. 1981)......................71

*In re Territo*, 156 F.2d 142 (9th Cir. 1946)..............................................61

*Khairkhwa v. Obama*, 703 F.3d 547 (D.C. Cir. 2012)................................26

*Khan v. Obama*, 655 F.3d 20 (D.C. Cir. 2011)........................24, 46, 50, 71

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009)..................................65

*Latif v. Obama*, 677 F.3d 1175 (D.C. Cir. 2011).......................................71

*Michigan v. Bryant*, 562 U.S. 344 (2011)................................................72

*Morgan v. United States*, 304 U.S. 1 (1938).............................................68

*Morrissey v. Brewer*, 408 U.S. 471 (1972)...............................................73

*Mousovi v. Obama*, 916 F. Supp. 2d 67 (D.D.C. 2013)..............................71

*Mousovi v. Obama*, No. 05-1124, 2016 WL 3771240 (D.D.C. July 11, 2016)
................................................................................................26, 50

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008).......48, 49, 50, 53, 58, 71, 72

*Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019)..........65, 66, 68, 69, 70, 71

*Rasul v. Bush*, 542 U.S. 466, 488 (2004).............................................64, 67

*Salahi v. Obama*, 625 F.3d 745 (D.C. Cir. 2010)...............................24, 26, 27

*Salahi v. Obama*, 710 F. Supp. 2d 1 (D.D.C. 2010)..................24, 27, 28, 42

*Specht v. Patterson*, 386 U.S. 605 (1967)................................................72

*United States v. Salerno*, 481 U.S. 739 (1987).........................................62

*Zadvydas v. Davis*, 533 U.S. 678 (2001)..................................................67

~~SECRET//NOFORN~~

SECRET//NOFORN

**Statutes**

18 U.S.C. § 2339A ...................................................................................6, 23

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................3

28 U.S.C. § 2241 ...........................................................................................3

28 U.S.C. § 2253 ...........................................................................................3

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224
    (Sept. 18, 2001)....... 4, 5, 6, 7, 17, 20, 22, 26, 27, 28, 29, 44, 60, 61, 62, 64

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-
    81, 125 Stat. 1297 (Dec. 31, 2011) .............................6, 23, 24, 29, 30, 48

**Other Authorities**

Exec. Order 13224, Blocking Property and Prohibiting Transactions with
    Persons who Commit, Threaten, or Support Terrorism, 66 FR 49079
    (Sept. 23, 2001).......................................................................................53

International Military Tribunal (Nuremburg), reprinted in 41 Am. J. Int'l L.
    172 (1947)................................................................................................61

Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and
    the War on Terrorism*, 118 Harv. L. Rev. 2047 (May 2005).. 29, 47, 49, 52

Jennifer K. Elsea and Michael John Garcia, Cong. Research Serv. R42143,
    *Wartime Detention Provisions in Recent Defense Authorization
    Legislation* (Mar. 14, 2016)...............................................................25, 49

Henry J. Friendly, *Some Kind of Hearing*, 123 U. Penn. L. Rev. 1267 (1975)
    ...............................................................................................................69

*The Federalist No. 84* (Alexander Hamilton) (C. Rossiter ed., 1961) .........67

Yasmin Naqvi, *Doubtful Prisoner-of-War Status*, 84 Int'l Rev. Red Cross
    571(2002)................................................................................................61

SECRET//NOFORN

~~SECRET//NOFORN~~

Red Cross Commentary on Third Geneva Convention (Jean Pictet ed., 1960) ..................................................................................................26

U.S. Dep't of Justice, et al., *Final Report: Guantanamo Review Task Force* (2010) ..............................................................................63

The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (Dec. 2016).............................22, 24, 25, 48, 55, 59

William Winthrop, *Military Law and Precedents* (rev. 2d ed. 1920) ..........62

**Constitutional Provisions**

Due Process Clause, U.S. Const. amend. V ...............5, 20, 60, 65, 66, 68, 71

**Treaties**

Geneva Convention relative to the Protection of Civilian Persons in Time of War art. 132, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287...........23, 30

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

## GLOSSARY

| | |
|---|---|
| 2012 NDAA | National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1297 (Dec. 31, 2011) |
| AAIA | Aden-Abyan Islamic Army |
| AUMF | Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) |
| CIA | Central Intelligence Agency |
| EIJ | Egyptian Islamic Jihad |
| ICRC | International Committee of the Red Cross |
| JA | Joint Appendix |
| PSO | Political Security Organization |

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

## INTRODUCTION

Abdulsalam Ali Abdulrahman al-Hela was a respected Yemeni businessman and tribal leader. He was a well-regarded citizen who assisted his country when asked by high Yemeni officials to help in the deportation of foreign Arabs from Yemen. The Yemen government, an early ally of the United States in the war on terror, has stated its unqualified support for Abdulsalam in this case. Abdulsalam was not a member of al Qaeda or any other terrorist group. He has never been a political or religious extremist. He had no involvement in the 9/11 attacks or in harboring the attackers. He was not a combatant. He never fought against the United States. █████

████████████████████████████████████

███ He was ██ seized ███████████████████ while he was on a business trip to Cairo in 2002. He was "rendered" to the CIA, which took him to secret prisons ██████████ where he was brutally tortured. Even his continued existence was hidden from his family. He was shipped to Guantanamo in 2004, where he has been ever since. He has never been charged with a crime nor given any explanation as to why he was seized and tortured.

1

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

Nothing in the record justifies his nearly seventeen-year detention, with no end in sight. This Court has the power to end this injustice. It should grant Abdulsalam's petition for habeas corpus.

~~SECRET//NOFORN~~

SECRET//NOFORN

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over this petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 1331 and 2241. *See Boumediene v. Bush*, 553 U.S. 723 (2008). The district court entered an order denying the petition for a writ of habeas corpus on January 28, 2019. JA 114. Petitioner-appellant filed a timely notice of appeal on March 22, 2019. JA 115. The district court's order constitutes a final judgment disposing of all parties' claims. This Court has appellate jurisdiction over the final judgment and order denying the petition pursuant to 28 U.S.C. §§ 1291 and 2253(a).

SECRET//NOFORN

SECRET//NOFORN

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in holding that Abdulsalam's actions constituted "substantial support" of al Qaeda or its "associated forces" so as to justify detention under the Authorization for Use of Military Force ("AUMF").

2. Whether the district court erred in defining "substantial support" and in applying that term to Abdulsalam's activity, including:

   a. Whether the district court erred in holding that Abdulsalam provided "substantial support" to al Qaeda and "associated forces" when there was no evidence or findings of "substantial support" taking place after the passage of the AUMF or at the time of his capture.

   b. Whether the district court erred in finding that Abdulsalam's actions to deport foreigners from Yemen constituted "substantial support" for al Qaeda and associated forces.

   c. Whether the district court erred in finding that Abdulsalam provided "substantial support" to plots against the American and British Embassies in Yemen.

SECRET//NOFORN

SECRET//NOFORN

3. Whether the district court erred in finding that Egyptian Islamic Jihad ("EIJ") and the Aden-Abyan Islamic Army ("AAIA") were "associated forces" of al Qaeda when there was no evidence that they were co-belligerents with al Qaeda or engaged in ongoing hostilities with the United States at the time that they were allegedly supported by Abdulsalam.

4. Whether it is lawful to detain an individual alleged to have provided support to an "associated force" when such force is not currently engaged in hostilities against the United States or its coalition partners.

5. Whether the unending confinement of Abdulsalam without charge or trial is barred by the AUMF, contrary to the law of war, or violative of the Due Process Clause.

6. Whether Abdulsalam's lack of access to the charges and evidence against him; the district court's reliance on *ex parte* evidence, anonymous hearsay, and heavily redacted documents; and the court's willingness to accept as true heavily redacted CIA documents despite testimony that the documents were not reliable and no contrary testimony from the Government, violated his procedural due process rights and his right to a "meaningful" opportunity to rebut the claims against him, as required by *Boumediene v. Bush*, 553 U.S. 723 (2008).

SECRET//NOFORN

~~SECRET//NOFORN~~

## PERTINENT STATUTES

1. Section 2(a) of the AUMF provides:

> IN GENERAL.--That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 20011, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

2. Section 2339A(b) of Title 18 of the United States Code provides,

> Definitions.--As used in this section--
> (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;
>
> (2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and
>
> (3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

3. 2012 NDAA Section 1021(a)-(d) provides,

> (a) IN GENERAL.--Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

(b) COVERED PERSONS--A covered person under this section is any person as follows:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

(c) DISPOSITION UNDER THE LAW OF WAR.--The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the [AUMF].

(2) Trial under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111-84)).

(3) Transfer for trial by an alternative court or competent tribunal having lawful jurisdiction.

(4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

(d) CONSTRUCTION.--Nothing in this diction is intended to limit or expand the authority of the President or the scope of the [AUMF].

SECRET//NOFORN

SECRET//NOFORN

## STATEMENT OF THE CASE

Petitioner Abdulsalam Ali Abdulrahman al-Hela has been a detainee at the Guantanamo Bay Naval Base since 2004. He filed a petition for a writ of habeas corpus in 2005. After the decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), his habeas case began to move forward. During discovery, the Government presented the district court *ex parte* with a large volume of documents relating to the case. Abdulsalam's counsel sought access to the materials and to the Government's *ex parte* motions. These requests were denied, even though counsel held Secret-level clearances. JA 207. In 2017, the Government filed its Amended Factual Return, alleging that Abdulsalam was a "part of" al Qaeda or "associated forces," but not claiming that he "substantially supported" those organizations. Most of the Return was classified as "Secret," and the Government would not allow it to be shown to Abdulsalam. Abdulsalam's counsel moved the Court to allow Abdulsalam access to the Amended Return. The district court denied the motion. JA 205. Abdulsalam instead was only allowed to see a two-page summary of the Amended Return and a few excerpts that supposed reflected Abdulsalam's statements.

The district court held a hearing on Abdulsalam's petition in November 2017. The only live testimony was from Abdulsalam, delivered

SECRET//NOFORN

SECRET//NOFORN

via remote video conference from Guantanamo Bay. The Government called no witnesses.

The parties filed post-hearing briefs on January 25, 2018. A year later, on January 28, 2019, the district court issued its decision. JA 197. The court held that Abdulsalam more likely than not provided "substantial support" to al Qaeda and two allegedly associated forces, Egyptian Islamic Jihad ("EIJ") and the Aden-Abyan Islamic Army ("AAIA"), and for this reason denied the petition. *Id.* The district court did not reach a conclusion about whether he was a "part of" al Qaeda or any "associated forces." JA 148 n.8.

SECRET//NOFORN

~~SECRET//NOFORN~~

## STATEMENT OF FACTS

### A. Early Life

Abdulsalam was born in Yemen. His father was a sheikh of a tribe, located near Yemen's capital city. JA 1289-90. His father died in 1983. JA 1291-92.[1] Abdulsalam was selected to succeed him. JA 1291. Abdulsalam became responsible for his family when his father died. JA 1292. Abdulsalam later married and had four children. JA 1305.

Abdulsalam was a successful, prosperous businessman, with interests in real estate, pharmaceuticals, and other ventures. JA 1293, 1297. He had foreign business partners, including American, Saudi, German, Canadian, and Egyptian companies. JA 1299-1300, 724-25. Through one of his companies he was involved in oil exploration, civil construction, and a $15 million housing project. JA 1298-1300, 1024-41.

Abdulsalam had personal relationships with the then-President of Yemen and with the current Vice President of Yemen. JA 1302-03, 1309-12. He was a member of Yemen's Permanent Committee of the People's Conference, made up of the top leaders of the then-ruling party. JA 1313-14, 1023. He had close relationships with the Director of the Yemeni

---

[1] Abdulsalam testified that he was born in 1971, but that when he got a passport he listed his birth year as 1968 so as to appear older and thus more respectable. JA 1289-90. The district court found his birth year to be 1968. JA 149-50.

10

~~SECRET//NOFORN~~

SECRET//NOFORN

Political Security Office ("PSO") and its Director of Internal Security. JA 1312. He held an honorary military title, usually referred to as Major or Lieutenant Colonel. JA 1313, 767-77.

Abdulsalam remained respected in Yemen even after his detention at Guantanamo. In 2016, twelve leaders from the area where his family lives, including local commissioners and members of Parliament, attested to his "good repute," "high morals and values," and that he "is a moderate character and away from any acts of extremism," "against all acts of violence," and "always does his best to reconcile and settle the disputes among people" and "to serve the society and his country with all honesty and sincerity." JA 760-61.

Yemen's government has also vouched for Abdulsalam's character and activities. The Undersecretary of the Ministry of the Interior for Security and Police and the Undersecretary of Internal Security, in a joint letter dated January 2016, wrote that Abdulsalam's "Security and criminal Record is Good," that he "does not have any connection or involvement with any terroristic or extremist organization at all," and that he "is actually [a] well known person and possesses higher social status because he is one of the respectable social figures and sheikh of the area where [he] lives in." JA 763-65. The letter was approved by the Yemen Foreign Ministry. *Id.* These

11

SECRET//NOFORN

~~SECRET//NOFORN~~

officials reaffirmed in August 2016 that Abdulsalam "was not and will not accomplice or has any connection with any terrorist or extremist organization and the Yemeni State ensures that entirely." JA 766-67. Yemen was an ally of the United States in the war on terror. JA 1017-19, 949. The President of Yemen had been among the first Arab leaders to visit the White House after the 9/11 attacks; President Bush called Yemen's President his "friend" and thanked him "for his strong support in this war against extremists and terrorists." JA 949.

### B. Deportation of Foreign Arabs

After the Soviet-Afghan War ended in 1989, many non-Yemeni Arabs who fought the Soviets resettled in Yemen. JA 776-77. Starting in the mid-1990s, to achieve internal stability and amid international concern about terrorism, the government of Yemen initiated a program to deport these "Afghan Arabs," as well as other foreigners. JA 777, 1012-13, 1322-23. The President of Yemen directed the deportation program, which the United States was aware of and apparently encouraged. JA 777, 1012-13, 1322-23, 1020. Abdulsalam and other sheiks were asked to help the deportation program by facilitating the travel of foreigners out of Yemen. Abdulsalam worked under the supervision of the PSO, which approved his travel facilitation activities. JA 1325-26, 821. In 2016, the Yemen Government

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

officially confirmed in writing that Abdulsalam "was deporting the foreigners from Yemen based on the Yemeni Higher Officers' instructions at that time." JA 767.

### D. Abduction, Rendition, and Torture

Abdulsalam resided in Yemen his entire life, conducting his business affairs in the open, and at times traveling internationally for business reasons. In September 2002, he went to Cairo for business meetings.

13

~~SECRET//NOFORN~~

SECRET//NOFORN

JA 837-42, 1366-67. Arriving in Cairo on September 19, 2002, he stayed at the InterContinental Semiramis Hotel, near the U.S Embassy complex. JA 1367, 837-39, 843. On September 25, he called his family and said he met "some people" and the "atmosphere is cloudy and dark over here." JA 843-46. Then he disappeared.

14

SECRET//NOFORN

He was kept in total darkness and subjected to loud noises for days at a time, chained to walls and floors in painful positions, hung from the ceiling, and still bears physical and emotional scars from his time in those secret prisons. JA 1372-80.

Finally, after two years in secret prisons, Abdulsalam was transferred to Guantanamo Bay sometime around October 2004. JA 845. He has remained there ever since. The Government to this day has not disclosed anything about its treatment of Abdulsalam, why it decided to abduct and torture him, or why it finally moved him to Department of Defense custody at Guantanamo in 2004. The Government at trial objected to his testifying about his brutal torture. JA 1372-73.

SECRET//NOFORN

SECRET//NOFORN

## SUMMARY OF THE ARGUMENT

1. Unlike all Guantanamo habeas cases in which detention has been upheld, Abdulsalam was not found to be "part of" al Qaeda, the Taliban, or an "associated force." Rather, the district court justified his detention solely on the theory that Abdulsalam had provided "substantial support" to al Qaeda and to two allegedly associated forces, EIJ and AAIA. The district court's decision rests on fundamental legal errors.

"Substantial support" justifies detention only when the support is provided in the context of hostilities against the United States or its coalition partners, and where the detainee was a combatant or directly participated in hostilities against the United States or its partners. In the only case where this Court cited "substantial support" as justification for the petitioner's detention, *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), the detainee was a member of a front line military unit in Afghanistan, and was found to be both "part of" that military unit while at war with the United States, and providing "substantial support" as a cook for the unit. *Id.* at 872-73. The district court did not find any such activities on the part of Abdulsalam.

The district court found that, under the law of war, "substantial support" may also apply to those who "accompany . . . enemy forces" and who are "apprehended" while with such a force, or whose temporary

16

SECRET//NOFORN

~~SECRET//NOFORN~~

detention is "absolutely necessary" because they present an imperative "threat to security in relation to the armed conflict." JA 131. There is no evidence or finding that Abdulsalam ever accompanied an enemy force, much less that he was apprehended while with such a force. There were no factual findings showing that he is a "threat to security" whose detention remains "absolutely necessary."

Also, to permit detention under the AUMF, "substantial support" must involve activities either in support of the 9/11 attacks or that occurred after the passage of the AUMF in October 2001. The substantial support also must be ongoing at the time of the detainee's capture. Abdulsalam's alleged "travel facilitation" activities principally occurred in the 1990's, and the last of the alleged bomb plots was in spring 2001. There was thus no lawful basis under the AUMF for using these alleged actions by Abdulsalam as justification for detention both because they took place before the AUMF and were unrelated to 9/11, and because they were not ongoing at the time of his September 2002 capture.

The court's "substantial support" holding rests on Abdulsalam's travel facilitation activities related to Yemen's program to deport the foreign Arabs and to his alleged involvement with supposed plots "primarily conducted or planned by AAIA" to attack the American and British Embassies in Yemen.

17

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

The travel facilitation findings do not show "substantial support." The Yemen deportation program was a government program, designed to remove foreigners from Yemen, not to deploy jihadists. There was nothing about the program that constituted support of al Qaeda or any other terrorist group; rather, it disrupted the lives of the people being deported. The court's finding that at times Abdulsalam acted outside the program by using false passports or by profiteering is irrelevant – the use of false passports or profit-taking did not transform the deportation of the foreign Arabs into support of al Qaeda or any associated force. Moreover, the court's holding that Abdulsalam's travel facilitation of foreigners "enable[ed] them to plot and conduct attacks and to remain an active part of the enemy's forces," JA 197, is unsupported by the record.

The district court's findings of support for attacks on the American and British embassies in Yemen are also insufficient. There was no evidence or finding that Abdulsalam ever helped these attacks by purchasing explosives, or by providing transportation, or in any other specific way. The court's findings that Abdulsalam was "aware" of plots to attack embassies or had been asked to help the attackers are not evidence that he actually did anything to support the plots. The findings that he "assisted in planning" an attack that never happened, or provided unspecified "logistical" help, are

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

vague and do not show actual conduct that would constitute "substantial support." In fact, Abdulsalam informed ███████████ Yemen security officials in real time of alleged bomb plots.

The only embassy bombing that actually occurred was of the British Embassy; the perpetrators were tried and convicted by Yemen, and Abdulsalam was never charged. The alleged plots to bomb the United States Embassy never came to fruition ████████████████

██████████

2. All of the alleged support for "terrorist attacks and plots" involved alleged support of AAIA, not al Qaeda, and the court's travel facilitation conclusions significantly rest on help allegedly provided to EIJ members, not al Qaeda. The court's decision depends on its finding that EIJ and AAIA were associated forces of al Qaeda. They were not. To be an "associated force" of al Qaeda, an organization must be "co-belligerent" in hostilities against the United States. AAIA was not shown to be a co-belligerent of al Qaeda at any time and it is no longer engaged in hostilities against the United States. It likely no longer exists. EIJ was not a co-belligerent at the time when Abdulsalam was allegedly engaged in travel facilitation activities.

3. Abdulsalam has been detained for nearly seventeen years, but has never even been charged with a crime, much less tried or convicted of one.

~~SECRET//NOFORN~~

SECRET//NOFORN

The AUMF does not permit the indefinite, perpetual, and punitive detention being imposed on Abdulsalam. Any power to detain under the AUMF has lapsed. Abdulsalam's unending detention without trial also violates the Due Process Clause.

4. The district court also denied Abdulsalam procedural due process, as well as the "meaningful opportunity" to be heard, promised by *Boumediene* under the Suspension Clause, "to rebut the factual basis for the Government's assertion that he is an enemy combatant." 553 U.S. at 779, 783. The fundamentally unfair procedures adopted by the district court included: (a) refusing to provide Abdulsalam with a copy of the Government's allegations as set forth in the Amended Factual Return; (b) reliance on evidence submitted *ex parte*, which was not available even to Abdulsalam's counsel with security clearances; (c) reliance on anonymous hearsay; (d) reliance on documents that were so heavily redacted that their trustworthiness cannot be evaluated; and (e) "deferring" to heavily redacted CIA documents purporting to reflect statements by Abdulsalam over Abdulsalam's courtroom testimony when the Government called no witnesses, not even the CIA personnel who Abdulsalam knew to be CIA and who had dealt with Abdulsalam before his detention.

SECRET//NOFORN

~~SECRET//NOFORN~~

## STANDARD OF REVIEW

On appeal from a denial of a Guantanamo habeas petition, this Court reviews the "district court's findings of fact for clear error, its habeas determination *de novo*, and any challenged evidentiary rulings for abuse of discretion." *Al-Bihani*, 590 F.3d at 870 (internal quotations and citations omitted).

SECRET//NOFORN

~~SECRET//NOFORN~~

## ARGUMENT

### I. The Court Erred in Holding that the United States May Detain Abdulsalam for Providing "Substantial Support" to al Qaeda or its "Associated Forces."

Until this case, every Guantanamo case upholding detention involved a finding that the detainee was "part of" al Qaeda, the Taliban, or "associated forces." This is the only case to hold that a civilian who was not "part of" such a group could be detained solely on grounds that he had provided "substantial support" to such groups.[2] *See* JA 148 n.8; *Al-Bihani*, 590 F.3d at 872. This unprecedented holding rests on legal errors.

#### A. The District Court's "Substantial Support" Legal Analysis Was Defective.

The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that

---

[2] It is not surprising that the court did not find Abdulsalam to be "part of" al Qaeda or any associated force. There was no evidence or finding that he had ever become a member of or sworn allegiance to such a group, that he had ever served as a combatant or in an al Qaeda-affiliated military unit, that he had visited al Qaeda guesthouses or gone to al Qaeda training camps, or that he ever fought against the United States. These are the principal factors that courts have considered in determining whether a person was part of al Qaeda or an "associated force." *See Al-Bihani*, 590 F.3d at 872-73, 873 n.2 (finding detainee was "part of" an al Qaeda military unit in Afghanistan); The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* 29-30 (Dec. 2016) ("White House Report") (citing cases). None applies to Abdulsalam.

22

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

occurred on September 11, 2001, or harbored such organizations or persons." AUMF § 2(a), Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001). Per the 2012 NDAA, this authority includes detaining "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces" until "disposition under the law of war." 2012 NDAA § 1021(a), (b)(2), Pub L. No. 112-81, 125 Stat. 1297 (Dec. 31, 2011).

The district court determined that "substantial support" should be construed using "material support" for terrorism as defined in the criminal law. JA 195-96 (citing 18 U.S.C. § 2339A(b)). It also held that "substantial support" allows detention until the end of hostilities for a person whose "actions demonstrate that he posed a threat to security in relation to the armed conflict between the U.S. and al Qaeda, the Taliban, and associated forces such that he would be subject to internment under the Fourth Geneva Convention." JA 196-97. The district court's definition was erroneous.

### 1. Involvement in "Hostilities" as a Prerequisite for a Finding of "Substantial Support"

Under the NDAA, "substantial support" involves aid to forces "engaged in hostilities against the United States or its coalition partners,"

23

~~SECRET//NOFORN~~

SECRET//NOFORN

including those who have "committed a belligerent act" or "directly supported such hostilities in aid of such enemy forces." 2012 NDAA § 1021(b)(2). Even before the NDAA, it was held that the support must take place "*in hostilities against U.S. Coalition partners.*" *Salahi v. Obama*, 710 F. Supp. 2d 1, 5 (D.D.C.) (emphasis in original), *vacated and remanded on other grounds*, 625 F.3d 745 (D.C. Cir. 2010) (quoting *Al-Bihani*, 530 F.3d at 872); *see also Ali v. Obama*, 736 F.3d 542, 544 n.1 (D.C. Cir. 2013) ("As this Court has explained in prior cases, the President may also detain individuals who substantially support al Qaeda, the Taliban, or associated forces *in the war.*") (emphasis added); White House Report 4 (courts have allowed detention of individuals "who substantially supported [Al Qaeda, the Taliban, or associated] forces *in the armed conflict against*" those groups) (citing *Ali*, 736 F.3d at 544; *Khan v. Obama*, 655 F.3d 20, 23 (D.C. Cir. 2011); *Al-Adahi v. Obama*, 613 F.3d 1102, 1102 (D.C. Cir. 2010); *Hussain v. Obama*, 718 F.3d 964, 967 (D.C. Cir. 2013)). Thus, in *Salahi*, the petitioner's alleged support included funding, passports, technology, and recruiting, but his conduct did not constitute "substantial support" because it was not provided "in hostilities against U.S. coalition partners." *Salahi*, 710 F. Supp. at 5. The Government did not challenge this finding on appeal. *Salahi v. Obama*, 625 F.3d 745, 747 (D.C. Cir. 2010).

24

SECRET//NOFORN

~~SECRET//NOFORN~~

The support offered must be of the type that renders the individual effectively a part of the enemy armed forces. All "substantial support" cases in this Court have relied on proof that the "detainee was functionally part of Al Qaeda, the Taliban, or an associated force." Jennifer K. Elsea and Michael John Garcia, Cong. Research Serv. R42143, *Wartime Detention Provisions in Recent Defense Authorization Legislation* 9 (Mar. 14, 2016) (citation omitted). In *Al-Bihani*, the only decision of this Court to uphold a petitioner's detention based on substantial support, the petitioner admitted to "accompanying the brigade on the battlefield [in Afghanistan], carrying a brigade-issued weapon, cooking for the unit, and retreating and surrendering under brigade orders," including after September 11, 2001. *Al-Bihani*, 590 F.3d at 869, 872-73. The group had al Qaeda members in its command structure and fought the U.S.-allied Northern Alliance. *Id.* at 869. Al-Bihani was thus effectively part of the al Qaeda armed forces.

The Government has adopted this same position. *See Gherebi v. Obama*, 609 F. Supp. 2d 43, 69-70 (D.D.C. 2009) (Government conceding that "'the substantial support' model . . . is restricted to those individuals that are 'effectively part of the [armed] force[s] of the enemy'") (alterations in original); White House Report 30 (substantial support includes those persons who are "'more or less part of' the enemy force") (quoting Red Cross

~~SECRET//NOFORN~~

SECRET//NOFORN

Commentary on Third Geneva Convention 64 (Jean Pictet ed., 1960)). None of the court's findings purport to show that Abdulsalam was functionally part of an enemy force, and this should result in dismissal of its "substantial support" holding.

### 2. "Support" Provided Before or Unrelated to 9/11

The district court also erred in holding that alleged "substantial support" occurring before and unrelated to 9/11 could justify detention. JA 132-33 (citing *Al-Bihani*, F.3d at 869; *Salahi*, 625 F.3d at 750-51; *Khairkhwa v. Obama*, 703 F.3d 547, 548-49 (D.C. Cir. 2012); and *Mousovi v. Obama*, No. 05-1124, 2016 WL 3771240, at *6-7 (D.D.C. July 11, 2016)). The cited cases all involved detainees who were found to be "part of" a proscribed group. In *Salahi*, the court held that the petitioner taking an oath of allegiance prior to his capture was relevant to whether he was a member of al Qaeda when captured. In *Al-Bihani*, the detainee was fighting with a military unit in Afghanistan both before 9/11 (when the Taliban was "harboring" al Qaeda, which is detainable conduct under the AUMF) and after 9/11. "Substantial support," on the other hand, requires evidence of

SECRET//NOFORN

SECRET//NOFORN

conduct in support of hostilities authorized by the AUMF and does not purport to cover pre-AUMF activities unrelated to "harboring" or 9/11.[3]

There is no evidence or finding that Abdulsalam engaged in any "support" activities against the United States or its coalition partners in the war authorized by the AUMF, or that his conduct was related to the 9/11 attacks. Therefore the alleged support cannot justify his detention.

### 3. "Support" Provided Before Capture

As the district court recognized, "substantial support" only justifies detention of an individual who "substantially supported al Qaeda, the Taliban, or associated forces *at the time of his capture*." JA 132 (emphasis added); *see also Salahi*, 625 F.3d at 751 ("[T]he relevant inquiry is whether Salahi was 'part of' al-Qaida *when captured*.") (emphasis added). Where the petitioner "provided some support to al-Qaida, or to people he knew to be al-Qaida," but the support was sporadic and "at the time of his capture, non-existent," the support standard was not met. *Salahi*, 710 F. Supp. 2d at 4-5. Abdulsalam was not substantially supporting al Qaeda, the Taliban, or an associated force at the time of his abduction in September 2002. The last

---

[3] The district court's citation to *Salahi* actually *supports* this proposition. *Salahi* found that the petitioner's conduct, which was before and not intentionally supporting 9/11, was not sufficient to be substantial support. *Salahi*, 710 F. Supp. 2d at 4-5.

SECRET//NOFORN

~~SECRET//NOFORN~~

alleged "support" activity found by the district court was in the spring of 2001, sixteen months before his abduction. JA 194. He thus cannot lawfully be detained under the AUMF.

While the district court found that Abdulsalam's relationship with al Qaeda and "associated forces" had not dissipated by the time of his capture, and so he could be detained, this was legal error. JA 194-95 (citing *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128 (D.D.C. 2009)). Under the *Al Ginco* test, a court can find the relationship is vitiated based on examining "(1) the nature of the relationship in the first instance; (2) the nature of the intervening events or conduct; and (3) the amount of time that has passed between the" relationship and custody. JA 195 (interpreting *Al Ginco*). Thus, where the petitioner "provided some support to al-Qaida, or to people he knew to be al-Qaida," but the support was sporadic and "at the time of his capture, non-existent," the support standard is not met. *Salahi*, 710 F. Supp. 2d at 4-5.

Abdulsalam's alleged activity does not support his detention under *al Ginco*. The "nature of the relationship in the first instance," even in the Government's telling, was sporadic and informal. It was not even wholly supportive. The deportation program was disruptive to the deportees. He helped disrupt an AAIA training camp. JA 1336-41, 543-44, 374. █

28

~~SECRET//NOFORN~~

SECRET//NOFORN

██████████████████████████████

████ He simply was not engaged in providing substantial support to EIJ

or AAIA when abducted, and thus cannot be detained.

### 4. Law of War Detention of Civilians for Providing "Substantial Support"

The 2012 NDAA makes clear that AUMF detention is "[d]etention under the law of war." 2012 NDAA § 1021(c)(1); *see also id.* § 1024(b) (addressing "long term" detention under the law of war pursuant to the AUMF).

Law of war detention can include civilians who participate directly in hostilities or are combatants. Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2113-15 (May 2005). It does not extend to every civilian supporter of the effort. *Id.* at 2115.

The district court held that civilian detention authority also extends to persons who "accompany enemy forces and are apprehended while accompanying such enemy forces may be detained under the law of war" or if "they pose a threat to security." JA 131.

SECRET//NOFORN

~~SECRET//NOFORN~~

Abdulsalam never accompanied enemy forces and was not apprehended while with such a force. Further, the district court erred when it looked to security internment of civilian noncombatants under the Geneva Conventions to justify detention. *See* JA 131. Under the Geneva Conventions, a security internee must be released "as soon as the reasons which necessitated his internment no longer exist." Geneva Convention relative to the Protection of Civilian Persons in Time of War art. 132, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Fourth Geneva Convention"). Even without such a finding, belligerents must "endeavor *during the course of hostilities*" to release "internees who have been detained for a long time." *Id.* (emphasis added). This does not authorize detention as described in the 2012 NDAA, because that detention is defined as "[d]etention under the law of war without trial *until the end of hostilities*," 2012 NDAA § 1021(c)(1) (emphasis added), whereas security internment may only last as long as the security risk remains. Even if the 2012 NDAA does extend to security internees, they may only be detained so long as "absolutely necessary" for "imperative reasons of security." Fourth Geneva Convention arts. 42, 78. There were no findings that Abdulsalam's continued detention is "absolutely necessary" for security reasons.

30

~~SECRET//NOFORN~~

**B. The "Travel Facilitation" and "Attacks and Plots" Allegations Do Not Involve Activities Constituting "Substantial Support."**

The district court's opinion is clear that the denial of the writ rests solely on its conclusion that Abdulsalam's travel facilitation activities and his alleged involvement in plots to attack the United States and British embassies in Yemen constituted "substantial support" of al Qaeda and "associated forces." JA 196-97.

As discussed below, the findings concerning travel facilitation and embassy bomb plots are insufficient to show "substantial support."

**1. The Travel Facilitation Allegations**

The district court found that Abdulsalam could be detained for facilitating travel for members of EIJ and al Qaeda. JA 196. This was error.

1. The Yemeni government adopted a program in the 1990's to expel and deport foreign Arabs who had fought against the Soviets in Afghanistan. JA 151. The purpose of the deportation program was to stabilize Yemen by removing foreign jihadists. JA 777, 1012-13, 1322-23. The United States was aware of the program and did not intervene. JA 777, 1012-13, 1322-23. The program was not designed to benefit al Qaeda or EIJ, or to deploy terrorists. Rather, the program was intended to evict foreigners who might be extremists. It was a Yemeni government program, not an al Qaeda or EIJ program. The deportation was not done at the direction or request of al

31

~~SECRET//NOFORN~~

SECRET//NOFORN

Qaeda or EIJ. If the program had any effect on al Qaeda or EIJ, it was disruptive, not supportive.

As the district court found, Abdulsalam participated in the deportation program to assist in arranging for outbound travel of the foreign Arabs. JA 151, 169. Since the deportation program was not supportive of al Qaeda or EIJ in any sense, Abdulsalam's efforts to facilitate the travel of the deportees cannot constitute "substantial support" of those entities.

2. The district court found, however, that at least some of Abdulsalam's travel activities were not within the program because his alleged use of false or fraudulent travel documents could not have been part of a "legitimate government program." JA 163, 168. This conclusion was not supported by evidence. ▮▮▮ Abdulsalam's alleged use of false documents is not evidence of work outside the deportation program, much less evidence of "substantial support" to enemies ▮▮▮ Because the Afghan Arabs were foreigners in Yemen, and not Yemeni citizens, any attempt to evict them may well have required the use of false passports.

32

SECRET//NOFORN

SECRET//NOFORN

of the United States. *See Bensayah v. Obama*, 610 F.3d 718, 727 (D.C. Cir. 2010) ("Mere possession and use of false travel documents is [not] proof of involvement with terrorism."). Even if the passports were false, they were still used to get foreigners "out of Yemen," JA 169, not to support al Qaeda or EIJ.

It should be disregarded. In any event, giving passports to Yemenis would not

33

SECRET//NOFORN

SECRET//NOFORN

constitute "substantial support," absent evidence that the Yemenis were al Qaeda or EIJ. There is no such evidence.

That Abdulsalam may have personally profited is also not, as the district court suggests, "likely" evidence that he was not engaged in a "legitimate government activity." JA 165. The fact that a person working for a government in a Third World country is making a profit on his government activities is unremarkable. There is no basis for viewing profiteering activity as "substantial support" of al Qaeda.

The district court also erred in refusing to acknowledge conclusive evidence showing that Abdulsalam operated entirely within the deportation program. In a letter signed by high-ranking Yemeni security officials and approved by the Yemeni Foreign Ministry, the Yemeni government officially and unequivocally stated that Abdulsalam's travel facilitation activities were under government orders – that he "was deporting the foreigners from Yemen based on the Yemeni Higher Officers' instructions at that time."[5] JA 763-67; *see also* JA 821, 1325-26. The court dismisses the letter as "vague," "not contemporaneous," and signed by people who did not know Abdulsalam. JA 166. But this misses the point of the letters. They are official government documents, from the organizations with the requisite

---

[5] PSO Director Ghalib al-Qamish also explained that Abdulsalam was operating under PSO orders to help control EIJ and al Qaeda. JA 1001.

SECRET//NOFORN

~~SECRET//NOFORN~~

knowledge in the Yemeni government. The agency is reporting its official position on Abdulsalam's activity, it was unrebutted by Respondents, and it deserved conclusive weight, not offhand dismissal.

3. The district court also erred in holding that it could deny Abdulsalam's petition because his efforts "enabled members of Al Qaeda and EIJ to travel freely and avoid arrest, enabling them to plot and conduct attacks and to remain an active part of the enemy's forces." JA 197; *see also* JA 169 ("This [travel facilitation] allowed these al Qaeda and EIJ members to continue to engage in terrorist activities and to escape the possibility of being arrested."). This, the court concluded, justified his detention for "imperative reasons of security," for providing "substantial support" to al Qaeda and associated forces. JA 196-97.

These conclusions were unsupported by the record. The Government presented no evidence, and the court did not find, that any of the deportees plotted or conducted attacks against the United States after they left Yemen, much less that the disruptive effect of deportation enabled them to do so, or that any "remain[ed] an active part of the enemy's forces." The deportation program was not al Qaeda's or EIJ's idea. Nothing shows that the travelers asked to be sent out of Yemen, or that they were being launched on terrorist missions, or that the travelers later conducted any attacks "enabled" by

35

SECRET//NOFORN

travel assistance provided by Abdulsalam.

For this reason as well, the conclusion that Abdulsalam's travel facilitation activities constituted "substantial support" must be rejected.

4. Finally, the district court's travel facilitation holding must be reversed because there is almost no evidence actually identifying the members of al Qaeda or EIJ who were deported. The court said that "[s]ome of these Afghan Arabs were likely members of al Qaeda and EIJ." JA 151. There is no basis for this hypothesis because, with few exceptions, the deportees are not described or otherwise identified.

The district court's few findings as to specific deportees fail to show involvement of al Qaeda or EIJ members.

36

SECRET//NOFORN

SECRET//NOFORN

- **Abu Ali al-Harithi.** The uncontested evidence is that al-Harithi sought travel help from Abdulsalam, but that Abdulsalam did nothing to help him.

### 2. The Embassy Bomb Plot Allegations

The district court found that Abdulsalam "provided logistical support" to bomb plots "primarily conducted or planned by AAIA," including plots that targeted the American and British Embassies in Yemen, and this justifies his detention. JA 196.

The Government did not allege or prove, and the district court did not find, any specifics about Abdulsalam's alleged "logistical" support. That is because, in each case, the underlying evidence does not provide any further detail about his alleged support.

37

SECRET//NOFORN

~~SECRET//NOFORN~~

There was no evidence or finding that he purchased or stored explosives, that he paid for explosives, that he provided any transportation for bombs or bombers, that he provided any financial support for the alleged plots, or that he took *any* specific action to provide support for plots to bomb embassies. Vague references to "logistical support" do not provide evidence of any actual conduct on the part of Abdulsalam that could fairly be characterized as "substantial support."

According to unrebutted testimony, former Yemeni

38

SECRET//NOFORN

President Ali Abdullah Saleh set up a committee of the Vice President, the PSO Director, and six tribal leaders, including Abdulsalam, to persuade AAIA to disband its training camp. JA 1336-41. They succeeded in closing most of the AAIA camp, and the PSO resettled the men, with Abdulsalam's help. *Id.*

An examination of the alleged plots and attacks further demonstrates that there is no basis for detaining Abdulsalam based on the alleged activities of AAIA.

### a) The British Embassy

The district court concluded that Abdulsalam was "involved in organizing and supporting" a bomb attack on the British Embassy in October 2000. JA 170. The bomb exploded in a courtyard and no one was injured. JA 1000. The men who perpetrated these attacks were arrested and convicted by the Yemen government. JA 170.

SECRET//NOFORN

SECRET//NOFORN

Jayul was also arrested and convicted in Yemen for his role in the attack on the British Embassy. JA 995.

In sum, the British Embassy accusations rest on tiers of anonymous hearsay This evidence was unreliable as a matter of law and should not have been credited. *See* p. 71

SECRET//NOFORN

~~SECRET//NOFORN~~

below.

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

The bombing of the British Embassy was investigated in 2000-2001, and the guilty parties were tried and convicted. Abdulsalam continued to live openly in Yemen for two years after the attack and was never charged by Yemen, the United Kingdom, or the United States with any involvement in the attack. (Abdulsalam testified that the UK ambassador thanked him for helping to bring the bombers to justice. JA 1349.) The Government presented no competent evidence showing that Abdulsalam had any involvement in the attack.

### b) The American Embassy

The district court also found that Abdulsalam had a role in an alleged October 2000 plot to bomb the U.S. Embassy in Sana'a. But the Government did not allege, and the district court did not find, that Abdulsalam did *anything* to support the plot. Although the district court addressed this allegation over the course of five pages, the entirety of the issue is captured in the subheading: "Al-Hela was asked to help transport a

41

SECRET//NOFORN

SECRET//NOFORN

missile to be used in an attack on the U.S. Embassy in Sana'a." JA 174-79.

As the district court found, he declined to assist. JA 175-76. That does not

amount to any kind of support for an attack, much less substantial support.

42

SECRET//NOFORN

SECRET//NOFORN

The district court also found that Abdulsalam was involved in an AAIA plot to attack United States interests, possibly the embassy, in spring 2001. No such attack ever took place. The court cites no evidence showing that Abdulsalam actually did anything to help the alleged plotters. The court states that he was "assisting" the plotters with "planning," but no plan is identified nor are any specifics provided. *See* JA 181, 510.

This uncorroborated chain of anonymous hearsay should not have been given any weight. *See* p. 71, below. In any event, the alleged plot was not an AAIA plot, but only involved some AAIA members. JA 179. Without a finding that it was conducted by an associated force, it cannot justify Abdulsalam's detention.

### 3. Activity Not Involving "Substantial Support"

The district court also engaged in a lengthy discussion of facts unrelated to travel facilitation and the embassy bombings. These are legally

43

SECRET//NOFORN

~~SECRET//NOFORN~~

irrelevant to the court's "substantial support" holding, and thus must be disregarded.

For instance, the court devoted four pages to its effort to show that Abdulsalam as a teenager had gone to Afghanistan in the 1980s to fight the Soviet Union.[8] JA 148-51. Even if true (and Abdulsalam adamantly denied that it was), participation in a war against the Soviets in the 1980s, in an effort supported by the United States, could not involve "substantial support" of al Qaeda or "associated forces" in hostilities against the United States. The court also stated that Abdulsalam had provided unspecified "logistical" support to an attempted assassination of Yemen's Minister of Interior and plots to bomb targets in Aden. JA 169. None of the targets involved the United States or its coalition partners, and thus, even if true, provide no basis for detention under the AUMF. These acts would



~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

constitute crimes under the laws of Yemen, and in fact the perpetrators were arrested.[9] JA 995. These events have no relevance to this case.

(Given his role as sheikh in Yemen and as a person who assisted the PSO, it is hardly surprising that he would at times meet all types of people, including extremists.) These findings are thus irrelevant to the court's "substantial support" holding.

Moreover, in 2016, Yemen's Interior Ministry, headed by the same Minister who was the alleged target of the assassination, sent official letters certifying that Abdulsalam is a respected figure with no terrorist connections. JA 763-67. The Minister obviously did not consider Abdulsalam to be an assassin.

45

~~SECRET//NOFORN~~

SECRET//NOFORN

[REDACTED]

## C. The District Court Erred in Finding EIJ and AAIA to be "Associated Forces."

The district court held that EIJ and the AAIA were "associated forces" of al Qaeda, and thus Abdulsalam could be detained on the basis of substantial support for those groups. This was critical to the decision to deny the writ because the embassy bombing allegations were entirely based on AAIA activities, not al Qaeda, and the travel facilitation allegations, to the extent they were based on anything, related significantly to EIJ.[11] The holding that EIJ and AAIA were "associated forces" of al Qaeda should be reversed. *See Khan*, 655 F.3d at 26 (whether an organization is an "associated force" is a legal decision subject to *de novo* review). These organizations do not fit key parts of the definition of associated forces, as articulated by prior decisions of this Court and by the district court itself. The district court's holding was a major departure from prior decisions about what types of groups constitute an associated force, all of which, to date,

[REDACTED]

SECRET//NOFORN

SECRET//NOFORN

have been groups fighting on the ground in Afghanistan after September 11, 2001.

### 1. The Legal Definition of "Associated Force"

The district court defined an "associated force" as "an organized entity that has entered the fight alongside al Qaeda or the Taliban." JA 132. Further, an "associated force must be a co-belligerent of al Qaeda or the Taliban in hostilities against the United States or its coalition partners as part of the same comprehensive armed conflict." *Id.*

As understood in the law of war, "[a] 'co-belligerent' in an international armed conflict context is a state that has become a 'fully fledged belligerent fighting in association with one or more belligerent powers.'" *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009) (quoting Bradley and Goldsmith at 2112) (additional quotations omitted). The Government has previously adopted a law-of-war-based definition of co-belligerency. *See id.* at 75-76. Under these standards,

> [t]errorist organizations that act as agents of al Qaeda, participate with al Qaeda in acts of war against the United States, systematically provide military resources to al Qaeda, or serve as fundamental communication links in the war against the United States, and perhaps those that systematically permit their buildings and safehouses to be used by al Qaeda in the war against the United States, are analogous to co-belligerents in a traditional war.

Bradley and Goldsmith 2112-13.

47

SECRET//NOFORN

~~SECRET//NOFORN~~

The law is also clear on what does *not* suffice to make a group an associated force. The group's relationship to al Qaeda or the Taliban must be much closer than the normal meaning of "associated." *See Parhat v. Gates*, 532 F.3d 834, 844 (D.C. Cir. 2008). Simply because an organization engages in terrorism, sympathizes with al Qaeda, or even embraces al Qaeda's ideology does not transform that group into an associated force. JA 132 (citing *Hamlily*, 616 F. Supp. 2d at 76 n.17).

The group also must have been an associated force at the time of the detainee's involvement with the group. This is clear from the text of the 2012 NDAA, which allows detention of a person who "substantially supported . . . associated forces." 2012 NDAA § 1021(b)(2); *see also Al Rabiah v. United States*, 658 F. Supp. 2d 11, 22 (D.D.C. 2009) (holding that a petitioner's involvement with a group before it was an associated force was not relevant to his detention).

Detention authority also extends only to those "associated forces that *are engaged* in hostilities against the United States." 2012 NDAA § 1021(b)(2) (emphasis added); White House Report at 5 ("associated force" is based on participation in "ongoing hostilities" against the U.S. or coalition forces); *Hamlily*, 616 F. Supp. 2d at 76 n.17 ("[T]here must be an actual association in the current conflict with al Qaeda or the Taliban."). If an

48

~~SECRET//NOFORN~~~~

~~SECRET//NOFORN~~

organization is not engaged in hostilities against the United States or its coalition partners, it is not an associated force, and its members and individuals supporting it may not be detained. *See* Bradley and Goldsmith 2124 (in international armed conflict, detention authority ends with the end of hostilities against a state); *Al Alwi v. Obama*, 653 F.3d 11, 18 n.7 (D.C. Cir. 2011) (considering this argument, but dismissing as waived and moot as to petitioner).

Moreover, hostilities in which the organization is engaged must be post-9/11. The district court's definition of "same comprehensive armed conflict," JA 132, cannot extend back to any and every hostile interaction between the United States and Islamic terror groups. The Government has previously argued, and this Court appeared to adopt, a definition of an "associated" organization as "an entity that, *subsequent to September 11*, becomes so closely associated with al Qaida or the Taliban that it is effectively part of the same organization." *Parhat*, 532 F.3d at 844 (emphasis added, quotation omitted).

The definition of "associated force" as a group engaged in ongoing hostilities comports with all prior decisions of this Court. *See* Elsea and Garcia at 10-11 ("In habeas cases so far, the term 'associated forces' appears to have been interpreted only to cover armed groups assisting the Taliban or

SECRET//NOFORN

SECRET//NOFORN

Al Qaeda in Afghanistan."). Courts have only ruled a group was an associated force in one contested case. In that case, the organization was on the ground in Afghanistan after September 11, 2001, operated a joint recruiting and fundraising office with the Taliban, and was actively involved in the post-9/11 fight against the United States and coalition allies in Afghanistan. *Khan*, 655 F.3d at 32. It was found to be an associated force. In all other reported cases where a court has found a group was an "associated force," the organizations were fighting forces on the ground in Afghanistan after September 11, 2001, and their status as "associated forces" was not contested. *See Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010) (not contesting organization was associated force); *Ali*, 736 F.3d at 544 (same); *Mousovi*, 2016 WL 3771240 at \*9 (relying on holding in *Khan*, 655 F.3d at 32-33, that the organization was an associated force).

Finally, the decision that an organization is an associated force cannot be supported by conclusory evidence lacking in underlying factual support. *Parhat*, 532 F.3d at 836, 838, 844. An organization's inclusion on lists assembled by the United States or the United Nations that simply assert a group is a terrorist organization and/or has ties to al Qaeda, without any underlying evidence, is not sufficient to support a holding that a group is an "associated force." *See id.* at 846.

SECRET//NOFORN

~~SECRET//NOFORN~~

## 2. AAIA

Abdulsalam's alleged "substantial support" for the AAIA does not justify his detention because AAIA and al Qaeda were not co-belligerents, AAIA was not an associated force at the time of Abdulsalam's alleged support, and AAIA is not engaged in ongoing hostilities against the United States or its coalition partners. Any one of these propositions is sufficient to reverse the district court's decision as to the AAIA.

The district court relied on the following to determine that AAIA was an "associated force" of al Qaeda:

1. In 1998, it "expressed support for Osama bin Laden, advocated for the overthrow of Yemeni government, and appealed for operations against U.S. and other Western interests in Yemen." JA 146 (citing JA 697-98).

2. ███████████████████████████████████████

3. ███████████████████████████████████████

4. In 1998 it kidnapped American, British, and Australian tourists. JA 146 (citing JA 697).

5. In 2000, it bombed the British embassy in Yemen. JA 146 (citing JA 697).

6. Its assets were frozen post-9/11 by Executive Order, the UN put it on a list of groups affiliated with bin Laden, and the Interagency Intelligence Committee on Terrorism ("IICT") listed it as capable of terrorist attacks as of 2005. JA 146-47.

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

These findings do not establish AAIA as a co-belligerent of al Qaeda. They do not show that it "entered the fight alongside al Qaeda," or that it undertook attacks in concert with, at the direction of, or alongside al Qaeda. There is no evidence that AAIA acted as al Qaeda's agent, participated in an act of war with al Qaeda, provided military resources to al Qaeda, was a communication link for al Qaeda in the war against the United States, or allowed its buildings or safehouses to be used by al Qaeda in that war. Those are the indicia of co-belligerency, *see* Bradley and Goldsmith at 2112-13, and they are absent here.

The evidence itself is also faulty. Items 1, 4, and 5 are all from the same source, a January 2004 guide for Border Patrol agents, based on multiple, anonymous, and open sources. It is conclusory and cites no underlying evidence. It actually supports finding AAIA is not an associated force. In the section describing AAIA's "External Aid," the document lists, "Not Known." JA 698. Compare that with the entry immediately above, for

~~SECRET//NOFORN~~

SECRET//NOFORN

the IRA, where "External Aid" lists relationships with terror groups worldwide. *Id.*

██████████████████████████████████████████████████ Another of the Government's own exhibits indicates the AAIA was founded by Yemenis returning from Afghanistan. *See* United Nations Security Council, *Islamic Army of Aden*, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summa ries/entity/islamic-army-of-aden. Abdulsalam testified that the AAIA was started in the 1990s in Southern Yemen by men opposed to the amnesty granted to their former opponents in the country's civil war. JA 1336-37.

None of the evidence in Item 6, the statements in the Executive Order, UN sanctions list, and IICT documents relied on by the court, JA 146-47, are reliable evidence under *Parhat* because they are wholly conclusory. The UN sanctions list contains no sources or details. Neither the Executive Order nor the IICT document even allege any relationship with al Qaeda. *See* Exec. Order 13224, Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten, or Support Terrorism, 66 FR 49079 (Sept. 23, 2001); JA 671.

53

SECRET//NOFORN

SECRET//NOFORN



Even if the AAIA were at some point an associated force of al Qaeda, it was not one at the time that Abdulsalam was alleged to have provided support to the group. The district court found that the AAIA became an associated force of al Qaeda as of an unspecified date in 2001. JA 147. All but one instance of Abdulsalam's alleged support of AAIA took place on or before January 2, 2001. The only exception is the alleged bomb plot against unspecified American interests (possibly the embassy) in spring 2001, which, as explained above, may never have existed and for which there is no evidence that Abdulsalam ever took any specific actions. *See* p. 42, above. The district court also did not determine a specific date that AAIA became

SECRET//NOFORN

SECRET//NOFORN

an associated force, so it could have been after the date of that alleged bomb plot.

In any event, there is no evidence that the United States remains engaged in ongoing hostilities against AAIA. The Government's own exhibit states that its "current status" as of January 2004 was "unknown," and that at that time, "Yemeni officials claim[ed] that the group is operationally defunct." JA 697.[12] As of December 2016, the Executive Branch was not taking action against AAIA. White House Report at 5 (listing "al-Qa'ida; the Taliban; certain other terrorist or insurgent groups affiliated with al-Qa'ida or the Taliban in Afghanistan; AQAP; al-Shabaab; individuals who are part of al-Qa'ida in Libya; al-Qa'ida in Syria; and ISIL") (footnotes omitted). No evidence shows that it has taken any action since then.

_____

[12] As widely reported, Yemen's situation has devolved since Abdulsalam's abduction. It is now a war-torn country, with fighting in Aden and elsewhere, among many factions and with the involvement of many foreign nations. *See* Ben Hubbard and Safeed Al-Batati, *Yemeni Separatists Oust Government in Key City*, N.Y. Times, Aug. 11, 2019, at A14 (Aden seized by secessionists supported by UAE, in opposition to Saudi-supported forces). There is no discussion of ongoing AAIA activity in any news reports in the Nexis database in recent years. It is clear that it no longer exists.

SECRET//NOFORN

~~SECRET//NOFORN~~

Key U.S. allies Canada and Australia have also determined that AAIA is inactive or no longer exists and have thus removed it from their list of terrorist organizations.[13]

Detention authority only extends to groups actively participating in hostilities, so any basis for Abdulsalam's detention based on alleged support of AAIA has ended.

### 3. EIJ

The district court relied on the following propositions to determine that EIJ was an "associated force" of al Qaeda:

1. ████████████████████████████████

2. It eventually was a primary bin Laden ally and had access to al Qaeda facilities and operatives. JA 145 (citing JA 687).

3. One of its leaders, Ayman al-Zawahiri, signed bin Laden's *fatwa* for Muslims to kill Americans in 1998. JA 145 (citing 685; *9/11 Commission Report* 47).

4. Its assets were frozen post-9/11 by the United States, the UN put it on a list of groups affiliated with bin Laden, and it was designated by the United States as a Foreign Terrorist Organization in 2002. JA 144-45.

---

[13] Aus. Assoc. Press, "FED: Two Groups Removed from Terror List," Mar. 9, 2012 ("[T]he Islamic Army of Aden (IIA) effectively no longer exists."); News Release, Gov't of Canada, "Government of Canada Lists al Qaida in the Indian Subcontinent and the Indian Mujahideen as Terrorist Entities," Dec. 29, 2016 ("[A]s a result of the required two-year review, the Government of Canada removed from the list of terrorist entities under the Criminal Code . . . the Islamic Army of Aden . . . Delisting reflects that circumstances may change over time. For example, groups may no longer exist or become inactive."); *see also* JA697 (Islamic Army of Aden is an alternate name for AAIA); JA 146 n.7.

~~SECRET//NOFORN~~

SECRET//NOFORN

5. It merged with al Qaeda in June 2001. JA 145 (citing JA 211-15, 679-83, 698; *9/11 Commission Report* (no page given)).

The first four of these propositions do not show that EIJ was a co-belligerent of al Qaeda. They are not evidence that EIJ was al Qaeda's agent, or provided military resources to al Qaeda, or served as a communication link, or participated with al Qaeda in acts of war, or permitted its buildings and safehouses to be used by al Qaeda, or in any respect was engaged in hostilities against the United States or its allies. It may show an embrace of al Qaeda ideology, but that does not establish co-belligerency. *See* p. 48, above.

In fact, the court's findings as to EIJ include only one plot by EIJ against the United States, that "EIJ planned to attack the U.S. Embassy in Albania in 1998." JA 144. Albanian authorities thwarted the attack. *Id.* The Government's exhibit concerning this plot does not establish co-belligerency. This nonspecific plan to attack the embassy was not shown to have an al Qaeda link, and thus cannot show that EIJ was a co-belligerent alongside al Qaeda.

SECRET//NOFORN

SECRET//NOFORN

The district court also cited evidence from United States and UN listings which, like the similar listings of AAIA, are entirely conclusory and thus unreliable under *Parhat*.

The fifth proposition, the merger of EIJ and al Qaeda, is also irrelevant. EIJ had a history as an organization focused on Egypt-related activity. JA 685. In June 2001, one of its leaders, Ayman al-Zawahiri, claimed to merge the group with al Qaeda

Another former EIJ leader said that only nine people actually participated in the merger, counting Zawahiri. *See* Will McCants, "The Denudation of the Exoneration: Part 12," Dec. 1, 2008, http://www.jihadica.com/the-denudation-of-the-exoneraiton-part-12/ (summarizing Sayyed Imam al-Sharif, *Denudation of the Exoneration* (2008)); *see also* Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11* at 246, 284, 296, 379 (2006) (describing various splits and defections in EIJ). There is no evidence that Abdulsalam supported any members of EIJ that collaborated

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

with and participated in the merger, and there is no evidence of co-belligerency prior to the merger.

Even if EIJ became an associated force of al Qaeda when it merged with al Qaeda in June 2001, as the court found, JA 145, it was after the time that Abdulsalam was alleged to have provided support to the group. Abdulsalam's alleged travel support for EIJ members was primarily, if not entirely, in the 1990's. This alone warrants reversal as to EIJ.

The Government presented no evidence, and the district court made no findings, as to the current relationship between al Qaeda and those factions of EIJ that Abdulsalam allegedly supported. As of December 2016, the Executive Branch was not taking action against any EIJ members or offshoots that did not join the al Qaeda merger. *See* White House Report at 5. There is no evidence that it has done so since. Because the legality of Abdulsalam's detention requires the Government to show that there are ongoing hostilities between the groups that he is alleged to have substantially supported and the United States or its coalition partners, and there is no such showing as to EIJ, the court erred in upholding his detention based on alleged support for EIJ.

SECRET//NOFORN

~~SECRET//NOFORN~~

## II. Abdulsalam's Prolonged Detention without Charge or Trial is Not Permitted by the AUMF and Violates the Due Process Clause.

Abdulsalam has been imprisoned for nearly seventeen years, first in the secret prisons ███████ where he was brutally tortured, followed by fifteen years at Guantanamo. The Government has said that he will be released when the war with al Qaeda has ended, but there is not even a hazy, far distant prospect of the end to that war, and the Government does not so much as hint that there is even a prospect the war will end within Abdulsalam's lifetime. Unless a court intervenes, he will continue to be the subject of perpetual detention, effectively serving a life sentence, without ever having been charged with or convicted of a crime. Such detention exceeds the Government's authority under the AUMF because it is punitive and impermissible under the law of war, and it violates the Due Process Clause.

### 1. AUMF

The AUMF by its terms limits the President to actions that are both "necessary and appropriate," and "does not authorize unlimited, unreviewable detention." *Basardh v. Obama*, 612 F. Supp. 2d 30, 34 (D.D.C. 2009), *abrogation on other grounds recognized in Al-Adahi*, 187 F. Supp. 3d 74, 76 (D.D.C. 2014); *see also Hussain v. Obama*, 134 S. Ct. 1621, 1622 (2014) (statement of Breyer, J., respecting denial of certiorari)

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

(observing that the Supreme Court has not "considered whether . . . either the AUMF or the Constitution limits the duration of detention").

The Supreme Court's plurality in *Hamdi* found that the AUMF authorizes detention only "to prevent a combatant's return to the battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004); *see also Ali*, 736 F.3d at 545 ("The purpose of military detention is to detain enemy combatants for the duration of hostilities so as to keep them off the battlefield and help win the war."); *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) ("The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on he must be removed as completely as practicable from the front, treated humanely and in time exchanged, repatriated or otherwise released.") (footnotes omitted). The boundaries of this authority are determined by "longstanding law-of-war principles." *Hamdi*, 542 U.S. at 521.

"Captivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war.'" Yasmin Naqvi, *Doubtful Prisoner-of-War Status*, 84 Int'l Rev. Red Cross 571, 572 (2002) (quoting International Military Tribunal (Nuremburg), reprinted in 41 Am. J. Int'l L. 172, 229 (1947)), *quoted with approval in Hamdi*, 542 U.S. at 518. Such

~~SECRET//NOFORN~~

SECRET//NOFORN

captivity is "merely a temporary detention which is devoid of all penal character." William Winthrop, *Military Law and Precedents* 788 (rev. 2d ed. 1920), *quoted with approval in Hamdi*, 542 U.S. at 518; *see also Ali*, 736 F.3d at 545 (citing same). Accordingly, even if detention could initially be justified as a preventative wartime measure, once it becomes predominantly punitive, it is not permissible under the law of war, and thus not authorized under the AUMF.

The only legitimate purpose for detaining Abdulsalam without trial is to "prevent [his] return to the battlefield." *Hamdi*, 542 U.S. at 519. If his continued deprivation of liberty "appears excessive in relation to" this purpose, then it is punitive in character. *United States v. Salerno*, 481 U.S. 739, 747 (1987) (quotation omitted). The length of Abdulsalam's detention and the circumstances of his detention, balanced against a theoretical risk of a return to a "battlefield" seventeen years after his capture, compel the conclusion that his continued deprivation of liberty is excessive and is therefore punitive. *See id.* at 747-48 (analyzing circumstances of detention, length of detention, and conditions of confinement).

Abdulsalam's detention is already longer than the fifteen-year *maximum* sentence for "the federal material support statutes . . . used to convict persons who have merely provided services to a terrorist

SECRET//NOFORN

~~SECRET//NOFORN~~

organization." U.S. Dep't of Justice, et al., *Final Report: Guantanamo Review Task Force* 22, 22 n.21 (2010), *available at* justice.gov/sites/default/files/ag/legacy/2010/06/02/guantanamo-review-final-report.pdf.

The excessiveness of Abdulsalam's detention is further underscored by the fact that his purportedly non-punitive detention has lasted longer than the punitive confinement of Guantanamo detainees who were convicted of crimes. For example, in 2007, David Hicks, captured in 2001 and later characterized by former Defense Secretary Donald Rumsfeld as being "among the world's most dangerous terrorists," pleaded guilty to "providing material support for terrorism by training at al Qaeda training camps in Afghanistan and taking up arms against coalition forces . . . ." Ofc. of Mil. Comm'ns, "David M. Hicks," https://www.mc.mil/Cases.aspx?caseType=omc&status=4&id=10 (last visited Feb. 22, 2018). His seven-year sentence was reduced to nine months' confinement, and he was released a decade ago. *See id.* Another detainee, Salim Ahmed Hamdan, one of Osama bin Laden's drivers, was convicted of providing material support for terrorism and sentenced to five-and-one-half years' imprisonment, and was released at the end of 2008.[14] Another detainee, Omar Khadr, pleaded guilty to five war

---

[14] *See* Ofc. of Mil. Comm'ns, "Salim Ahmed Hamden," https://www.mc.mil/Cases.aspx?caseType=omc&status=4&id=23 (last visited Feb. 22, 2018).

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

crimes, including "murder in violation of the law of war," but was sent to Canada and released on bond in 2015.[15]

The AUMF by its terms authorizes only "necessary and appropriate" actions by the Executive. It does not authorize unending, decades-long detention without charge or trial. Because Abdulsalam's ongoing detention is both plainly excessive and punitive in character, it is not authorized by the AUMF.

Fifteen years ago, Justice O'Connor ruled with respect to the AUMF,

> [We] understand Congress's grant of authority for the use of "necessary and appropriate force" to include authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles. If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel.

*Hamdi*, 542 U.S. at 521 (2004) (plurality opinion); *see also Rasul v. Bush*, 542 U.S. 466, 488 (2004) (Kennedy, J., concurring) ("[A]s the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker."). Law-of-war detention is meant to be a temporary wartime expedient. In this case, as a practical matter, the Government is attempting to impose a life sentence, but without charging or proving a crime, simply because the "war on terror" has turned out to be a

---

[15] *See* Ofc. of Mil. Comm'ns, "Omar Ahmed Khadr," https://www.mc.mil/Cases.aspx?caseType=omc&status=23 (last visited May 1, 2018).

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

war without end, "entirely unlike those of the conflicts that informed the development of the law of war." Justice O'Connor's unraveling point has surely been reached with respect to Abdulsalam.

### 2. Due Process Clause

The perpetual detention of Abdulsalam without charge or trial is also a textbook violation of the Due Process Clause. His detention is not for the purpose of preventing his return to a battlefield (and he was never on a battlefield), or because he is deemed to be dangerous. The detention at the stage is pure punishment, but without due process, and thus unconstitutional.

The district court refused to entertain a due process claim, holding that this Court had ruled that "the due process clause does not apply to Guantanamo detainees." JA 138 (citing *Kiyemba v. Obama*, 555 F.3d 1022, 1026-27 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131, *reinstated in relevant part*, 605 F.3d 1046, 1047-48 (D.C. Cir. 2010)). This Court has now held that *Kiyemba* does not foreclose the application of the Due Process Clause to Guantanamo detainees. *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019). Indeed, this Court has strongly implied that due process applies to Guantanamo detainees.

> The Supreme Court's decision in *Boumediene* was explicit that detainees must be afforded those 'procedural protections' necessary (i) to 'rebut the factual basis for the Government's assertion that he is an enemy combatant'; (ii) to give the

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

prisoner 'a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law,'; and (iii) to create a record that will support 'meaningful review' by the district court.

*Id.* at 528-29 (quoting *Boumediene*, 553 U.S. at 779, 783); *see also*

*Almerfedi v. Obama*, 654 F.3d 1, 5-6 (D.C. Cir. 2011) (*Hamdi* considered

"due process limitations" when it suggested a detention decision

framework).

The Supreme Court's reasoning in *Boumediene* concerning the

Suspension Clause applies equally to the Due Process Clause. To reach its

conclusion in *Boumediene*, the Supreme Court "pointed to both the"

Suspension Clause "and the procedural protections of the Due Process

Clause." *Qassim*, 927 F.3d at 529 (citing *Boumediene*, 553 U.S. at 781).

*See also Al-Bahlul v. Obama*, 767 F.3d 1, 49 (D.C. Cir. 2017) (en banc)

(Rogers, J., concurring in the judgment in part and dissenting in part)

(reasoning that *Boumediene* requires application of the Ex Post Facto Clause

to Guantanamo).

Moreover, implicit in the Supreme Court's recognition that

Guantanamo detainees may invoke the habeas writ is its recognition that the

detainees have rights that may be vindicated by recourse to the writ. *See*

*Boumediene*, 553 U.S. at 739 ("Petitioners contend they do have cognizable

constitutional rights and that Congress, in seeking to eliminate recourse to

66

~~SECRET//NOFORN~~

SECRET//NOFORN

habeas corpus as a means to assert those rights, acted in violation of the Suspension Clause."). Among these rights must be the due process right to be free from the arbitrary deprivation of liberty at the hands of the Government. *See id.* at 744 ("'[T]he practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny.'") (quoting *The Federalist No. 84*, at 512 (Alexander Hamilton) (C. Rossiter ed., 1961)).

The right to be free from arbitrary imprisonment is a necessary corollary to the fundamental rights of habeas corpus. *See id* at 739 ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."). Recognizing the right to the habeas writ without recognizing the right to be free from arbitrary detention would be incongruous. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (recognizing the writ's "historic purpose" of "reliev[ing] detention by executive authorities without judicial trial") (quoting *Brown v. Allen*, 344 U.S. 443, 533 (1953) (Jackson, J., concurring in result))); *see also Rasul*, 542 U.S. at 474 (citing same).

Abdulsalam has never been charged with a crime, much less tried and convicted. The arbitrary nature of his detention is further demonstrated by

SECRET//NOFORN

~~SECRET//NOFORN~~

the fact that other Guantanamo detainees who were tried and convicted of crimes, including "murder in violation of the law of war," have already been released.[16] Judge Tatel recently observed that a due process claim challenging the "length of confinement" at Guantanamo "deserves to be taken seriously" by this Court, as the detentions "are lengthening into decades, with no end in sight." *Ali v. Trump*, 18-5297, 2019 WL 850757 (D.C. Cir. Feb. 22, 2019) (Tatel, J., concurring in denial of petition for initial hearing en banc). When taken seriously, the challenge to the length of detention in this case should be upheld.

### III. Abdulsalam Was Denied the "Meaningful" Hearing Required by *Boumediene* and His Procedural Due Process Rights Were Violated.

As explained above, the Due Process Clause should be found to apply to Guantanamo detainees. This guarantees a hearing with a "reasonable opportunity to know the claims of the opposing party and to meet them." *Morgan v. United States*, 304 U.S. 1, 18 (1938). In addition, as this Court recognized in *Qassim*, *Boumediene* provides detainees with procedural rights under the Suspension Clause that are at least as broad as their due process rights. *See Qassim*, 927 F.3d at 528-29. The Court, quoting *Boumediene*,

---

[16] In contrast to Abdulsalam's unending detention, based in part on alleged use of "false passports," a man who provided some of the 9/11 hijackers with false drivers' licenses was sentenced to only four months in jail. Assoc. Press, "Jail Time for Helping Hijackers," Feb. 1, 2002, https://www.cbsnews.com/news/jail-time-for-helping-hijackers.

~~SECRET//NOFORN~~

SECRET//NOFORN

ruled that a detainee must be given the procedural protection "necessary" to rebut the factual basis for the Government's case, and a "meaningful opportunity" to show that his detention is unlawful. *Id.* Accordingly, Abdulsalam was entitled to be advised of the charges against him, to see the Government's evidence, and to rebut that evidence. Abdulsalam's procedural rights were denied in numerous important ways.

1. Abdulsalam was not allowed to see the thirty-six-page Return, or the eighty-nine exhibits attached to the Return. These are the documents that set forth the charges against him. Instead, he was given a two-page summary of the Return and access to a few lines in the Return and related exhibits that purport to show his own statements. As a consequence, he was denied notice of the charges and evidence against him, and thus denied both a "meaningful hearing" and due process. *See* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Penn. L. Rev. 1267, 1280-81, 1283 (1975). It follows that he was deprived of a fair opportunity to challenge the evidence against him or to rebut the Government's claims. And without his aid and participation, his counsel were unfairly hamstrung in attempting to defend him.

Abdulsalam sought an order allowing him to see the allegations against him and the factual basis for them, arguing for full disclosure under

69

~~SECRET//NOFORN~~

procedures similar to the Classified Information Procedure Act ("CIPA"). JA 200 (*Al-Hela v. Obama*, 05-1048, 2016 WL 2771804 at *1 (D.D.C. May 13, 2016)). The court denied the motion, ruling that "petitioner has offered no evidence that CIPA's substitution method should, must, or may be imported wholesale to detainee habeas cases." JA 200. *Qassim*'s reopening of the due process issue undermines this ruling.

2. Abdulsalam's counsel were given access to more information than was available to Abdulsalam, up to the Secret classification level, but there are still very substantial redactions in the exhibits provided to counsel, to the point that the information disclosed is often so fragmented as to be meaningless and unreliable. *See, e.g.,* JA 301-03, 327-29, 362-65, 494-99.

3. There were also documents relevant to the case that counsel has not been allowed to see at all. The Government and the district court, however, had access to all of the relevant documents in unredacted form. The district court relied on some of those undisclosed documents *ex parte* in upholding Abdulsalam's detention, which allegedly allowed the court "to more fully evaluate the sources." JA 141. The court also made "credibility determinations" based on a review of unredacted documents that were never shown to Abdulsalam's counsel. JA 143; *see also* JA 156 n.11. While the court cited D.C. Circuit law allowing it to assess "highly sensitive"

~~SECRET//NOFORN~~

~~SECRET//NOFORN~~

information *ex parte*, those cases were based on the mistaken understanding that the Due Process Clause does not apply at Guantanamo. JA 141 (citing *Khan*, 655 F.3d at 31; *Parhat*, 532 F.3d at 849; *Mousovi v. Obama*, 916 F. Supp. 2d 67, 68-69 (D.D.C. 2013)). "Due process, however, requires that a party be aware of and allowed to refute 'the evidence against the *merits* of his case.'" *Clifford v. United States*, 136 F.3d 144, 149 (D.C. Cir. 1998) (quoting *In re Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. Unit B Sept. 1981)) (emphasis in *Clifford*).[17]

4. The district court relied extensively on anonymous and multi-layered hearsay. While this Court has held that hearsay evidence is always admissible in Guantanamo cases, evidence based on multiple layers of hearsay "inherently raises questions about reliability." *Al Rabiah*, 658 F. Supp. 2d at 18. Anonymous, conclusory hearsay is unreliable because it is so lacking in information that it is impossible for the court to assess its reliability. *Latif v. Obama*, 677 F.3d 1175, 1183 (D.C. Cir. 2011); *see also*

---

[17] At oral argument, the *Qassim* panel appeared to suggest that, even if there might be some situations where the petitioner may not be allowed to review documents, he must be given substitutes that give him functionally the same opportunity to challenge his detention as if he had seen the full documents, and his counsel with security clearances should have been allowed access to all of the evidence. *See* Robert Loeb, "Due Process for Guantanamo Detainees: The D.C. Circuit Rules in *Qassim*," Lawfare, June 25, 2019, https://lawfareblog.com/due-process-guantanamo-detainees-dc-circuit-rules-qassim.

~~SECRET//NOFORN~~

SECRET//NOFORN

*Al Rabiah v. United States*, Civ. Action 02-828(CKK), Classified Slip. Op. at 16 (D.D.C. Sept. 17, 2009) (rejecting evidence as unreliable when Government presented no information about person questioned, the report stated the source's "reliability had not been established," and there was no indication of the basis for the source's knowledge); *Parhat*, 532 F.3d at 846-49. Admission of unreliable evidence, including hearsay, can violate due process. *See Michigan v. Bryant*, 562 U.S. 344, 370 n.13 (2011).

Also unreliable is evidence that describes events as "having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that 'may' be true or are 'suspected of' having taken place," without saying who "reported" or "said" these things, or without any underlying reporting or assessment of reliability. *Parhat*, 532 F.3d at 846-47. Even for sourced information, the reviewer must have the information necessary to assess how the source obtained his information and how the person taking down the comments assessed the source's reliability. *Id.* at 846 n.11.

Reliance on hearsay in this setting is also a due process violation. Where liberty interests are at stake, the Supreme Court has routinely found that due process includes a confrontation right. *See Specht v. Patterson*, 386 U.S. 605 (1967) (finding due process requires confrontation in proceeding to

SECRET//NOFORN

SECRET//NOFORN

enhance sentence for habitual sex offender, regardless of whether proceeding was criminal or civil); *Gardner v. Florida*, 430 U.S. 349 (1977) (defendant at sentencing must be able to address the quality and quantity of the evidence, including resolving hearsay concerns); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (confrontation required in parole revocation hearings absent good cause). Abdulsalam is simply seeking the basic right to be able to know the identities of the anonymous sources so he can be in a position to rebut them.

Many of the documents relied on by the district court violated these principles and should have been disregarded. Redacted documents and substitutes must "provide *the detainee* with a meaningful opportunity to demonstrate" that his detention is unlawful. *Al Odah v. United States*, 559 F.3d 539, 547 (D.C. Cir. 2009) (quotation omitted; emphasis added). Abdulsalam had no fair opportunity to defend himself against those documents.

Other documents on which the court relied were unsourced altogether, and were so heavily redacted that only fragments remained. *See, e.g.*, JA

SECRET//NOFORN

SECRET//NOFORN

301-03 (cited by court at JA 149). Abdulsalam could not have a "meaningful opportunity" to rebut these documents without knowing the source and without being able to discuss the source with counsel.

5. While at times drawing inferences against Abdulsalam for not offering proof or explanations, the district court never demanded anything comparable from the Government.

SECRET//NOFORN

SECRET//NOFORN

The court, with no justification, dismissed Abdulsalam's testimony as "vague" and "self-serving." JA 142. This was error.

## CONCLUSION

Abdulsalam's case is unlike any other in which this Court has upheld a Guantanamo detention. This Court has never upheld detention of a person who was not "part of" al Qaeda, the Taliban, or an "associated force." Abdulsalam was never a part of any terrorist organization and was never a combatant.

Abdulsalam was not a radical Islamist, but a businessman in Yemen, supporting his family and living openly. The Government of Yemen provided letters vouching for his good character and his activities. Yet, Abdulsalam is undergoing life-crushing punishment at the hands of the

75

SECRET//NOFORN

~~SECRET//NOFORN~~

United States. He has been separated from home and family for nearly two decades, held 8,000 miles from home in a desolate camp, without even the straw of hope given to convicted criminals – a known date when his jail sentence will finally end. This Court should put an end to this continuing unjust punishment, reverse the judgment below, and direct the district court to grant the writ.[18]

---

[18] We realize that judges may be concerned about releasing Guantanamo detainees. *See Esmail v. Obama*, 639 F.3d 1075, 1077 (D.C. Cir. 2011) (Silberman, J., concurring). Abdulsalam believes that, once his release is approved, he can obtain a statement from an allied Persian Gulf nation saying that he would be welcomed there, is not and has not been a threat to security, and would not raise security concerns.

~~SECRET//NOFORN~~

SECRET//NOFORN

Respectfully submitted,

S. William Livingston
Brian E. Foster
Andrew D. Garrahan
Covington & Burling LLP
One City Center
850 10th Street NW
Washington, DC 20001
(202) 662-6000 phone
(202) 662-6291 facsimile

David H. Remes
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508 phone

*Counsel for Petitioner-Appellant*

August 16, 2019

77

SECRET//NOFORN

SECRET//NOFORN

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief of the petitioner-appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as modified by this Court's order of July 30, 2019 and contains 16,343 words, excluding portions of the brief excluded by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

Andrew D. Garrahan

SECRET//NOFORN

~~SECRET//NOFORN~~

## PROOF OF SERVICE

I certify that on this 16th day of August, 2019, I caused to be filed with the Court by way of the classified information security officer a true and correct copy of the foregoing brief of the Petitioner-Appellant upon counsel of record for the Appellees-Respondents.

_____
Andrew D. Garrahan

~~SECRET//NOFORN~~