# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 30, 2021

Decided April 4, 2023
Reissued April 12, 2023

No. 19-5079

ABDULSALAM ALI ABDULRAHMAN AL-HELA, DETAINEE CAMP
DELTA, ALSO KNOWN AS ABD AL-SALAM ALI AL-HILA AND
ABDULWAHAB ALI ABDULRAHMAN AL-HELA, AS NEXT
FRIEND OF ABDULSALAM ALI ABDULRAHMAN AL-HELA,
APPELLANTS

v.

JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET
AL.,
APPELLEES

———

On Petition for Rehearing En Banc

———

*David M. Zionts* argued the cause for appellants. On the
briefs were *David H. Remes*, *Beth D. Jacob*, *S. William
Livingston*, *Brian E. Foster*, *Andrew D. Garrahan*, and
*Bethany Theriot*. *Cyril Djoukeng* and *Robert A. Long*, *Jr*
entered appearances.

*Joseph Margulies*, *Stephen M. Truitt*, *Kermit Roosevelt,
III*, *Bruce Ackerman*, *Erwin Chemerinsky*, *Eugene R. Fidell*,
*Eric M. Freedman*, *Jared Goldstein*, *Randy Hertz*, *Alan
Morrison*, and *Laurence H. Tribe* were on the brief for *amicus
curiae* The Commonwealth Lawyers Association in support of
appellants.

2

*Thomas B. Wilner* and *Neil H. Koslowe* were on the brief for *amicus curiae* Khalid Ahmed Qassim in support of appellants.

*George M. Clarke*, *III* and *Parisa Manteghi Griess* were on the brief for *amicus curiae* Tofiq Nasser Awad Al Bihani in support of appellants.

*Anil K. Vassanji* was on the brief for *amicus curiae* Professor Eric Janus in support of appellants.

*Mark C. Fleming* and *Patricia Lee Refo* were on the brief for *amicus curiae* The American Bar Association in support of appellants.

*Shayana Kadidal* and *J. Wells Dixon* were on the brief for *amicus curiae* The Center for Constitutional Rights in support of appellants.

*Jack B. Gordon* was on the brief for *amicus curiae* Human Rights First and Reprieve US in support of appellants.

*Matthew S. Hellman* was on the brief for *amicus curiae* The National Association of Criminal Defense Lawyers in support of appellants.

*Sarah E. Harrington*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General at the time of argument, and *Sharon Swingle* and *Brad Hinshelwood*, Attorneys.

3

Before: SRINIVASAN, *Chief Judge*, HENDERSON, ROGERS*,
TATEL*, MILLETT, PILLARD, WILKINS, KATSAS**, RAO,
WALKER, JACKSON***, CHILDS**, and PAN**, *Circuit Judges,*
and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* PILLARD, with
whom *Circuit Judges* ROGERS and MILLETT join.

Opinion concurring in the judgment in part and dissenting
in part filed by *Circuit Judge* RAO, with whom *Circuit
Judge* WALKER joins.

Opinion concurring in the judgment and dissenting filed
by *Senior Circuit Judge* RANDOLPH, with whom *Circuit
Judges* HENDERSON and WALKER join.

WILKINS, *Circuit Judge*:  Yemeni citizen Abdulsalam Ali
Abdulrahman al-Hela ("Mr. al-Hela") challenges the basis of
his detention at U.S. Naval Station Guantanamo Bay.  Detained
in 2004, Mr. al-Hela filed a petition for a writ of habeas corpus
in 2005 pursuant to 28 U.S.C. § 2241.  Pet. 2; Resp. Br. 1
(Judge Randolph mistakenly asserts that Mr. al-Hela invokes
the common law, rather than the statutory, writ of habeas
corpus.  Randolph Op. 5.).  The petition languished as the law
surrounding the availability of constitutional protections for
Guantanamo Bay detainees developed.  However, that changed

---

* Circuit Judges Rogers and Tatel assumed senior status after this
case was argued and before the date of this opinion.

** Circuit Judges Katsas, Childs, and Pan did not participate in this
matter.

*** Circuit Judge, now Justice, Jackson was a member of the *en banc*
Court at the time the case was argued but did not participate in this
opinion.

4

when the Supreme Court confirmed the availability of the constitutional privilege of habeas corpus in *Boumediene v. Bush*, 553 U.S. 723 (2008), and concluded that the Suspension Clause entitles noncitizens detained at Guantanamo to a "meaningful opportunity" to challenge the basis of detention and requires a habeas process providing a "meaningful review" of the cause for detention and the Executive's power to detain. *Id*. at 779, 783; *see* U.S. CONST. art. I, § 9, cl. 2.

Proceedings began, and following a series of hearings, the District Court denied Mr. al-Hela's petition. *Al-Hela v. Trump*, No. 05-cv-1048, unclass.  slip op.  (D.D.C. Jan. 28, 2019) (Lamberth, J.) (an electronic version of the opinion is available at 2019 U.S. Dist. LEXIS 42717).

Mr. al-Hela appealed. He argued that the length of his detention without trial violated the Due Process Clause.  He also argued that the District Court's procedural decisions and evidentiary rulings deprived him of his right under the Suspension Clause to meaningful review of, and a meaningful opportunity to challenge, the basis for his detention, *see Boumediene*, 553 U.S. at 779, 783, as well as his rights under the Due Process Clause.

A panel of this Court affirmed the District Court's decision.  It concluded that Petitioner's detention remained lawful and that the District Court proceedings had satisfied what was required under the Suspension Clause.  *Al Hela v. Trump*, 972 F.3d 120, 127 (D.C. Cir. 2020).  But the panel went a step further.  Rather than ruling on the government's "first position," which was that Petitioner's detention satisfied the Due Process Clause, Oral Arg. Tr. 90, the panel adopted the government's "backup position," *id.*, and ruled that the protections of the Due Process Clause were categorically unavailable to Guantanamo Bay detainees and rejected Mr. al-

5

Hela's due process challenges on that basis. *Al Hela*, 972 F.3d at 127, 150. Judge Randolph concurred, *id*. at 155 (Randolph, J., concurring), based on his separate opinion in *Ali v. Trump*, in which he stated his view that the "Fifth Amendment does not apply to aliens without property or presence in the United States," 959 F.3d 364, 380 (D.C. Cir. 2020) (Randolph, J., concurring).

Judge Griffith concurred in part and in the judgment. Notably, he agreed that Mr. al-Hela's petition failed on the merits but found no reason to reach "the broader question of whether the Due Process Clause applies at Guantanamo." *Al Hela*, 972 F.3d at 151 (Griffith, J., concurring). Judge Griffith concluded that Petitioner received "as much process as he would have been due under the Due Process Clause with respect to his particular claims." *Id*.

Because this Court has on numerous occasions assumed without deciding that the Due Process Clause extends to Guantanamo detainees when assessing the specific claims raised by petitioners, we vacated the panel's judgment and agreed to rehear Petitioner's due process claims *en banc*. Order, *Al-Hela v. Biden*, No. 19-5079, 2021 WL 6753656, at *1 (D.C. Cir. Apr. 23, 2021) ("*2021 Al-Hela Order*"). And because the Court's grant of *en banc* review is confined to Mr. al-Hela's due process claims, we reinstate the panel's judgment as to his other claims.

After we granted rehearing, the government altered its position on whether the Due Process Clause applies to Guantanamo detainees. No longer arguing its secondary position, the government urges us not to reach the question of whether noncitizen Guantanamo detainees are beyond the scope of the Due Process Clause. Instead, the government asks us to reject Mr. al-Hela's petition because, even assuming the

6

Due Process Clause applies, he received all the process he is due and his detention does not violate substantive due process. Resp. Br. 20–21, 24–25.

For the reasons set forth below, we affirm the District Court. Every judge on the *en banc* Court rejects Mr. al-Hela's claim that his procedural due process rights were violated. We hold that we need not decide whether due process protections apply to Guantanamo detainees, because even assuming the Due Process Clause applies, we find that the procedures employed by the District Court to adjudicate Mr. al-Hela's habeas petition satisfy procedural due process. Our dissenting colleagues would hold that the Due Process Clause does not apply to Mr. al-Hela as a Guantanamo Bay detainee and would reject his procedural due process claim on that ground.

In addition, every member of the *en banc* Court rejects Mr. al-Hela's claims that his detention violates substantive due process because there is insufficient evidence that he was an enemy combatant or solely because of the lengthy duration of the military conflict. As with the procedural due process claim, we conclude that even assuming the Due Process Clause applies to Mr. al-Hela, these claims fail on the merits. Again, our dissenting colleagues would reject these claims based on their conclusion that the Due Process Clause does not apply at Guantanamo.

And as to Mr. al-Hela's claim that his continued detention violates substantive due process because he no longer poses a significant threat to the United States, the *en banc* Court is similarly divided.

We remand this claim to the District Court to resolve a potentially antecedent statutory issue. Following argument before the three-judge panel but prior to argument before the

7

*en banc* Court, the Periodic Review Board created by Executive Order, *see* Exec. Order No. 13,567 § 1(a), (b), 76 Fed. Reg. 13,277, 13,277 (Mar. 7, 2011), determined that Mr. al-Hela was eligible for a transfer because his detention "is no longer necessary to protect against a continuing significant threat to the security of the United States." Periodic Review Board, Unclassified Summary of Final Determination, Abd Al-Salam Al-Hilah (ISN 1463) (June 8, 2021) [hereinafter "Periodic Review Board Determination"]. (Petitioner's name is spelled a variety of ways throughout the record.). Mr. al-Hela contends that this intervening Periodic Review Board Determination undermines the statutory authority for his detention. Pet'r Reply Br. 2–3, 7–9. (The Determination was issued after the filing of Mr. al-Hela's opening brief to the *en banc* Court.). Because the District Court did not have occasion to address this argument, and because this statutory contention could render his substantive due process claim moot or afford a non-constitutional ground for granting the relief he seeks, we remand this claim, along with the parallel substantive due process claim, to the District Court for its consideration in the first instance. (Our dissenting colleagues, however, would reject this last substantive due process claim.).

## I.

The panel rejected Mr. al-Hela's contentions that the District Court's factual findings were in clear error, *Al Hela*, 972 F.3d at 134–35, and that ruling of the panel is not before us. Accordingly, we recount the District Court's findings here.

Mr. al-Hela is a Muslim man who enjoyed power in Yemen. Born in Sana'a, he became sheikh (leader) of his tribe after his father's death in 1983. He had many successful business ventures ranging from real estate, pharmaceutical

8

sales, used car trading, weapons sales, oil exploration, and Yemeni infrastructure investments with international companies and government officials. Mr. al-Hela was also close to the political elite in Yemen. Throughout the mid-1990s and early 2000s, he supported the Political Security Organization, a governmental internal security organization.

Through the Political Security Organization, Yemen conducted a deportation program to rid the country of "Afghan Arabs," a coalition of people who settled in Yemen after fighting in the war against the Soviet Union in Afghanistan. The District Court found that Mr. al-Hela "acted outside the scope" of this deportation program by facilitating the travel of Islamic extremists, including members of al Qaeda and its associated force, the Egyptian Islamic Jihad. It also found that he supported bombing attacks conducted by the Aden-Abyan Islamic Army. *Al Hela*, unclass. slip op. at 2–4.

In September 2002, Mr. al-Hela traveled to Cairo, Egypt on business and disappeared. He arrived at United States Naval Station Guantanamo Bay two years later, in 2004. He has been held there as an enemy combatant pursuant to the 2001 Authorization for Use of Military Force ("AUMF") without charge ever since. Pub. L. No. 107-40, 115 Stat. 224 (2001).

Congress passed and President George W. Bush signed the AUMF a week after the September 11, 2001, terrorist attacks. The AUMF stipulates:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or

9

persons, in order to prevent any future acts of
international terrorism against the United States
by such nations, organizations or persons.

AUMF § 2(a). In *Hamdi v. Rumsfeld*, the Supreme Court
confirmed that the President's ability to detain "individuals
who fought against the United States in Afghanistan as part of
the Taliban . . . [in] support[] [of] the al Qaeda terrorist network
responsible for" the September 11, 2001, terrorist attacks is
authorized by the AUMF "for the duration of the particular
conflict in which they were captured." 542 U.S. 507, 518
(2004) (plurality opinion). Congress reconfirmed this
authority in 2012 by authorizing the continued detention of
"covered persons" "without trial until the end of the hostilities
authorized by the AUMF." National Defense Authorization
Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021(c)(1),
125 Stat. 1298, 1562 (2011).

On May 25, 2005, Mr. al-Hela filed a petition for habeas
corpus challenging his detention on the ground that the
President lacked the authority to detain him. Following
*Boumediene*, the District Court judges consolidated most of the
pending habeas cases for administrative purposes, and the
District Court entered a Case Management Order mandating
the procedures for conducting discovery and merits
determinations for those petitions. *See In re Guantanamo Bay
Detainee Litig.*, Misc. No. 08-0442, 2008 WL 4858241
(D.D.C. Nov. 6, 2008), *amended* 2008 WL 5245890 (D.D.C.
Dec. 16, 2008) (hereinafter "Case Management Order"). The
Case Management Order was entered in Mr. al-Hela's case and
governed his petition. *See* Dkt. 155; Dkt. 172.

Pursuant to the Case Management Order, the government
filed a Factual Return containing narrative and exhibits in
support of the decision to detain Mr. al-Hela, and it produced

10

exculpatory evidence.  Much of this information was classified, and the Case Management Order prohibited Mr. al-Hela from accessing classified information (other than his own statements), but permitted his lawyers to access it, so long as they had adequate security clearances. Case Management Order §§ I.E.1, I.F.  However, the Case Management Order provided that the government could seek to have highly sensitive classified documents reviewed and considered by the court *in camera* and *ex parte*, including in instances where petitioner's counsel had the requisite clearance, *id*. § I.F., and the government availed itself of that procedure with respect to a subset of documents that were classified above the clearance level of Mr. al-Hela's lawyers.  The government filed a Factual Return justifying its detention decision in 2010 and an Amended Factual Return in 2017.

Also pursuant to the Case Management Order, the District Court applied a "presumption of regularity" to the government's documents, *see Al Hela*, unclass. slip op. at 22, admitted hearsay as evidence, and used the preponderance of the evidence standard to determine whether the government proved the legal and factual basis for Mr. al-Hela's detention.

Mr. al-Hela unsuccessfully challenged those procedures. *See Al-Hela v. Obama*, No. 05-cv-1048, 2016 WL 2771804 (D.D.C. May 13, 2016); Order, *Al-Hela v. Obama*, No. 05-cv-1048 (D.D.C. Nov. 19, 2014).

After a merits hearing, at which Mr. al-Hela was the sole witness, the District Court denied his habeas petition.  *See Al Hela*, unclass.  slip op. at 82.  In relevant part, the District Court held that the AUMF permits the continued detention of Mr. al-Hela because he "more likely than not was part of or substantially supported al Qaeda, the Taliban, or associated forces." *Id.* at 22.  *See generally Al-Bihani v. Obama*, 590 F.3d

11

866, 872 (D.C. Cir. 2010). It accepted the government's evidence in support of Mr. al-Hela's detention despite the government's reliance on anonymous, multi-layered hearsay after reviewing some of the material *ex parte*, *in camera*. *Al Hela,* unclass. slip op. at 25–27. The District Court also concluded that "the due process clause does not apply to Guantanamo detainees." *Id*. at 23 (citing *Kiyemba v. Obama,* 555 F.3d 1022, 1026–27 (D.C. Cir. 2009) (*Kiyemba I*), *vacated and remanded*, 559 U.S. 131 (2010) (per curiam) (*Kiyemba II*), *judgment reinstated as amended*, 605 F.3d 1046, 1047–48 (D.C. Cir. 2010) (per curiam) (*Kiyemba III*)).

Petitioner filed a timely appeal. As noted above, a panel of this Court affirmed the District Court's decision, and we granted rehearing *en banc* to consider whether Mr. al-Hela "is entitled to relief on his claims under the Due Process Clause." *2021 Al-Hela Order*, 2021 WL 6753656, at *1.

II.

"[T]he writ of habeas corpus . . . [is] a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law," *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973), including a claim that the petitioner "is being unlawfully detained by the Executive or the military." *Id*. at 486. The Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Accordingly, the writ can be employed to ensure that the petitioner "was not deprived of his liberty without due process of law." *Felts v. Murphy*, 201 U.S. 123, 129 (1906). *See generally* RANDY HERTZ &

12

JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND
PROCEDURE § 2.3 (7th ed. 2015).

But whether the Due Process Clause applies to a habeas
petition filed by a foreign national detained at the Guantanamo
Bay military base as an alleged enemy combatant is a question
that the Supreme Court has not yet answered. As noted above,
*Boumediene* established that the Suspension Clause applies to
such a petitioner. *See* 553 U.S. at 771. The Suspension Clause
and the Due Process Clause have distinct functions under the
Constitution. The Suspension Clause regulates when Congress
or the Executive can suspend the writ altogether, so that,
"except during periods of formal suspension, the Judiciary will
have a time-tested device, the writ, to maintain the 'delicate
balance of governance' that is itself the surest safeguard of
liberty." *Id*. at 745 (quoting *Hamdi*, 542 U.S. at 536 (plurality
opinion)). The Due Process Clause regulates "the procedural
contours of [the] mechanism" used to exact the deprivation of
liberty. *Hamdi*, 542 U.S. at 525 (plurality opinion).

The doctrinal distinction between the two Clauses can blur
upon detailed examination, at least in the Guantanamo habeas
context as they do here. In *Boumediene*, the Court explained
that the Suspension Clause, "except during periods of formal
suspension," 553 U.S. at 745, requires a habeas or habeas-
substitute process that enables courts to undertake "a
meaningful review of both the cause for detention and the
Executive's power to detain," *id.* at 783. Because the Court
held that the system of review in place under the Detainee
Treatment Act of 2005 did not provide an avenue of
"meaningful review" of the Executive's detention decisions,
the writ was deemed to have been suspended. *Id*. at 792. But
the Court also explained that the Suspension Clause has
another aspect, the requirement that the habeas or habeas-
substitute procedures afford the detainee "a meaningful

13

opportunity to demonstrate that he is being held [unlawfully]." *Id.* at 779.  The Court did not determine what detention review procedures are required by the Due Process Clause, *see id.* at 783–85, and therefore left open the question of what difference, if any, exists when courts review Executive detention decisions pursuant to the Due Process Clause rather than the "meaningful opportunity" standard under the Suspension Clause.

Since *Boumediene*, nearly all detainees have either based challenges to their detention solely upon an alleged violation of the "meaningful review" and "meaningful opportunity" required by the Suspension Clause or argued that "meaningful review" and "meaningful opportunity" are essentially equivalent to the requirements of the Due Process Clause.  We have thus had little occasion to address the distinction, if any, between the two clauses.  As a result, we have a robust collection of precedent applying the Suspension Clause's "meaningful review" standard to Guantanamo detainees, *see, e.g.*, *Khan v. Obama*, 655 F.3d 20, 31 (D.C. Cir. 2011); *Uthman v. Obama*, 637 F.3d 400, 403 n.3 (D.C. Cir. 2011); *Al-Bihani*, 590 F.3d at 875–76, 879, 880; *Odah v. United States*, 611 F.3d 8, 13–14 (D.C. Cir. 2010), but very little addressing the requirements of the Due Process Clause, *see Ali*, 959 F.3d at 369–73.

The government asks us to reject Mr. al-Hela's petition because, even assuming the Due Process Clause applies, he received all the process he is due.  Our dissenting colleagues take issue with the government's argument, protesting that it constitutes a change in position.  *See* Rao Op. 9; Randolph Op. 3.  But the government's primary position has always been that this Court need not determine whether the Due Process Clause extends to Mr. al-Hela and other Guantanamo detainees.  *See* Panel Resp. Br. 63 ("Because al-Hela's detention comports with both substantive and procedural due process, this Court

14

need not decide whether the Due Process Clause extends to individuals such as al-Hela[.]").  And, as explained below, we agree that this is the correct and most prudent course of action.

"[E]ven when a constitutional question must be joined, courts must choose the narrowest constitutional path to decision." *Ass'n of Am. R.Rs. v. United States Dep't of Transp.*, 896 F.3d 539, 544 (D.C. Cir. 2018) (citing *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995)).  *See generally United States v. Hayman*, 342 U.S. 205, 223 (1952); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Burton v. United States*, 196 U.S. 283, 295 (1905). As the Supreme Court admonished long ago, we should "never . . . anticipate a question of constitutional law in advance of the necessity of deciding it," nor should we "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  *Liverpool, N.Y. & Phila. Steam-Ship Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885).  We abide by that guidance here because "[t]hese rules are safe guides to sound judgment.  It is the dictate of wisdom to follow them closely and carefully."  *Id.*

A holding that the Due Process Clause, assuming its applicability, was satisfied by the habeas procedures employed in this case would resolve solely those claims in this case and those cases where a district court judge employed materially indistinguishable mechanisms.  By contrast, a holding that the Due Process Clause does not apply to Guantanamo detainees would resolve all potential future substantive and procedural due process claims against all such detainees, regardless of the nature of the substantive due process allegation or the processes used by the district court judge to decide the merits of any such petition.  The non-applicability holding would also apply beyond habeas petitions to foreclose all Due Process Clause claims by non-citizens challenging the procedures or

15

rulings of military tribunals at Guantanamo.  Because "[i]t is customary in deciding a constitutional question to treat it in its narrowest form," *Engel v. Vitale*, 370 U.S. 421, 437 (1962) (Douglas, J., concurring), and because the former ground is the narrower ground for decision, we are obliged to resolve the case using that option, if possible.  *See Plaut*, 514 U.S. at 217 (after analyzing the two different constitutional challenges before it, the Court concluded that "the former is the narrower ground for adjudication of the constitutional questions in the case, and we therefore consider it first").

Brushing aside these venerable jurisprudential principles, Judge Rao and Judge Randolph would hold that the Due Process Clause does not apply to noncitizens at Guantanamo. *See* Rao Op. 1, 20; Randolph Op. 1–3.  In their view, *Johnson v. Eisentrager*, 339 U.S. 763 (1950), clearly established that the Constitution does not extend to foreign citizens outside the sovereign territory of the United States, Rao Op. 1, *see* Randolph Op. 6, a clarity that seems to have eluded the Supreme Court.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (distinguishing *Eisentrager* by noting that "the Court has ruled that, under some circumstances, foreign citizens . . . in 'a territory' under the 'indefinite' and 'complete and total control' and 'within the constant jurisdiction' of the United States []may possess certain constitutional rights[,]" (quoting *Boumediene*, 553 U.S. at 755–71)); *see also Al Bahlul v. United States*, 767 F.3d 1, 63, 65 & n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment in part and dissenting in part) ("As the Government concedes, the *Boumediene* analysis leads inexorably to the conclusion that the ex post facto right applies at Guantanamo.  It would be no more impracticable or anomalous to apply the Article I, Section 9 ex post facto right

16

at Guantanamo than it is to apply the Article I, Section 9 habeas corpus right at Guantanamo.").

Through their efforts to find *Eisentrager* controlling, our dissenting colleagues also recharacterize Circuit precedent by isolating and relying on language from prior cases, divorcing these quotes from the limited precedential holdings. For example, Judges Rao and Randolph argue that, in *Kiyemba I*, 555 F.3d at 1026, we clearly held that the Due Process Clause does not apply to foreign citizens detained at Guantanamo, a clarity that has apparently eluded the government, *see* Resp. Br. 34 ("[T]his Court has declined to decide the independent applicability of the Due Process Clause and other constitutional provisions [to Guantanamo detainees] on multiple occasions, including while sitting *en banc*") (emphasis added), and that has similarly eluded prior panels of this court. *See*, *e.g.*, *Qassim v. Trump*, 927 F.3d 522, 528, 530 (D.C. Cir. 2019) (collecting cases) (clarifying that "the issue on appeal in *Kiyemba [I]* was the narrow question of what remedy could be given once the government conceded that it could not lawfully hold [certain] detainees [in Guantanamo]," as "[w]e would not have repeatedly reserved such Due Process Clause questions if they had already been conclusively answered in *Kiyemba [I]*"); *Ali*, 959 F.3d at 368 (holding that "[t]he district court's decision that the Due Process Clause is categorically inapplicable to detainees at Guantanamo Bay was misplaced"). Our dissenting colleagues' reliance on additional Circuit precedent concerning Guantanamo fails for similar reasons. *See*, *e.g.*, *Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011) (abstaining from holding that the Due Process Clause does not apply at Guantanamo, because "[e]ven assuming" that the Clause applies, the record showed any error would be harmless); *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (per curiam) (declining to "decide whether *Boumediene* portends

17

application of the Due Process Clause . . . to Guantanamo detainees").

As much as our dissenting colleagues would like us to resolve the *Eisentrager* debate in one direction or the other, deciding the applicability of the Due Process Clause is unnecessary here, where, as explained below, we find that the habeas procedures Mr. al-Hela received actually satisfy what the Clause would require. Even when the Supreme Court has recognized that the "logic of [its] cases" likely provides the answer to whether a liberty interest protected by the Due Process Clause is implicated, it has declined to so hold where, even assuming the right applied, it was not violated in that particular instance. *See Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 279–87 (1990). Indeed, the Court regularly declines to decide whether a constitutional right applies where, even assuming that it does, there is no constitutional error because the challenged actions comported with the right (or any such error was harmless). *See, e.g.*, *NASA v. Nelson*, 562 U.S. 134, 147 & n.10, 148–54 (2011) (assuming without deciding that the Constitution protects a right to informational privacy, plaintiffs' claim failed because the challenged questionnaire did not violate any such right); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619–20 (1992) (despite noting its prior holding that States of the Union are not "persons" protected by the Due Process Clause, the Court assumed that the Clause did apply to Argentina and held the suit met the due process requisites of personal jurisdiction); *Rushen v. Spain*, 464 U.S. 114, 118 n.2, 119–20 (1983) (where state conceded that juror's *ex parte* communication with trial judge was constitutional error, the Court assumed without deciding that the defendant's constitutional rights were

18

implicated but found any error harmless because of the absence of prejudice).

If that minimalist jurisprudential path is satisfactory to the Court, then it must certainly be good enough for us. Judge Rao seeks to reach conclusions about the extraterritorial application of the entire Constitution with respect to foreign citizens writ large. *See* Rao Op. 1 ("[A]liens outside the territorial United States do not possess constitutional rights[.]"). But even the government disagrees with such an approach and "urge[s] the Court to decline to address the broader issue" as doing so "would not affect the outcome here and would require resolution of sensitive and complex constitutional questions[.]" Resp. Br. 24. Out of respect for "the cardinal principle of judicial restraint," we take the narrower approach. *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

III.

We begin with Mr. al-Hela's procedural due process claims. He makes four challenges to the District Court's discovery and evidentiary procedures. He challenges: (1) the use of the preponderance of the evidence standard to determine whether he was an enemy combatant; (2) the application of the presumption of regularity standard to the government's evidence; (3) the use of hearsay to justify his detention; and (4) his inability to personally review most all of the classified evidence against him and the District Court's *ex parte*, *in camera* review of the highly sensitive classified evidence against him. Pet'r Br. 19.

The government correctly points out that Mr. al-Hela did not raise the first two arguments before the panel, Resp. Br. 60,

19

which is grounds for forfeiture on rehearing, *see United States v. Whitmore*, 384 F.3d 836, 836–37 (D.C. Cir. 2004) (per curiam); *Price v. Barry*, 53 F.3d 369, 371 (D.C. Cir. 1995) (per curiam). But given that we granted rehearing to determine whether the Due Process Clause entitles Petitioner to relief, we will exercise our discretion in this instance to consider all of Mr. al-Hela's due process arguments on rehearing. *See Fox Television Stations, Inc. v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002) (with respect to enforcing forfeiture of arguments that were not raised before the panel at the rehearing stage, "our practice is in fact more practical than rigid").

A.

*Mathews v. Eldridge*, 424 U.S. 319 (1976), is the leading authority for deciding what procedural protections are required to comport with the Due Process Clause. *Id.* at 335. *Mathews* explains that "'[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334 (alteration in original) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Accordingly, the analysis "is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The Court incorporated those concepts in a venerated three-factor framework examining:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the

20

additional or substitute procedural requirement would entail.

*Id*. at 335.

Even though *Mathews* involved a deprivation of property, the Court has used the *Mathews* framework on multiple occasions to adjudicate procedural due process claims involving deprivations of liberty, such as juvenile and criminal pretrial detention and involuntary civil commitment. *See, e.g.*, *Heller v. Doe,* 509 U.S. 312, 330–31 (1993); *Zinermon v. Burch,* 494 U.S. 113, 127–28 (1990); *United States v. Salerno,* 481 U.S. 739, 746 (1987); *Schall v. Martin,* 467 U.S. 253, 274–75 (1984); *Addington v. Texas*, 441 U.S. 418, 425 (1979). (Curiously, notwithstanding this precedent, Judge Randolph asserts that the *Mathews* framework was never intended to apply to deprivations of liberty and thus cannot be employed here. *See* Randolph Op. 7, 8 & n.10.).

The *Hamdi* plurality used the *Mathews* framework to determine whether the mechanism used to review whether a United States citizen detained as an enemy combatant accorded with due process. 542 U.S. at 529–39. As the narrowest opinion in favor of granting the detainee some relief, the *Hamdi* plurality opinion is arguably controlling, *see Boumediene*, 553 U.S. at 814 (Roberts, C.J., and Scalia, Thomas & Alito, JJ., dissenting) (referring to the *Hamdi* plurality as the "controlling opinion"), *see also Doe v. Mattis*, 928 F.3d 1, 14 (D.C. Cir. 2019) (treating the *Hamdi* plurality as binding); *Al-Bihani*, 590 F.3d at 872 (same), and, even if not, it is certainly persuasive authority on the due process issue. *See generally Marks v. United States*, 430 U.S. 188, 193 (1977); *United States v. Epps*, 707 F.3d 337, 349 (D.C. Cir. 2013) (describing our circuit's application of the *Marks* rule). (All further references and

21

citations to *Hamdi* are to the plurality opinion unless otherwise noted.).  For this reason, we must consider *Hamdi*, and in doing so, we can glean several lessons from its analysis.

First, *Hamdi* teaches that "substantial interests lie on both sides of the scale" in the context of enemy combatant detention.  542 U.S. at 529.  The interest in freedom from detention is a fundamental liberty interest, and even though *Hamdi* involved a U.S. citizen rather than a foreign national, it cannot be gainsaid that Mr. al-Hela's liberty interest is also substantial.  *See Rasul v. Bush*, 542 U.S 466, 480–82 (2004).  "On the other side of the scale are the weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States."  *Hamdi*, 542 U.S. at 531.  Given the compelling interests on both sides, the Court focused on achieving the "proper constitutional balance" by zeroing in on whether the procedures used created a risk of erroneous detention that was "unacceptably high," and whether the additional procedures proffered by the detainee were unacceptable either because of their limited value in preventing error or because of the burdens they would place on the Executive.  *Id*. at 532–33 (citing *Mathews*, 424 U.S. at 335).  We believe it incumbent upon us to follow that framework to determine whether the habeas procedures afforded Mr. al-Hela satisfy due process.  (*Hamdi* itself belies Judge Randolph's suggestion, (Randolph Op. 7–8, citing *Weiss v. United States*, 510 U.S. 163, 177 (1994)), that the Court has categorically refused to use *Mathews* to assess procedural due process claims in contexts affected by military exigency or national security.  *Weiss* itself involved the courts-martial justice system developed by Congress rather than, as here, a habeas petition in an Article III court.  We also reject Judge Randolph's invitation to rely upon an immigration case, (Randolph Op. 7, citing *DHS v. Thuraissigiam*, 140 S. Ct. 1959

22

(2020)), when, as the Court explained, "*Boumediene*[] is not about immigration at all[,]" *Thuraissigiam*, 140 S. Ct. at 1981.).

Another word on our approach before turning to Mr. al-Hela's claims. While *Hamdi* applied the three-factor test from *Mathews*, the plurality summarized its due process holding as requiring "*meaningful* opportunity to contest" and the right to "challenge *meaningfully*" the Executive's enemy combatant finding. *Id*. at 509, 535 (emphases added). Describing the level of rigor needed to satisfy due process using the adjective "meaningful" was not a breakthrough. Indeed, *Mathews* itself quoted earlier due process precedent and equated due process with a "meaningful" opportunity to be heard. *See Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"). Further examples abound. *See*, *e.g.*, *LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."); *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (due process mandates "that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend"); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("[N]otice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (internal quotation marks omitted); *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971) ("[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard.").

Thus, it is quite notable that *Boumediene* similarly used "meaningful" to describe the level of review compelled by the

23

Suspension Clause: "[T]he privilege of habeas corpus entitles the prisoner to a *meaningful* opportunity to demonstrate that he is being held [unlawfully]." 553 U.S. at 779 (emphasis added); *see also id.* at 815 (Roberts, C.J., dissenting) (summarizing the majority as holding that the Suspension Clause grants a Guantanamo detainee a "meaningful opportunity" to demonstrate he is being held unlawfully). As a result, the review required by the Due Process and Suspension Clauses is similar in scope in the specific circumstance of an alleged enemy combatant's challenge to wartime detention. *Compare Hamdi*, 542 U.S. at 534 (finding due process is satisfied where the review mechanism sufficiently mitigates the risk of an erroneous deprivation of liberty and does not utilize procedures that fail to add value or unduly burden the government), *with Boumediene*, 553 U.S. at 785 (finding habeas substitute procedures were inadequate under the Suspension Clause because "there [was] considerable risk of error in the tribunal's findings of fact").

Context also explains why the Suspension and Due Process Clauses operate congruently in Guantanamo detainee habeas cases. In the most common applications of the writ, the district judge reviews a criminal conviction, where there is already a well-developed body of caselaw prescribing the requirements of due process, confrontation of witnesses, effective assistance of counsel and every other constitutional guarantee applicable to the proceeding employed by the Executive to justify the detention. There, "meaningful review" and "meaningful opportunity" pursuant to the Suspension Clause require the court to use factfinding and decision-making procedures that will ensure that the conduct of the criminal trial comported with those predetermined constitutional standards. But prior to *Boumediene*, there was no similarly detailed set of constitutionally-tested procedures for enemy combatant detention proceedings, such as the combatant status review

24

tribunal (CSRT) used in this case. Furthermore, the
government has not sought denial of the writ by requesting
deference to the CSRT findings or by arguing that the CSRT
mechanism comported with due process. Instead, as further
explained *infra* at 28–31, the government has abdicated
reliance on the CSRT findings and acceded to *de novo* review
of the legality of detention via the habeas proceedings. Thus,
assuming the Due Process Clause applies to Guantanamo
detainees, the habeas proceedings are not ascertaining whether
a prior detention determination (the CSRT) satisfied due
process—the habeas proceeding itself must satisfy due process.
In other words, the habeas proceeding that must provide the
"meaningful opportunity" to challenge the legality of detention
guaranteed by the Suspension Clause, *Boumediene*, 553 U.S. at
779, has also become the proceeding that must provide the
"right to notice and a meaningful opportunity to be heard"
guaranteed by the Due Process Clause, *LaChance*, 522 U.S. at
266, assuming due process applies.

In this case, the District Court measured its procedures
only against the Suspension Clause, because it ruled that the
Due Process Clause was not applicable to Mr. al-Hela. That
said, as explained below, the District Court's application of
*Boumediene*'s "meaningful opportunity" and "meaningful
review" standards under the Suspension Clause was thorough
and carefully calibrated to minimize the risk of error without
unduly burdening the Executive. For this reason, we hold that
the procedures employed by the District Court in its effort to
satisfy the Suspension Clause also provided whatever process
would be required to satisfy *Mathews*'s context-dependent Due
Process Clause framework. Given the similarity between the
procedural protections afforded by both clauses in this
particular context, we perform the *Mathews/Hamdi* analysis for
each of Mr. al-Hela's procedural due process claims. (The
distinctions Judge Randolph identifies between this case and

25

*Hamdi*, *see* Randolph Op. 4–5, do not render *Hamdi* inapposite. Because we assume without deciding that the Due Process Clause applies, we review to determine whether the present circumstances satisfy the content of the Due Process Clause right.  Thus, we use *Hamdi* as a benchmark for the most robust articulation of the standard to which a detainee in Mr. al-Hela's position could be entitled.).  With this context, let's press forward.

B.

Mr. al-Hela challenges the preponderance of evidence standard, the presumption of regularity, admission of hearsay, and access to classified evidence. We recount the facts pertinent to each of these contentions together because the issues involving these claims are intertwined.

Under the Case Management Order, the government presents its evidence supporting detention in a Factual Return, supported by exhibits.  *See* Case Management Order § I.A.  The detainee responds to the government's allegations in a Traverse.  *Id.* § I.G.  The District Court then determines whether to grant judgment on the pleadings or to hold an evidentiary hearing.  *Id.* § III.B.  The Case Management Order provides that, upon consideration of the merits, the judge "may accord a rebuttable presumption of accuracy and authenticity to any evidence the government presents as justification for the petitioner's detention."  *Id.* § II.B.  The petitioner must be given the opportunity to rebut the presumption with respect to any or all of the government's documents.  *Id.*

The District Court handled classified information within the framework of the Case Management Order and a Protective Order.  The Protective Order specified that information properly designated as classified could not be disclosed to

26

unauthorized persons.  Dkt. 138, Protective Order §§ I.C., I.D (hereinafter "Protective Order").     Accordingly, classified information could only be disclosed to persons having a security clearance at the appropriate level and a "need to know" the classified information.  *Id.* § I.D., ¶ 28; *see also* Exec. Order No. 13,526, § 4.1(a)(3), 75 Fed. Reg. 707, 720 (Dec. 29, 2009) ("A person may have access to classified information provided that . . . the person has a need-to-know the information.").  The Executive Order defines "need-to-know" as a determination made within the executive branch "that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized government function."  Exec. Order No. 13,526, 75 Fed. Reg. at 729.

Mr. al-Hela's lawyers presumably had a "need to know" classified information relating to him, and the issues raised by his petition.  As long as they had adequate security clearances, his attorneys had presumptive access to the government's classified filings and any classified discovery or evidence proffered by the government.  In contrast, because Mr. al-Hela had no security clearance, he presumptively had no access to classified filings, discovery, or evidence.

However, the governing orders also had exceptions to the presumed practice.  An amendment to the Protective Order granted an exception for any statements made by Mr. al-Hela which had been designated as classified.  Dkt. 216; *see also* Dkt. 215 at 6.  Mr. al-Hela's counsel could request to disclose those statements to him, and if the government did not agree to declassify the statement or provide Mr. al-Hela with a classified substitute or redacted version that was amenable to him, the parties could ask the District Court to resolve the dispute.  Dkt. 216; Dkt. 215 at 13.  Cutting in the other direction, the Case Management Order provided that the government could move for an exception to disclosure.  Case

27

Management Order § I.F. Thus, if the government believed that classified information was highly sensitive and should not be disclosed to Mr. al-Hela's counsel regardless of security clearances, the government could ask the District Court to review that highly sensitive classified information *in camera*. *Id*. The District Court would then determine whether the government had presented sufficient justification to preclude disclosure to Mr. al-Hela's counsel. *Id*. The District Court would hear any objections from Mr. al-Hela, and then hear any particularized arguments by the government *ex parte*.

The Case Management Order also addressed the admission and consideration of hearsay at the merits stage, specifying that the judge "may admit and consider hearsay evidence that is material and relevant to the legality of the petitioner's detention." Case Management Order § II.C. However, the Order made the admission and consideration of hearsay evidence contingent on the showing that it "is reliable and that the provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security." *Id*. Like the procedure used for the presumption of regularity, the Order stated that a party opposing admission of hearsay must be given an "opportunity to challenge the credibility of, and weight to be accorded, such evidence." *Id*.

The Case Management Order further provides that after the close of discovery, either party can file a motion for judgment on the record. *Id*. § III.A. If the District Court concludes that material issues of fact preclude a ruling on the papers, then it must hold an evidentiary hearing at which the government bears the burden of proving by a preponderance of

28

the evidence that the petitioner is an enemy combatant and lawfully detained. *Id.* §§ II.A, III.B.

Those are the procedures in the abstract. Here is how they played out in this case.

As mentioned, Mr. al-Hela filed his petition in 2005 asserting that he was unlawfully detained. In late 2010, following the entry of the Case Management Order, the government filed its Factual Return setting forth the asserted legal and factual basis justifying his detention. Much of the information in the Return's narrative, and many of the 63 attached exhibits, contained classified information and were therefore not accessible to Mr. al-Hela. *See Abdul-Rahman Al-Hela v. Obama*, No. 05-cv-1048, 2016 WL 2771804, at *1 (D.D.C. May 13, 2016). Instead, the government prepared an unclassified summary that provided Mr. al-Hela with a broad overview of most of the facts and allegations in the government's Return. *Id.* However, Mr. al-Hela's counsel had access to the entirety of the 2010 Factual Return. *Id.*

Mr. al-Hela filed a motion for access to the Factual Return, asserting that he did not have adequate notice of the charges against him and a meaningful opportunity to respond. *Id.* The District Court denied the motion, ruling that the government had shown that further disclosure would harm national security by revealing intelligence sources and methods. *Id.* at *2–3. Further, the District Court ruled that the unclassified summary disclosed to Mr. al-Hela, in conjunction with the disclosures to his lawyers, allowed him "the requisite opportunity to contest his detention." *Id.* at *3.

In the meantime, the government produced exculpatory evidence to Petitioner and responded to his discovery requests, producing over 500 additional documents. Again, many of

29

those documents were intelligence reports and other material containing classified information, so they were disclosed to Mr. al-Hela's counsel, but not to him.  However, there was some material that the government did not want to disclose even to counsel, and the government filed motions for exceptions to disclosure with respect to that material.  Some of the government's motions concerned potentially exculpatory evidence—the government contended that the material was not exculpatory, but it nevertheless requested an *in camera, ex parte* review and ruling from the District Court to ensure compliance with its discovery obligations.  In at least one instance, the District Court disagreed with the government, deemed the material exculpatory, and ordered its disclosure. *See* Resp. Br. Add. 4–5; *Ex Parte* Order of May 9, 2016.

Most of the government's requests for *in camera*, *ex parte* review involved inculpatory classified information that the government considered too sensitive to disclose to Mr. al-Hela's counsel, even via classified substitute.  The District Court made clear that it did not wish to consider any inculpatory evidence going to the merits on an *ex parte* basis unless absolutely necessary.  As such, the District Court pressed the government on each of its requests for exception. In a lengthy series of *ex parte* hearings and orders spanning several months, the District Court denied many of the motions for exception.  Instead, the District Court ordered the government to prepare classified substitute language for the highly sensitive portions of the documents and to produce each document with as few redactions as possible.  The District Court required that the government provide detailed justifications for each redaction in every document, which were sometimes rejected, resulting in an order to eliminate certain redactions so that Mr. al-Hela's counsel would have adequate context to assess the information in the documents.  The District Court scrutinized the substitutes with equal care,

30

sometimes ordering the government to create more fulsome versions. *See Ex Parte* Hr'g Trs. of Apr. 9, 2015, Apr. 14, 2015 & Apr. 28, 2015; *Ex Parte* Orders of June 30, 2015, Aug. 25, 2015, Dec. 17, 2015, Apr. 19, 2016, May 9, 2016 (two orders), May 27, 2016, Dec. 23, 2016 & Jan. 22, 2018. *See generally* Resp. Br. Add. 4–5. As a result of this back and forth, the government withdrew its reliance on some documents altogether, apparently because it did not wish to produce the more robust classified substitute or the less-redacted version of the document to Petitioner's counsel. *Ex Parte* Hr'g Trs. of Apr. 9, 2015, Apr. 14, 2015 & Apr. 28, 2015; *see also* Dkt 413-1. In addition, the government agreed not to rely upon redacted material in any documents to support detention. Dkt. 435 at 5; Dkt. 441 at 6.

In any event, the upshot is that the government presented only a handful of documents in support of Mr. al-Hela's detention to the District Court completely *ex parte*, and the government only did so after the District Court found that the material being withheld was especially sensitive and that its disclosure to counsel—even in redacted form with substitute language—would risk harm to national security. *Ex Parte* Orders of May 9, 2016 & May 27, 2016. With respect to most of the documents the government sought to exempt from disclosure, the District Court ordered them disclosed with adequate substitute language for the highly sensitive information and with as few redactions as possible. And for context, recall that the documents subject to the motions for exemption from disclosure were a small subset of the hundreds of documents that were produced to counsel.

After the close of discovery, the government filed an Amended Factual Return that functioned as a compilation of the evidence upon which it intended to rely at the merits hearing to support detention. Per its standard practice in these

31

cases, the government did not rely solely upon the CSRT's findings to support detention, and the government did not ask the District Court to defer to any findings or rulings of the Tribunal when adjudicating Mr. al-Hela's petition. *See* Oral Arg. Tr. 44, 83, 94. *See generally Al-Adahi v. Obama*, 613 F.3d 1102, 1105 n.2 (D.C. Cir. 2010) (observing that the government followed this practice). Petitioner then filed his Traverse, setting forth his legal argument and evidence in support of the contention that he is unlawfully detained. Each party filed motions for judgment on the record, which functioned essentially as pre-trial briefs. The District Court then held a hearing on the merits of the petition, at which Mr. al-Hela was the only live witness. The remaining evidence presented by the government and Petitioner was proffered via affidavit and documentary exhibits. Following post-trial briefing, the District Court denied the petition in a written decision in which it applied the presumption of regularity to the government's evidence, admitted and credited some hearsay presented by each party, and ruled that the government had proved by a preponderance of the evidence that Mr. al-Hela is an enemy combatant and is therefore lawfully detained.

C.

Relying principally on *Addington v. Texas*, 441 U.S. at 423, 427, 433, Mr. al-Hela claims that use of the preponderance of the evidence standard of proof to determine whether he is an enemy combatant violates due process. In *Addington*, the Court applied the three factors from *Mathews* to conclude that the preponderance of the evidence standard in civil commitment proceedings—for those alleged to be mentally ill and dangerous—violates due process. *Id*. at 425–32. Instead,

32

the Court held that the clear and convincing evidence standard must govern.  *Id*. at 432–33.

For several reasons, we find *Addington* and its progeny distinguishable.  *See generally Foucha v. Louisiana*, 504 U.S. 71 (1992). We acknowledge that the private interest in freedom from involuntary detention as an enemy combatant is akin to an individual's interest in avoiding confinement in a mental hospital, and the higher standard of proof also reflects the importance we place on human liberty.  *See Addington*, 441 U.S. at 425–26.  And of course, the use of the more stringent standard of proof would reduce the risk of an erroneous enemy combatant determination, just as the clear and convincing evidence standard reduces the risk that a person who is not mentally ill or dangerous will be erroneously committed.  But that is where the similarities end.

First, *Addington* concluded that the state interest is not furthered by use of the preponderance standard for civil commitment.  At the time, every state but one used a higher standard than preponderance of the evidence, thus reflecting the prevailing state interest in protecting individual rights of the mentally ill and those who periodically experience emotional difficulties.  *Id*. at 426–27.  By contrast, the pertinent U.S. military regulations, which are domestic law based upon internationally recognized law of war principles, *see Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013); *Al-Bihani v. Obama*, 619 F.3d 1, 13–14 (D.C. Cir. 2010) (Mem.) (Kavanaugh, J., concurring in the denial of rehearing *en banc*), have long provided that enemy combatant status is to be determined by the preponderance of the evidence.  U.S. Dep'ts of the Army, the Navy, the Air Force, and the Marine Corps, Army Regulation 190–8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees ch. 1, § 1–6(e)(9) (Oct. 1, 1997).  These regulations reflect the state

33

interest in supporting the preponderance standard in this context, in a way that domestic law did not support the state interest in applying the preponderance standard in the civil commitment context.

Most importantly, the risk of harm analysis is quite different here than in the civil commitment context. *Addington* rejected the preponderance standard because that standard allows litigants to "share the risk of error in roughly equal fashion," 441 U.S. at 423, and "[t]he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state," *id*. at 427. Given "the particular dangers of terrorism in the modern age," the possible harm to the state if an enemy combatant is erroneously released is much greater than the possible harm posed by the typical person subject to a civil commitment proceeding. *Boumediene*, 553 U.S. at 752; *see also id*. at 797 ("The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security."). For similar reasons, we are not persuaded that cases mandating the clear and convincing evidence standard in the deportation and denaturalization contexts are forceful analogues here because there was no consideration in those cases that the imposition of a higher standard of proof could create a significant risk to national security. *See Woodby v. INS*, 385 U.S. 276, 285–86 (1966); *Nowak v. United States*, 356 U.S. 660, 663–64 (1958).

With so much at stake for national security, we conclude that it is appropriate that Mr. al-Hela, a foreign national detained as an enemy combatant and suspected of substantially supporting designated terrorist organizations, share the risk of error nearly equally with U.S. society. *Cf. Boumediene*, 553 U.S. at 766–71 (ruling that whether petitioners were U.S. citizens was relevant to the Suspension Clause analysis). Our

34

conclusion is buttressed by the fact that domestic law interprets the preponderance of the evidence standard as consistent with the requirements of the law of war for this type of determination. Army Regulation 190–8 at ch. 1, §§ 1–1, 1–6(a), (e)(9); *see Al Warafi*, 716 F.3d at 629. We therefore uphold the District Court's use of the preponderance of the evidence standard as consistent with the requirements of the Due Process Clause.

D.

As noted above, the Case Management Order specified that the judge "may accord a rebuttable presumption of accuracy and authenticity to any evidence the government presents as justification for the petitioner's detention." Case Management Order § II.B. In its opinion on the merits, the District Court ruled that "intelligence reports and interrogation reports are entitled to the presumption of regularity." *Al Hela*, unclass. slip op. at 22. Mr. al-Hela contends that these government documents were not worthy of such deference and that placing the burden on him to rebut the presumption of regularity denied him due process. We are not persuaded.

"The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) (internal quotation marks and citation omitted). As used in the Case Management Order and applied by the District Court, the presumption of regularity assumes that the government's documents "accurately identif[y] the source and accurately summarize[] [the source's] statement, but [] implies nothing about the truth of the underlying non-government source's statement." *Latif v. Obama*, 677 F.3d 1175, 1180 (D.C. Cir. 2012). This presumption can be rebutted

35

if a petitioner demonstrates internal inconsistencies or inconsistencies with other evidence. *Id*. at 1185–86.

Applying the presumption of regularity did not violate due process. Unlike the hearsay exception for official government records, *see* FED. R. EVID. 803(8), the presumption of regularity does not go to the truth of any statement contained in the government's documents, but merely to whether the contents of the statements were accurately recorded. As such, there was not a significant risk that use of the presumption of regularity increased the chance of error, as would have been the case if this was a presumption that the statements in the documents were actually true. The District Court scrutinized the government's documents and provided opportunities for Mr. al-Hela to raise concerns about the authenticity or accuracy of the documents. *See Al Hela*, unclass. slip op. at 24–28 (detailing the evaluation of the evidence).

Returning explicitly to the *Mathews* calculus, the government interest in the application of the presumption is quite significant. For good reason. The administrative burdens that would accompany having to authenticate and lay a foundation for the introduction of each of the dozens of intelligence reports and other documents at issue would require testimony from the documents' authors. *See Latif*, 677 F.3d at 1179 (eliminating the presumption of regularity "would subject all such documents to the he-said/she-said balancing test of ordinary evidence"). Those authors—members of the military, intelligence, and diplomatic communities located all over the world—would need to be hauled into court to testify as to whether a document was accurately recorded. *See* FED. R. EVID. 901. How often is that additional process likely to uncover an error of material proportions? Like the public records exception to the rule against hearsay, the presumption of regularity can be justified on "the assumption that a public

36

official will perform his duty properly and the unlikelihood that he will remember details independently of the record." 1972 Adv. Cmte. Note to Fed. R. Evid. 803, Note to paragraph (8). We acknowledge that records are not infallible, and Mr. al-Hela and amicus point out instances of transcription and other errors that have been discovered. But we must weigh the likelihood that any material error will be discovered against the burden of bringing every single document's author into court. On balance, these burdens far outweigh the probable value of eliminating the presumption of regularity altogether, particularly since the presumption is rebuttable. That is enough to convince us that abandoning the presumption of regularity is not appropriate under *Mathews*.

Accordingly, we decline Mr. al-Hela's invitation to strike down the presumption of regularity as violative of due process.

E.

Next, Petitioner contends that the broad admission of hearsay in his case violated due process, particularly because, in many documents the identity of the declarant was redacted or the documents contained multiple layers of hearsay.

These contentions face serious headwinds from Supreme Court precedent. It is well settled that the requirements of due process are flexible and highly dependent on context. Hence, whether due process mandates the use of the Federal Rules of Evidence in a civil or criminal trial is not dispositive of whether the same is required in this quite different context. *See, e.g.*, *Morrissey*, 408 U.S. at 481–89 (due process did not prohibit admission of letters, affidavits and other documents in parole revocation hearing even though not admissible in a criminal trial). The Court reiterated this message in *Hamdi*, observing that the exigencies of war "may demand that" enemy-

37

combatant proceedings "be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." 542 U.S. at 533. For instance, it observed that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Id*. at 533–34. The exigencies that *Hamdi*'s context-specific approach highlighted may differ now from what they were in the immediate aftermath of September 11, 2001. But, at a minimum, the evolving context reinforces *Hamdi*'s premise that the admission of hearsay in enemy combatant proceedings is compatible with the Due Process Clause, so long as the district court carefully assesses whether it is indeed "the most reliable available evidence." *Id*. at 534.

The District Court carefully evaluated all the evidence proffered by the government and assessed the reliability of all hearsay. Cognizant of its responsibility to ensure that the evidence relied upon for detention was reliable, the District Court excluded or refused to rely upon some of the hearsay statements proffered by the government after concluding that they were unreliable or insufficiently corroborated. *Al Hela*, unclass. slip op. at 28, 41–42. The District Court made multiple reliability findings throughout its opinion, *see id.* at 27–28, 34, 39–42, 45, 50, 58, 65, 72–73, 75, and where the District Court chose to rely on certain hearsay statements over others, it explained its reasoning for finding that evidence more reliable. *See id*. at 44, 46. This is the type of rigorous evidentiary analysis we expect from the District Court. *See Odah*, 611 F.3d at 14. Both in its opinion and in the numerous hearings and rulings regarding discovery and disclosure, the District Court demonstrated that it meticulously reviewed all the evidence proffered by the government to compare and

38

contrast the various hearsay statements and determine which statements were corroborated and reliable.

These actions, taken as a whole, "sufficed to provide meaningful protections of due process interests in adequate notice and accurate decision making, and prevent government overreach." *Fares v. Smith*, 901 F.3d 315, 319 (D.C. Cir. 2018). As a result of such careful and discerning review of the documents containing hearsay, as evidenced by the District Court's numerous reliability findings, we find no due process violation related to the admission of hearsay.

We have sought, within the limits of a substantially classified record, to describe the "rigorous evidentiary analysis" in which the District Court engaged because that is what provides the grounding for our considered conclusion that "th[o]se actions, taken as a whole," satisfied the *Mathews* due process balancing. Op., *supra* at 36, *see id.* at 25–39. All we are saying is that while seeking to craft case management procedures that satisfied the Suspension Clause, the District Court created a mechanism, as implemented here, that also satisfies the Due Process Clause. It is hardly surprising that procedures designed to provide "meaningful review" pursuant to the Suspension Clause would coincidentally provide a "meaningful opportunity to be heard" as required by the Due Process Clause and compatible with *Hamdi*. Indeed, when drafting the Case Management Order, the District Court indicated that it was "proceeding with the caution" advised by *Hamdi*, Dkt. 155, Case Management Order Introduction (quoting *Hamdi*), and it adopted habeas procedures very similar to those approved in *Hamdi,* citing the *Hamdi* plurality no less than seven times in the Order. *See* Dkt. 155, Case Management Order §§ I.A., I.E.2., I.G., II.B., II.C., 1.F.; Dkt. 172; Case Management Order § 1.G. We therefore hold, assuming the Due Process Clause applies, that Mr. al-Hela's

39

procedural due process rights were not violated.  The panel rejected Mr. al-Hela's Suspension Clause claims and those claims are not before us on rehearing.  As to the criticism that we have "appl[ied] a watered-down version of the Due Process Clause[,]" Rao Op. 24, we note that we proceeded with the same caution and in the same manner as the plurality in *Hamdi*, which hardly employed a "watered-down" application of the Clause.

F.

Mr. al-Hela makes two final due process challenges related to the District Court's procedures for handling access to classified information.  He contends that his inability to review classified information violated due process because he was not given adequate notice of the charges against him and therefore could not adequately respond.  Further, and most troublingly, he contends that the *ex parte* review of government evidence by the District Court violated due process.

The government argues that our consideration of this issue is wholly governed by *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009) (per curiam).  But *Al Odah* involved what discovery the petitioner was entitled to prior to filing his Traverse.  *See id.* at 542–43.  *Compare Odah*, 611 F.3d at 11 (appeal after hearing on the merits), *with Al Odah*, 559 F.3d at 542–43.  By contrast, this case implicates not just whether the detainee's counsel has access prior to filing the Traverse, but also whether counsel will ever have the opportunity to see the document prior to or during the merits determination.  This distinction is critical.  Procedures whereby all the government's evidence is not disclosed in advance of trial are commonplace, including in almost all criminal trials. *See*, *e.g.*, FED. R. CRIM. P. 16(a)(2) (defendant not entitled to pretrial discovery of prosecution witnesses' statements).  However,

40

procedures whereby neither the person affected by the government's proposed action, nor his counsel, are permitted to view all the government's evidence during the merits determination are rare, and any such procedures raise more serious due process concerns regarding notice and opportunity to rebut.  Contrary to the government's view, *Al Odah* did not address this distinction.

The District Court was highly cognizant of the challenges posed by the nature of this case and put forth a yeoman effort to mitigate the harms to Mr. al-Hela and his counsel.  Petitioner was given an unclassified summary of the Factual Return.  We note that Army Regulation 190–8, which reflects the domestic interpretation of international law requirements for the treatment of prisoners of war, allows a military tribunal to exclude the detainee from hearing the classified evidence introduced against him.  *See* Army Reg. 190–8 at § 1–6(e)(3) ("Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.").  Thus, the District Court continued its general practice of providing Petitioner as helpful a substitute as federal law would allow.

With respect to the government's motions to except certain documents from disclosure to Mr. al-Hela's counsel, the District Court proceeded with extreme care.  The default position of the Case Management Order is that "the government shall, unless granted an exception by the Merits Judge, provide the petitioner's counsel with the classified information, *provided the petitioner's counsel is cleared to access such information*."  Dkt. 172, Case Management Order § 1.F. (emphases added).  A problem arose because Mr. al-Hela's counsel held clearances at the Secret level, but some of the government's evidence in support of detention was classified as Top Secret or deemed Sensitive Compartmented

41

Information, which Petitioner's counsel did not have clearance to view. Top Secret information is classified as such because the Executive has concluded that its unauthorized disclosure "could reasonably be expected to cause exceptionally grave damage to the national security." 41 C.F.R. § 105-62.101(a). It is a violation of federal law to disclose classified information to someone who has not been cleared to receive it. *See* 18 U.S.C. § 798; Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).

In a footnote, Mr. al-Hela states that "[i]f this was the reason for nondisclosure, then the Government should have allowed [his] counsel to apply for Top Secret clearances[.]" Pet'r Br. 54 n.16. But Mr. al-Hela cites nothing from the District Court record indicating that his counsel sought Top Secret or Sensitive Compartmented Information clearances, or sought to associate with co-counsel who already held the requisite clearances. Lacking any record allowing us to assess meaningfully any objection to inadequate clearance, we do not opine on the more difficult question of whether the District Court can consider classified evidence in support of detention at the merits stage on an *ex parte* basis where the detainee's counsel held the requisite security clearance or the government unreasonably withheld granting the requisite clearance.

Before hearing from the government on the motions for exception from disclosure, the District Court allowed Petitioner's counsel to explain their theory of how and why certain classes of documents were exculpatory. This gave the court the benefit of that reasoning when reviewing the documents with the government *ex parte* and issuing a ruling. Indeed, as stated above, the District Court ordered the disclosure of some documents as exculpatory over the government's initial objection. *See* Resp. Br. Add. 4–5; *Ex Parte* Orders of May 9, 2016 & Jan. 23, 2018. With regard to

42

any highly sensitive, classified information that pertained to the government's basis for detaining Petitioner, the District Court denied most of the requests to exempt the documents completely from disclosure to Mr. al-Hela's counsel. Instead, the District Court required the government to provide a copy of the document with the fewest redactions possible, and to justify each and every redaction. In addition, the District Court required the government to provide an adequate summary of the highly sensitive information wherever possible, such that Mr. al-Hela's counsel had a sufficient opportunity to rebut the government's asserted factual basis for Petitioner's detention (and to exploit exculpatory information). In several instances, the government elected to withdraw its reliance upon a document altogether rather than comply with the disclosure order. As a result, only a small number of documents in support of Mr. al-Hela's detention were reviewed by the District Court *ex parte* at the merits stage, and only after a finding that the material being withheld was especially sensitive and that its disclosure—even in redacted form or with substitute language—would risk harm to national security. (Our review of this issue was unnecessarily difficult because the government failed to provide us with the dispositions of each motion for exception, the District Court docket did not initially list all of the *ex parte* proceedings, and the exhibit list did not identify which *ex parte* exhibits were considered by the court at the merits stage, oversights that we expect not to recur in future appeals. With the assistance of the District Court and the government, we were later able to reassemble and review the entire record.).

The District Court faced a daunting challenge. As the Supreme Court ruled in *Hamdi*, 542 U.S. at 533, the core of procedural due process requires that the petitioner "receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions[,]"

43

and the petitioner cannot respond to or rebut evidence in support of detention if his lawyer is not even provided a classified summary of that evidence.  On the other side of the scale, "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."  *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam).

In light of these competing interests, the District Court compelled the government to provide adequate substitutions and the fewest possible redactions, so that documents classified as Top Secret or containing Sensitive Compartmented Information could be reclassified at the Secret classification level and therefore disclosed to Mr. al-Hela's counsel pursuant to federal law and the Protective Order.  Under the circumstances, we do not believe that the District Court abused its discretion in failing to order either disclosure of those highly sensitive documents to Mr. al-Hela's counsel or the exclusion of those documents from the government's case.

The *ex parte* documents consisted of only a very small subset of the government's case, both quantitatively and qualitatively.  The District Court's reliance on *ex parte* evidence was tightly circumscribed and generally used not to break new ground, but rather to test whether other evidence was corroborated.  For example, when weighing aspects of Mr. al-Hela's testimony that apparently conflicted with his own earlier statements, the District Court agreed with the government's contention that the court should credit the earlier statements.  In rejecting Mr. al-Hela's argument that those earlier statements must have been mistranslated, the court cited an array of evidence, only one facet of which drew from *ex parte* materials.  J.A. 152–53.  Mr. al-Hela was able to (and

44

frequently did) challenge the government's contentions on other bases, despite the conceded limitations posed by his counsel's access restraints. *E.g.*, J.A. 190. And the District Court's use of *ex parte* evidence did not invariably favor the government—in one instance, the court referenced *ex parte* evidence to reject as unreliable certain evidence the government had proffered. J.A. 156–57 n.10. Thus, although the District Court did not have the full benefit of adversarial presentation, the record shows that the District Court considered *ex parte* documents only to a very minimal degree, and that it did so with the inquisitive and evenhanded manner required under the extraordinary circumstances. *See also* Oral Arg. Tr. 46:11–15 (per government counsel, "the [D]istrict [C]ourt relied on *ex parte* documents in four instances and only in each instance to make a credibility determination with respect to a source, three times finding the source credible and one time finding the source not credible").

This judicious and common-sense approach sufficiently reduced the risk of an erroneous deprivation of liberty while mitigating the burdens to both parties as much as possible. Though providing additional disclosures would no doubt have been helpful to Mr. al-Hela and his counsel, the provision of that additional process is outweighed by the government's specifically identified competing national security interests in nondisclosure of this highly sensitive information. As the Supreme Court admonished in *Boumediene*, "the Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible." 553 U.S. at 796. While the question is close, we hold that the balance struck by the District Court in this case comported with the Due Process Clause, given the rigorous review of classified substitutes, the minimization of redactions, the non-reliance on redacted material in support of

45

detention, the minimal amount of *ex parte* evidence, and the close scrutiny of the reliability of the *ex parte* evidence and all hearsay evidence.  We doubt that anything less would suffice.


IV.

We turn next to Petitioner's argument that his continued and prolonged detention without charge or trial amounts to a substantive due process violation.

Substantive due process "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty[.]" *Salerno*, 481 U.S. at 746 (internal citations and quotation marks omitted); *see also Ali*, 959 F.3d at 369–70 (defining "arbitrary" to include any government action that can "fairly be said to shock the conscience"); *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006) ("[T]he conscience-shock inquiry is a threshold question in a due process challenge to executive action." (citations and quotation marks omitted)).  Put another way, the substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  *Foucha*, 504 U.S. at 80 (quotation marks omitted).  In sum, the substantive aspect of due process tests the government's justification and authority to deprive Mr. al-Hela of his liberty.

A.

Mr. al-Hela claims that two decades of indefinite detention without charge or trial exceed whatever original purpose may have existed for his detention and is now punitive.

Again assuming (without deciding) that substantive due process protections apply to noncitizen Guantanamo detainees,

46

we reject Petitioner's contention that the duration of his detention, in and of itself, entitles him to relief. The length of Mr. al-Hela's detention is neither arbitrary nor conscience-shocking merely because the AUMF imposes no time limits on the detention of enemy combatants. "[Mr. al-Hela]'s detention is long because the armed conflict out of which it arises has been long[.]" *Ali*, 959 F.3d at 370. Although American troops withdrew from Afghanistan in August 2021, Petitioner does not argue that the armed conflict out of which his detention arises has concluded, and because "[w]ar does not cease with a cease-fire order," the President's war powers "[are] not exhausted when the shooting stops." *Ludecke v. Watkins*, 335 U.S. 160, 167 (1948). We have no occasion here to consider whether, in circumstances in which an armed conflict may continue essentially in name only, the notion that a lengthy conflict supports a commensurately lengthy detention might give way. *Cf. Hamdi*, 542 U.S. at 521 ("If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel."). Petitioner makes no such argument in this case.

Insofar as Mr. al-Hela contends that his detention violates substantive due process principles because he was never an enemy combatant, that claim too is rejected. The District Court found Mr. al-Hela more likely than not substantially supported al Qaeda and its associated forces. As the panel determined, there was sufficient evidence of Mr. al-Hela's status as an enemy combatant and the District Court's finding was not clearly erroneous. *Al Hela*, 972 F.3d at 134.

## B.

Prior to argument, the Periodic Review Board, a body that reviews the continued detention of individuals at Guantanamo pursuant to Executive Order 13,567, determined by consensus "that continued law of war detention [of Mr. al-Hela] is no

47

longer necessary to protect against a continuing significant threat to the security of the United States." *See* Periodic Review Board Determination. Mr. al-Hela argues that since he is no longer a threat to the United States, his continued detention is arbitrary and therefore violative of substantive due process. *See*, *e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (substantive due process violated by "the exercise of power without any reasonable justification in the service of a legitimate governmental objective"); *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 944 (D.C. Cir. 1988) (substantive due process prohibits "action that is 'legally irrational [in that] it is not sufficiently keyed to any legitimate state interests'") (citation omitted). For several reasons, we believe that this substantive due process claim should be remanded to the District Court and express no views on its merits.

First, given the finding of the Periodic Review Board, the Executive Order mandates that "the Secretaries of State and Defense shall be responsible for ensuring that vigorous efforts are undertaken to identify a suitable transfer location for [Mr. al-Hela] outside of the United States. . ." § 4(a), 76 Fed. Reg. at 13,279. At oral argument, Petitioner's counsel did not clearly specify how the relief Mr. al-Hela could obtain if he prevailed on the substantive due process claim would differ from the undertakings mandated by the Executive Order. *See*, *e.g.*, Oral Arg. Tr. 11–14. If the Executive Order provides Mr. al-Hela with the same relief that he could obtain from a successful substantive due process challenge, the constitutional claim could be moot (particularly if Mr. al-Hela can enforce any aspect of the Executive Order). This issue was not briefed by the parties and should be addressed by the District Court in the first instance. Again, we express no view on its merits.

48

Second, in setting forth its legal authority for detention below, the government conceded that "[t]he detention authority conferred by the AUMF is necessarily informed by principles of the laws of war." Dkt. 192 at 1 (citing *Hamdi*, 542 U.S. at 521); *see also* National Defense Authorization Act for Fiscal Year 2012 § 1021(a) ("Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority for the Armed Forces of the United States to detain covered persons . . . pending *disposition under the law of war*.") (emphases added). Thus, the government agreed that "[p]rinciples derived from law-of-war rules governing international armed conflicts . . . must inform the interpretation of the detention authority Congress has authorized for the current armed conflict." Dkt. 192 at 1. The Executive Order provides that "[c]ontinued law of war detention is warranted for a detainee . . . if it is necessary to protect against a significant threat to the security of the United States[,]" 76 Fed. Reg. at 13,277. Thus, contrary to the protestations of Judge Rao (Rao Op. 2, 21, 27–28, 31), statements of the political branches *could be* construed as suggesting that law of war principles have at least some relevance, since the Executive concedes those principles "inform" the President's authority under the AUMF and Congress cited law of war principles when affirming the President's detention authority in 2012.

Accordingly, the Periodic Review Board's finding that Mr. al-Hela's detention is no longer necessary to protect against a significant threat to the United States *could be* construed as implicitly undermining the contention that Mr. al-Hela's detention remains justified by the law of war and the AUMF. The Periodic Review Board also found a "lack of indication that [Mr. al-Hela] harbors extremist beliefs or intentions to reengage," Periodic Review Board Determination, which is significant given that the "purpose of [law of war] detention is

49

to prevent captured individuals from returning to the field of
battle and taking up arms once again[,]" *Hamdi*, 542 U.S. at
518; *cf. Ali*, 959 F.3d at 370 ("Ali's detention still serves the
established law-of-war purpose of preventing captured
individuals from returning to the field of battle and taking up
arms once again.") (formatting modified and internal quotation
marks and citation omitted).   The question of whether the
Periodic Review Board's Determination renders Petitioner's
continued detention unlawful under the AUMF should be
resolved.   Whether the laws of war place *any* limits on the
President's detention authority under the AUMF is an open
question in our circuit and should be addressed by the District
Court in the first instance.   Judge Rao contends (Rao Op. 27–
28) that *Al-Bihani* held that international laws of war cannot
limit the President's authority under the AUMF.   *See* 590 F.3d
at 871.   But as she acknowledges, Rao Op. 27–28, seven of the
nine members of the *en banc* Court denied the petition for
rehearing.   In doing so, the majority of the *en banc* Court
explained that the *Al-Bihani* panel's law-of-war discussion was
"not necessary to the disposition of the merits" and was
therefore nonbinding dictum.   *See Al-Bihani*, 619 F.3d at 1
(Mem.) (Sentelle, C.J., and Ginsburg, Henderson, Rogers,
Tatel, Garland & Griffith, JJ., concurring in the denial of
rehearing *en banc*).   We adhere to that position today.

Even if, as the government has argued, the Determination
does not create any right or benefit that is enforceable by Mr.
al-Hela, *see* Executive Order 13,567 § 10(c), 76 Fed. Reg. at
13,280, the government's factual findings could nonetheless be
relevant to a court's consideration of whether Mr. al-Hela's
continued detention violates the law of war and thus potentially
contravenes the statutory authority conferred by the AUMF.
To be sure, Congress has said that "the purpose of the periodic
review process is not to determine the legality of any detainee's
law of war detention," National Defense Authorization Act for

50

Fiscal Year 2012 § 1023(b)(1); *see also* Executive Order 13,567, 76 Fed. Reg. at 13,279 ("The process established under this order does not address the legality of any detainee's law of war detention[]"), but it is a different question whether factual findings underlying a Periodic Review Board decision are admissible and how, if at all, such findings affect the legality of a petitioner's detention. *Cf. Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 & n.13 (noting that whether "legal conclusions" from an official report are admissible under Federal Rule of Evidence 803(8) is a different question than whether "findings of fact" in an official report of a legally authorized investigation are admissible). Because the effect of the government's findings on its AUMF detention authority was not briefed by the parties, and, if Mr. al-Hela were to prevail, this statutory claim would afford a non-constitutional ground for granting relief, the issue should be addressed by the District Court in the first instance.

Once again, we express no view on the merits of Mr. al-Hela's statutory claim or his substantive due process claim. (Judge Rao incorrectly posits that by expressing no view on the merits of the substantive due process claim, we have nonetheless somehow "effectively conclude[d] that al-Hela enjoys the protections of substantive due process." Rao Op. 31.). Rather, we remand the statutory claim to enable the District Court to consider the effect, if any, of the Periodic Review Board's Determination on the lawfulness of Mr. al-Hela's detention under the AUMF. As such, the District Court need only reach the merits of the overlapping substantive due process claim if it finds that the claim is not moot and that the statutory claim is without merit.

\* \* \*

We affirm the finding that Mr. al-Hela is an enemy combatant because the District Court's procedures at the merits

51

stage, which satisfied the Suspension Clause, also provided what the Due Process Clause would require.  Likewise, assuming due process protections apply to Guantanamo detainees, we reject Petitioner's substantive due process challenge based solely on the length of his detention.  We do, however, remand to the District Court Petitioner's claim that continuing to detain him if he no longer presents an ongoing threat violates substantive due process.  In doing so, we hold that before the District Court considers the substantive due process claim, it should consider the effect of the Periodic Review Board's Determination on mootness and the President's authority to continue to detain Mr. al-Hela under the AUMF.

Although our dissenting colleagues disagree with the reasoning set forth in this opinion, the Court largely agrees upon the outcome.  All members of the *en banc* Court agree that we should affirm the District Court's rejection of Mr. al-Hela's procedural due process claims.  All members of the *en banc* Court also agree that we should affirm the denial of Mr. al-Hela's claims that his detention violates substantive due process because there is insufficient evidence that he was an enemy combatant, or solely because of the lengthy duration of the military conflict.  However, while our dissenting colleagues would dismiss Mr. al-Hela's claim that his continued detention violates substantive due process because he no longer poses a significant threat to the United States, we remand this claim to the District Court for further proceedings consistent with this opinion.

*So ordered.*

PILLARD, *Circuit Judge*, with whom ROGERS and MILLETT, *Circuit Judges*, join, concurring:

I join the majority opinion in full.  The *en banc* court assumes without deciding that the Due Process Clause applies and holds, after careful review of the record, that the District Court's exacting review of Mr. al Hela's habeas petition, including strict limitation of *ex parte* evidence, provided him what the Due Process Clause would afford.  I write separately to underscore that established precedent provides ample footing for the court's predicate assumption that the Due Process Clause's protections could apply to detainees at Guantanamo, including Mr. al Hela.  Because the United States has total and indefinite control amounting to *de facto* sovereignty over Guantanamo Bay, non-U.S. citizens detained there may have some constitutional protections beyond those provided by the Suspension Clause.  The courts, not the Executive Branch, decide the reach of constitutional rights.  And no established precedent bars the court from assuming the applicability of the Due Process Clause so as to decide this case in the narrowest way.

*    *    *

The dissents insist that, under "settled law," "aliens outside the territorial United States do not possess constitutional rights."  Rao Op. 1-2; *see also* Randolph Op. 3, 6.  They advert to a binary, sovereignty-based approach under which the Constitution protects non-U.S. citizens only when they are within, and not beyond, the sovereign territory of the United States.  That analysis ignores a third category that the Supreme Court crystallized and held decisive in *Boumediene v. Bush*, 553 U.S. 723 (2008).  Referring to Guantanamo Bay, the Court in *Boumediene* explained that, where the United States "maintains *de facto* sovereignty over [a] territory" due to "its complete jurisdiction and total control" over it, the Constitution, as applied to foreign citizens, does not

2

"necessarily stop[] where *de jure* sovereignty ends." *Id.* at 755; *see id.* at 764-65, 770-71.

Today the *en banc* court permissibly reads *Boumediene* to leave open the possibility that non-U.S. citizens whom the U.S. government detains at Guantanamo are entitled to due process. Maj. Op. 12-18.   As the Supreme Court recounted in *Boumediene*, "[t]he United States has maintained complete and uninterrupted control of [Guantanamo] [B]ay for over 100 years," dating back to the end of the Spanish-American War in 1898.  553 U.S. at 764.  Although the 1903 Lease Agreement between the United States and Cuba "recognized . . . that Cuba retained 'ultimate sovereignty' over Guantanamo, the United States continued to maintain the same plenary control it had enjoyed since 1898." *Id.* at 765.  Because Guantanamo remains under the "absolute" and "indefinite" control of the United States, the Court explained, "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 768-69.  Within such "*de facto*" U.S. territory, *id.* at 755, the Court recognized that it is possible for "noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty [to] have . . . rights under our Constitution," *id.* at 770; *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (reaffirming that "under some circumstances, foreign citizens in the U.S. Territories—or in 'a territory' under the 'indefinite' and 'complete and total control' and 'within the constant jurisdiction' of the United States—may possess certain constitutional rights" (quoting *Boumediene*, 553 U.S. at 755-71)).

The *Boumediene* Court relied on "separation-of-powers" principles in recognizing that at least some constitutional protection applies to Guantanamo detainees:

3

> [T]he Government's view is that the Constitution
> ha[s] no effect [at Guantanamo], at least as to
> noncitizens, because the United States disclaimed
> sovereignty in the formal sense of the term. The
> necessary implication of the argument is that by
> surrendering formal sovereignty over any
> unincorporated territory to a third party, while at the
> same time entering into a lease that grants total
> control over the territory back to the United States, it
> would be possible for the political branches to
> govern without legal constraint.
>
> Our basic charter cannot be contracted away like
> this. The Constitution grants Congress and the
> President the power to acquire, dispose of, and
> govern territory, not the power to decide when and
> where its terms apply.

553 U.S. at 764-65. To conclude otherwise "would permit a
striking anomaly in our tripartite system of government,
leading to a regime in which Congress and the President, not
this Court, say 'what the law is.'" *Id.* at 765 (quoting *Marbury
v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The Supreme
Court in *Boumediene* declined to read "[o]ur basic charter" as
empowering the Executive to "switch the Constitution on or off
at will" by contractually disclaiming formal sovereignty over a
territory that is functionally "within the constant jurisdiction of
the United States." *Id.* at 765, 769. *Boumediene* therefore
rejected the categorical position the dissents here urge—that,
apart from the acknowledged applicability of the Suspension
Clause at Guantanamo, the Constitution cannot protect non-
U.S. citizens outside the territorial United States. *See id.* at
764-65, 770-71.

4

The Court in *Boumediene* did not confine its language or logic to the Suspension Clause, *contra* Rao Op. 9-14, and its approach supports our assumption that the Due Process Clause could apply to a Guantanamo detainee's habeas petition. For starters, the one location that undoubtedly qualifies as a *de facto* U.S. territory is Guantanamo, where the United States continues to hold Mr. al Hela. *See Boumediene*, 553 U.S. at 755, 764-65, 770-71. And *Boumediene* speaks not of habeas corpus exclusively, but of constitutional rights more generally: The Court rejected "[t]he Government's formal sovereignty-based test" for "determining the geographic reach of the *Constitution*," as well as "of habeas corpus" in particular. *Id.* at 764 (emphasis added). It denied that "the *Constitution* necessarily stops where *de jure* sovereignty ends." *Id.* at 755 (emphasis added). And it rebuffed "the Government's view . . . that the *Constitution* had no effect [at Guantanamo], at least as to noncitizens, because the United States disclaimed sovereignty in the formal sense of the term." *Id.* at 765 (emphasis added). The *en banc* court's decision to assume without deciding that the Due Process Clause applies at Guantanamo thus rests on firm ground.

In addition, members of this court have recognized that *Boumediene*'s analytic framework is not limited to the Suspension Clause. Indeed, "[o]f the seven judges on the en banc Court" in *Al Bahlul v. United States*, five agreed that "in light of *Boumediene v. Bush* . . . the Ex Post Facto Clause applies at Guantanamo." *Al Bahlul v. United States*, 767 F.3d 1, 63 (D.C. Cir. 2014) (Kavanaugh, J., concurring in the judgment in part and dissenting in part); *see id.* at 18 n.9 (opinion of Henderson, J., joined by Garland, C.J., and Tatel and Griffith, JJ.) (stating the views of then-Chief Judge Garland and Judges Tatel and Griffith on this point); *id.* at 49-

5

50 (Rogers, J., concurring in the judgment in part and dissenting). As then-Judge Kavanaugh put it:

> [T]he *Boumediene* analysis leads inexorably to the conclusion that the ex post facto right applies at Guantanamo. It would be no more impracticable or anomalous to apply the Article I, Section 9 ex post facto right at Guantanamo than it is to apply the Article I, Section 9 habeas corpus right at Guantanamo.

*Id.* at 65 n.3. Judge Rogers similarly reasoned that *Boumediene*'s "analysis of the extraterritorial reach of the Suspension Clause applies to the *Ex Post Facto* Clause because the detainees' status and location at Guantanamo Bay are the same, and the government has pointed to no distinguishing 'practical obstacles' to its application." *Id.* at 49 (Rogers, J., concurring in the judgment in part and dissenting). Three additional judges—then-Chief Judge Garland and Judges Tatel and Griffith—noted that if they were to decide the *ex post facto* issue *de novo* (*i.e.*, if the Government had not conceded the point), they would conclude that the Clause applies "for the reasons stated" by Judges Rogers and Kavanaugh in the above-quoted sections of their respective opinions. *Id.* at 18 n.9.

It is fair to assume, as today's *en banc* court does, that the same reasoning could apply here. It would be no more impracticable to apply the Due Process Clause than the Suspension or *Ex Post Facto* Clause in this context. If anything, the due process analysis is particularly well calibrated to take account of practical obstacles, given that it weighs any "burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Nor would application of the Due Process Clause

6

be anomalous, given the Court's application of the Suspension Clause in this setting. The Suspension Clause plays a similar role to due process in "preserv[ing] the Constitution's separation-of-powers structure" by preventing arbitrary exercise of Executive power. *Al Bahlul*, 767 F.3d at 49 (Rogers, J., concurring in the judgment in part and dissenting). And, as Judge Wilkins's opinion for the majority points out, the "meaningful opportunity" to challenge the legality of detention guaranteed by the Suspension Clause, *Boumediene*, 553 U.S. at 779, provides protection that is congruent in this context to the "opportunity to be heard 'at a meaningful time and in a meaningful manner'" afforded by the Due Process Clause, *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see* Maj. Op. 22-25. Indeed, it is hard to imagine how any procedural protections that *Mathews* affords to a detained enemy combatant's habeas petition, *see Hamdi*, 542 U.S. at 529-39 (plurality opinion), would not also be demanded by the Suspension Clause's requirement of a "meaningful opportunity" to contest the basis for detention and "meaningful review" by the courts of detention decisions, *Boumediene*, 553 U.S. at 779, 783.

*Johnson v. Eisentrager*, 339 U.S. 763 (1950), does not compel a contrary conclusion. *Contra* Rao Op. 1-9; Randolph Op. 3, 6. As *Boumediene* made clear, *Eisentrager* should not be read to foreclose constitutional claims of non-U.S. citizens outside U.S. sovereign territory under a "bright-line test" based solely on *de jure* territorial sovereignty. *Boumediene*, 553 U.S. at 763. The government had argued for a bright-line *de jure* sovereignty test in *Eisentrager* and did so again in *Boumediene*. *See Boumediene*, 553 U.S. at 763 (citing Brief for Petitioners at 74-75, *Eisentrager*, 339 U.S. 763 (O.T. 1949, No. 306), 1950 WL 78514). But in a broad-ranging discussion of its past decisions regarding "the Constitution's extraterritorial application," *id.* at 755; *see id.* at 755-64, the *Boumediene*

7

Court rejected the government's "formalistic" test and its reading of precedent: "Nothing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution . . . ." *Id.* at 764. Instead, the Court drew on its own more nuanced reading of *Eisentrager*, as well as the Insular Cases and *Reid v. Covert*, 354 U.S. 1 (1957), to identify "a common thread uniting" its precedents on the Constitution's applicability outside the sovereign territory of the United States—namely "the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Boumediene*, 553 U.S. at 764; *see id.* at 766-71.

In accordance with that precedent, *Boumediene* instructs that a "formal sovereignty-based" approach is inadequate for Guantanamo, *id.* at 764-65, yet today's dissenters contend that, because "Guantanamo Bay is decidedly outside the territorial United States," foreign citizens detained there "cannot benefit from the protections of the Due Process Clause," Rao Op. 1. That reasoning runs headlong into *Boumediene*'s explicit rejection of the view that the Constitution, as applied to non-U.S. citizens, "necessarily stops where *de jure* sovereignty ends," at least where the United States, "by virtue of its complete jurisdiction and total control over [a territory], maintains *de facto* sovereignty over th[at] territory." *Boumediene*, 553 U.S. at 755; *see id*. at 770-71; *see also All. for Open Soc'y Int'l*, 140 S. Ct. at 2086 (citing *Boumediene*, 553 U.S. at 755-71). In short, the dissenters take a route that the Supreme Court has plainly marked a dead end, all while deeming irrelevant factors and concerns that the Court has identified as germane to deciding Mr. al Hela's constitutional claims.

8

\*   \*   \*

It suffices in this case to assume without deciding that the Due Process Clause applies.  Because a premise of the *en banc* court's assumption is that no binding precedent forecloses application of the Due Process Clause at Guantanamo, I write to highlight why we fairly deem open an issue that some of our colleagues would treat as closed.  I join Judge Wilkins's majority opinion in full.

Rao, *Circuit Judge*, with whom Walker, *Circuit Judge*, joins, concurring in the judgment in part and dissenting in part:

More than twenty years after the first enemy alien was detained at the Guantanamo Bay Naval Station in Cuba, this court discovers the Due Process Clause *might* protect these alien detainees. On this assumption, the court applies the Due Process Clause outside the sovereign territory of the United States, pioneering a jurisprudence squarely at odds with the Constitution.

The Due Process Clause simply does not extend to aliens outside the territorial United States, as the Supreme Court emphatically recognized in *Johnson v. Eisentrager*, 339 U.S. 763, 781–85 (1950). The Court and this circuit have relied on *Eisentrager* in the ensuing years to reaffirm that aliens outside the territorial United States do not possess constitutional rights. Guantanamo Bay is decidedly outside the territorial United States. *Boumediene v. Bush*, 553 U.S. 723, 753–54 (2008). As an alien detained there, Abdulsalam Ali Abdulrahman al-Hela cannot benefit from the protections of the Due Process Clause.

To avoid this straightforward conclusion, the court takes a convoluted path. At the outset, it boldly asserts that it is an open question whether the Due Process Clause applies to Guantanamo detainees. Rather than decide that question, the court merely assumes the Clause applies. With that unprecedented assumption in hand, it concludes for the first time in our history that the procedural protections of the Suspension Clause and the Due Process Clause are equivalent. But apparently not identical, because the court imports the *Mathews v. Eldridge* balancing test to assess each of al-Hela's procedural due process claims, manufacturing new and significant procedural due process law along the way. As to al-Hela's "substantive due process" claims, the court effectively holds, not assumes, that al-Hela possesses such rights by

2

remanding one of his claims to the district court. Finally, almost as an aside, the court upends circuit precedent by stating the *international law of war* may limit the reach of the Authorization for the Use of Military Force ("AUMF"), the statute that provides the basis for the detention of al-Hela and other enemy aliens after the terrorist attacks of September 11.

Despite this rampage through our settled law, al-Hela still loses on his due process claims, the same result that would have followed from applying *Eisentrager*. For Guantanamo detainees who have argued for greater constitutional protections, this court's cramped application of due process is at best a pyrrhic victory. Nevertheless, the loss to the rule of law is substantial. The court's novel and unfounded approach will upset ongoing military and district court proceedings and invariably require yet more litigation, further entangling this court in sensitive matters of national security and foreign affairs.

I.

Under settled Supreme Court precedent, al-Hela's due process claims are readily rejected. To reach a contrary conclusion, the majority asserts a tabula rasa—namely that this Court has never resolved the question of whether "the Due Process Clause extends to Guantanamo detainees." Maj. Op. 5. The majority simply assumes the Due Process Clause applies to enemy aliens held at Guantanamo Bay, but cannot distinguish the numerous Supreme Court precedents to the contrary.

This Part first discusses the unbroken line of decisions of our highest court, as well as this circuit, holding that the Due Process Clause does not apply to aliens outside the territorial United States. Second, the Supreme Court in *Boumediene* allowed the writ of habeas corpus to run to Guantanamo Bay

3

but did not explicitly or implicitly abrogate the long-settled principle that constitutional protections do not extend to aliens outside our sovereign territory. Finally, because this constitutional principle is so fundamental, previous decisions have not examined its origins. The text and structure of the Constitution, as well as its original meaning, make clear that the constitutional upheaval wrought by the majority is entirely without support. The Due Process Clause does not apply outside the territorial United States, and therefore alien detainees at Guantanamo Bay do not enjoy its protections.

A.

As a lower court, it is a bedrock principle of our judicial system that we are bound to follow Supreme Court precedent. The majority's failure to engage with these precedents is irregular to say the least, all the more so because the Court's decisions in this area have been clear and unequivocal.

In *Johnson v. Eisentrager*, the Supreme Court "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Eisentrager*, 339 U.S. at 770, 784). Writing for the Court, Justice Jackson explained that:

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it. The

4

practice of every modern government is
opposed to it.

*Eisentrager*, 339 U.S. at 784–85 (cleaned up).

In overruling a decision of this circuit, the Supreme Court
rejected the theory that because the Fifth Amendment applies
to "any person," it must apply to aliens detained outside the
United States who take up arms against it. *Id.* at 781–82
(overruling *Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir.
1949)). It made little sense to read the phrase "any person" in
the Fifth Amendment to include enemy aliens given that
American soldiers are subject to military discipline and
"thereby stripped of their Fifth Amendment rights." *Id.* at 783;
*see also* U.S. CONST. amend. V (exempting "cases arising in
the land or naval forces, or in the Militia" from certain
procedural protections). "It would be a paradox indeed," the
Court explained, "if what the Amendment denied to Americans
it guaranteed to enemies." *Eisentrager*, 339 U.S. at 783. The
U.S. Constitution, consistent with the longstanding practice of
constitutional governments, simply did not apply to aliens
outside the territorial United States.

The intervening decades have only reinforced the central
holding of *Eisentrager* that the Constitution does not extend
extraterritorially to aliens. For example, in *Verdugo-Urquidez*
the Court described *Eisentrager*'s conclusion as "emphatic"
and held the Fourth Amendment does not apply to "property
that is owned by a nonresident alien and located in a foreign
country." 494 U.S. at 261, 269. The Court reasoned that the
Fifth Amendment did not extend extraterritorially, even though
it spoke "in the relatively universal term of 'person,'" and
therefore the inappropriateness of extraterritorial application
"would seem even more true with respect to the Fourth
Amendment, which applies only to 'the people.'" *Id.* at 269.

5

In *Zadvydas v. Davis*, the Court again recognized, "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." 533 U.S. 678, 693 (2001) (citing *Verdugo-Urquidez*, 494 U.S. at 269; *Eisentrager*, 339 U.S. at 784). The Court held that indefinite detention of an alien within the United States would "raise a serious constitutional problem" under the Due Process Clause and emphasized it "made all the difference" that Zadvydas had already entered the United States. *Id.* at 690, 693. The case was therefore unlike *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), in which the Court held that an alien who was refused admission could be indefinitely detained without constitutional concern. *Zadvydas*, 533 U.S. at 693 (citing *Eisentrager*, 339 U.S. at 784). Recognizing the continuing and "well established" principles articulated in *Eisentrager* and subsequent cases, the Court emphasized the "critical distinction" between situations in which an alien has legally entered the United States and those in which the alien remains effectively outside our borders. *Id.* at 693–94. The Court's holding was narrow—only when an alien "has effected an entry into the United States" is the Due Process Clause even implicated.[1] *Id.* at 693.

---

[1] Four justices did not agree even with this narrow holding and would have upheld the plain meaning of the challenged statute, which allowed for indefinite detention of aliens who were ordered removed from the United States. *See Zadvydas*, 533 U.S. at 702, 705 (Scalia, J., dissenting) (identifying "the Attorney General's clear statutory authority to detain criminal aliens with no specified time limit" and finding "no constitutional impediment to the discretion Congress gave to the Attorney General"); *id.* at 705 (Kennedy, J., dissenting) (arguing the Court had "interpret[ed] a statute in obvious disregard of congressional intent").

6

In recent years, the Supreme Court has reaffirmed the broadest understanding of *Eisentrager*. In *Agency for International Development v. Alliance for Open Society International, Inc*. ("*AID*"), the Supreme Court held "foreign organizations operating abroad … possess no rights under the First Amendment." 140 S. Ct. 2082, 2087 (2020). To reach this conclusion, the Court began with the fundamental principle: "*First*, it is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution." *Id.* at 2086. For this proposition the Court cited, not just *Eisentrager*, but also *Boumediene*, 553 U.S. at 770–71; *Hamdi v. Rumsfeld*, 542 U.S. 507, 558–59 (2004) (Scalia, J., dissenting); *Verdugo-Urquidez*, 494 U.S. at 265–75; *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); and the Preamble to the United States Constitution. *AID*, 140 S. Ct. at 2086. Similarly, in *Department of Homeland Security v. Thuraissigiam*, the Court stated that allowing an alien who had not been lawfully admitted to the United States to invoke the Due Process Clause would be "contrary to more than a century of precedent." 140 S. Ct. 1959, 1982 (2020).

This circuit has consistently applied *Eisentrager* and *Verdugo-Urquidez* to foreclose the application of constitutional provisions to aliens abroad. We have held that a nonresident alien who was allegedly tortured by officials of the Central Intelligence Agency in Guatemala lacked a substantive due process claim under the Fifth Amendment. *Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002). And we have maintained that foreign entities without presence in the United States could not assert a procedural due process challenge to their designation as foreign terrorist organizations. *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C Cir. 1999); *see also Pauling v.*

7

*McElroy*, 278 F.2d 252, 254 n.3 (D.C Cir. 1960) (per curiam) (stating that nonresident aliens could not assert constitutional claims).

Until very recently, we have also faithfully applied the *Eisentrager* line of cases and held explicitly that the Due Process Clause does not extend to aliens detained at Guantanamo Bay. *See Al Hela v. Trump*, 972 F.3d 120, 138–43, 147–50 (D.C. Cir. 2020) (discussing cases). For example, we recognized just after *Boumediene* that "[d]ecisions of the Supreme Court and of this court … hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." *Kiyemba v. Obama* ("*Kiyemba I*"), 555 F.3d 1022, 1026 & n.9 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131, *reinstated by* 605 F.3d 1046 (D.C. Cir. 2010) ("*Kiyemba III*") (per curiam). Similarly, we have rejected the "premise[]" that an alien "ha[s] a constitutional right to due process" at Guantanamo Bay. *Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011); *see also Kiyemba v. Obama* ("*Kiyemba II*"), 561 F.3d 509, 518 n.4 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (Since *Boumediene*, "[t]his Court has … stated that the detainees possess no constitutional due process rights."). And we have explicitly stated that *Boumediene* did not overrule *Eisentrager*. *Rasul v. Myers*, 563 F.3d 527, 528–29 (D.C. Cir. 2009) (per curiam). After *Boumediene*, this court and the district court have articulated the contours of the procedural rights afforded to Guantanamo detainees under the Suspension Clause, but have explicitly declined to extend constitutional due process protections.

The majority's only response to this unbroken line of caselaw is to cite a single line from *AID*; to rely on a couple of recent circuit cases that ignored settled Supreme Court and circuit precedent; and to lean on the government's political

8

change of heart. But none of these arguments support the majority's approach.

To begin with, the majority asserts *Eisentrager* no longer is understood to bar the extraterritorial application of the Due Process Clause. In support of this proposition, the majority cites only a single sentence from *AID* that, "under some circumstances, foreign citizens" in Guantanamo Bay "may possess certain constitutional rights." 140 S. Ct. at 2086; *see* Maj. Op. 15. In *AID*, the Court simply cites *Boumediene* and recognizes the narrow and specific holding that the habeas writ may run to a place over which the United States maintains "complete and total control." 140 S. Ct. at 2086 (quoting *Boumediene*, 553 U.S. at 771). *AID* in no way abrogated *Eisentrager* or its holding that the Due Process Clause does not apply outside the territorial boundaries of the United States.[2]

Overlooking almost two decades of Guantanamo precedents, the majority relies on only two recent circuit cases that merely assert the application of the Due Process Clause to Guantanamo detainees is an "open question." *See Ali v. Trump*, 959 F.3d 364, 368–69 (D.C. Cir. 2020); *Qassim v. Trump*, 927 F.3d 522, 528–30 (D.C. Cir. 2019); Maj. Op. 16. But as was recognized at the time, both of these cases ignored the Supreme

---

[2] The majority and the concurrence similarly err in relying on then-Judge Kavanaugh's separate opinion in *Al Bahlul v. United States*, which suggested the Ex Post Facto Clause might apply at Guantanamo. 767 F.3d 1, 65 & n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment in part and dissenting in part); *see* Maj. Op. 15–16; Concurring Op. 4–5. These statements were dicta in a separate opinion, but in any event, the reasoning turned on the fact that both the Suspension Clause and the Ex Post Facto Clause are part of Article I, section 9. *See Al Bahlul*, 767 F.3d at 65 n.3 (Kavanaugh, J.). To state the obvious, such reasoning does not apply to the Due Process Clause of the Fifth Amendment.

9

Court's settled law and departed from circuit precedent. *See Ali*, 959 F.3d at 373–80 (Randolph, J., concurring in the judgment); *Qassim v. Trump*, 938 F.3d 375, 376–79 (D.C. Cir. 2019) (Henderson, J., dissenting from denial of rehearing en banc). Ignoring governing precedent to declare a question open does not make it so.

More puzzling still is the majority's suggestion that *Eisentrager*'s holding has "apparently eluded the government." *See* Maj. Op. 16. In its panel brief, the government followed *Eisentrager* and maintained that, "[b]ecause al-Hela is indisputably an alien with no presence in the United States, the Due Process Clause does not extend to him with respect to his detention at Guantanamo." Breaking with the government's longstanding position in Guantanamo litigation, counsel candidly stated at the en banc argument that the government's change in position reflected the intervening "change in administration." A new administration may change the government's litigating position, but cannot change the meaning of the Constitution.

In short, the issue of whether the Due Process Clause applies at Guantanamo Bay is not an open one.

B.

Ignoring these bedrock principles of constitutional law, the majority attempts to rely on *Boumediene v. Bush*. But today's hypothetical constitutional upheaval finds no support in that decision either.

*Boumediene* held that Guantanamo detainees may petition for a writ of habeas corpus to challenge the lawfulness of their detentions. 553 U.S. at 732. Recognizing that Guantanamo was outside the territorial United States, the Court nonetheless concluded that the writ could run to a place over which the

10

government maintained de facto sovereignty. *Boumediene* was momentous, but its holding and reasoning were carefully cabined to the reach of the Suspension Clause. *Boumediene* leaves in place the *Eisentrager* line of cases holding that aliens outside the territorial United States do not enjoy substantive constitutional rights.

First, the *Boumediene* Court repeatedly emphasized the unique procedural protection of the habeas writ, "one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights." *Id.* at 739. The Great Writ served as a "vital instrument" to secure "freedom from unlawful restraint." *Id.* These considerations particular to the habeas writ—the "broad historical narrative of the writ and its function"—were "central" to the Court's analysis. *Id.* at 746. They undergirded the Court's conclusion that, because the United States "maintains *de facto* sovereignty" over Guantanamo, the Suspension Clause guarantees detainees there a "meaningful opportunity" to challenge the basis of their detention. *Id.* at 755, 779. *But see id.* at 843–48 (Scalia, J., dissenting) (contending the history of the common law habeas writ demonstrates that it was not available for aliens held outside sovereign territory).

Importantly, the conclusion that the writ of habeas corpus could run to a location like Guantanamo Bay, over which the United States maintained de facto sovereignty, turned on the nature of the writ as a procedural protection. Nowhere did the Court suggest that its de facto sovereignty test for the habeas writ would also extend substantive constitutional rights to aliens beyond the territorial United States.

Second, *Boumediene* explicitly focused only on Part II of *Eisentrager*, which concerned the availability of a habeas writ for a detainee in Landsberg Prison in Germany. In fact, the

11

Court carefully cabined its understanding of de facto sovereignty to the availability of habeas corpus, explaining that "practical considerations [] were integral to Part II" of *Eisentrager*. *Id.* at 763 (majority opinion); *see also id.* (explaining that Part II was substantially about "practical barriers to the running of the writ" and the "objective degree of control the United States asserted over" the prison). When setting forth factors "relevant in determining the reach of the Suspension Clause," the Court again emphasized Part II of *Eisentrager*. *Id.* at 766. And the opinion concluded, "[i]t bears repeating that our opinion does not address the *content* of the law that governs petitioners' detention." *Id.* at 798 (emphasis added); *see also id.* at 787 ("The extent of the showing required of the Government in these cases is a matter to be determined."). The Court applied its de facto sovereignty test for assessing the reach of the writ of habeas corpus but repeatedly emphasized that its holding and reasoning applied *only* to the reach of the writ.[3]

Furthermore, the *Boumediene* Court left untouched Part III of *Eisentrager*, in which the Court squarely held that enemy aliens detained outside United States territory are beyond the ambit of the Due Process Clause. *Eisentrager*, 339 U.S. at 781–85. The Court has never questioned, let alone overruled, that part of *Eisentrager*. Unlike Part II, on which the *Boumediene* majority relied, Part III of *Eisentrager* makes no mention of practical considerations against the application of due process

---

[3] Moreover, four dissenting justices categorically rejected the de facto sovereignty test for determining the reach of the Constitution. *See id.* at 849 (Scalia, J., dissenting) ("Today the Court warps our Constitution in a way that goes beyond the narrow issue of the reach of the Suspension Clause, invoking judicially brainstormed separation-of-powers principles to establish a manipulable 'functional' test for the extraterritorial reach of habeas corpus.").

12

and other constitutional rights to aliens abroad. Rather, the Court recognized the categorical rule that "the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States." *Id.* at 785.

Finally, on the concurrence's understanding of *Boumediene*, it must now be an open question whether aliens outside the territorial United States enjoy all constitutional rights. The concurrence emphasizes the most general statements in *Boumediene*. Concurring Op. 2–4. But that fails to answer the relevant question, namely whether *Boumediene*'s holding extends beyond the Suspension Clause to the Due Process Clause. Neither the majority nor the concurrence attempt the detailed historical approach of *Boumediene* to determine whether the Due Process Clause should also follow de facto sovereignty. Nor could they without running headlong into *Eisentrager*. Instead, they merely assume the running of the writ to Guantanamo means the rest of the Constitution may follow. If the application of the Due Process Clause at Guantanamo is an open question, so apparently is the application of the First, Fourth, Fifth, and Sixth Amendments.[4]

---

[4] In overturning this court's decision in *Eisentrager*, the Supreme Court emphasized the absurdity of allowing extraterritorial application of the Due Process Clause, because it "would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments." *Eisentrager*, 339 U.S. at 784.

13

That should ensure full employment for detainee counsel in the years to come.

Formal territorial sovereignty has always governed the reach of our Constitution, with the sole exception recognized in *Boumediene* for the unique procedural protection of the writ of habeas corpus. As this court explained in *Rasul*, "*Boumediene* disclaimed any intention to disturb existing law governing the extraterritorial reach" of substantive constitutional rights and therefore left in place the blackletter rule that the Constitution does not apply to aliens outside the United States. 563 F.3d at 529; *see also Al Hela*, 972 F.3d at 140–41. If *Boumediene* left any doubt on this front, in the years since that case was decided the Supreme Court has reaffirmed both *Eisentrager*'s specific holding as well as the more general principle that the Constitution does not confer any rights on aliens outside the territorial United States. *AID*, 140 S. Ct. at 2086. The majority simply fails to explain how its decision may be squared with *Eisentrager* and the unbroken line of Supreme Court and circuit precedent faithfully applying it. *Eisentrager*'s holding that the Due Process Clause does not apply to aliens outside the territory of the United States remains good law, and we are bound by that holding.

Even on the majority's view that *Boumediene* silently invited a constitutional sea change, that interpretation does not permit this court to ignore *Eisentrager*. We are bound by that decision because when the Court's precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

14

The majority claims it is an open question whether aliens detained at Guantanamo may benefit from the protections of the Due Process Clause. But *Boumediene* did not leave the question open; it left the Court's previous answer in place.

C.

When *Eisentrager* was decided in 1950, it was not necessary to provide a lengthy justification for the conclusion that the Constitution had no application to aliens outside of sovereign territory because the principle was so well established and fundamental. "Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments" as to be wild and outlandish. *Eisentrager*, 339 U.S. at 784. The majority's revisionist assumption that the Due Process Clause may apply to aliens outside the territorial United States suggests this fundamental legal principle has been lost or obscured. I therefore explain why the majority's framework is at odds with the text, structure, and original meaning of the Constitution.[5]

---

[5] I agree with Judge Randolph that after *Boumediene* al-Hela is entitled only to the "Privilege of the Writ of Habeas Corpus," as guaranteed by the Suspension Clause. U.S. CONST. art. I, § 9, cl. 2. *See* Randolph Op. 5, 9–11. In 28 U.S.C. § 2241(e)(1), Congress stripped the federal courts of jurisdiction to review habeas petitions by detainees such as al-Hela. *Boumediene* held section 2241(e)(1) unconstitutional only to the extent that the provision violated the Suspension Clause. Section 2241(e)(1) therefore still operates to strip federal courts of jurisdiction to conduct any habeas review not guaranteed by that Clause. While we have jurisdiction to review al-Hela's petition under 28 U.S.C. § 2241(a), that jurisdiction now extends only to those claims encompassed by the habeas writ as preserved in the Suspension Clause.

15

The Constitution was established by "We the People of the United States." U.S. CONST. pmbl. As this language conveys, the Constitution "was ordained by the people, and, when duly ratified, it became the Constitution of the people of the United States." *Hawke v. Smith*, 253 U.S. 221, 226 (1920). The American people sought "to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." U.S. CONST. pmbl. The Constitution also establishes what counts as "the supreme Law of the Land." U.S. CONST. art. VI. By its plain terms, the Constitution applies to the people of the United States and to those within its territorial borders. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens."); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("These provisions are universal in their application, to all persons within the territorial jurisdiction.").

---

The majority makes no effort to demonstrate how the due process claims brought by al-Hela are preserved by the Suspension Clause. Judge Randolph suggests the common law writ at the time of the Founding did not permit review of claims like the ones at issue in this case. While this may be correct, I take it as a difficult question unnecessary to resolve here, particularly in light of the Supreme Court's unwillingness to define the boundaries of the writ's constitutional protection. *Thuraissigiam*, 140 S. Ct. at 1969 & n.12 (considering the writ as it existed in 1789, but declining to address its scope and concluding only that "the writ has never encompassed respondent's claims" because he requested relief for the purpose of entering the United States). As the majority rests solely on the assumption that the Due Process Clause applies at Guantanamo, I explain why that Clause does not extend beyond our territorial borders.

16

At the time of the Founding, law was "limited to persons and things within the territory over which a government exercised sovereignty." J. Andrew Kent, *A Textual and Historical Case Against a Global Constitution*, 95 GEO. L.J. 463, 486 (2007). *See generally id.* at 485–505. At the root of this principle was the understanding that protection and obligation were reciprocal—those who were subject to the sovereign's authority and obeyed his laws in turn received the sovereign's protection. *See generally* Philip Hamburger, *Beyond Protection*, 109 COLUM. L. REV 1823 (2009). As Sir Edward Coke put it, protection and obligation were a "*duplex et reciprocum ligamen*," a dual and reciprocal bond. *Calvin's Case* (1608) 77 Eng. Rep. 377, 382, 7 Co. Rep. 1 a, 5 a; *see also id.* at 382, 7 Co. Rep. at 4 b (stating that, "as the subject oweth to the King his true and faithful ligeance and obedience, so the Sovereign is to govern and protect his subjects"). In Blackstone's phrasing, "[a]llegiance is the tie, or *ligamen*, which binds the subject to the king, in return for that protection which the king affords the subject." 1 WILLIAM BLACKSTONE, COMMENTARIES *354; *see also* Hamburger, 109 COLUM. L. REV. at 1838–40 (collecting authorities). This fundamental principle was also explicitly incorporated in multiple state constitutions. *See, e.g.*, N.C. CONST. OF 1776 pmbl. ("Allegiance and Protection are in their nature reciprocal, and the one should of right be refused, when the other is withdrawn."); N.J. CONST. OF 1776 pmbl. ("Allegiance and Protection are, in the Nature of Things, reciprocal Ties, each equally depending upon the other, and liable to be dissolved by the other's being refused or withdrawn.").

From this understanding of territorial sovereignty it followed that the government's legal protections could extend to resident aliens of friendly nations but not to nonresident aliens. In Blackstone's words, "as the prince affords his protection to an alien, only during his residence in this realm,

17

the allegiance of an alien is confined (in point of time) to the duration of such his residence, and (in point of locality) to the dominions of the British empire." 1 WILLIAM BLACKSTONE, COMMENTARIES *358. This understanding—that legal protections were due to aliens only when they entered the realm of the sovereign—was widespread. Coke expressed this view in *Calvin's Case*. *See* 77 Eng. Rep. at 383, 7 Co. Rep. at 5 b ("[W]hen an alien that is in amity cometh into England, because as long as he is within England, he is within the King's protection; therefore so long as he is here, he oweth unto the King a local obedience or ligeance, for that the one (as it hath been said) draweth the other."). Emmerich de Vattel, "the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019), also maintained the sovereign had the power to admit foreigners and those who entered did so "only upon this tacit condition, that [they] be subject to the laws," EMMERICH DE VATTEL, THE LAW OF NATIONS 172 (G.G. & J. Robinson ed. 1797) (1758). Correspondingly, "as soon as [the sovereign] admits them, he engages to protect them as his own subjects, and to afford them perfect security, as far as depends on him." *Id.* at 173. John Locke similarly recognized the reciprocal obligations between the government and resident aliens. *See* JOHN LOCKE, SECOND TREATISE OF GOVERNMENT § 122 (C.B. Macpherson ed., Hackett Publishing Co., Inc. 1980) (1690) ("[T]hus we see, that *foreigners*, … living all their lives under another government, and enjoying the privileges and protection of it … are bound, even in conscience, to submit to its administration, as far forth as any denison.").

The leading legal authorities of the eighteenth century consistently expressed the same theory of obligation and protection—friendly aliens within a nation's territory must submit to the laws of that nation and in turn would be protected

18

by its laws—but both the protection and obligation stopped at the nation's territorial borders.

American law early recognized this territorial view. In the debates concerning the Alien and Sedition Acts, Democratic-Republicans suggested that resident aliens should enjoy the protection of American law—precisely because, by residing in the country, they owed it their allegiance. James Madison argued that "[a]liens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." 4 DEBATES ON THE FEDERAL CONSTITUTION 556 (Jonathan Elliot ed., 2d ed. 1836); *see also* Gerald L. Neuman, *Whose Constitution?*, 100 YALE L.J. 909, 934–38 (1991) (discussing the theory of "municipal law" adopted by the Jeffersonians over the course of the debate). No one advanced the position that resident aliens would have been entitled to constitutional rights absent the obedience they owed to the United States by virtue of their physical presence. "[G]iven the poles of debate in the 1790s—Federalists denying that any aliens had constitutional rights; Republicans arguing that friendly aliens resident in the United States had constitutional rights—it is difficult to imagine that any thought that *non*resident aliens located abroad had constitutional rights, especially during military conflicts." Kent, 95 GEO. L.J. at 531.

The territorial understanding endured in the following decades. As a Representative, John Marshall stated that "the jurisdiction of a nation extends to the whole of its territory, and to its own citizens in every part of the world." 10 ANNALS OF CONG. 597 (1800). As Chief Justice, Marshall described "full and absolute territorial jurisdiction" as "being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power." *The Schooner Exchange v. McFaddon*,

19

11 U.S. (7 Cranch) 116, 137 (1812). Future Justice Henry Baldwin similarly declared as a member of Congress that "out of the territorial limits of the United States, … our laws or Constitution have no operation, except as between us and our own citizens." 33 ANNALS OF CONG. 1042 (1819). In his commentary on the conflict of laws, Justice Story stated "the laws of one country" can "bind only its own subjects, and others, who are within its jurisdictional limits; and the latter only while they remain there." JOSEPH STORY, COMMENTARIES ON THE CONFLICT OF LAWS FOREIGN AND DOMESTIC § 7 (1834).

This territorial reasoning was subsequently recognized and reaffirmed in an uncontested line of Supreme Court decisions that span the length of the nineteenth and twentieth centuries. *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 137; *Pennoyer v. Neff*, 95 U.S. 714, 722 (1878) ("[I]t is laid down by jurists, as an elementary principle, that the laws of one State have no operation outside of its territory, except so far as is allowed by comity."); *In re Ross*, 140 U.S. 453, 464 (1891) ("By the Constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits," and "[t]he Constitution can have no operation in another country."); *United States v. Belmont*, 301 U.S. 324, 332 (1937) ("[O]ur Constitution, laws and policies have no extraterritorial operation, unless in respect of our own citizens.").

The Supreme Court later explicitly held that constitutional rights were retained by American citizens even when outside the territorial United States. *See Reid v. Covert*, 354 U.S. 1, 5–6 (1957) (plurality opinion). This decision turned on the unique nature of citizenship, a concept "as old as government." *Id.* at 6; *see also id.* at 14 ("[H]ere the basis for governmental power is American citizenship."). This emphasis on citizenship was

20

nothing new: "Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." *Eisentrager*, 339 U.S. at 769. By contrast, it was beyond dispute that aliens outside the United States have no constitutional rights.

The original meaning of the Constitution and subsequent historical practice confirm that constitutional rights do not extend to aliens without property or presence in the sovereign territory of the United States.

\* \* \*

The Due Process Clause does not apply to aliens detained at the Guantanamo Bay Naval Station because it is located outside the sovereign territory of the United States. That territorial limitation controls under the Constitution and our precedents. We have never applied a de facto sovereignty test to determine the reach of substantive constitutional rights. *See Boumediene*, 553 U.S. at 753–54; *Kiyemba I*, 555 F.3d at 1026 n.9. Moreover, the majority's assumption that the Due Process Clause applies at Guantanamo Bay cannot be squared with the Constitution's text, structure, and history.

As an alien detained abroad, al-Hela cannot claim the protections of the Due Process Clause either with respect to his detention or the procedures for reviewing his petition for a writ of habeas corpus. After *Boumediene*, al-Hela's habeas petition must simply be reviewed in accordance with the Suspension Clause and our cases applying that provision to detainees. As the majority agrees, these standards were readily met in this case.

21

II.

Instead of following this well-trod path, the majority asserts a clear constitutional field. The government and the district court are now informed it is an "open question" whether the Due Process Clause applies to Guantanamo detainees. The majority, however, does not decide that supposedly open question. Instead it clings to the maxim that "courts must choose the narrowest constitutional path to decision." Maj. Op. 14 (quoting *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 896 F.3d 539, 544 (D.C. Cir. 2018)). Particularly for lower courts, it is often preferable to avoid deciding a constitutional question when a narrower ground of decision is available. This principle respects the separation of powers because courts should refrain from rendering unnecessary pronouncements of constitutional law that may constrain the actions of the co-equal branches of government.

The claim to restraint rings hollow, however, because in the face of contrary precedent the majority *assumes* the Due Process Clause applies at Guantanamo, and then proceeds to decide numerous constitutional questions that are actually open. The majority also effectively holds that substantive due process applies to Guantanamo detainees by remanding one of al-Hela's claims. And finally, the majority casually suggests the laws of war may limit the President's detention authority under the AUMF, a proposition flatly contradicted by our caselaw. Ignoring established Supreme Court and circuit precedent, the majority issues significant constitutional holdings and blazes a wide and winding trail in the wrong direction.

A.

Despite the claim to be following a "narrowe[r] constitutional path," the majority has in fact decided

22

consequential questions of constitutional law. It has taken the "unappealing" approach of "crafting a *hypothetical* standard for a *hypothetical* constitutional right." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 718 (2010) (plurality opinion). Consistent with the power of Article III courts to decide cases and controversies, it would have been "[b]etter simply to state and apply the law forthrightly than to hold our view of the law *in pectore*, so that we can inquire into matters beyond our charter, and probably beyond our ken." *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 165 (2011) (Scalia, J., concurring in the judgment). Certainly here it would have been more forthright to decide the purportedly "open" question of whether the Due Process Clause applies to an enemy alien outside the United States. Instead, the majority assumes the Due Process Clause applies and undertakes a painstaking review of what a hypothetical due process right would require, creating significant constitutional holdings along the way.

At the outset, the majority suggests the procedures demanded by the Due Process Clause are identical to those required by the Suspension Clause for habeas petitions brought by Guantanamo detainees. Maj. Op. 22–25. This constitutional holding is an innovation and a profoundly significant and broad one. It does not rest on *Boumediene*, which explicitly disclaimed this conclusion, 553 U.S. at 798, or on any other Supreme Court or circuit decision. Embarking on uncharted territory, the majority discovers that the judicial descriptions of a detainee's rights under the Suspension Clause are similar to the descriptions, in entirely other domestic contexts, of the rights guaranteed by the Due Process Clause. Maj. Op. 22; *see also* Maj. Op. 38 (finding the procedures employed by the district court that satisfy the Suspension Clause also "coincidentally" satisfy the requirements of the Due Process Clause).

23

Because stating for the first time that the protections of the Suspension Clause and the Due Process Clause are equivalent is not enough to dispose of this case, the majority must go further, deciding each of al-Hela's specific claims. Belying the claim of judicial minimalism, the majority also forgives al-Hela's forfeiture of two claims in order to reach them. Maj. Op. 18–19. The caselaw in this area is scant, and so to decide al-Hela's procedural due process claims, the majority necessarily must break new ground with each determination. The majority holds:

1. Determining the legality of an enemy combatant's detention on a preponderance of the evidence standard is consistent with procedural due process, and such detentions are distinguishable from civil commitments. Maj. Op. 31–34.

2. Applying a "rebuttable presumption of accuracy and authenticity to any evidence the government presents," including the types of evidence unique to showing the legality of detaining an enemy alien, is consistent with due process. Maj. Op. 34–36 (cleaned up).

3. Admitting hearsay in proceedings to judge the legality of an enemy alien's detention is consistent with due process. Maj. Op. 36–39.

4. Admitting ex parte evidence can be consistent with due process, but anything less than the very high level of scrutiny the district court gave to the government's requests to submit ex parte evidence likely would not be. Maj. Op. 39–45.

These are substantial constitutional holdings that cannot be cabined to the specific facts of this case. Determinations of due process turn on context, which requires courts to weigh

24

competing interests. When new circumstances arise, courts invariably draw comparisons with the balance made in other contexts to determine what process is due.[6] The majority's comparison of al-Hela's detention to civil commitments demonstrates the inevitability of this type of comparative analysis. *See* Maj. Op. 31–33 (distinguishing this case from *Addington v. Texas*, 441 U.S. 418 (1979)). Although the majority asserts these holdings "resolve solely those claims in this case," Maj. Op. 14, its decision and reasoning set a new benchmark for due process balancing that will impact future decisions.

Moreover, the majority resolves al-Hela's claims by applying a watered-down version of the Due Process Clause to accommodate the procedures applied at Guantanamo. This limited view of due process threatens to undermine procedural protections in the very contexts where they actually apply.

Failing to decide the threshold question here leads the majority to render a series of entirely unnecessary constitutional decisions. The majority correctly observes that courts "should never anticipate a question of constitutional law in advance of the necessity of deciding it." Maj. Op. 14 (cleaned up). Yet by deciding what due process requires in the

---

[6] *See, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 228–29 (2005) (comparing the procedures required to place a prisoner in a "Supermax" facility with those required to revoke parole or "good-time credits"); *Goldberg v. Kelly*, 397 U.S. 254, 263–64 & n.10 (1970) (comparing the process required to terminate welfare benefits with the process required to end government employment or tax exemptions); *Hamdi*, 542 U.S. at 575 (Scalia, J., dissenting) (decrying the plurality's use of the same balancing test as "a case involving … *the withdrawal of disability benefits!*").

25

context of enemy detentions abroad, the majority does precisely that.

If the majority believes aliens detained at Guantanamo are entitled to protections of the Due Process Clause, despite *Eisentrager* and its progeny, then it should declare its view of the law rather than "coyly not[e] that the right is 'assumed' rather than 'decided.'" *Nelson*, 562 U.S. at 165 (Scalia, J., concurring in the judgment). Perhaps implicitly recognizing that such a forthright acknowledgment would fly in the face of the Supreme Court's unwavering adherence to *Eisentrager*, the court instead charts a new path through the procedural due process thicket.

B.

The majority also extends the reach of "substantive due process." Without a word of explanation, the majority simply assumes without deciding that substantive due process guarantees against punitive and arbitrary detention apply to alien detainees at Guantanamo. *See* Maj. Op. 45. Whatever implications *Boumediene* might have for procedural due process, none of the Court's analysis pertains to *substantive* due process. The question supposedly left open by *Boumediene* is "what detention review *procedures* are required by the Due Process Clause." Maj. Op. 13 (emphasis added). The arguments about procedural due process remaining an open question are misplaced for the reasons already discussed, but absolutely nothing in *Boumediene* suggests that *substantive* constitutional guarantees might apply extraterritorially or that de facto sovereignty should generally determine the reach of the Constitution. *Boumediene* was concerned purely with "the fundamental procedural protections of habeas corpus." 553 U.S. at 798; *see also id.* at 802 (Roberts, C.J., dissenting) ("Habeas is most fundamentally a procedural right, a

26

mechanism for contesting the legality of executive detention."). "It bears repeating," the *Boumediene* Court insisted, "that our opinion does not address the *content* of the law that governs petitioners' detention." *Id.* at 798 (majority opinion) (emphasis added).

The majority applies substantive due process to Guantanamo detainees notwithstanding that *Boumediene* on its face was concerned entirely with procedural guarantees, notwithstanding that the majority itself understands *Boumediene* entirely in this sense, and notwithstanding that this circuit has plainly held that substantive due process guarantees do not apply to Guantanamo detainees. *Kiyemba I*, 555 F.3d at 1026–27 (recognizing substantive due process does not apply extraterritorially); *see also Ali*, 959 F.3d at 369 (finding a detainee's argument "that the Due Process Clause's substantive protections apply with full force to all detainees at Guantanamo Bay … runs crosswise with this court's decision" in *Kiyemba I*). It seems these precedents have been abrogated sub silentio by the en banc court.

Assuming substantive due process applies at Guantanamo, the majority remands one of al-Hela's claims to the district court for further review. The majority claims to withhold judgment on how the legal question should be resolved. But by remanding, the majority has effectively determined that al-Hela is entitled to the protections of substantive due process. The majority recognizes the district court "need only reach the merits of the overlapping substantive due process claim if it finds that the claim is not moot and that the statutory claim is without merit." Maj. Op. 50. Although the district court may avoid the constitutional question, the majority effectively holds that al-Hela is entitled to the protections of substantive due process.

27

It is one thing to assume without deciding the answer to a constitutional question when doing so does not change the disposition of the case. *See, e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995). Here the majority goes much further, applying a threshold assumption to alter constitutional rights by remanding al-Hela's substantive due process claim. This disposition directly contravenes *Eisentrager* and subsequent Supreme Court decisions. Applying these precedents would require *dismissing* al-Hela's substantive claims because as an alien abroad al-Hela is not entitled to the protections of the Due Process Clause.

C.

In its treatment of the remand question, the majority makes another serious legal error, mischaracterizing a previous panel decision and effectively ignoring binding circuit precedent. The majority states: "Whether the laws of war place *any* limits on the President's detention authority under the AUMF is an open question in our circuit and should be addressed by the District Court in the first instance." Maj. Op. 49. This is flatly incorrect. In *Al-Bihani v. Obama*, a panel of this court squarely held that "[t]he international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts." 590 F.3d 866, 871 (D.C. Cir. 2010). Even more explicitly, we held it was "mistaken" to conclude "that the war powers granted by the AUMF and other statutes are limited by the international laws of war." *Id.*

Declaring this question too is "open" cannot change the fact that the *Al-Bihani* panel decision is binding law in this circuit. The majority cannot distinguish the panel decision on its own terms and therefore relies on a concurrence in the denial of rehearing en banc, which opined that the panel opinion law-

28

of-war discussion was "not necessary to the disposition of the merits" because there was an alternative holding. *Al-Bihani v. Obama*, 619 F.3d 1, 1 (D.C. Cir. 2010) (Sentelle, C.J., and Ginsburg, Henderson, Rogers, Tatel, Garland, & Griffith, J.J., concurring in the denial of rehearing en banc); *see* Maj. Op. 49. This ex post characterization was entirely advisory: the court did not grant en banc rehearing. The panel opinion, not commentary on that opinion by other members of the circuit, is controlling. In addition, the reasoning of the concurrence is at odds with the full respect afforded to our precedents. As we have repeatedly held, "where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter dictum, but each is the judgment of the court, and of equal validity with the other." *Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*, 216 F.3d 1180, 1189 (D.C. Cir. 2000) (cleaned up); *see also Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*.").

*Al-Bihani* rested on two alternative holdings, and both are binding. *See* 590 F.3d at 871 (rejecting the premise that "the war powers granted by the AUMF and other statutes are limited by the international laws of war"); *id.* at 873 (finding that the government "can *also* draw statutory authority to detain Al-Bihani directly from the language of the AUMF") (emphasis added). *Al-Bihani* has not been overturned, and so on remand the district court must abide by this binding precedent holding that the laws of war do not limit the scope of the AUMF.

### D.

The majority's novel constitutional holdings upend the settled legal framework post-*Boumediene* and provide little guidance for future claims. The result is an uncertain and

29

confusing legal landscape against which the Executive Branch and district courts will struggle to address the due process claims raised by Guantanamo detainees.

The judiciary has a relatively limited role in our tripartite system of government. The Article III judicial power extends as far as judicially enforceable rights and no further. U.S. CONST. art. III, § 2 (extending "[t]he judicial Power" only to "Cases" and "Controversies"). Our job is to "say what the law is" and decide the case before us. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Nothing more and nothing less. Judges must exercise this power always mindful of its limits— but within those limits, determining which approach is the minimalist one is often more a matter of preference than law. And it is often a feature of "minimalism" that it casts doubt on a range of constitutional activity without ever stating clearly what the Constitution requires in a particular context. The practical result of a "supposedly 'narrow' opinion" too often is to "bedevil our jurisprudence (and proliferate litigation) for years to come." *Bond v. United States*, 572 U.S. 844, 881–82 (2014) (Scalia, J., concurring in the judgment).

Our role of ensuring the political branches follow the Constitution is critically important, but when the courts exercise this power, clear pronouncements of constitutional rules allow the political branches to conform their actions and provide "a clearer sense of the constitutional limits to which new legislative or policy initiatives must adhere." *Noriega v. Pastrana*, 559 U.S. 917, 927–28 (Mem.) (2010) (Thomas, J., dissenting from denial of certiorari) (cleaned up). The majority provides no clear pronouncements. It states instead that the procedures below "provided whatever process would be required to satisfy" the *Mathews* test, yet the majority never actually states what process would be required. Maj. Op. 24. Even more confusing is the majority's suggestion that it uses

30

"*Hamdi* as a benchmark for the most robust articulation of the standard" to which detainees are entitled. Maj. Op. 25. The majority never explains whether the *Hamdi* framework is necessary or merely sufficient. Conversely, while *Hamdi* perhaps sets a ceiling for the requisite standards, the majority treats the district court's procedures as a floor, "doubt[ing] that anything less would suffice." Maj. Op. 45. The majority never clarifies which procedures are necessary and which are merely sufficient. The result is a muddle of mixed messages.

The inevitable result of this uncertainty will be to ossify district court procedures and engender further litigation, thus interfering with "the province and responsibility of the Executive" to protect national security and conduct foreign affairs. *Haig v. Agee*, 453 U.S. 280, 294 (1981). The Executive will scramble to anticipate and to abide by these yet-to-be-defined constitutional protections in habeas and military commission proceedings. Because the en banc court provides so little guidance, the only thing that is now certain is that more litigation and judicial supervision of foreign affairs will be necessary to understand the contours of these assumed due process rights.

And spare a thought for the district court, which must now revisit the previously settled framework for resolving the claims of Guantanamo detainees. When detainees invariably raise due process challenges to the procedures and substantive law governing their detention, what law should the district court apply? Must the district court simply assume that the Due Process Clause applies and then resolve detainee claims under the watered-down standard of the majority? If the district court follows the assuming-without-deciding approach, then the majority's holding will be equivalent to saying the Due Process Clause applies to Guantanamo detainees—in direct contravention of *Eisentrager* and the many cases following it.

31

Alternatively, the district court may recognize that the en banc majority has not in fact held that the Due Process Clause applies to Guantanamo detainees, leaving the lower courts free to recognize that *Eisentrager* governs the issue. *See* Maj. Op. 17 (emphasizing it is "unnecessary" "to resolve the *Eisentrager* debate in one direction or the other"). In fact, it is perhaps more accurate to say the district court *must* follow the governing Supreme Court precedent—untouched by the en banc court— that has resoundingly held the Due Process Clause does not apply outside the territorial United States, an area that includes Guantanamo Bay.

\* \* \*

The court today ignores the fundamental principle, long recognized by the Supreme Court and this circuit, that the protections of the Constitution do not extend to aliens outside the sovereign territory of the United States. Holding open the possibility that the Due Process Clause applies to enemy aliens detained at Guantanamo Bay, the court renders a series of hypothetical decisions about al-Hela's procedural due process claims. The government wins, as it should, but the court establishes a low bar for future due process claims from Guantanamo detainees and, more importantly, for claims in other contexts. The court also effectively concludes that al-Hela enjoys the protections of substantive due process. And, to top it off, the court newly asserts that the laws of war may limit the terms of the AUMF. Needless to say, somewhere along the way the majority lost its narrow constitutional path.

The Supreme Court in *Boumediene* stressed the unique and sensitive context of enemy aliens detained in the War on Terror, explaining that "[i]n considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the

32

political branches." *Boumediene*, 553 U.S. at 796–97 (citing *Curtiss-Wright*, 299 U.S. at 320). "The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security." *Id.* at 797. The majority ignores this context, as well as longstanding constitutional principles, to create a shadowy framework for judicial oversight of the prosecution of enemy combatants in the War on Terror.

Because al-Hela is neither an American citizen nor present in the United States, he cannot claim the protections of the Due Process Clause. I concur in the judgment to the extent the majority denies al-Hela's procedural and substantive due process claims. As to the rest, I respectfully dissent.

RANDOLPH, *Senior Circuit Judge*, with whom HENDERSON and WALKER, *Circuit Judges*, join, concurring in the judgment and dissenting:

I.

The question on rehearing en banc was whether the Fifth Amendment's Due Process Clause applies to alien enemies, such as al-Hela, held at the U.S. Naval Station, Guantanamo Bay, Cuba.

The majority does not answer the question. Instead, it assumes without deciding that the Due Process Clause does apply. The majority's reason for adopting this device? Because the question is unresolved, or so it claims.

That has things upside down. When an important and recurring but unresolved question is confronting our court, that is a reason for deciding the question en banc, not for evading it and perpetuating uncertainty. *See* FED. R. APP. P. 35(a).

There is another problem with the majority's explanation. Its opinion distorts the law of our circuit and of the Supreme Court.

More than a decade ago our court held that the Due Process Clause did not apply to the alien enemies detained at Guantanamo. "Decisions of the Supreme Court and of this court . . . hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010), *reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam), *certiorari denied*, 563 U.S. 954 (2011) (Breyer, J., joined by Kennedy, Ginsburg, and Sotomayor, JJ., concurring); *accord Bahlul v. United States*, 840 F.3d 757, 796 (D.C. Cir. 2016) (en

2

banc) (Millett, J., concurring).

Given the prominence of the *Kiyemba* case, with its trips back and forth from our court to the Supreme Court, it is impossible to suppose that *Kiyemba*'s Due Process holding escaped attention. There is more to say about the majority's misrepresentation of circuit law,[1] but I will leave it at that.

The majority offers another explanation for not deciding the en banc question: "whether the Due Process Clause applies to a habeas petition filed by a foreign national detained at the Guantanamo Bay military base as an alleged enemy combatant is a question that the Supreme Court has not yet answered." Maj. Op. 12.

That statement is true, but it is true only in the same trivial sense that the following statement is also true: "'The Supreme Court has not yet answered' whether the Due Process Clause applies to a citizen arrested by the FBI in Last Chance, Idaho, for distributing drugs."

One might make some sense of the statement if it resulted from a careful analysis of Supreme Court precedents, some of which are cited in the margin.[2] But the majority opinion displays no awareness of the holdings of these Supreme Court

---

[1] *See Ali v. Trump*, 959 F.3d 364, 378–80 (D.C. Cir. 2020) (Randolph, J., concurring in the judgment), citing among other D.C. Circuit decisions, *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009), and *Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011).

[2] *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763 (1950); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); *Zadvydas v. Davis*, 533 U.S. 678 (2001); *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020); *see also* Rao Dissent 3-8.

3

decisions, let alone an analysis of them, careful or cursory.

At an earlier stage in this case, when the Department of Justice was acting responsibly, *see infra* pp. 11–13, the government provided a succinct, forceful and accurate statement of Supreme Court law. That submission stands in vivid contradiction of the majority opinion and deserves full quotation:

"The Supreme Court's 'rejection of extraterritorial application of the Fifth Amendment' has been 'emphatic." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Court held that aliens arrested and imprisoned overseas could not seek writs of habeas corpus on the theory that their convictions had violated the Fifth Amendment. The Court explained that '[s]uch extraterritorial application . . . would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment.' *Id.* at 784. Yet '[n]ot one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it.' *Id.* (citation omitted); *accord United States v. Curtis-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936); *Yamataha v. Fisher*, 189 U.S. 86, 101 (1903); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). The Court's holding in *Eisentrager* 'establish[es]' that the 'Fifth Amendment's protections' are 'unavailable to aliens outside of our geographical borders.' *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)."[3]

## II.

After assuming that the Fifth Amendment applies, the

---

[3] U.S. Panel Br. 64.

4

majority invokes *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), to test whether al-Hela was "deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

But the portion of "*Hamdi*" the majority relies upon was not a decision of "the Supreme Court."  Maj. Op. 9; *see also id.* at 21 ("the Court").  It was only a plurality opinion by Justice O'Connor.  *See Hamdi*, 542 U.S. at 529–39 (plurality opinion). And none of the separate opinions in *Hamdi* endorsed, explicitly or implicitly, Justice O'Connor's due process analysis (for good reason, as explained below).  *See id.* at 553 (Souter, J., joined by Ginsburg, J., concurring in the judgment), 575–76 (Scalia, J., joined by Stevens, J., dissenting), 594 (Thomas, J., dissenting).

So the question naturally arises – what is the majority's justification for relying on this plurality opinion?  The pattern holds – the majority offers no reason.  It simply slaps the *Hamdi* plurality opinion down on the table and starts discussing how it would affect al-Hela.

Especially in view of the significant differences between *Hamdi* and this case, that is not responsible decision-making.

One of the most important distinctions is that Hamdi was born in Louisiana and is an American citizen.[4]  Al-Hela is not an American citizen.

Another is that Hamdi, held as an enemy combatant, was imprisoned in Virginia and South Carolina.[5]  In contrast, al-Hela has never set foot in this country; and he is being held at a

---

[4]  *Hamdi*, 542 U.S. at 510 (plurality opinion); *see also Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 121–22 (1866).

[5]  *Hamdi*, 542 U.S. at 510 (plurality opinion).

5

military base outside of the United States.

    And then there is the point that Hamdi's habeas arguments rested on 28 U.S.C. § 2241, the habeas statute for federal prisoners.[6]  Al-Hela, on the other hand, invokes the common law writ of habeas corpus, which he claims the Suspension Clause of the Constitution preserved.[7]

    At this point it is worth pausing to note that in *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), seven Justices (five in the majority plus two others) joined opinions indicating that whether the Suspension Clause independently preserved a common law writ of habeas corpus was an "open" question,[8] a

---

    [6] *Hamdi*, 542 U.S. at 511, 525–26 (plurality opinion).

    [7] The majority opinion claims that I "mistakenly assert[]" that al-Hela relies on the common law writ of habeas corpus.  Maj. Op. 3.  There is a mistake, but it is the majority's.  Al-Hela's jurisdictional statement in his en banc brief cited 28 U.S.C. § 2241 on page 1 and never mentioned the statutory provision again.  Instead, his brief and his argument relied entirely on *Boumediene v. Bush*, and its view of the Suspension Clause and the common law writ.  *See* 553 U.S. 723, 732, 748, 779 (2008); *see also Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93–94 (1807) ("That for the meaning of the term habeas corpus, resort may unquestionably be had to the common law . . .." (emphasis removed)), relied upon in *Boumediene*, 553 U.S. at 779.

    [8] The Suspension Clause provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. CONST. art. 1, § 9, cl. 2.  Whether the Clause itself "guarantees the availability of the writ or simply restricts the temporary withholding of its operation" if the writ is otherwise available "is subject to controversy."  *Thuraissigiam*, 140 S. Ct. at 1969 n.12.  *Compare INS v. St. Cyr*, 533 U.S. 289, 300 (2001), *with id.* at 336–41 (Scalia, J., dissenting).

6

development that astonished at least one learned commentator. *See* Lee Kovarsky, *Habeas Privilege Origination and* DHS v. Thuraissigiam, 121 COLUM. L. REV. F. 23, 36–37 (2021).

True to form, the majority opinion, while supplying hypothetical content to the writ of habeas corpus preserved by the Suspension Clause, fails to take into account that seven Justices think it is not settled whether the Suspension Clause even preserves the common law habeas writ.

To round things out, the very Supreme Court opinion the majority purports to be interpreting – *Boumediene* – held that *Hamdi* did not apply to the detainees at Guantanamo. That of course directly contradicts the entirety of the majority opinion.

The Supreme Court in *Boumediene* put it this way: "*Hamdi* did not garner a majority of the Court, it does not control the matter at hand. None of the parties in *Hamdi* argued there had been a suspension of the writ. Nor could they. The § 2241 habeas process remained in place." *Boumediene v. Bush*, 553 U.S. 723, 784 (2008).

There is yet another crucial consideration, one the majority again suppresses.

It is this. As *Boumediene* recognized, even on the narrowest reading of the *Hamdi* plurality opinion, nothing that matters here commanded the approval of a majority of the Justices. *See Marks v. United States*, 430 U.S. 188, 193 (1977). In that circumstance, the proper course "is to follow the Supreme Court's pre-existing precedent." *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015). In al-Hela's case, that precedent is *Johnson v. Eisentrager*, which held that alien enemies detained overseas are not "persons" within the meaning of the Fifth Amendment's Due Process Clause. 339 U.S. 763,

7

784–85 (1950).

III.

Having decided to assume without deciding the Fifth Amendment issue, the majority had to discern the content of due process for detainees at Guantanamo. Although *Boumediene* itself left the issue open, as the majority rightly acknowledges,[9] there are close Supreme Court analogies.

One is due process for aliens illegally trying to enter the United States and detained at the border. Another is due process in the military context; Guantanamo, after all, is a military base and the detainees there are military prisoners.

As to illegal aliens, the Court has long held that "the only procedural rights of an alien seeking to enter the country are those conferred by statute." *Thuraissigiam*, 140 S. Ct. at 1977. In other words, "'the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.'" *Id.* (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)).

As to the military context, the Court has "recognized in past cases that 'tests and limitations of [due process] may differ because of the military context.'" *Weiss v. United States*, 510 U.S. 163, 177 (1994) (alteration in original) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981)).

Rather than drawing on either or both of these analogous lines of cases, the majority adopts as its Due Process test for Guantanamo detainees, *Mathews v. Eldridge*, 424 U.S. 319 (1976), a case dealing with the denial of disability benefits! *See*

---

[9] *See* Maj. Op. 13; *Boumediene*, 553 U.S. at 785–87.

8

Maj. Op. 19.

The majority's explanation?  *Mathews* "is the leading authority for deciding what procedural protections are required to comport with the Due Process Clause."  *Id.*  But *Mathews* is not "the leading authority," or for that matter, any authority in cases involving illegal aliens held at the border.  And in *Weiss*, the Supreme Court flatly rejected the argument that "the due process analysis established in *Mathews v. Eldridge*" should apply in the military context.  *Weiss*, 510 U.S. at 177.[10]

IV.

The majority opinion makes much of a single word, repeated several times in the *Boumediene* opinion.  The word is "meaningful."[11]  Maj. Op. 22–24.

*Boumediene* stated that "The Privilege of the Writ of

---

[10] *Mathews v. Eldridge* was never meant to bear the weight of determining sufficient process for a putative liberty interest.  *See Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 59–60 (1981) (Stevens, J., dissenting).  To the contrary, it derived from and sought to settle controversies over entitlement to public benefits—matters that courts were viewing as property interests.  *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 262 n.8 (1970).  Nothing suggested that *Mathews* would govern cases regarding liberty interests, particularly where the Constitution and common-law history already supplied answers.  *See* 424 U.S. at 333–34.

[11] There is a hint or two in the majority opinion that by using this word, the *Boumediene* opinion smuggled the Due Process Clause into its holding, even though Justice Kennedy, writing for the majority, disavowed doing any such thing.

9

Habeas Corpus" in the Suspension Clause entitled a Guantanamo prisoner to a "meaningful opportunity to demonstrate that he is being held" contrary to law.  553 U.S. at 779.  The Court's use of "meaningful" came out of the blue.  It lacked context and it supplied no content, and the Court, having laid it down, just moved on without further elaboration.

Before placing so much weight on a single word, the majority here should have asked, but did not, "meaningful" habeas corpus in comparison to what?  That essential inquiry would have yielded several options.[12]

"Meaningful" as in the common law writ of habeas corpus *ad subjiciendum* in 1789, in this country or in England?  Or habeas corpus for aliens facing deportation?  For members of the United States armed forces who faced court martial?  For criminals convicted in state court?  In federal court?  For criminal defendants awaiting trial?  For those held by state or federal authorities without being charged with committing a criminal offense?

In the first part of the *Boumediene* opinion, dealing with the geographical reach of the common law writ of habeas corpus as preserved in the Suspension Clause, all nine Justices agreed that the answer depended on whether the common law writ in 1789 extended beyond a country's sovereign territory.  553 U.S. at 739; *id.* at 801, 818 (Roberts, C.J., joined by Scalia, Thomas, and Alito, J.J., dissenting); *id.* at 826–27 (Scalia, J., joined by Roberts, C.J., and Thomas, and Alito, J.J., dissenting).

---

[12] The great philosopher of science, Sir Karl Popper, once supplied a list of commonly used terms that were "trivial," and "philosophically unimportant."  Near the top of the list was "meaningful."  KARL POPPER, UNENDED QUEST: AN INTELLECTUAL AUTOBIOGRAPHY 21 (1990).

10

No good reason appears – the majority here supplies none – for treating the content of the common law writ any differently than its geographic scope. Thus, what amounts to a "meaningful" common law writ of habeas corpus preserved by the Suspension Clause necessarily depends on the content of the writ in 1789.

That is the analysis the Supreme Court used in its latest decision concerning the Suspension Clause and "[t]he Privilege of the Writ of Habeas Corpus." In deciding the petitioner's claim, the Court examined how "the writ of habeas corpus was understood at the time of the adoption of the Constitution." *Thuraissigiam*, 140 S. Ct. at 1969.

As applied to this case, we can be absolutely certain that the Framers of the Suspension Clause in 1789 did not intend to incorporate the Fifth Amendment and its Due Process Clause. We can be certain of this because in 1789 there was no Fifth Amendment.

The common law writ of habeas corpus, as it existed in 1789, allowed a prisoner to obtain only limited judicial review of his detention. The process required the jailor to produce the prisoner, accompanied by the indictment, warrant, and a return stating reasons for confining the prisoner. Habeas Corpus Act of 1679, 31 Car. 2, c.2, § II (Eng.);[13] Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial*

---

[13] "With the sole exception of Connecticut, which passed its own unique habeas corpus statute in 1821, all of the habeas corpus acts passed in the thirteen original colonies or states were patterned after the English [Habeas Corpus Act of 1679]." Dallin H. Oakes, *Habeas Corpus in the States—1776-1865*, 32 U. CHI. L. REV. 243, 253 (1965); *see also* AMANDA L. TYLER, HABEAS CORPUS IN WARTIME 102–08, 119–21 (2017).

11

*Contexts, and American Implications*, 94 VA. L. REV. 575, 598–99 (2008).  A prisoner could not "traverse," or contest, the return.  *Opinion on the Writ of Habeas Corpus*, 97 Eng. Rep. 29, 43–45 (1758).  The prisoner was not permitted to introduce evidence to controvert the truth of the return, and the habeas court lacked power to examine its truth.  *Id.* at 43;  Dallin H. Oakes, *Legal History in the High Court—Habeas Corpus*, 64 MICH. L. REV. 451, 453 (1966).

This was the meaning of "[t]he Privilege of the Writ of Habeas Corpus" as "understood at the time of the adoption of the Constitution," *Thuraissigiam*, 140 S. Ct. at 1969, and it remained valid across the board for nearly a century until federal legislation altered habeas procedures for citizens imprisoned in the United States.  *See* Note, *Developments in the Law — Federal Habeas Corpus*, 83 HARV. L. REV. 1038, 1113–14 (1970).

The majority pays no attention to this history in determining the content of the writ to which al-Hela is entitled, even though *Boumediene* suggests that it should and *Thuraissigiam* holds that it must.

V.

Fifteen years ago the Solicitor General, the chief litigating official representing the United States, stated in the government's Supreme Court brief that detainees at Guantanamo have "no due process" rights.  Brief for the Respondents at 68, *Boumediene*, 553 U.S. 723 (Nos. 06-1195 & 06-1196).  In support, the Solicitor General provided a comprehensive analysis of "well established" legal principles showing "that the Fifth Amendment, including its Due Process Clause, does not apply to aliens who have no presence in any

12

territory over which the United States is sovereign." *Id.*[14]

The Supreme Court did not reach the Due Process question in *Boumediene*. Years later, when al-Hela's case came before a panel of this court, the United States reiterated the position it had taken in the Supreme Court and in intervening cases before our court – "consistent with controlling precedent – that al-Hela lacks due process rights." U.S. Panel Br. 64. I have already quoted the government's analysis. *See supra* p. 3. Our panel, of which I was a member, agreed with that analysis.

Al-Hela petitioned for rehearing en banc. The United States again objected in December 2020: "The panel decision correctly applies longstanding precedent to conclude that the Due Process Clause, unlike the Suspension Clause, does not apply to al-Hela." U.S. Opposition to Petition for Rehearing En Banc at 6.

Yet on rehearing en banc, in its brief filed on July 9, 2021, the Civil Division of the Department of Justice declined – as their attorneys put it – to "renew" their argument that the Due Process Clause does not apply at Guantanamo. U.S. En Banc Br. 24.

What changed between December 2020 and July 2021? At the en banc oral argument, held in September 2021, we sought to understand what exactly the Justice Department knew now that it did not know then. The Constitution was the same. No Supreme Court decision on which the Solicitor General had relied in presenting the position of the United States in

---

[14] The Solicitor General cited and relied on the following decisions: *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990), and *Johnson v. Eisentrager*, 339 U.S. 763, 784–85 (1950).

13

*Boumediene* or in this court had been overruled or called into doubt.

And so we asked for an explanation. The Civil Division attorney responded: "I'll be honest, it is the change in administration." Oral Arg. Tr. 89:23–24.

That is not a legal explanation.  It is a political excuse. It brings to mind  Justice Scalia's question, a question the Chief Justice and other Justices asked in oral arguments when confronting such rare DOJ about-faces: "Why should . . . we listen to you rather than the solicitors general who took the opposite position . . .?"  Michael R. Dreeben, *Stare Decisis in the Office of the Solicitor General*, 130 YALE L.J.F. 541, 549, 550–51 (2021) (internal quotation marks omitted).

In this case, the answer to Justice Scalia's question is that we should give no credit to the Justice Department's political retreat from the well-established Constitutional principles it vigorously advocated throughout the three Administrations preceding this one, that the Due Process Clause does not extend outside the United States to military prisoners at Guantanamo.