SECRET//NOFORN

No. 19-5079

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ABDULSALAM ALI ABDULRAHMAN AL-HELA,

Petitioner-Appellant,

v.

DONALD J. TRUMP, et al.

Respondents-Appellees.

On Appeal from the United States District Court
for the District of Columbia

### BRIEF FOR APPELLEES

JOSEPH H. HUNT
*Assistant Attorney General*

SHARON SWINGLE
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

SECRET//NOFORN

SECRET//NOFORN

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.  Parties and Amici

The petitioner in this case is Abdulsalam Ali Abdulrahman al-Hela, a Guantanamo Bay detainee also identified by Internment Serial Number 1463. The respondents are Donald J. Trump, in his official capacity as President of the United States; Mark Esper, in his official capacity as Secretary of Defense; Rear Admiral Timothy C. Kuehhas, in his official capacity as Commander of the Joint Task Force Guantanamo (JTF-GTMO); and Steven Yamashita, in his official capacity as Commander of the Joint Detention Group, JTF-GTMO. There have been no amici in this Court or the district court.

### B.  Rulings Under Review

The rulings under review are the district court's January 28, 2019 order denying a writ of habeas corpus, JA 116-98, and orders issued on May 12, 2016 (JA 199-205) and November 19, 2014 (JA 206-07). All of the orders were issued by Judge Lamberth. The orders are unpublished, but the May 2016 order is available on Westlaw (2016 WL 2771804).

SECRET//NOFORN

SECRET//NOFORN

C. **Related Cases**

This case has previously been before this Court as No. 05-5230 and 08-

5268. Counsel for respondents are not aware of any other related cases within

the meaning of D.C. Circuit Rule 28(a)(1)(C).

*s/ Brad Hinshelwood*
Brad Hinshelwood

SECRET//NOFORN

SECRET//NOFORN

## TABLE OF CONTENTS

GLOSSARY

STATEMENT OF JURISDICTION ............................................................................1

STATEMENT OF THE ISSUE ..................................................................................1

STATEMENT OF THE CASE ..................................................................................1

    A.    Statutory Background .........................................................................1

    B.    Factual Background and Prior Proceedings.....................................2

SUMMARY OF ARGUMENT ................................................................................10

STANDARD OF REVIEW......................................................................................13

ARGUMENT ..........................................................................................................13

    I.    Al-Hela Was Part Of And Substantially Supported Al Qaeda
        And Its Associated Forces .............................................................13

        A.    Al-Hela's Travel Facilitation Activities and Logistical
            Support for Terrorist Plots Justify His Detention..........................14

        B.    Al-Hela Identifies No Error in the District Court's
            Findings That He Engaged in Travel Facilitation and
            Assisted With Terrorist Attacks......................................................22

        C.    Al-Hela's Contentions That These Activities Do Not
            Support Detention Are Meritless.....................................................37

    II.    The District Court Properly Found That AAIA And EIJ
        Were Associated Forces Of Al Qaeda.............................................46

SECRET//NOFORN

SECRET//NOFORN

III.  Al-Hela's Suspension Clause And Due Process Arguments
      Are Meritless ...................................................................................52

CONCLUSION ..............................................................................................70

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

SECRET//NOFORN

ii

~~SECRET//NOFORN~~

## TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Agostini v. Felton,*
  521 U.S. 203 (1997) ............................................................................................ 70

*Al-Adahi v. Obama,*
  613 F.3d 1102 (D.C. Cir. 2010) ...................................................................... 18, 26, 43

*Al-Alwi v. Obama,*
  653 F.3d 11 (D.C. Cir. 2011) .................................................................................. 34

*Al-Alwi v. Trump,*
  901 F.3d 294 (D.C. Cir. 2018) .......................................... 2, 12, 53, 54, 57, 58

*Al-Bihani v. Obama,*
  590 F.3d 866 (D.C. Cir. 2010) ........................... 2, 21, 33, 38, 42, 51, 59, 60

*Ali v. Obama,*
  736 F.3d 542 (D.C. Cir. 2013) ...................................................................... 36, 39, 54

*Al-Madhwani v. Obama,*
  642 F.3d 1071 (D.C. Cir. 2011) .......................................................................... 65

*Almerfedi v. Obama,*
  654 F.3d 1 (D.C. Cir. 2011) .......................................................................... 13, 36

*Al-Nashiri, In re,*
  835 F.3d 110 (D.C. Cir. 2016) .................................................................................. 42

*Al Odah v. United States,*
  559 F.3d 539 (D.C. Cir. 2009) ...................................................................... 56, 57

*Alsabri v. Obama,*
  684 F.3d 1298 (D.C. Cir. 2012) .................................................................... 43, 56

*Alsawam v. Obama,*
  942 F. Supp 2d 6 (D.D.C. 2013) .................................................................................. 5

*Awad v. Obama,*
  608 F.3d 1 (D.C. Cir. 2010) .......................................................... 36, 38, 50, 56

~~SECRET//NOFORN~~

iii

SECRET//NOFORN

*Bensayah v. Obama*,
  610 F.3d 718 (D.C. Cir. 2010) ................................................................ 11, 20, 37

*Bin Attash v. Obama*,
  628 F. Supp. 2d 24 (D.D.C. 2009) ..................................................................... 3

*Bismullah v. Gates*,
  501 F.3d 178 (D.C. Cir. 2007), *vacated on other grounds*,
  554 U.S. 913 (2008) ........................................................................................ 56

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ..... ......................................... 2, 6, 7, 12, 55, 59, 61-62, 68, 69

*Ellsberg v. Mitchell*,
  709 F.2d 51 (D.C. Cir. 1983) .......................................................................... 63

*Ex parte Quirin*,
  317 U.S. 1 (1942) .......................................................................................... 54

*Halkin v. Helms*,
  598 F.2d 1 (D.C. Cir. 1978) ............................................................................ 63

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ............................................. 1, 2, 53, 54, 58, 59, 60, 61, 62

*Hussain v. Obama*,
  718 F.3d 964 (D.C. Cir. 2013) ............................................. 36, 37, 38, 41, 43

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) .... .......................................................... 62, 65

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ...................................................................................... 64

*Khan v. Obama*,
  655 F.3d 20 (D.C. Cir. 2011) ................................................................. 28, 56, 62

*Khairkhwa v. Obama*,
  703 F.3d 547 (D.C. Cir. 2012) ........................................................................ 42

SECRET//NOFORN

iv

SECRET//NOFORN

*Kiyemba v. Obama,*
  555 F.3d 1022 (D.C. Cir. 2009), *vacated,*
  559 U.S. 131, *reinstated in relevant part,*
  605 F.3d 1046 (D.C. Cir. 2010), *cert. denied,*
  563 U.S. 954 (2011) ............................................................................... 65, 66

*National Council of Resistance of Iran v. Department of State,*
  251 F.3d 192 (D.C. Cir. 2001) .................................................................. 62

*Parhat v. Gates,*
  532 F.3d 834 (D.C. Cir. 2008) ................................................ 12, 47, 48, 50, 56

*People's Mojahedin Org. of Iran v. Department of State,*
  327 F.3d 1238 (D.C. Cir. 2003) ............................................................. 62, 65

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
  182 F.3d 17 (D.C. Cir. 1999) ............................................................... 67, 68

*Qassim v. Trump,*
  927 F.3d 522 (D.C. Cir. 2019) ............................................................. 64, 67

*Rasul v. Bush,*
  542 U.S. 466 (2004) ........................................................................... 65, 70

*Salahi v. Obama,*
  625 F.3d 745 (D.C. Cir. 2010) ........................................................ 36, 42, 44

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ............................................................................. 64

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990) ........................................................................... 64, 67

*Uthman v. Obama,*
  637 F.3d 400 (D.C. Cir. 2011) .................................................................. 36

*Yamataha v. Fisher,*
  189 U.S. 86 (1903) ............................................................................... 64

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) ............................................................................. 64

SECRET//NOFORN

v

SECRET//NOFORN

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ..................................................................................... 64, 67

**Treaty:**

Geneva Convention Relative to the Treatment of Prisoners of
War August 12, 1949, art. 4, 6 U.S.T. 3316, 75 U.N.T.S. 135 ..................................... 40

**Statutes:**

Authorization for Use of Military Force,
Pub. L. No. 107-40, 115 Stat. 224 (2001) ..................................................................... 1

National Defense Authorization Act for Fiscal Year 2012,
Pub. L. No. 112-81, 125 Stat. 1298 (2011) ..................................................... 2, 40, 41, 55

8 U.S.C. § 1189 .......................................................................................................... 67

28 U.S.C. § 1291 .......................................................................................................... 1

28 U.S.C. § 2241 .......................................................................................................... 1

**Regulatory Material:**

Exec. Order No. 13,224,
66 Fed. Reg. 49,079 (Sept. 23, 2001) ......................................................................... 52

Exec. Order No. 13,567,
76 Fed. Reg. 13,277 (Mar. 7, 2011) ........................................................................... 55

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ............................................................................................. 1

**Other Authority:**

United Nations, *Islamic Army of Aden,*
https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/
summaries/entity/islamic-army-of-aden (last visited Nov. 5, 2019) .............................. 50

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## GLOSSARY

| | |
|---|---|
| AAIA | Aden-Abyan Islamic Army |
| AUMF | Authorization for Use of Military Force |
| CIA | Central Intelligence Agency |
| EIJ | Egyptian Islamic Jihad |
| NDAA | National Defense Authorization Act of 2012 |

~~SECRET//NOFORN~~

SECRET//NOFORN

## STATEMENT OF JURISDICTION

Abdulsalam Ali Abdulrahman al-Hela petitioned for a writ of habeas corpus

under 28 U.S.C. § 2241. The district court entered judgment denying the petition on

January 28, 2019. JA 198. Al-Hela filed a timely notice of appeal on March 22, 2019.

JA 208-10; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C.

§ 1291.

## STATEMENT OF THE ISSUE

Whether the district court correctly concluded that al-Hela is properly detained

under the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224

(2001).

## STATEMENT OF THE CASE

### A.    Statutory Background

In response to the attacks of September 11, 2001, Congress enacted the

Authorization for Use of Military Force (AUMF), which authorizes the President "to

use all necessary and appropriate force against those nations, organizations, or

persons he determines planned, authorized, committed, or aided the terrorist attacks

that occurred on September 11, 2001, or harbored such organizations or persons."

Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001). In *Hamdi v. Rumsfeld*, 542 U.S.

507, 521 (2004), the Supreme Court held that "Congress' grant of authority for the

use of 'necessary and appropriate force'" in the AUMF "include[s] the authority to

SECRET//NOFORN

SECRET//NOFORN

detain for the duration of the relevant conflict." *Id.* at 521 (plurality opinion); *id.* at 587 (Thomas, J., dissenting).

Congress subsequently affirmed in the National Defense Authorization Act for Fiscal Year 2012 (NDAA) that the President's authority under the AUMF includes "[d]etention under the law of war without trial until the end of the hostilities authorized by" the AUMF. Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. 1298, 1562 (2011). This detention authority includes the power to detain individuals who were "part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces." *Id.* § 1021(a), (b)(2), 125 Stat. at 1562; *see Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010). Neither the AUMF nor the NDAA "places limits on the length of detention in an ongoing conflict." *Al-Alwi v. Trump*, 901 F.3d 294, 297 (D.C. Cir. 2018).

### B.    Factual Background and Prior Proceedings

1.  Al-Hela, a Yemeni citizen who has been detained at Guantanamo since 2004, filed this habeas petition in 2005. After the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), the government filed a factual return outlining the basis for al-Hela's detention, supported by numerous exhibits. To manage

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

proceedings in this case and others, the district judge here adopted a case management order identical to one employed by other judges in the district. *See* Dkt. Nos. 155, 172 ("Order"); *Bin Attash v. Obama*, 628 F. Supp. 2d 24, 30 (D.D.C. 2009). The case management order imposes various disclosure obligations on the government, including the obligation to disclose to a detainee's counsel, if they hold a Secret-level security clearance and subject to a protective order, the information on which the government relies to justify a detainee's continued detention, as well as exculpatory information. Order §§ I.C, I.D.1, I.E.1, I.F; Dkt. Nos. 138, 216 (protective order). If the government believes it is necessary to withhold classified information from a detainee's counsel, it must seek an exception to disclosure from the district court. Order § I.F.

Al-Hela contests two rulings made by the district court under the case management order.

a. In cases before most district judges who have adopted the case management order, the government complies with its disclosure obligations by providing a detainee's counsel with the portions of the various documents on which the government relies to justify detention, disclosing all arguably exculpatory information that the government locates in its searches of the reasonably available materials, and certifying that it has met its disclosure obligations. Under this procedure, the government typically redacts classified material that is unrelated to a particular

SECRET//NOFORN

3

SECRET//NOFORN

detainee or otherwise not relied on to justify detention. Under this district judge's interpretation of the case management order, however, the government is required to seek an exception to disclosure even for those redactions in the amended factual return that merely withhold classified information on which the government does not rely to justify detention and which is not arguably exculpatory. *See Bin Attash*, 628 F. Supp. 2d at 36.

Following the district judge's procedure, the government filed multiple motions for exceptions to disclosure. These motions, which were filed *ex parte*, in many respects addressed classified information unrelated to al-Hela that the government did not rely on to justify detention, and thus was not relevant and material to al-Hela and not subject to disclosure. However, the government's evidence in this case also includes a large volume of highly sensitive national security information. This information—particularly ███████████████—is among the most sensitive classified information held by the United States government. ████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ The requests for exceptions thus also encompass material that could not be disclosed to al-Hela's counsel, such as information ████████████ even though such information

SECRET//NOFORN

4

SECRET//NOFORN

was inculpatory or exculpatory. Al-Hela's counsel moved for access to the government's first three *ex parte* motions and supplemental briefs. JA 206.

The district court denied the motion, observing that such motions "by their nature, must explain the [respondents'] rationale for objecting to the disclosure of sensitive information, which necessarily requires discussion of the nature and/or substance of the classified information at issue." JA 207 (quoting *Alsawam v. Obama*, 942 F. Supp. 2d 6, 12 (D.D.C. 2013)).

b. Al-Hela also challenges a district court ruling related to his personal access to portions of the factual return and supporting exhibits. Al-Hela's security-cleared counsel had the factual return and exhibits. The government also prepared a public version of the return and exhibits, which counsel could share with al-Hela. *See* Dkt. No. 333. Al-Hela's counsel subsequently requested that the government provide a classified version of the redacted material in the amended factual return and exhibits that could be shared directly with al-Hela. Because of the sensitivity of the information—including information that would necessarily reveal to al-Hela the identity of the government's sources—the government was not able to provide a less redacted version of the factual return narrative and exhibits for al-Hela's personal review. In an effort to assist al-Hela's counsel, the government provided a summary of some of the allegations against al-Hela and supporting facts, which counsel could discuss with him. JA 199-200; *see* Dkt. No. 353-3 (Ex. C).

SECRET//NOFORN

5

SECRET//NOFORN

Subsequently, al-Hela moved for personal access to "the allegations made by the Government against him as well as the purported factual bases for the allegations," asserting that such access was necessary to ensure a "meaningful opportunity" to contest his detention. JA 199-200 (quoting Dkt. No. 353, at 1, and *Boumediene*, 553 U.S. at 779). The government opposed, explaining that much of the information withheld from al-Hela addresses his extremist activities in Yemen, including the possibility that senior members of the Yemeni government were aware of his activities. Disclosure of such information would likely have serious effects on the foreign relations and activities of the United States in Yemen and elsewhere, and as the government explained in greater detail in an *ex parte* filing, disclosure of this information would necessarily reveal

The district court denied the motion. It explained that there was no "support for petitioner's argument that personal access is essential to a meaningful opportunity to contest detention." JA 201. It noted that this Court had previously approved "the use of classified evidence in habeas cases—even when no disclosure was made to defense counsel, let alone to the petitioner," and that these holdings "demonstrate[] that lack of personal access does not per se violate *Boumediene*'s guarantee." JA 202. The court also explained that "revealing an allegation sometimes necessarily reveals

SECRET//NOFORN

6

SECRET//NOFORN

the source or method from which it emerged." *Id.* In addition, the court concluded that the government had provided *ex parte* "specific and persuasive reasons to believe that further disclosure [to al-Hela personally] of the allegations against petitioner and the factual bases therefor would risk revealing U.S. intelligence sources and methods." JA 203. Any impediment to al-Hela's case, the court held, reflected "respondents' 'legitimate interest in protecting sources and methods of intelligence gathering … to the greatest extent possible.'" JA 204 (quoting *Boumediene,* 553 U.S. at 796).

In addition, after filing an amended factual return in June 2017, the government in August 2017 provided al-Hela with versions of the exhibits that contain his own statements on which the government relied that he could discuss with counsel, JA 1042-93, along with a version of the amended factual return narrative.

2. In 2017, the district court held a five-day hearing on al-Hela's petition, which included live testimony from al-Hela. After receiving post-hearing briefs, the court issued a lengthy opinion denying the petition, concluding that the government had met its burden to demonstrate that al-Hela more likely than not had "substantially supported" al Qaeda and certain associated forces. JA 116-97.

As a threshold matter, the district court made certain credibility findings regarding the evidence in the case. The court observed that "[t]he government relies heavily on petitioner's ███████████ statements ████████

████████████████████████████████████████

SECRET//NOFORN

7

SECRET//NOFORN

█████████████████████ Al-Hela had access to these statements, and the court found they "are not tainted by coercion." *Id.* In addition, the court noted, al-Hela "did not testify that he did not make these statements," nor did he "testify that he lied ████████████████████ JA 142. The court rejected al-Hela's suggestion that some of the statements may have been the result of "misunderstandings," as al-Hela provided no specific examples and al-Hela's statements "are often corroborated by reporting from other sources." *Id.* The court concluded that "these ████████ statements are reliable." *Id.*

The district court also found that, even taking into account the length of time that had passed between the events at issue and al-Hela's live testimony at the merits hearing, al-Hela "gave vague and non-responsive answers" to some questions. JA 143 & n.3. It also "found that petitioner gave false testimony" at points, and that, "[c]onsidering al-Hela's personal stake in the proceedings and the reliable evidence in the record, there are portions of petitioner's testimony that the Court cannot accept." *Id.*

On the merits, the district court first found that two organizations with which al-Hela was involved—Egyptian Islamic Jihad (EIJ) and the Aden-Abyan Islamic Army (AAIA)—were "associated forces" of al Qaeda. JA 144. The court cited the close links between these groups and bin Laden, along with their efforts to attack targets associated with the United States and its coalition partners. JA 144-48.

SECRET//NOFORN

8

~~SECRET//NOFORN~~

The district court also made extensive findings about al-Hela's personal involvement with al Qaeda, EIJ, and AAIA. In summary, the district court found that al-Hela fought in Afghanistan against the Soviet Union, where he developed relationships with other jihadists, including Yasir Tawfiq al-Sirri, who later became an EIJ leader. JA 117. Al-Hela returned to Yemen, where, according to his own

███████████████ statements ████████ he ████████████████████████

███████████████████████████████████ to facilitate the travel of numerous Islamic extremists, including al Qaeda and EIJ members. JA 118. As part of this scheme, al-Hela obtained false or fraudulent travel documents for foreigners and Yemenis, and purchased legitimate passports from Yemenis and sold them to extremists, including bin Laden associates. *Id.* ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

The district court also found that al-Hela provided support for bombing attacks carried out or attempted by AAIA, including the bombing of the British Embassy in Sana'a, Yemen in October of 2000. JA 119-20. ████████████████

█████████████████████████████████████████████████ al-Hela had a

██████ relationship with the AAIA leader and bin Laden associate who masterminded

~~SECRET//NOFORN~~

9

SECRET//NOFORN

the attacks, Abu Bakr Jayul. JA 120. Subsequently, al-Hela told ▆▆▆▆▆▆ he was

approached to participate in two additional planned attacks by al Qaeda or AAIA,

both likely targeting the U.S. Embassy. JA 120-21.

    The district court also found that al-Hela had extensive connections to

prominent al Qaeda, EIJ, and AAIA figures. He was close to al-Sirri, an important

EIJ leader, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

    The district court concluded that these activities demonstrated that al-Hela had

"substantially supported" al Qaeda, EIJ, and AAIA, which authorized his continued

detention. JA 195-97. The district court therefore denied the writ. JA 198.

### SUMMARY OF ARGUMENT

    The district court found that al-Hela facilitated the travel of members of al

Qaeda and associated forces over a period of years—a finding largely based on al-

Hela's own ▆▆▆▆▆▆▆▆▆ statements. His statute as a travel facilitator for al

SECRET//NOFORN

10

SECRET//NOFORN

Qaeda was such that the organization trusted him

In the aftermath of the bombing of the USS Cole, al-Hela was         contacted about helping al Qaeda figures escape Yemen. Separately, al-Hela was involved with five planned, attempted, or successful terrorist plots carried out primarily by AAIA, which the district court found was an associated force of al Qaeda. These findings are more than sufficient to show that al-Hela was "part of" al Qaeda and associated forces under the "functional" test mandated by this Court's precedent, *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010). They also demonstrate that al-Hela "substantially supported" al Qaeda and associated forces, which provides an independent basis for his detention.

Al-Hela's various efforts to undermine these conclusions fail. His attempts to contest the district court's factual findings show nothing approximating clear error. His legal arguments, which focus entirely on the contention that he did not "substantially support[]" al Qaeda and associated forces, are irrelevant given that the evidence demonstrates that he was "part of" those organizations. In any event, those arguments ignore the text of the AUMF and the NDAA, this Court's decisions, and the nature of the conflict authorized by the AUMF. Detention authority under the

SECRET//NOFORN

11

SECRET//NOFORN

AUMF necessarily reaches individuals, like al-Hela, who provide substantial support to al Qaeda and its associated forces over a period of years.

The district court also did not err in finding that AAIA and EIJ were associated forces of al Qaeda, relying on evidence that these organizations were closely linked to bin Laden and carried out or planned attacks against Western targets in the wake of bin Laden's 1998 fatwa against the United States and other Western countries. Al-Hela's reliance on *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), is erroneous; the evidence before the district court here included substantial material permitting the district court to assess its reliability, and in many respects was uncontested.

Finally, al-Hela's various arguments under the AUMF, the Suspension Clause, and the Due Process Clause of the Fifth Amendment fail. His argument under the AUMF is foreclosed by *Al-Alwi v. Trump*, 901 F.3d 294, 297-98 (D.C. Cir. 2018). Al-Hela cites no support for his contention that substantive due process requires the government to release him while hostilities are ongoing. His arguments that the procedures available to him in district court did not provide the "meaningful opportunity" to contest the basis for his detention required by *Boumediene v. Bush*, 553 U.S. 723 (2008), are irreconcilable with this Court's cases interpreting that standard, which have endorsed the procedures applied here. And his effort to circumvent these cases by invoking procedural due process protections under the Fifth Amendment ignores that he forfeited those arguments by failing to raise them in district court;

SECRET//NOFORN

12

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

docs not grapple with the Supreme Court's instructions in *Hamdi* about the process due; and fails to engage in the context-sensitive inquiry required in any due process analysis, particularly in light of the Supreme Court's repeated statements that these proceedings must respect the government's legitimate interest in protecting intelligence sources and methods. Finally, although the Court need not reach the question, al-Hela's due process claims fail because he lacks Fifth Amendment due process rights as an alien without property or presence in the United States.

## STANDARD OF REVIEW

In reviewing the denial of a petition for a writ of habeas corpus, this Court reviews the district court's factual findings for clear error and its ultimate decision de novo. *Almerfedi v. Obama,* 654 F.3d 1, 5 (D.C. Cir. 2011).

## ARGUMENT

### I.      Al-Hela Was Part Of And Substantially Supported Al Qaeda And Its Associated Forces

The district court's factual findings demonstrate that al-Hela was both part of and substantially supported al Qaeda and associated forces. Al-Hela does not address much of the most damaging evidence (his own ███████████ statements), the district court's findings about al-Hela's lack of credibility during his live testimony at the merits hearing, or the evidence as a whole, instead attempting to undermine individual pieces of the case against him. These failures are especially glaring in light

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

of the clear error standard of review. And al-Hela's legal contentions have no basis in the text of the AUMF and NDAA, are inconsistent with the decisions of this Court, and ignore the realities of the conflict authorized by the AUMF.

### A.    Al-Hela's Travel Facilitation Activities and Logistical Support for Terrorist Plots Justify His Detention

The district court found that al-Hela more likely than not was a trusted facilitator for al Qaeda and its associated forces over a period of years. Al-Hela's relationships with numerous high-level al Qaeda, EIJ, and AAIA figures; his travel facilitation activities on behalf of al Qaeda and EIJ; and his support for multiple plots largely planned or carried out by AAIA all demonstrate that al-Hela was part of and substantially supported al Qaeda and associated forces.

1. During al-Hela's time in Afghanistan during the Soviet-Afghan war, he developed connections to other prominent jihadists, including with individuals close to Osama bin Laden and with Yasir Tawfiq al-Sirri, a high-level member of EIJ. JA 148-49. The district court found that al-Hela's statements at the merits hearing about his age, which he used in an attempt to undermine the government's evidence of his time in Afghanistan, were not truthful. JA 150.

These relationships continued—and grew in number—after al-Hela's return to Yemen. The district court credited evidence ██████████████████████

██████████████████████████████████████████████

SECRET//NOFORN

14

SECRET//NOFORN



SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



The government, however, withdrew its reliance on that portion of the cited exhibit before the merits hearing, and does not rely on that contention here. *See* JA 317 (cited language); JA 706-07 (withdrawing reliance on that statement).

SECRET//NOFORN

16

SECRET//NOFORN

████████████████████████████████████████████ The district

court found that the presence of ████████ demonstrated "that al-Hela had ties

to members of al Qaeda and other terrorist groups." JA 185.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

  2.  Al-Hela's "extensive relationships and connections with high-level al Qaeda

and EIJ members," JA 192, were reflected in, and led to, many of al-Hela's specific

activities on behalf of al Qaeda, EIJ, and AAIA. ████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████ The district court credited this "contemporaneous" statement over

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

his denial at the merits hearing that he had ever provided such support, finding that al-Hela "falsely testified" and noting that "[s]uch 'false statements are evidence—often strong evidence—of guilt.'" JA 152-53 (quoting *Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010)). The district court also observed that "[n]umerous sources corroborate al-Hela's ███████████ admissions of facilitating the travel of extremists." JA 153; *see* JA 153-57.



███████ In his testimony at the merits hearing, al-Hela did not deny making these statements, did not suggest that they were exaggerated ███████ ████████████████ and did not contend that they were false. JA 157-60.

SECRET//NOFORN

18

SECRET//NOFORN

Al-Hela also told ████ that he had been contacted by Abd Ali al-Harithi, a close bin Laden associate, "about the possibility of facilitating travel for al-Harithi" ████████████████████████ As the district court observed, "[i]n the immediate aftermath of the attack on the USS Cole, al Qaeda members in Yemen would likely have been very cautious about those they reached out to for travel facilitation." JA 163.

3. Al-Hela's connections also played a role in his involvement in five planned, attempted, or accomplished terrorist attacks in Yemen in late 2000 and early 2001, including two planned attacks on the U.S. Embassy in Sana'a. Three of those attacks—a bombing of the British Embassy in October 2000, the attempted assassination of the Yemeni Minister of Interior in December 2000, and bombings ████████████████ around New Year's Day 2001—were carried out by AAIA members with logistical support from al-Hela. JA 169-71. Al-Hela had a ████ relationship" with Jayul, the AAIA leader and bin Laden associate responsible for the attacks. JA 171, 178. Al-Hela likewise "assist[ed] members" of AAIA with another plot likely targeting the U.S. Embassy. JA 179, ████████████

SECRET//NOFORN

19

SECRET//NOFORN



4. This evidence demonstrates that al-Hela is "part of" al Qaeda and associated forces. As this Court has explained, there is no "exhaustive list of criteria" for determining when an individual is "part of" al Qaeda or an associated force; instead, "[t]hat determination must be made on a case-by-case basis using a functional rather than a formal approach and by focusing on the acts of the individual in relation to the organization." *Bensayah v. Obama,* 610 F.3d 718, 725 (D.C. Cir. 2010). Al-Hela's relationship with members of al Qaeda and EIJ began with his time in Afghanistan, and then continued through the late 1990s and early 2000s. He had close relationships with multiple prominent al Qaeda, EIJ, and AAIA figures; By his own admission, al-Hela facilitated travel for numerous al Qaeda and EIJ members during this period. Al-Hela's close connection to al Qaeda is likewise illustrated by

SECRET//NOFORN

20

SECRET//NOFORN

███████████ the information with which he was entrusted and the circumstances in which he was contacted. He was so trusted that, in the time period surrounding the attack on the USS Cole, he ████████████████████████████████████ ████████████████████████████ was sought out by an al Qaeda figure ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ Similarly, in the space of just six months in late 2000 and early 2001, al-Hela assisted AAIA with four planned, attempted, or successful plots to attack a host of targets, including the U.S. and British embassies, and was asked to assist with a fifth plot involving AAIA members. This activity alone would be sufficient to demonstrate that al-Hela was functionally "part of" AAIA for purposes of detention.

For many of the same reasons, these activities are also sufficient to show that al-Hela "substantially supported" al Qaeda and associated forces. As this Court has explained, "substantial[] support[]" of an enemy force is an "independent[]" criteria for detention. *Al-Bihani v. Obama,* 590 F.3d 866, 873-74 (D.C. Cir. 2010). Al-Hela does not appear to contest the district court's conclusion that his activities—serving as a "trusted and important facilitator" who obtained "fraudulent passports and passports with false identities" that enabled members of al Qaeda and EIJ to travel,

SECRET//NOFORN

21

SECRET//NOFORN

and providing "logistical support to numerous terrorist attacks and plots" carried out

by AAIA—are the sort of activities that can qualify as substantial support. JA 196.

The importance of al-Hela's assistance is demonstrated by the fact ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These acts are substantial under any sensible

understanding of the term.

**B.    Al-Hela Identifies No Error in the District Court's Findings That He Engaged in Travel Facilitation and Assisted With Terrorist Attacks**

Al-Hela devotes much of his brief (Br. 31-46) to efforts to undermine the

district court's factual findings about his close relationships with numerous al Qaeda,

AAIA, and EIJ figures; travel facilitation; and involvement in five terrorist plots. But

al-Hela shows no error—much less clear error—in the district court's assessment of

the evidence.

1. Al-Hela argues that his acknowledged travel facilitation activities cannot be a

basis for his detention. Br. 31-37. This argument takes two tacks. Most broadly, al-

Hela suggests that there "is no basis" for the district court's conclusion that some of

the individuals whose travel he facilitated were al Qaeda or EIJ members. Br. 36. But

this conclusion was based on al-Hela's ▮▮▮▮▮▮▮▮▮▮▮ "admissions" ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

████ Though al-Hela now complains that the specific al Qaeda and EIJ members he helped "are not described or otherwise identified," Br. 36, that is in part because he did not provide the promised information.  As the district court observed, █████████

██████████████████████████████████████████████

Al-Hela's ██████ statements ██████—which he has never recanted—are alone sufficient to conclude that al-Hela more likely than not facilitated the travel of al Qaeda and EIJ members.  But if more were needed, other evidence corroborates his statements that he facilitated travel for al Qaeda and EIJ members.  The district court catalogued reports from multiple sources that identified al-Hela as a key travel facilitator.  JA 153-56. ████████████████████████

████████████████████████ These reports "provide robust corroboration that al-Hela facilitated the travel of extremists, including members of Osama bin Laden's group, which refers to al Qaeda members, and members of EIJ." JA 156.  Al-Hela does not attempt to undermine these reports corroborating his own ████████ statements.  And the district court likewise observed that al-Hela stated that had

██████████████████████████████

SECRET//NOFORN

SECRET//NOFORN

The district court also pointed out that important al Qaeda figures contacted al-Hela for travel facilitation purposes—contacts that would be difficult to explain if al-Hela did not have an established track record of providing such support, or if, as al-Hela contends, his efforts were "disruptive" to al Qaeda and EIJ (Br. 31-32, 35).



Al-Hela likewise                                            was contacted by Abd Ali al-Harithi, an important al Qaeda lieutenant in Yemen, about travel facilitation. JA 161-62. These included discussions about getting al-Harithi and                                            the bombing of the USS Cole out of Yemen after the attack. *Id.* Such sensitive and high-level contacts would be difficult to explain unless al-Hela was "a trusted travel facilitator for members" of al Qaeda. JA 163; *accord* JA 158.

SECRET//NOFORN

SECRET//NOFORN

More narrowly, al-Hela contends that his activities were officially sanctioned as part of a plan to "evict foreigners who might be extremists." Br. 31. As an initial matter, this defense is irrelevant under the AUMF in this context. Even if al-Hela's activities were sanctioned by Yemeni government figures, nothing in this Court's precedents suggests that an individual becomes immune from detention if he engages in conduct as part of or substantially supporting al Qaeda and associated forces that has some degree of sanction from a foreign government. But al-Hela's defense also fails on its own terms.

Al-Hela's suggestion that his activities were entirely government-sanctioned cannot be squared with his false exculpatory statements at the merits hearing. ████ ████████     al-Hela told ███████████████     that he had provided false travel documents to al Qaeda and EIJ members. JA 152-54; *see* JA 353-54, 358-60, 367, 374, 603. This fact was corroborated by multiple other sources, ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ This evidence showed "that al-Hela facilitated this travel by providing false passports and other false travel documentation." JA 157.

Despite these facts, al-Hela emphatically denied in his merits hearing testimony having ever provided false travel documents to those he helped. *See* JA 1392 ("Q:

SECRET//NOFORN

25

SECRET//NOFORN

And you didn't provide false passports to any of the Afghan Arabs to leave Yemen? A: Never. And neither to Afghan Arabs."). Yet al-Hela "never testified that he lied ▮▮▮ ▮▮▮▮▮▮ about providing false passports to extremists, and petitioner never claimed he had not disclosed such information" ▮▮▮▮▮▮▮▮ JA 152. As a result, the district court found that "al-Hela falsely testified during the merits hearing when he said he never provided false passports to Afghan Arabs. Such 'false exculpatory statements are evidence—often strong evidence—of guilt.'" JA 153 (quoting *Al-Adahi*, 613 F.3d at 1107).

Al-Hela now contends that even if he provided false documents, that would not be inconsistent with work in a legitimate government program deporting extremists because ▮▮▮▮▮▮▮▮ ▮▮ efforts to get foreign jihadists out of Yemen "may well have required the use of false passports." Br. 32 & n.4. Even if al-Hela's newly minted theory were true, it would not explain why al-Hela lied at the merits hearing about his provision of false passports to foreign jihadists—a finding al-Hela does not address. Al-Hela testified at length on both direct and cross-examination about his involvement in the deportation program. *See* JA 1319-29, 1380-81, 1389-96, 1413. Instead of testifying that the use of false passports was simply part of this government-run program, al-Hela falsely denied any involvement with the provision of false passports to extremists.

SECRET//NOFORN

SECRET//NOFORN

Al-Hela's other arguments likewise fall flat. For example, ██████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ Even if true, that is

not why al-Hela's involvement in their travel is significant. Al-Hela became involved

because ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████ Al-Hela's ████████████████████

██████████████████████ showed his "willing[ness] to engage in activities that

were not authorized by the Yemeni government" and "to operate beyond the scope

of the government authorized deportation program." JA 164-65. Al-Hela offers no

explanation for how ████████████████ could reflect participation in a legitimate

government program.

The same is true of the evidence that ████████████████████████
████████████████████████████████████████████████████████

SECRET//NOFORN

27

SECRET//NOFORN

████████████████████████████████████████████████████

████████████████████ This evidence, too, supports the conclusion that al-

Hela acted outside the scope of government authorization, as "providing passports

under false identities to Yemenis would not have been part of Yemen's deportation

program as that program was focused on foreigners." JA 163-64. ████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ Al-Hela cannot demonstrate clear error by

the district court in crediting this ████████████████████ *Khan v. Obama*, 655

F.3d 20, 30 (D.C. Cir. 2011).

The district court also found that al-Hela had likely "profited from his activities

providing fraudulent travel documents," and that this profiteering was inconsistent

with government authorization. JA 165. This, too, aligns with the other evidence that

al-Hela did not feel constrained to operate within the confines of any official

authority.

In addition, even accepting al-Hela's contention that his activities were carried

out with the knowledge and encouragement of his superiors in the Yemeni

government, the district court correctly concluded that that fact would not "mean that

he was not supporting terrorists or that he was not acting outside the scope of the

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Yemeni government's official deportation program." JA 168. The Yemeni Political

Security Organization "had substantial links to extremists,"

The district court also observed that

The district

court thus concluded that even if "al-Hela may have sometimes followed the lead of

these officials when facilitating the travel of extremists, this does not mean that he

was not supporting terrorists." JA 168.

Al-Hela does not grapple with this evidence. Instead, he offers a letter from

Yemeni officials in 2016 which generally states that al-Hela's activities were authorized

by higher officials in the Yemeni government. JA 767. But the district court was

correct to conclude that these statements are "not contemporaneous" with al-Hela's

activities, that "[t]here is no indication that the people who signed these letters worked

with al-Hela on the deportation of extremists in the late 1990s and early 2000s," and

that the letters "are vague, do not contain any details of the evidence the conclusions

SECRET//NOFORN

SECRET//NOFORN

are based on, and do not specify which extremists and foreigners the letters are referring to." JA 166. The letters are thus fully consistent with the conclusion that, even if some of al-Hela's activities were authorized, "it is more likely than not that al-Hela also engaged in activities that were not sanctioned by the Yemeni government." *Id.*

2.   Al-Hela fares no better in challenging the district court's finding that he was involved with five planned, attempted, or successful terrorist attacks in Yemen in late 2000 and early 2001. Br. 37-43. Al-Hela mostly attacks the credibility of the sources who provided the information about his involvement in these plots by repeating his arguments from district court, without addressing any of the aspects of that information that led the district court to conclude that it was credible.

Al-Hela's involvement in one of these plots—a planned attack on the U.S. Embassy in Sana'a in October of 2000—is sourced to al-Hela himself.



SECRET//NOFORN

SECRET//NOFORN

In addition, al-Hela testified at the merits hearing "that Jayul and his friends stated that something needed to be done to the U.S. Embassy in retaliation for Israeli hostilities against Palestinians," and that Jayul (or possibly al-Harithi) was the source of his information about the plot. JA 176; *see* JA 1347-48, 1384-87. The district court concluded that

And the district court concluded that al-Hela "was indeed approached by associates of Osama bin Laden to facilitate                                         an attack against the U.S. Embassy,"

SECRET//NOFORN

31

SECRET//NOFORN

[REDACTED]

The district court likewise concluded that al-Hela "more likely than not provided logistical support to a terrorist cell that was plotting to attack a U.S. target in Sana'a in spring 2001"—likely the U.S. Embassy. JA 179. This attack was being planned by "a cell [REDACTED] primarily of AAIA members." *Id.*; *see* JA 569-70, 582. [REDACTED]

Al-Hela asserts that this evidence is unreliable because it is vague. Br. 43. But the district court concluded that [REDACTED] Former U.S. Ambassador to Yemen Barbara Bodine also stated that "she was aware of a plot against the U.S. Embassy in the months prior to June 2001," which "fits with" the timeframe of this plot. *Id.*

SECRET//NOFORN

32

SECRET//NOFORN

Al-Hela's other complaints with this evidence fare no better. Al-Hela contends
that ▮▮▮ allegations are "hearsay" that "should not have been given any weight."
Br. 43. But hearsay is always admissible in these habeas proceedings, subject only to
assessment of its reliability. *Al-Bihani*, 590 F.3d at 879. Al-Hela has not demonstrated
clear error in the district court's decision to credit ▮▮▮ statements. He does not
attempt to undermine ▮▮▮ credibility, nor does he address the corroboration of the
timeframe for the plot provided by the Bodine declaration. Similarly, al-Hela's
assertion that this plot "only involved some AAIA members" misses the point. Br.
43. The fact that al-Hela was involved in the plot along with other AAIA members
reinforces the conclusion that he was "part of" or "substantially supported" AAIA for
purposes of detention. And as the district court repeatedly noted, that al-Hela was
involved in providing logistical support for this attack reinforces the conclusion that
al-Hela provided the same type of support to other attacks likewise tied to AAIA or al
Qaeda. JA 180-81; *see also* JA 173, 179.

Nor does al-Hela undermine the evidence that he assisted with three other
AAIA plots—the bombing of the British Embassy in Yemen, the attempted
assassination of the Yemeni Minister of Interior, and the "New Year's Day" attacks in
Aden. Al-Hela's involvement in those plots was reported by ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ Al-Hela argued in district court—and repeats now—that ▮▮▮▮▮

SECRET//NOFORN

33

SECRET//NOFORN

██████████████████████ are "largely based on secondhand reports,"

and that ████████████████████ the lack of any action by the Yemeni

authorities against al-Hela demonstrates he could not have been involved.  JA 171-72;

*accord* Br. 39-41.

Recycling these arguments has not improved them, particularly now that al-

Hela must show clear error to prevail.  *Al-Alwi v. Obama*, 653 F.3d 11, 19 (D.C. Cir.

2011).



Al-Hela likewise does not account for the evidence that he had a ████████

relationship with Jayul, the AAIA leader and bin Laden associate responsible for these

attacks. ████████████████████████████

████████████████████████████████ Al-Hela

acknowledged that he knew Jayul, JA 1340-46, and this relationship further supports

the conclusion that al-Hela assisted Jayul and his fellow AAIA members in planning

and executing these plots.  And the district court found that ████████████████

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



Finally, al-Hela provides no answer to the district court's conclusion that the consistent reporting from multiple sources about al-Hela's involvement with these plots was mutually reinforcing.



Al-Hela's own testimony about the logistical assistance he was asked to provide (likely by Jayul) to a plot against the U.S. Embassy is consistent with, and reinforces, the evidence about the other plots the district court found that al-Hela assisted with, particularly given his evasive testimony on this point at the merits hearing. Nor does al-Hela provide any answer to why the U.S. Embassy plotters would have come to him for assistance



SECRET//NOFORN

35

SECRET//NOFORN

3. Finally, al-Hela's suggestion that certain factual findings were not relevant to his detention (Br. 43-46) mischaracterizes the purpose of those findings. Al-Hela's participation in the Soviet-Afghan War is relevant because it reinforces the evidence of al-Hela's relationship with al-Sirri, the EIJ leader with whom he cooperated in some of his travel facilitation activities, as well as his relationship with al Qaeda. ▮

▮ are likewise relevant because "evidence of association with other al Qaeda members is itself probative of al Qaeda membership." *Uthman v. Obama*, 637 F.3d 400, 405 (D.C. Cir. 2011); *accord Ali v. Obama*, 736 F.3d 542, 546 (D.C. Cir. 2013); *Salahi v. Obama*, 625 F.3d 745, 753 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 3 (D.C. Cir. 2010). ▮ Al-Hela's attempt ▮

▮ ignores that this evidence "increases the likelihood that al-Hela facilitated travel for members of al Qaeda and its associated force, EIJ, and supported numerous

SECRET//NOFORN

36

SECRET//NOFORN

terrorist attacks that were primarily conducted by al Qaeda's associated force, AAIA," and is thus relevant to whether al-Hela was part of al Qaeda or an associated force or provided such support. JA 192.

## C.    Al-Hela's Contentions That These Activities Do Not Support Detention Are Meritless

1. Al-Hela offers various challenges to the legal basis for his detention, particularly the district court's conclusion that he "substantially supported" al Qaeda and its associated forces. These challenges are largely irrelevant; as discussed above, the district court's factual findings are more than sufficient to demonstrate that al-Hela was "part of" al Qaeda and associated forces, and this provides an alternative basis for affirming the district court's judgment. Al-Hela contends that conclusion is unwarranted because he did not "sw[ear] allegiance," "serve[] as a combatant," or visit a guesthouse or training camp. Br. 22 n.2. But this argument simply ignores this Court's rejection of efforts to create an "exhaustive list of criteria" for demonstrating that an individual is "part of" al Qaeda or an associated force, and this Court's instruction that the determination instead turns on a "functional" analysis of "the actions of the individual in relation to the organization." *Bensayah,* 610 F.3d at 725; *accord Hussain,* 718 F.3d at 968. Al-Hela's actions in relation to al Qaeda and associated forces—including serving as a trusted travel facilitator and assisting with multiple terrorist plots—are sufficient to demonstrate that he was "part of" al Qaeda

SECRET//NOFORN

37

SECRET//NOFORN

and associated forces. This conclusion is reinforced by the numerous ways in which members of those organizations entrusted al-Hela with ▮▮▮▮▮▮ information about high-level al Qaeda figures and planned terrorist operations—facts attested to by al-Hela ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That al Qaeda and associated forces "treated [al-Hela] as one of their own" demonstrates that he was functionally "part of" those forces. *Awad*, 608 F.3d at 3.

2. Al-Hela's complaints about the district court's conclusion that he "substantially supported" al Qaeda and associated forces are likewise unpersuasive.

a. As an initial matter, al-Hela suggests that he cannot be detained unless his support rendered him "functionally part of an enemy force." Br. 26. Al-Hela's "functionally part of" test is indistinguishable from the test this Court already employs to determine whether an individual is "part of" al Qaeda and associated forces, *see Hussain*, 718 F.3d at 968, and thus would render the government's express authority to detain those who "substantially supported" enemy forces wholly superfluous. But detention authority under the AUMF and the NDAA by necessity covers individuals who are not "functionally part of" an enemy force, but instead provide substantial support. *See Al-Bihani*, 590 F.3d at 874. At a minimum, that standard for detention must encompass individuals, like al-Hela, who provide support to al Qaeda and two

SECRET//NOFORN

38

SECRET//NOFORN

of its associated forces that is collectively substantial. If that support does not render him functionally "part of" one or more of those forces, it would be anomalous to conclude that, by distributing his support activities among multiple organizations covered by the AUMF, al-Hela has insulated himself from detention.

The NDAA's inclusion of substantial support as an independent ground for detention accords with the nature of this armed conflict. Unlike a state-sponsored regular armed force, al Qaeda and associated forces operate in substantial part through loosely affiliated terrorist cells of individuals who often seek to hide their connection to the broader organization. As this Court has recognized, such individuals do not "wear uniforms" or carry "membership cards." *Ali,* 736 F.3d at 546. Treating individuals who knowingly provide recruitment, transportation, travel facilitation, communications services, financing and financial services, or other forms of substantial support to al Qaeda and associated forces as beyond the scope of the AUMF would subvert the statute and undermine the law of war by rewarding terrorist groups for assigning pivotal tasks to individuals who purposefully attempt to disguise their connection to the organization.

As the district court recognized, the law of war provides for detention in certain analogous circumstances. For instance, in certain circumstances, the Geneva Conventions afford prisoner of war status to (and thus contemplates the detention of) individuals like "supply contractors" "who accompany the armed forces without

SECRET//NOFORN

39

SECRET//NOFORN

actually being members thereof." Geneva Convention Relative to the Treatment of Prisoners of War Aug. 12, 1949, art. 4, 6 U.S.T. 3316, 75 U.N.T.S. 135. Similarly, as a historical matter, one of the first codifications of the law of war recognized that a sovereign may detain persons who aid the enemy, including certain individuals who contribute to the enemy's war efforts or threaten the security of the detaining state. *See, e.g.,* Instructions for the Government of Armies of the United States in the Field, art. 15 (Apr. 24, 1863) (Lieber Code) ("Military necessity ... allows of the capturing of every armed enemy," as well as "every enemy of importance to the hostile government, or of peculiar danger to the captor").

b. Al-Hela is likewise wrong to suggest that the support he provided must be tied to a specific hostile act against the United States or a coalition partner. *See* Br. 23-24. As a factual matter, the district court found that al-Hela provided support to a successful attack on the British Embassy in 2000, and was involved in two plots against U.S. targets as well. In any event, the text of the 2012 NDAA makes clear that detention authority extends to "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities." 2012 NDAA § 1021(b)(2). It is the organizations and forces that are "engaged in hostilities against the United States or its coalition partners," not the "person" who is a "part of or

SECRET//NOFORN

40

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

substantially supported" those forces. *Id.* This is confirmed by the NDAA's "including" clause, which lists individuals who "commit[] a belligerent act" or "directly support[] such hostilities" as examples of those who may be detained, without indicating that those circumstances are the *only* justifications for detention. And it is wholly consistent with this Court's precedent, which has consistently "reject[ed] the notion that a detainee must have engaged in hostilities" to be subject to detention. *Hussain,* 718 F.3d at 968.

c. Al-Hela also offers various temporal arguments about his detention. He contends that he cannot be detained because he "was not substantially supporting al Qaeda, the Taliban, or an associated force at the time of his abduction in September 2002," Br. 27, or, more broadly, because there was no finding of specific instances of support for the September 11, 2001 attacks, or after September 11, 2001, Br. 26-27.[2] Despite his long-term and repeated track record of support, outlined in his own statements, al-Hela apparently believes that the United States was required to wait to detain him until it developed evidence that he had successfully facilitated an attack or the travel of an al Qaeda fighter post-September 11. These contentions lack merit.

—————

2 ████████████████████████████████████████████ The district court, however, did not make any findings about that ████████

SECRET//NOFORN

41

SECRET//NOFORN

As an initial matter, al-Hela appears to recognize that pre-September 11 conduct is unquestionably a basis for detention under the authority to detain individuals "part of" al Qaeda and associated forces. Br. 26 (citing *Khairkhwa v. Obama*, 703 F.3d 547, 548-49 (D.C. Cir. 2012); *Salahi*, 625 F.3d at 750-51; *Al-Bihani*, 590 F.3d at 869). Such conduct is thus indisputably relevant to the conclusion that al-Hela is detainable as part of al Qaeda and its associated forces. Al-Hela's only contention is thus that detention based on "substantial support" must be subject to a different standard. Br. 26-27.

Even accepting al-Hela's implicit premise that hostilities began only on September 11—a view the government contests, *see In re Al-Nashiri*, 835 F.3d 110, 135-38 (D.C. Cir. 2016)—al-Hela provides no textual or common-sense basis for his conclusion. As a practical matter, the district court found that al-Hela repeatedly engaged in support activities for al Qaeda and its associated forces over a period of several years leading up to the September 11 attacks. Much of this support postdated bin Laden's February 1998 fatwa against the United States, which made clear that one of al Qaeda's primary goals was to attack the United States and other Western countries. Both AAIA and EIJ supported bin Laden in that effort, with EIJ going so far as to formally sign the fatwa. *See* JA 145, 147; *see infra* pp. 46-52. Al-Hela thus provided support to these organizations throughout a period in which they were engaged in attacks on the United States and its coalition partners, including al Qaeda's

SECRET//NOFORN

42

SECRET//NOFORN

attack on U.S. embassies in East Africa in 1998; EIJ's planned attack on the U.S.

Embassy in Albania in 1998; the attack on the USS Cole in October 2000; AAIA's

bombing of the British Embassy in Yemen in 2000; and plots against the U.S.

Embassy in Yemen as late as the spring of 2001—just a few months before the

September 11 attacks. As the district court observed, this evidence demonstrates that

"al-Hela had an extremely strong relationship with al Qaeda and its associated forces,

EIJ and AAIA," and "a rather short amount of time passed between the time period

from which the government's evidence comes … and the point in time at which al-

Hela was taken into custody." JA 195. Moreover, "[t]here is absolutely no evidence

in this case that al-Hela's relationships with al Qaeda, EIJ, and AAIA members

dissipated at all," and "no evidence that he ceased providing support for these

terrorist groups" in the time between the spring of 2001 and his capture in 2002. JA

195. Indeed, al-Hela has not tried to contend that he disassociated himself from these

organizations in that time period, much less shown "the type of concrete, affirmative

steps to dissociate" that would be required to demonstrate that he ended his

longstanding association with and efforts on behalf of al Qaeda and associated forces.

*Hussain*, 718 F.3d at 970; *see Alsabri v. Obama*, 684 F.3d 1298, 1307 (D.C. Cir. 2012);

*Al-Adahi*, 613 F.3d at 1109.

In addition, the NDAA requires that an individual "substantially supported"

"al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the

SECRET//NOFORN

43

SECRET//NOFORN

United States or its coalition partners." As discussed above, this language defines the scope of detention authority by reference to the role of the *organization* in the ongoing conflict. It imposes no temporal requirement on when that "substantial[] support[]" must have occurred, so long as that support was provided to "al Qaeda, the Taliban, or associated forces." This understanding of the text of the NDAA also ensures parity between the "part of" and "substantially supported" tests for detention, as neither requires a showing that an individual engaged in conduct post-September 11 in order to demonstrate detainability. *See, e.g., Salahi,* 625 F.3d at 748-49 (outlining activities between 1992 and mid-2001 that could support detention).

Parity between the "part of" and "substantially supported" tests for detention also accounts for the realities of the conflict authorized by the AUMF. Unlike traditional armies, entities like al Qaeda, EIJ, and AAIA rely on their lack of public identifying marks or formal structures to hide their activities from view. Al-Hela's support activities—many of which were conducted under cover of his official government connections, ███████████████████████████ ███████████████████████—are prime examples. Delaying detention for individuals like al-Hela with long-established track records of support for al Qaeda and associated forces would reward those organizations for their ability to mask and diffuse their activities.

SECRET//NOFORN

44

SECRET//NOFORN

d.  Al-Hela's general contentions about the nature of his relationship with al

Qaeda and associated forces fare no better.  His contention that his support was only

"sporadic and informal" (Br. 28) is inconsistent with the evidence.  The evidence of

al-Hela's involvement in bomb plots alone places him in five plots over roughly seven

months.  The evidence of his travel facilitation activities—█████████████████████

█████████████████████████████████████████████████████—likewise

demonstrates a longstanding relationship with high-level EIJ and al Qaeda leaders,

particularly in light of ███████████ information with which they entrusted him.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████  The district court dealt at length with this

contention, ██████████████████████████████████████████████████

██████████████████████████████████████████████  necessarily required

that al-Hela be an insider with respect to al Qaeda and its associated forces.  JA 182.

SECRET//NOFORN

45

SECRET//NOFORN

## II.    The District Court Properly Found That AAIA And EIJ Were Associated Forces Of Al Qaeda

Al-Hela contests the district court's findings that AAIA and EIJ were "associated forces" of al Qaeda such that his involvement with those organizations renders him detainable. His arguments fail.

**A.** 1. Al-Hela primarily contends that no evidence supports the proposition that AAIA "entered the fight alongside al Qaeda." Br. 52. Al-Hela does not contest that AAIA announced its support for al Qaeda and bin Laden after the fatwa in 1998 and began to call for attacks against Western targets in Yemen. *See* JA 697-98. Nor does he contest that in the wake of those statements, AAIA began to undertake attacks against Westerners, including the kidnapping of a group of Western tourists in 1998. *See* JA 697. And he does not contest that AAIA carried out a successful bombing attack on the British Embassy in 2000. *See* JA 697; *see also supra* pp. 19. The district court also found that AAIA, or members of the organization, had a role in two additional plots to attack the U.S. Embassy in Yemen (one with al-Hela's assistance). JA 174-81. The district court properly concluded that these efforts demonstrated that AAIA "entered the fight alongside al Qaeda by participating in hostilities against the U.S. and its coalition partners in the same comprehensive armed conflict," and that AAIA was an associated force "at the time al-Hela was captured in 2002." JA 147-48.

SECRET//NOFORN

SECRET//NOFORN

The district court also had before it substantial evidence that AAIA was more

than merely sympathetic to bin Laden and al Qaeda. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Al-Hela curiously suggests that this is inconsistent with other

evidence that "AAIA was founded by Yemenis returning from Afghanistan," Br. 53,

but the two points are mutually reinforcing. In addition, the district court found that

AAIA leader Jayul, mastermind of several attacks for which al-Hela provided support,

was linked to bin Laden, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JA 120, 159, 168, 178; *see* JA

506-09, 541-45, 549-51.

2. Al-Hela's reliance on *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), only

underscores his failure to demonstrate clear error. In *Parhat*, this Court concluded that

evidence relied on by the factfinder (the now-defunct Combatant Status Review

Tribunal) to conclude that Parhat was part of an associated force was insufficiently

reliable to meet the government's threshold burden under the preponderance

standard of proof. *Id.* at 847. This Court so held because the Tribunal was unable "to

assess the reliability of most of the evidence presented" because the underlying

evidence spoke in "qualified" language; those sources the Tribunal did evaluate had

"sufficient discrepancies" to call them into doubt; no source information was

provided for the government's assertions; Parhat made credible assertions that the

SECRET//NOFORN

47

SECRET//NOFORN

actual source of the information was biased against him; and it was not even clear

whether the government "departments regard the statements in those documents as

reliable" or whether "the departments rely on those documents for decisionmaking

purposes in the form in which they were presented." *Id.* at 848-49.

None of those flaws are present here. The underlying source for much of the

evidence linking AAIA and al Qaeda is available to al-Hela or (at a minimum) the

district court. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ the district court had before it the underlying source

information regarding ▮▮▮▮ It also had before it source information regarding

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The

government here has provided information to explain the context in which ▮▮▮

▮▮▮▮▮▮▮▮▮ were created and the purposes for which they are used. *See*

JA 295-300. As the district court observed, the exhibits it relied on "do not consist of

purely bottom-line assertions that are anonymous hearsay as was the case in *Parhat*,"

and it was able to "more fully evaluate the sources" by reviewing unredacted versions

of the reports. JA 140-41; *see Parhat*, 532 F.3d at 849 (recognizing that the

government "can submit information that will permit an appropriate assessment of

the information's reliability while protecting the anonymity of a highly sensitive

source").

SECRET//NOFORN

48

SECRET//NOFORN

Other facts—like AAIA's 1998 profession of support for bin Laden and its subsequent kidnapping of Western tourists—are undisputed, making al-Hela's complaint that they are sourced to public documents (Br. 52) difficult to understand. (Al-Hela's own declarant, former Ambassador Bodine, discussed the kidnapping in her declaration. JA 1020-21). In addition, al-Hela has identified no discrepancies in the evidence supporting the district court's conclusion that AAIA was an associated force of al Qaeda. The most he offers is a statement from former Ambassador Bodine that AAIA "was not considered an affiliate of" al Qaeda. JA 1021; *see* Br. 54. This statement would be irrelevant even if credited. Al-Hela relied on it to combat the assertion that AAIA was "not just an associated force, but a part of al Qaeda, [a] regional affiliate of al Qaeda." JA 1685. But for purposes of detention, AAIA need not have been an alter ego of al Qaeda; it need only have been an associated force, and Ambassador Bodine's carefully worded statement does not undercut that conclusion. In any event, the district court discounted this statement as "conclusory" and "not support[ed] by any evidence," and al-Hela shows no clear error in that determination. JA 147.

All of these facts are further bolstered by AAIA's inclusion on lists of organizations affiliated with al Qaeda. A United Nations committee, for example, listed AAIA as an al Qaeda affiliate in the first list of such affiliates it created, and explained that AAIA "received financial and material support from Al-Qaida …

SECRET//NOFORN

49

SECRET//NOFORN

leader Usama bin Laden (deceased) in exchange for its support for Al-Qaida's agenda," and "played a role in the 12 October 2000 bombing of the American warship USS Cole in Aden Harbor, Yemen." United Nations, *Islamic Army of Aden*, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/e ntity/islamic-army-of-aden (last visited Nov. 5, 2019). This contemporaneous list is strong evidence, particularly where, as here, it is corroborated by additional facts. *See Awad*, 608 F.3d at 10. Similarly, the district court appropriately considered other sources—including the assessment of the Interagency Intelligence Committee on Terrorism that AAIA was capable of attacks against Americans in 2005, and AAIA's inclusion on a list of blocked organizations that threatened the security of the United States—as reinforcing AAIA's capabilities and the other evidence that AAIA was an associated force of al Qaeda. Al-Hela's contention that such evidence is categorically irrelevant (Br. 50, 58) misreads *Parhat*, which did not address the status of those documents because the relevant lists in that case were not submitted to the factfinder. 532 F.3d at 846. And here, as discussed, ample other evidence permits an assessment of the credibility of those documents.

The district court properly concluded that this evidence was sufficient to show that AAIA was an associated force of al Qaeda, and al-Hela has offered nothing seriously contesting this evidence, much less sufficient to demonstrate clear error.

SECRET//NOFORN

50

SECRET//NOFORN

3. Finally, al-Hela's suggestion that he cannot be detained because AAIA is no longer "engaged in ongoing hostilities" against the United States and its coalition partners is meritless. Br. 55. Al-Hela's theory is apparently that if the United States succeeds in neutralizing an associated force by capturing its members, the United States must immediately release the members and enablers of that force to rejoin the continuing fight against al Qaeda and its other associated forces. This Court has already rejected this premise, which "would make each successful campaign of a long war but a Pyrrhic prelude to defeat" and would require "the victors … to constantly refresh the ranks" of enemy forces in the ongoing conflict. *Al-Bihani*, 590 F.3d at 874.

**B.** Al-Hela's arguments that the district court erred in concluding that EIJ was an associated force fail for essentially the same reasons. Al-Hela's only dispute with the facts of EIJ's connection to al Qaeda is his contention that the June 2001 merger between EIJ and al Qaeda involved very few EIJ members, but that contention rests on a web article and a book not submitted to or considered by the district court. Br. 58. Otherwise, al-Hela does not seriously contest that EIJ leader Ayman al-Zawahiri signed bin Laden's fatwa in 1998; that EIJ was a primary ally of bin Laden in the ensuing years; and that al-Zawahiri is now the leader of al Qaeda, a position he assumed after bin Laden's death. JA 145. The district court also found that "EIJ members had access to al Qaeda training facilities and terrorist operatives," JA 145, and that EIJ planned to attack the U.S. Embassy in Albania after signing the fatwa in

SECRET//NOFORN

51

SECRET//NOFORN

1998, JA 144. Al-Hela complains that this plan "was not shown to have an al Qaeda link," Br. 57, but ignores the evidence of EIJ's alliance with al Qaeda in 1998 and the fact that this attack showed EIJ "had changed its targeting" to include Western targets outside Egypt after al-Zawahiri signed bin Laden's fatwa. JA 686. As the district court explained, "EIJ, under the leadership of Ayman al-Zawahiri, made clear that the U.S. was one [of] its primary enemies when Zawahiri signed bin Laden's fatwa in 1998 and planned to attack the U.S. Embassy in Albania that same year." JA 146. And these conclusions are supported by EIJ's designation as an entity associated with al Qaeda by the United Nations, as well as its designation as a foreign terrorist organization by the Department of State and the blocking of its assets under Executive Order No. 13,224. JA 145; 66 Fed. Reg. 49,079 (Sept. 23, 2001). Al-Hela cannot show clear error in the district court's determination that EIJ was an associated force of al Qaeda.

### III. Al-Hela's Suspension Clause And Due Process Arguments Are Meritless

Al-Hela advances various arguments that his continued detention violates the AUMF and the Due Process Clause of the Fifth Amendment, and that his habeas proceeding did not satisfy either the Suspension Clause or the Due Process Clause. These arguments are meritless.

**A.** Al-Hela first contends that his detention is no longer authorized by the

SECRET//NOFORN

52

SECRET//NOFORN

AUMF, asserting that the government's authority to detain him has "unravel[ed]" because the conflict is "entirely unlike those … conflicts that informed the development of the law of war." Br. 64 (quoting *Hamdi*, 542 U.S. at 521 (plurality op.)). As the district court recognized, JA 135-36, this Court recently rejected precisely this argument, explaining that detention under the AUMF is authorized "'for the duration of the relevant conflict'" in which al-Hela was captured, and neither the AUMF nor the NDAA "places limits on the length of detention in an ongoing conflict." *Al-Alwi v. Trump*, 901 F.3d 294, 297 (D.C. Cir. 2018) (quoting *Hamdi*, 542 U.S. at 521). Because "hostilities between the United States and the Taliban and al Qaeda continue," the government's authority to detain under the AUMF has not "unraveled." *Id.* at 297-98.

   **B.** Al-Hela next suggests that his continued detention violates the Due Process Clause of the Fifth Amendment. Br. 65-68. Even accepting the premise that al-Hela can invoke the Fifth Amendment, *see infra* pp. 63-70, al-Hela does not specify how the duration of his detention implicates due process. To the extent that al-Hela advances a claim that substantive due process somehow imposes an unspecified limit on the length of law-of-war detention even while hostilities continue, that argument is meritless.[3] No case embraces the proposition that substantive due process requires

---

[3] This question is pending before this Court in *Ali v. Trump*, No. 18-5297 (oral argument scheduled December 11, 2019).

SECRET//NOFORN

53

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

the government to release enemy combatants before active hostilities have ended. On the contrary, law of war detention to "prevent captured individuals from returning to the field of battle and taking up arms once again" is a "fundamental and accepted … incident to war" by "'universal agreement and practice.'" *Hamdi*, 542 U.S. at 518 (plurality op.) (quoting *Ex parte Quirin*, 317 U.S. 1, 30 (1942)). Neither precedent nor common sense suggests that the government's detention authority should dissipate simply because hostilities are protracted. *Id.* at 520-21; *Al-Alwi*, 901 F.3d at 297-98. Accepting that substantive due process entitles al-Hela to release would effectively reward the Nation's enemies for continuing to fight, forcing the government to release enemy fighters whenever a court believed that a conflict had gone on too long. Nothing in the Fifth Amendment, even if applied to enemy combatants detained at Guantanamo, would compel these radical results.

In any event, al-Hela's continued detention does not offend substantive due process. His detention is not indefinite, but is bounded by the duration of hostilities—which the Nation's adversaries are themselves extending by continuing to fight—and continues to serve the purposes of the detention while hostilities are ongoing. *See Ali*, 736 F.3d at 551. Al-Hela's detention is not punitive, as he contends (Br. 62), but is "solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war." *Hamdi*, 542 U.S. at 518 (plurality op.). Moreover, to ensure that military detention at Guantanamo remains

SECRET//NOFORN

54

SECRET//NOFORN

"carefully evaluated and justified, consistent with [U.S.] national security and foreign policy," the Executive has chosen periodically to review whether certain Guantanamo detainees' continued confinement is necessary to protect against a continuing significant threat to the security of the United States. Exec. Order No. 13,567, 76 Fed. Reg. 13,277, 13,277 (Mar. 7, 2011); *see* NDAA § 1023 (establishing procedures for periodic detention review of unprivileged enemy combatants detained at Guantanamo). Pursuant to that process, the Executive has exercised its discretion to transfer out of U.S. custody most of the individuals detained at Guantanamo at the time of the Executive Order's issuance. In al-Hela's case, however, the Executive has consistently determined through multiple periodic reviews that al-Hela poses a continuing and significant threat to the security of the United States.

 **C.** Al-Hela also asserts that the procedures under which his habeas petition was litigated deprived him of the "meaningful opportunity" to contest his detention required by *Boumediene v. Bush*, 553 U.S. 723 (2008), and violated his procedural due process rights under the Fifth Amendment. Br. 68-75.

 1. As an initial matter, the procedural arguments al-Hela raises have been rejected by this Court in interpreting *Boumediene*'s "meaningful opportunity" standard. Al-Hela complains at length, for example, that the district court relied on hearsay. Br. 71-74. But this Court has "repeatedly held … 'that hearsay evidence is admissible in

SECRET//NOFORN

55

SECRET//NOFORN

this type of habeas proceeding if the hearsay is reliable.'" *Alsabri v. Obama*, 684 F.3d 1298, 1309 (D.C. Cir. 2012) (quoting *Awad*, 608 F.3d at 7).

Al-Hela likewise complains that some highly classified information was shown only to the district court *ex parte*. Br. 70-71. But, as al-Hela acknowledges, the court applied settled Circuit precedent that where highly sensitive national security information is involved, it may be provided to the court *ex parte*, especially where such information relates to intelligence sources. *Khan*, 655 F.3d at 31; *see Parhat*, 532 F.3d at 849 (same in pre-*Boumediene* proceedings); *Bismullah v. Gates*, 501 F.3d 178, 180 (D.C. Cir. 2007), *vacated on other grounds*, 554 U.S. 913 (2008) (similar).

Al-Hela's argument (Br. 69-70) that he was required to have personal access to additional information is likewise meritless. As the district court observed, given that this Court has recognized that highly sensitive information may be shown to the court *ex parte*, there is no basis for the suggestion that a petitioner must be shown all of the classified information underlying his detention. JA 200-01 (citing *Khan*, 655 F.3d at 31). That is all the more true where, as here, al-Hela's "counsel has actual access to the information" to which al-Hela contends he should have personal access. JA 201-02. This Court has contemplated requiring the government to disclose classified information in circumstances where the disclosure would be to a petitioner's security-cleared *counsel*, but has never required disclosure to the petitioner himself. *See Al Odah*, 559 F.3d 539, 544, 547-48 (D.C. Cir. 2009); JA 202. In devising the test for

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

such disclosures in *Al Odah*, this Court observed that disclosure to counsel alone facilitated "meaningful review," and that such disclosure could be ordered only if "access by petitioner's counsel (pursuant to a court-approved protective order) is necessary to facilitate [meaningful] review." 559 F.3d at 545. It is thus unsurprising that al-Hela points to no case holding "that a habeas petitioner's right to [classified] information includes personal access." JA 202. Al-Hela's reference to the Classified Information Procedures Act is beside the point; this Court has never held that such procedures must be imported wholesale into the Guantanamo habeas context, instead looking to them as simply one available analogy, not "a floor for the government's disclosure obligations." *Id.*

2. Al-Hela does not address these holdings, which control under the Suspension Clause, and does not explain how a panel of this Court could overrule those cases. Instead, al-Hela attempts to circumvent this longstanding body of precedent by asserting that procedural due process entitles him to additional procedures beyond those this Court has already held satisfy the Suspension Clause. These arguments were not preserved in district court, and are thus forfeited. *Al-Alwi*, 901 F.3d at 301. And in any event, even accepting the erroneous premise that al-Hela has Fifth Amendment rights, the procedures available in district court fully comport with any applicable due process requirements.

SECRET//NOFORN

57

SECRET//NOFORN

a. Al-Hela's contentions—that due process requires that he be given additional personal access to classified information, that his counsel have access to sensitive information revealing intelligence sources and methods, and that he be granted a "confrontation right" of undefined scope, Br. 69-74—were not presented to the district court. Al-Hela's briefs on his motions seeking his counsel's access to the government's *ex parte* motions and documents, his motion seeking personal access to additional information from the factual return, and his pre- and post-hearing briefing make no mention of procedural due process or contend that he is entitled to additional procedures under the Fifth Amendment. *See* Dkt. Nos. 242, 247, 272, 294, 299, 353, 380. Al-Hela did not reference due process during the merits hearing. *See* JA 1261-1775. Al-Hela has thus forfeited any argument that he is entitled to additional procedural due process protections. *Al-Alwi*, 901 F.3d at 301.

b. Those arguments would be meritless even had they been preserved. In assessing the process due to a U.S. citizen detained in the United States, a plurality of the Supreme Court in *Hamdi* explicitly recognized that any due process analysis must be "tailored" to address the "uncommon potential" of "enemy-combatant proceedings ... to burden the Executive at a time of ongoing military conflict." *Hamdi*, 542 U.S. at 533-34. This includes accounting for the "practical difficulties that would accompany a system of trial-like process," including intrusion "on the sensitive secrets of national defense." *Id.* at 531-32; *accord id.* at 539 (cautioning that a district

SECRET//NOFORN

58

SECRET//NOFORN

court must take into account "matters of national security that might arise in an individual case"). *Boumediene*, too, observed that habeas proceedings "need not resemble a criminal trial," and recognized the government's "legitimate interest in protecting sources and methods of intelligence gathering" in habeas proceedings, expressing its expectation "that the District Court will use its discretion to accommodate this interest to the greatest extent possible." 553 U.S. at 783, 796. The resulting procedures must simply ensure that the *court* is adequately positioned "to make a determination in light of the relevant law and facts." *Id.* at 787; *accord Al-Bihani*, 590 F.3d at 880 (observing that the core of habeas is "the independent power of a judge to assess the actions of the Executive").

In striking that balance, the *Hamdi* plurality stated that a citizen-detainee in the United States would be provided due process under a system that applied "a presumption in favor of the government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided"; accepted hearsay "as the most reliable available evidence from the Government in such a proceeding"; and included a requirement that the government produce "credible evidence" of detainability before shifting the burden "to the petitioner to rebut that evidence with more persuasive evidence." 542 U.S. at 533-34. The Court also explained that the government could meet its initial burden by having "a knowledgeable affiant ... summarize [detainee] records to an independent tribunal,"

SECRET//NOFORN

59

SECRET//NOFORN

so long as the detainee could also "present his own factual case to rebut the Government's return." *Id.* at 534, 538.

The framework that is constitutionally permissible for U.S. citizens detained within U.S. sovereign territory is *a fortiori* sufficient for noncitizens detained at Guantanamo Bay, and al-Hela received far more than that limited process. His counsel was provided access to an enormous quantity of inculpatory and exculpatory classified material, ███████████████████████—not the mere summaries of "a knowledgeable affiant." He also received personal access to much of the most critical evidence against him—████████ his own █████████████ statements ████████ He augmented the information disclosed by the government with his own materials, including a declaration from a former U.S. Ambassador to Yemen, letters from the Yemeni government, and his own live testimony at a merits hearing before a district judge sitting as a neutral factfinder. Using this material, al-Hela mounted an extensive case, which attacked the credibility of numerous sources (including those that placed him in multiple terrorist plots), laid out an alternative story for his travel facilitation activities, and ███████████████████████ And the district court assessed this evidence under a preponderance of the evidence standard that mirrors the standard articulated in *Hamdi. See Al-Bihani,* 590 F.3d at 878.

*Hamdi's* recognition that the use of hearsay evidence in enemy combatant proceedings is consistent with due process forecloses al-Hela's complaint about its use

SECRET//NOFORN

60

SECRET//NOFORN

here. Al-Hela's contention that due process requires a "confrontation right" is likewise difficult to square with *Hamdi*, which discounted concerns that habeas review would unduly impinge on the Executive's national security activities by emphasizing the "minimal" nature of burdens such as "requiring a knowledgeable affiant to summarize" military records pertaining to a particular detainee. 542 U.S. at 534. The burdens are particularly manifest here,

Al-Hela's other contentions likewise ignore *Hamdi*'s guidance. Al-Hela argues that the government should have been compelled to provide him personal access to additional information about the basis for his detention. Br. 69-70. That conclusion would be both extraordinary and unprecedented: it would compel the government to reveal classified information about intelligence sources and methods to an individual held as an enemy combatant. As the district court here explained, the government provided "specific and persuasive reasons to believe that further disclosure of the allegations against petitioner and the factual bases therefor would risk revealing U.S. intelligence sources and methods." JA 202-03. Al-Hela's "right to present evidence" to combat the basis for his detention continued, and any burden on al-Hela reflected "respondents' legitimate interest in protecting sources and methods of intelligence gathering ... to the greatest extent possible." JA 204 (quoting *Boumediene*, 553 U.S. at

SECRET//NOFORN

61

SECRET//NOFORN

796). *Hamdi* reinforces the point; al-Hela's ability to "present his own factual case to rebut the Government's return" remains in force—as illustrated by the vigorous case mounted here—and the court's protection of "the sensitive secrets of national defense" did not violate al-Hela's due process rights, particularly where many of those secrets were known to (and used by) his counsel in litigating the case. 542 U.S. at 538, 543.

Al-Hela's contention that his counsel should have been allowed access to *ex parte* information that revealed intelligence sources (Br. 70-71) likewise does not grapple with the government's legitimate interest in protecting such information in the context of enemy combatant detention proceedings. Procedures that protect that information through *ex parte* submissions, as al-Hela acknowledges, have been employed by this Court in addressing other Guantanamo cases. *See Khan,* 655 F.3d at 31. This Court has repeatedly recognized in other contexts that due process is not offended by permitting "classified information to be presented *in camera* and *ex parte* to the court," emphasizing that such information "is within the privilege and prerogative of the executive." *National Council of Resistance of Iran v. Department of State,* 251 F.3d 192, 208 (D.C. Cir. 2001); *accord Jifry v. FAA,* 370 F.3d 1174, 1182 (D.C. Cir. 2004); *People's Mojahedin Org. of Iran v. Department of State,* 327 F.3d 1238, 1242 (D.C. Cir. 2003). These cases rest on the principle that every additional disclosure of classified information increases the risk to national security, irrespective of the trustworthiness

SECRET//NOFORN

62

SECRET//NOFORN

of a particular individual. *Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978). And those risks are heightened where litigation counsel's "sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy," even if inadvertently. *Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983). These principles apply with even greater force here, where the disclosures would be made in the context of a proceeding in which the detainee is held because of his relationship to enemy forces engaged in hostilities with the United States.

In any event, the district court specifically relied on *ex parte* evidence just four times in its opinion, and on one of those occasions did so to discount evidence the government relied on to justify detention. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This Court, too, may review the underlying materials in considering the credibility of those sources and whether the district court clearly erred in crediting them. Al-Hela does not explain how his due process rights were violated by permitting a neutral factfinder to assess the credibility of sources de novo.

**D.** Because al-Hela's detention comports with both substantive and procedural due process, this Court need not decide whether the Due Process Clause extends to individuals such as al-Hela, a Yemeni national detained as an unprivileged enemy

SECRET//NOFORN

63

SECRET//NOFORN

combatant outside the United States. Should the Court nevertheless reach the question, however, it should hold—consistent with controlling precedent—that al-Hela lacks due process rights.

1. The Supreme Court's "rejection of extraterritorial application of the Fifth Amendment" has been "emphatic." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Court held that aliens arrested and imprisoned overseas could not seek writs of habeas corpus on the theory that their convictions had violated the Fifth Amendment. The Court explained that "[s]uch extraterritorial application ... would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment." *Id.* at 784. Yet "[n]ot one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it." *Id.* (citation omitted); *accord United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936); *Yamataha v. Fisher*, 189 U.S. 86, 101 (1903); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). The Court's holding in *Eisentrager* "establish[es]" that the "Fifth Amendment's protections" are "unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Consistent with this unbroken line of precedent, this Court has declined to extend the Due Process Clause to aliens "without property or presence" in the

SECRET//NOFORN

64

SECRET//NOFORN

sovereign territory of the United States. *See, e.g., Jifry*, 370 F.3d at 1183; *People's Mojahedin*, 327 F.3d at 1240-41.

The principle that the Due Process Clause extends only to aliens who are present in the United States (or claim due-process rights in connection with property in the United States) precludes the Clause's extension to al-Hela, an alien unprivileged enemy combatant detained at Guantanamo. Both the Supreme Court and this Court have recognized that, as a *de jure* matter, the U.S. Naval Station at Guantanamo Bay is not part of the sovereign territory of the United States. *Rasul v. Bush*, 542 U.S. 466, 471 (2004); *Kiyemba v. Obama*, 555 F.3d 1022, 1026 n.9 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (per curiam), *reinstated in relevant part*, 605 F.3d 1046, 1047-48 (D.C. Cir. 2010) (per curiam), *cert. denied*, 563 U.S. 954 (2011). This Court has rejected due-process claims brought by identically situated detainees. *Kiyemba*, 555 F.3d at 1026-27 (holding that, because the Due Process Clause does not extend to Guantanamo detainees, a district court lacked authority to order the government to release seventeen detainees into the United States); *see Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011) (declining to accept the "premise[]" that Guantanamo detainees have a "constitutional right to due process"). Because al-Hela is indisputably an alien with no presence in the United States, the Due Process Clause does not extend to him with respect to his detention at Guantanamo.

SECRET//NOFORN

65

SECRET//NOFORN

The Court's decision in *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019), does not alter this conclusion. The question at issue in *Qassim* was whether *Kiyemba*'s recognition that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States," *id.* at 527 (quoting *Kiyemba*, 555 F.3d at 1026), constituted binding Circuit precedent as to "whether Guantanamo detainees enjoy procedural due process protections under the Fifth Amendment … in adjudicating their habeas petitions," *id.* at 528. The Court held that the answer was no, and construed *Kiyemba*'s holding to apply only to "substantive due process claim[s] concerning the scope of the habeas remedy." *Id.* The Court thus remanded for the district court "to consider in the first instance whether and how the Due Process Clause" applied to the petitioner's procedural claims. *Id.*

*Qassim* casts no doubt on the settled principle that substantive due process does not extend to aliens without property or presence in the United States. *Qassim* had no occasion even to consider the question because that petitioner's constitutional claims sounded exclusively in procedural due process. 927 F.3d at 527. Thus, al-Hela's substantive due process argument—that the Fifth Amendment independently limits the duration of his law-of-war detention, Br. 65-68—remains foreclosed by circuit precedent. *See Kiyemba*, 555 F.3d at 1026-27.

Nor does *Qassim* undermine the vitality of the property-or-presence test as applied to procedural due process claims brought by foreign entities and persons.

SECRET//NOFORN

66

SECRET//NOFORN

The Court declined to decide, or even to opine on, the merits of the *Qassim* petitioner's procedural-due-process claim. 927 F.3d at 531-32. The Court simply held that "Circuit precedent leaves open and unresolved the question of what constitutional procedural protections apply to the adjudication of detainee habeas corpus petitions." *Id.* at 530. That uncertainty is resolved by the Supreme Court's categorical refusal to apply the Fifth Amendment extraterritorially. *Eisentrager*—the Court's leading case, which directly addresses the detention of enemy combatants under the laws of war—did not parse whether petitioners' due process claims sounded in substance or procedure before rejecting them out of hand. And the Court has continued to characterize *Eisentrager*'s holding broadly, never distinguishing between the Due Process Clause's substantive and procedural components. *Zadvydas*, 533 U.S. at 693; *Verdugo-Urquidez*, 494 U.S. at 269. This Court has also applied this principle to procedural due process claims. In *People's Mojahedin Organization of Iran v. U.S. Department of State*, two foreign entities challenged the State Department's decision to designate them as "foreign terrorist organizations" pursuant to 8 U.S.C. § 1189, asserting that their designations violated procedural due process because the State Department had failed to "giv[e] them notice and opportunity to be heard." 182 F.3d 17, 18, 22 (D.C. Cir. 1999). This Court rejected those claims, explaining that, because the Due Process Clause does not extend to aliens without property or

SECRET//NOFORN

67

SECRET//NOFORN

presence in the United States, the entities "ha[d] no constitutional rights[] under the due process clause." *Id.* at 22.

2. Al-Hela does not address this body of precedent, instead simply asserting that *Boumediene*'s logic for extending the Suspension Clause "applies equally to the Due Process Clause"; that *Boumediene* treats as "implicit" that "detainees have rights that may be vindicated by recourse to the writ" of habeas corpus; and that those rights must include due process rights. Br. 66-67.

These arguments disregard the limits of *Boumediene*'s holding. *Boumediene* held only that "Art. I, § 9, cl. 2 of the Constitution"—which prohibits Congress from suspending the privilege of the writ of habeas corpus—"has full effect at Guantanamo Bay" in the specific context of law-of-war detainees who had been detained there for an extended period. 553 U.S. at 771. The Court repeatedly emphasized that its holding turned on the unique role of the writ in the separation of powers. *E.g.*, *id.* at 739 ("In the system conceived by the Framers the writ had a centrality that must inform proper interpretation of the Suspension Clause."); *id.* at 746 ("The broad historical narrative of the writ and its function is central to our analysis."); *id.* at 743 ("[T]he Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme."). The Court concluded that treating "*de jure* sovereignty [as] the touchstone of habeas," even though the United States has *de facto* sovereignty over Guantanamo given its complete control, was "contrary to

SECRET//NOFORN

68

SECRET//NOFORN

fundamental separation-of-powers principles." *Id.* at 755.  And the Court expressly

acknowledged that *Boumediene* is the *only* case extending a constitutional right to

"noncitizens detained by our Government in territory over which another country

maintains *de jure* sovereignty," and admonished that "our opinion does not address the

content of the law that governs petitioners' detention." *Id.* at 770, 798.  Accordingly,

*Boumediene* is consistent with the rule that the Fifth Amendment does not extend to

aliens without property or presence in the United States.

Nor is it "incongruous" (Br. 67) to conclude that al-Hela may invoke the writ

of habeas corpus but not the Due Process Clause. The Suspension Clause secures

"the common-law writ" of habeas corpus, and was enacted "in a Constitution that, at

the outset, had no Bill of Rights," and thus no Due Process Clause. *Boumediene,* 553

U.S. at 739.  The significance of this point is underscored by *Boumediene*'s rejection of

the government's argument that, because the Combatant Status Review Tribunal

process "was designed to conform to the procedures suggested by the plurality in

*Hamdi,*" the petitioner there had received an adequate substitute for a habeas

proceeding. *Id.* at 784.  The Court explained that even assuming the Tribunals "satisfy

due process standards, it would not end our inquiry," because even in that context

"the Suspension Clause remains applicable and the writ relevant." *Id.* at 784-85.

Accordingly, *Boumediene*'s standard for determining whether the Suspension

Clause extended to Guantanamo detainees does not apply *ipso facto* to the Due Process

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Clause, and instead must be understood as limited to the Suspension Clause, in light of that Clause's centrality to the separation of powers. Indeed, this Court has previously recognized that "*Boumediene* disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions[] other than the Suspension Clause." *Rasul*, 563 F.3d at 529. In any event, given *Boumediene*'s express refusal to decide the extraterritorial scope of the substantive law governing detention, and given settled pre-*Boumediene* precedent holding that the Due Process Clause does not extend to aliens outside the sovereign territory of the United States—and specifically to alien law-of-war detainees—this Court must follow the latter body of case law even if "*Boumediene* has eroded the precedential force of *Eisentrager* and its progeny." *Id.; see Agostini v. Felton*, 521 U.S. 203, 237 (1997).

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

SHARON SWINGLE

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

NOVEMBER 2019

SECRET//NOFORN

71

SECRET//NOFORN

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the Court's order of July 30, 2019, enlarging the word limit to 17,000 words, because it contains 16,984 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Brad Hinshelwood
BRAD HINSHELWOOD

SECRET//NOFORN

~~SECRET//NOFORN~~

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2019, I filed the foregoing brief with the

Clerk of the Court for the United States Court of Appeals for the District of

Columbia Circuit by causing an original and six copies to be deposited with the

Department of Justice Classified Information Security Officer. I also served the

foregoing brief to counsel for appellant by causing one copy to be deposited with the

Classified Information Security Officer for delivery to the appropriate secure facility.


/s/ Brad Hinshelwood
BRAD HINSHELWOOD

~~SECRET//NOFORN~~