UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Filed with the Classified Information Security Officer
CISO DM Guerrero/Randall
Date 12/12/2019

Oral Argument: Not Yet Scheduled

19-5079

# In the United States Court of Appeals for the District of Columbia Circuit

**ABDULSALAM ALI ABDULRAHMAN AL-HELA,**
*Petitioner-Appellant,*

v.

**DONALD J. TRUMP**, et al.,
*Respondents-Appellees.*

On appeal from the United States District Court for the District of Columbia, Civil Action No. 05-1048, Hon. Royce C. Lamberth, District Judge

## Reply Brief of Petitioner-Appellant

David H. Remes
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508 phone

S. William Livingston
Brian E. Foster
Andrew D. Garrahan
Megan O'Neill
Covington & Burling LLP
One City Center
850 10th Street NW
Washington, DC 20001
(202) 662-6000 phone
(202) 662-6291 facsimile

*Counsel for Petitioner-Appellant*

December 12, 2019

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## Table of Contents

Table of Contents ..... i

Table of Authorities ..... iii

Glossary ..... vi

Introduction and Summary of Argument ..... 1

Argument ..... 3

I. Abdulsalam Did Not Provide "Substantial Support" to al Qaeda or an Associated Force ..... 3

A. The Travel Facilitation Allegations ..... 3

B. The "Bomb Plot" Allegations ..... 10

C. Legal Issues Relating to "Substantial Support" ..... 12

II. Abdulsalam Was Not "Part Of" al Qaeda or an Associated Force ..... 14

III. AAIA and EIJ are not "Associated Forces" of al Qaeda ..... 21

IV. Neither the AUMF nor the Due Process Clause Permits Abdulsalam's Prolonged Detention without Charge or Trial ..... 25

A. AUMF ..... 25

B. Substantive Due Process ..... 26

1. Persons Detained at Guantanamo Are Entitled to Due Process Rights ..... 26

2. Substantive Due Process Mandates Abdulsalam's Release from Guantanamo ..... 31

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

V. The Limited Procedures Provided to Abdulsalam Denied Him the "Meaningful" Hearing Required by *Boumediene* and His Procedural Due Process Rights. .......... 33

A. Waiver of Contention .......... 33

B. Violation of Rights .......... 35

Conclusion .......... 39

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## TABLE OF AUTHORITIES

### Cases

*Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc) ........ 30

*Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010) ........ 7

*Al-Alwi v. Trump*, 901 F.3d 294 (D.C. Cir. 2018) ........ 25, 26

*Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010) ........ 12, 15, 24, 25

*Ali v. Obama*, 736 F.3d 542 (D.C. Cir. 2013) ........ 12, 18

*Al-Madhwani v. Obama*, 642 F.3d 1071 (D.C. Cir. 2011) ........ 31

*Almerfedi v. Obama*, 654 F.3d 1 (D.C. Cir. 2011) ........ 19

*Awad v. Obama*, 608 F.3d 1 (D.C. Cir. 2010) ........ 18

*Bensayah v. Obama*, 610 F.3d 718 (D.C. Cir. 2010) ........ 6

*Boumediene v. Bush*, 553 U.S. 723 (2008) ........ 26, 27, 29, 30, 33, 35, 36

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ........ 32, 35

*Haller v. Robbins*, 409 F.2d 857 (1st Cir. 1969) ........ 36

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ........ 22

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ........ 25, 26, 31, 35

*Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009) ........ 21

*Hussain v. Obama*, 718 F.3d 964 (D.C. Cir. 2011) ........ 19

*Jifry v. F.A.A.*, 370 F.3d 1174 (D.C. Cir. 2004) ........ 28

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ........ 27

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ..... 34

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) ..... 30, 31

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) ..... 17

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) ..... 29

*Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019) ..... 31

*Rasul v. Bush*, 542 U.S. 466 (2004) ..... 27

*Reid v. Covert*, 354 U.S. 1 (1957) ..... 27

*River v. Superintendent Houtzdale SCI*, 738 Fed. App'x. 59 (3d Cir. 2018) ..... 34

*Salahi v. Obama*, 710 F. Supp. 2d 1 (D.D.C. 2010) ..... 12, 18

*United States v. Al-Nashiri*, Mil. Comm'n's Trial Judiciary, Order on AE 400N (Nov. 7, 2019) ..... 37, 38

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ..... 28

*United States v. Meyer*, 733 F.2d 362 (5th Cir. 1984) ..... 7

*United States v. Napue*, 834 F.2d 1311 (7th Cir. 1987) ..... 36

*United States v. Penn*, 974 F.2d 1026 (8th Cir. 1992) ..... 7

*United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998) ..... 36

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ..... 28

*United States v. Williamson*, 806 F.2d 216 (10th Cir. 1986) ..... 34

*Uthman v. Obama*, 637 F.3d 400 (D.C. Cir. 2011) ..... 18, 19

*Yamataya v. Fisher*, 189 U.S. 86 (1903) ..... 28

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........ 28

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ........ 28

**Statutes**

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) ........ i, vii, 3, 25, 26

**Other Authorities**

Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047 (May 2005) ........ 21

Jeremy M. Sharp, *Yemeni Civil War and Regional Intervention*, Cong. Research Serv. R43960 (Sept. 17, 2019) ........ 5

The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (Dec. 2016) ........ 13, 15

**Constitutional Provisions**

Due Process Clause, U.S. Const. amend. V ........ 3, 25, 26, 28, 30, 33, 34, 38

Suspension Clause, U.S. Const. art. I, § 9, cl. 2 ........ 3, 26, 27, 29, 30, 34

**Treaties**

Geneva Convention relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ........ 13

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## GLOSSARY

| | |
|---|---|
| AAIA | Aden-Abyan Islamic Army |
| AUMF | Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) |
| CIA | Central Intelligence Agency |
| EIJ | Egyptian Islamic Jihad |
| JA | Joint Appendix |
| PSO | Political Security Organization |

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## INTRODUCTION AND SUMMARY OF ARGUMENT

The decision below rested entirely on the holding that Petitioner-Appellant Abdulsalam Ali Abdulrahman al-Hela had provided "substantial support" to al Qaeda and associated forces. The Government obviously has little confidence in the validity of this holding because, in the Government's view, Abdulsalam's detention should be upheld because he was "part of" al Qaeda and associated forces. Br. 11. The district court, however, expressly declined to make a "part of" finding. In any event, there is no more basis for a "part of" finding than there was for the district court's incorrect "substantial support" finding.

It is noteworthy that the Government makes no rebuttal to the core undisputed facts in the case: Abdulsalam was a civilian, a businessman in Yemen. He was not a combatant and never fought against the United States. There is no evidence that he was an Islamic extremist or that he ever embraced any of the radical positions or terrorism doctrines espoused by al Qaeda. In 2016, the Yemen Government, an ally of the United States in the war on terror, provided express written assurances that Abdulsalam was a respected citizen of high character, who had assisted the Yemen Government in deporting unwanted foreigners, and who had no connection "with any terroristic or extremist organizations at all." JA 763-67.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

The Government's brief fails to show that Abdulsalam actually took any specific actions that supported al Qaeda or its associated forces, much less "substantially" supported them. Its "travel facilitation" claims are all in the context of Yemen's program to deport foreigners, and thus not at all supportive of al Qaeda or Egyptian Islamic Jihad ("EIJ"). The Government also failed to show any *acts* by Abdulsalam that helped the Aden-Abyan Islamic Army ("AAIA") in its alleged "bomb" plots. Moreover, the district court's holding that Abdulsalam "substantially supported" al Qaeda or associated forces is not justified even by the court's own factual findings.

The Government's claim that Abdulsalam can be detained because he was "part of" al Qaeda, EIJ, and AAIA is unsupported by any evidence that he was ever a member of those organizations, that he ever associated himself with those organizations, or that he ever sympathized with their aims or philosophies.

The Government's case also rests largely if not entirely on its argument that AAIA and EIJ were "associated forces" of al Qaeda. Neither group, however, was a co-belligerent of al Qaeda in actual hostilities against the United States, which is the *sine qua non* for an "associated force."

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

The Government's seventeen-year (and counting) continued imprisonment of Abdulsalam, without him ever being charged, tried, or convicted of anything, is punitive, and thus is not authorized by the AUMF and violates the Due Process Clause. In addition, the district court's reliance on *ex parte* evidence, its refusal to provide Abdulsalam with a copy of the charges against him, and other irregularities, violated his procedural due process rights and his right under the Suspension Clause to a "meaningful" hearing. Abdulsalam timely objected in the district court to these procedural violations; there was no waiver, contra the Government's claim.

Unless this Court intervenes and grants his habeas petition, Abdulsalam will continue to serve what amounts to a life sentence, as cruel in its own way as the horrific physical torture that he endured in the CIA's "dark prisons." This Court should end this injustice and order his release.

## ARGUMENT

**I.    Abdulsalam Did Not Provide "Substantial Support" to al Qaeda or an Associated Force.**

### A.    The Travel Facilitation Allegations

Abdulsalam's alleged "travel facilitation" was undertaken in the context of a program by the Yemen Government to deport foreign Arabs. *See, e.g.,* JA 151. The United States was aware of the deportation program and did not object to it.

3

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

JA 1018. The Government does not claim that the program was inspired or directed by al Qaeda or EIJ, and it plainly was not. The program necessarily disrupted the lives of those being deported, and thus was in no respect supportive of al Qaeda or EIJ, even assuming that some of the deportees were members of those groups. There is simply no way to spin Abdulsalam's assistance with the deportations as "substantial support" of al Qaeda or EIJ.

1. The Government's argument that it is no defense that Abdulsalam's travel facilitation activities may have been sanctioned by the Government of Yemen misses the point. Br. 25, 28-29. The issue is not whether Abdulsalam is covered by some form of sovereign immunity. Rather, the point is that the deportation program was a Yemen Government program, *not* designed by or to aid al Qaeda or EIJ, and therefore Abdulsalam's actions in aid of the deportations could not be viewed as support of those organizations.

The Government also argues that even though Abdulsalam may have been working for the Government of Yemen, he was still supporting al Qaeda and EIJ





~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



5

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

2. The Government argues, and the district court found, that Abdulsalam acted outside of any "legitimate" government program when he used false travel documents to facilitate the travel of people who were being deported from Yemen. JA 163; Br. 28. The Government, however, points to no evidence that using false documents was inconsistent with Yemen's deportation program (which, again, was not an al Qaeda program). The CIA itself admits to use of false passports, a practice that is well documented.[3] In any event, "mere possession and use of false travel documents is [not] proof of involvement with terrorism." *Bensayah v. Obama*, 610 F.3d 718, 727 (D.C. Cir. 2010) (internal quotation marks omitted).

---

[3] *See, e.g.*, Antonio J. Mendez, "A Classic Case of Deception," Central Intelligence Agency, https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/vol43no3/html/v43i3a01p.htm; Raf Sanchez, *How CIA Spies Move Freely Through Europe on Fake Passports*, The Telegraph, Dec. 22, 2014, https://www.telegraph.co.uk/news/worldnews/europe/ eu/11308775/How-CIA-spies-move-freely-through-Europe-on-fake-passports.html.

The Government relies heavily on the district court's finding that Abdulsalam lied about using false documents in the deportations, and that this was evidence of guilt. *See, e.g.*, Br. 18, 25-28; JA 152-53 (citing *Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010)). The Government and the district court, however, misunderstand and misapply the law. The rule is that false exculpatory statements *may* be considered in weighing guilt. *See United States v. Penn*, 974 F.2d 1026, 1029 (8th Cir. 1992) (cited in *Al-Adahi*); *United States v. Meyer*, 733 F.2d 362, 363 (5th Cir. 1984) (same). The fact that false travel documents may have been used by Abdulsalam or others in connection with the deportation program does not show or even tend to show that the program was supportive of al Qaeda or EIJ. Even if false travel documents were used, they were used in service of the Yemeni deportation program, not to support al Qaeda and its associated forces. The use of false travel documents is thus irrelevant to a charge of supporting or being part of al Qaeda and associated forces, and so alleged lying about the use of such documents has no relevance to the issues in this case.

3. The Government repeatedly refers to Abdulsalam's alleged admission

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

there is no corroboration of this "admission"

In any event, Abdulsalam has never denied helping his Government in the program to deport foreigners, including extremists.[4]

4. The Government mischaracterizes Abdulsalam's testimony

Br. 18.

4

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

[redacted]

5. The Government's few claims about travel facilitation for specific alleged members of al Qaeda [redacted] also do not support Abdulsalam's detention. Br. 18-19, 27. [redacted]

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

6. Finally, the Government makes no attempt to defend the linchpin finding of the district court's travel facilitation holding — that the travel facilitation "enabled members of al Qaeda and EIJ" to engage in terrorist acts. JA 197. There was not a shred of evidence presented to support this finding. This necessarily collapses the entire "travel facilitation" theory.

**B. The "Bomb Plot" Allegations**

The gaping hole in the district court's opinion concerning alleged AAIA bomb plots is that it cites no evidence of any specific conduct by Abdulsalam to support the plots. *See* Appellant's Br. 37-38. The court relied on vague allegations that Abdulsalam helped in planning or in providing unspecified logistical support. JA 169. The court cited no evidence that Abdulsalam actually did anything to help or facilitate the alleged bombing plots. The Government also cites no such evidence and makes no effort to defend the court's willingness to find "substantial support" when there is no evidence that he purchased explosives, or provided transportation, or provided financing, or did anything at all to support the plots in even a minimal, much less a "substantial," way.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

The Government relies heavily on hearsay

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

[redacted] These [redacted] hearsay [redacted] are worthless as evidence, and do not rebut [redacted] Abdulsalam's first-hand testimony in open court [redacted]

In any event, the central finding that was critical to the district court's decision — that Abdulsalam "directly enabled AAIA" to bomb the British Embassy and to attempt to strike the U.S. Embassy — was unsupported by the evidence. JA 197. This is not surprising, given the absence of any evidence showing that Abdulsalam took any action that "enabled" AAIA to do anything.

**C. Legal Issues Relating to "Substantial Support"**

The Government is incorrect that substantial support need not be in aid of hostilities to justify detention, but only in aid of a group engaged in hostilities. Br. 40-41. The support must be "'*in hostilities against U.S. Coalition partners.*'" *Salahi v. Obama*, 710 F. Supp. 2d 1, 5 (D.D.C.) (emphasis in original), *vacated and remanded on other grounds*, 625 F.3d 745 (D.C. Cir. 2010) (quoting *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010)); *see also Ali v. Obama*, 736 F.3d 542, 544 n.1 (D.C. Cir. 2013) (President may detain those who provide substantial support "in the war"); The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related*

*National Security Operations* (Dec. 2016) ("White House Report") at 4 (courts allow detention of those who provide substantial support "in the armed conflict").

The Government also disputes Abdulsalam's position that the "substantial support" must be after or related to 9/11 in order to justify detention. Br. 41-44. But again, the law is against the Government. *See* Appellant's Br. 26-28. This does not mean, as the Government claims, that the Government is "required to wait to detain" a person until it has developed evidence of post-9/11 activity. Br. 41-42, 44. It simply means that pre-9/11 activity is not relevant to "substantial support" detention. Similarly, the Government does not dispute the legal requirement that the alleged support be ongoing at the time of capture. *See* Appellant's Br. 27-29.

The district court ultimately concluded that detention of individuals who provide "substantial support" was allowed under the law of war only for those who pose a security threat, citing the Geneva Convention's rule allowing detention when "absolutely necessary" and only "for imperative reasons of security." JA 131 (quoting Geneva Convention relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287, arts. 5, 27, 42-43, 78). The Geneva Convention, however, makes clear that such a detainee must be released when the threat has ended. *Id.* arts. 42, 78, 132. There is no proof that

Abdulsalam is still a security threat, assuming he ever was, so he must be released for this reason as well.

The Government's complete lack of engagement with the district court's "substantial support" analysis, and its near-exclusive focus on its argument that Abdulsalam is detainable as "part of" al Qaeda or an associated force, is a tacit acknowledgement that the court's "substantial support" holding cannot be justified. As explained below, the Government's "part of" argument was not only not adopted by the district court, it is also meritless.

## II. Abdulsalam Was Not "Part Of" al Qaeda or an Associated Force.

In every prior case upholding detention, the detainee has been found to be a "part of" al Qaeda and/or associated forces. Common sense dictates that if the district court believed that Abdulsalam was "part of" al Qaeda or an associated force, it would have so ruled. It did not. The Government wants this Court to find what the district court refused to find after trial, that Abdulsalam was not only "part of" al Qaeda, but also "part of" AAIA and EIJ. There is no basis in the record for this Court to make such a finding.

1. There is no evidence of any of the indicia of a "part of" relationship found in prior Guantanamo cases. Abdulsalam did not swear allegiance to any leader or group; he did not attend any meetings; he did not serve as a combatant in

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

an armed force; he did not visit guesthouses; he did not attend training camps; he was not found on a battlefield; and he did not appear on any membership list. These are the key factors that courts have considered for the "part of" test. *See Al-Bihani*, 590 F.3d at 872-73, 873 n.2; White House Report 29-30 (citing cases). In addition, there is no evidence that he was an Islamic extremist or that he had any affinity with ideologies espoused by al Qaeda, EIJ, or AAIA.

Abdulsalam was probably not even eligible to be "part of" EIJ because it is the *Egyptian* Islamic Jihad and Abdulsalam is not an Egyptian. He would also be a very unlikely member of the Aden-Abyan Islamic Army, because it was formed by men from southern Yemen (a separate country during the Cold War) which was involved in a civil war with north Yemen, where Abdulsalam's home is located. JA 1336-38.

2. The Government wants this Court to ignore the fact that in 2016, the relevant security agencies in Yemen certified that Abdulsalam has no "connection with any terrorist or extremist organizations." JA 764-67. This certification was approved by Yemen's Interior Ministry and Foreign Ministry, *id.*, at a time when the Yemen Government was in power in Sana'a and was an ally of the United States in the war on terror. Those agencies surely had better information about a well-known sheikh and businessman who lived in Sana'a than did the district court

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

or Government counsel in this case. Their certification should be treated as dispositive of the "part of" claim.

3. The Government argues that Abdulsalam was a "part of" al Qaeda, EIJ, and AAIA because he allegedly had close relationships with certain individuals, he was trusted with certain information, he was a travel "facilitator," and he had a role in AAIA bomb plots. Br. 20-21.

The specific alleged relationships with extremists cited by the Government are very few. Some bear mention here:

- The Government's continued repetition of claims about a relationship between Abdulsalam and Tawfiq al-Sirri remain irrelevant, because al-Sirri's Vanguards of Conquest group broke away from EIJ in one of EIJ's many schisms. JA 686-87; *see* p. 23, below. The Government's evidence showed that the group has been inactive since 1997. JA 686-87.

This is

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

meaningless evidence. *See Parhat v. Gates*, 532 F.3d 834, 846-47 (D.C. Cir. 2008).[6]

Abdulsalam's contacts with extremist individuals were not sinister, but a natural result of his role as a successful businessman and tribal sheikh in the capital of Yemen, who knew leading government figures, including the president of Yemen. JA 1302-03, 1307-08. He worked with other sheikhs and the PSO to deport foreigners from Yemen, some of whom were extremists. JA 807-08. He was tasked by his government to help monitor the activities of AAIA in south Yemen, and helped break up an AAIA camp. JA 374, 544-45, 1336-46. It was inevitable that he would have contacts with extremists, but this did not make him a

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

part of any extremist organization

Moreover, the cases cited by the Government for support of the argument that mere associations with other people can be probative of a "part of" relationship are entirely unlike Abdulsalam's case. *See* Br. 20-21, 36. In one case, the "association" was that the detainee was captured "in the company of a Taliban fighter and two al Qaeda members and Osama bin Laden bodyguards 12 miles from Tora Bora in December 2001." *Uthman v. Obama*, 637 F.3d 400, 405 (D.C. Cir. 2011). In *Ali*, the association was established at an al Qaeda-affiliated guesthouse in Pakistan in March 2002. *Ali*, 736 F.3d at 545-46. In *Awad v. Obama*, it was that "in December 2001 Awad joined a group of al Qaeda fighters who had barricaded themselves inside a hospital" in Afghanistan. *Awad v. Obama*, 608 F.3d 1, 3 (D.C. Cir. 2010).[7] Abdulsalam, in contrast, was a civilian businessman living openly and peacefully in his home area in Yemen, not captured in or near the Afghanistan war zone.

[7] In the only other case the Government cites, *Salahi*, the detainee was already determined to have been an al Qaeda member, and the court was asking (not stating) whether his continued association with other members was evidence of his own continued membership. *Salahi*, 625 F.3d at 752.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Similarly, the cases cited by the Government to support its claim that [REDACTED] is evidence he was "part of" al Qaeda are unlike his case. Br. 36. In two of these cases, the detainees stayed for months circa 2001 in Pakistan with a group designated as a Terrorist Support Entity aligned with al Qaeda. *Almerfedi v. Obama*, 654 F.3d 1, 6 (D.C. Cir. 2011); *Hussain v. Obama*, 718 F.3d 964, 969-70 (D.C. Cir. 2011). In the third case, the detainee studied at an alleged al Qaeda recruiting center with two of bin Laden's bodyguards and he was captured near Tora Bora with those two men. *Uthman*, 637 F.3d at 405. These are proximate to 9/11 and include actions in Afghanistan or Pakistan, and generally in a combat context. The alleged associations of Abdulsalam, by contrast, were largely long before 2001, outside Afghanistan [REDACTED] and not in a context of hostilities against the United States.

The Government also argues that Abdulsalam must have been "part of" al Qaeda and associated forces because of [REDACTED] the information with which he was entrusted. Br. 21; *see also* Br. 18-20, 24, 31-32, 38. [REDACTED]

[REDACTED]

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

Had Abdulsalam really been "part of" al Qaeda or associated forces, he presumably would have acted to help those organizations.

Abdulsalam's "travel facilitation" activities do not show him to be a "part of" al Qaeda or EIJ any more than they constituted substantial support of al Qaeda or EIJ. His travel-related activities were all in the context of helping Yemen's deportation program, which cannot be spun as an al Qaeda or EIJ program. Appellant's Br. 31-37. A person who helps to remove EIJ or al Qaeda members resident in Yemen from the country is not thereby a part of al Qaeda or EIJ. If he is part of anything, he is part of a homegrown Yemeni effort to expel foreigners.

Abdulsalam's relationship with AAIA also does not make him a part of that group. Instead, it results from his role as a sheikh who was asked by the Yemen Government to help neutralize and monitor the group. JA 374, 544, 1336-46.

None of this points to membership in AAIA.

**III. AAIA and EIJ are not "Associated Forces" of al Qaeda.**

The Government does not dispute the obvious — that its case hinges on finding that AAIA and EIJ are "associated forces." All of the so-called "bomb attack" allegations involve only AAIA, not al Qaeda, and the "travel facilitation" allegations involve the travel of EIJ members, among others. The Government also does not dispute that to be an "associated force" of al Qaeda, an organization must have "entered the fight alongside al Qaeda," and "must be a *co-belligerent* of al Qaeda . . . in hostilities against the United States or its coalition partners as part of the same comprehensive armed conflict." JA 132 (emphasis added); *see also Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009) ("co-belligerent" in international armed conflict is "'a fully fledged belligerent fighting in association with one or more belligerent powers'") (quoting Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2112 (May 2005)); Bradley & Goldsmith 2112-13 (describing activities that would be co-belligerency in international terrorism context).

1. The Government alleges that AAIA attacked or attempted to attack Western targets in Yemen, including embassies and tourists. Br. 46. None of these actions by AAIA, however, involved AAIA working with, on behalf of, alongside of, or actively supporting al Qaeda, and they were not in the same comprehensive armed conflict as post-9/11 hostilities. None made AAIA a "co-belligerent" of al Qaeda.[9]

The only relationship between al Qaeda and AAIA that the Government can point to involves the AAIA's disputed origins. [redacted] But other evidence shows that it was founded by Yemenis in Yemen. Ambassador Edmund J. Hull, U.S. Ambassador to Yemen from 2001 to 2004, described the AAIA as "a *homegrown* terrorist group with *loose ideological* links to al Qaeda." Edmund J. Hull, *High-Value Target* 130 (2011) (emphasis added). His predecessor, Ambassador Barbara Bodine, confirmed that AAIA was not an affiliate of al Qaeda. JA 1021. *See also* United Nations Security Council, *Islamic Army of Aden*,

---

[9] The Government contests the idea that hostilities began only on September 11, 2001. Br. 42. But a plurality of the Supreme Court has endorsed that position. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 598-600 (2006).

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/islamic-army-of-aden. In any event, even if some AAIA members had some contact with bin Laden, that would not make AAIA and al Qaeda co-belligerents. There is simply no evidence of any acts of co-belligerency involving AAIA.

The Government's claim that AAIA member Jayul was "linked to bin Laden" also does not make AAIA an associated force of al Qaeda. *See* Br. 47. [REDACTED] There is no exploration as to what this alleged [REDACTED] "link" involved, and it certainly does not show that AAIA ever acted as a co-belligerent with al Qaeda. All of AAIA's activities were undertaken in Yemen, with no evidence of any aid from al Qaeda and nothing to indicate co-belligerency.

The Government does not refute that EIJ has faced repeated schisms and divisions, [REDACTED] Appellant's Br. 58-59. Those reports are not sourced solely to a "web article and book not submitted to or considered by the district court," Br. 51, but to the Government's own exhibits and intelligence about EIJ, JA 681, 687. The Government did not show that

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

Abdulsalam's alleged relationship was with any part of EIJ that merged with al Qaeda.

2. Even if at some point AAIA or EIJ were associated forces of al Qaeda, this would justify detention of Abdulsalam only if they were associated forces at the time of his involvement with the group and at his capture and only if they were still engaged in active hostilities with the United States or coalition partners. Appellant's Br. 48-50.

The Government does not dispute that Abdulsalam's facilitation of travel of EIJ members occurred in the 1990s, long before the alleged al Qaeda/EIJ merger in June 2001. There is no evidence of any interaction by Abdulsalam with EIJ members after the merger.

The Government argues that even if AAIA is no longer engaged in hostilities, AAIA members may continue to be detained. Br. 51 (citing *Al-Bihani*, 590 F.3d at 874). The Government's reliance on *Al-Bihani* is misplaced. In that case, the detainee had argued that because the Taliban was no longer the government of Afghanistan, hostilities against the Taliban had ended, and hostilities against the Taliban as a non-government group were a different conflict. *Al-Bihani*, 590 F.3d at 874. This Court said that would make no sense because the released Taliban fighters could just join Taliban forces still in the field. *Id.* The

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

AAIA, by contrast, is not engaged in *any* hostilities against the United States, and in fact no longer exists. Appellant's Br. 55. Any previous connection between Abdulsalam and AAIA thus can no longer justify detention. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004); *Al-Bihani*, 590 F.3d at 874 (citing Third Geneva Convention art. 118).

## IV. Neither the AUMF nor the Due Process Clause Permits Abdulsalam's Prolonged Detention without Charge or Trial.

### A. AUMF

The punishment being imposed on Abdulsalam — seventeen years of imprisonment and counting — is not "necessary and appropriate," as required by the AUMF, and is thus barred by the AUMF. Appellant's Br. 60-65. The Government's response is only that *Al-Alwi v. Trump* forecloses Abdulsalam's position.[10] Br. 53 (citing *Al-Alwi v. Trump*, 901 F.3d 294, 297 (D.C. Cir. 2018)). Yet *Al-Alwi* addressed a different question — whether the AUMF's detention authorization is still valid, given that the nature of the so-called "war on terror" is fundamentally different from the wars that had guided the development of law-of-war principles on detention. *Al-Alwi*, 901 F.3d at 297-98. While the Court

[10] Appellant believes that *Al-Alwi* was wrongly decided, and reserves the right to challenge that decision en banc or before the Supreme Court.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

rejected that contention, it did not address the separate question of whether Al-Alwi's detention had violated law-of-war principles because it had become punitive. *See generally Al-Alwi*, 901 F.3d 294. Abdulsalam presents this latter argument. His detention has become punitive and is therefore unwarranted under the law-of-war principles that inform the AUMF.

### B. Substantive Due Process

#### 1. Persons Detained at Guantanamo Are Entitled to Due Process Rights.

In *Boumediene v. Bush*, the Supreme Court employed a functional test to determine whether constitutional provisions extended to prisoners held at Guantanamo, and it concluded that the Suspension Clause was applicable to Guantanamo. 553 U.S. 723, 753-71, 798 (2008). The Court's reasoning — which focused on "practical concerns," including the nature and location of the detention and potential obstacles to providing certain rights — applies with equal force to the Due Process Clause. *See id.* at 766. Moreover, the Supreme Court has recognized that the Suspension and Due Process Clauses are intertwined, such that the application of the former without the protections of the latter would be hollow and ineffective. *See Hamdi*, 542 U.S. at 533, 538 (plurality opinion).

The Government contends that Supreme Court precedent dictates that foreign persons outside the United States have no due process protections, focusing

primarily on *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950). *See* Br. 64. This position entirely ignores the intervening authority of *Boumediene*, which — unlike the Government's cases — specifically addresses the application of the Constitution to the Guantanamo detentions. It also disregards the robust case law eschewing a blanket rule that the Constitution never extends past the limits of the United States' *de jure* sovereignty. *See Boumediene*, 553 U.S. at 757-64 (discussing *Reid v. Covert*, 354 U.S. 1 (1957) and the "Insular Cases" regarding U.S. territories).

The Government's reliance on *Eisentrager* is puzzling. *Boumediene* expressly relied on this case when it held that the application of the Constitution does *not* depend on a formal test of *de jure* sovereignty, and that practical considerations must be taken into account when determining the reach of constitutional provisions. *See Boumediene*, 553 U.S. at 762-64, 766-71. Though these practical considerations led the *Eisentrager* Court to deny the applicability of the Suspension Clause to prisoners of war held in Germany, the *Boumediene* Court ultimately found that those same considerations mandated application of the Clause to Guantanamo detainees. *See id.* at 798; *see also Rasul v. Bush*, 542 U.S. 466, 476 (2004) (noting that "[p]etitioners in these cases differ from the *Eisentrager* detainees in important respects," including that they have not been

"charged with or convicted of wrongdoing" and that they "have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control").

Further, most of the cases relied on by the Government do not actually involve the application of the Due Process Clause to persons located outside the United States. *See generally Zadvydas v. Davis*, 533 U.S. 678 (2001) (examining the protections due to persons held in immigration detention within the United States); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (determining whether the *Fourth* Amendment applies to the search of a Mexican citizen and his home in Mexico); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) (establishing the executive branch's power over foreign affairs); *Yamataya v. Fisher*, 189 U.S. 86 (1903) (analyzing due process in the context of persons being deported from the United States); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (holding that a San Francisco municipal ordinance violated the Fourteenth Amendment).. Similarly, in *Jifry v. F.A.A.*, the court had no occasion to determine whether foreign persons enjoy due process protections, because the persons at issue in the case had "received all the process that they are due." 370 F.3d 1174, 1183 (D.C. Cir. 2004).

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

The Government's only case that squarely addresses the issue merely serves to highlight the importance of the practical considerations embraced by *Boumediene*. *People's Mojahedin Organization of Iran v. U.S. Department of State* involved two foreign entities, with *no* connection to the United States, that had been designated as terrorist organizations without notice or an opportunity to be heard. 182 F.3d 17, 22 (D.C. Cir. 1999) (holding that the entities had no due process rights, analogizing to a foreign country's lack of due process rights in relation to an embargo imposed by the United States). In contrast, Abdulsalam has been imprisoned indefinitely by the United States Government in a location over which the United States exercises effective control and jurisdiction. Abdulsalam's connection to the United States is therefore of a fundamentally different character than the entities at issue in *People's Mojahedin*. The *Boumediene* Court recognized these types of considerations when it held that the Suspension Clause applied to Guantanamo detainees. *See Boumediene*, 553 U.S. at 766.

Several judges of this Court have recognized that *Boumediene*'s emphasis on practical considerations and functional concerns is the appropriate framework within which to analyze the applicability of all constitutional provisions to Guantanamo detainees. In *Al Bahlul v. United States*, then-Judge Kavanaugh concluded that the Ex Post Facto Clause applied in Guantanamo, applying

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

*Boumediene*'s "'functional' rather than . . . 'formalistic' analysis." 767 F.3d 1, 65 n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in part and dissenting in part) (stating that five of the seven judges participating in the *en banc* proceeding agreed with this conclusion "in light of *Boumediene*"); *see also id.* at 63, 65; *id.* at 49 (Rogers, J., concurring) (agreeing that the application of the Ex Post Facto Clause "follow[ed] from *Boumediene*" because both this provision and the Suspension Clause are "safeguards of liberty"; "the detainees' status and location at Guantanamo Bay are the same[;] and the government has pointed to no distinguishing practical obstacles to [the Ex Post Facto Clause's] application") (internal quotation marks omitted). The Government has pointed to no reason why this Court should not similarly follow *Boumediene* here, and find that the Due Process Clause, just like the Suspension Clause and the Ex Post Facto Clause, applies at Guantanamo.

Finally, the Government broadly overstates the relevance of two precedents of this court — *Kiyemba v. Obama* and *Al-Madhwani v. Obama*. *See* Br. 65-66. *Kiyemba* merely addressed whether Guantanamo detainees had a substantive due process right to be released into the United States. *Kiyemba v. Obama*, 555 F.3d 1022, 1026-27 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131, *reinstated in relevant part*, 605 F.3d 1046, 1047-48 (D.C. Cir. 2010). It did not preclude

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Guantanamo detainees from making *other* substantive due process claims, as has been recognized by this Court. *See Qassim v. Trump*, 927 F.3d 522, 528 (D.C. Cir. 2019) ("[T]he issue on appeal in *Kiyemba* was the narrow question of what remedy could be given once the government conceded that it could not lawfully hold [the] detainees."). And *Al-Madhwani*, which briefly recited *Kiyemba*'s holding, did not actually determine whether or not the petitioner had *any* due process rights. *See Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011) (rejecting petitioner's due process claim because any such error was harmless, regardless of the "underlying legal basis").

**2. Substantive Due Process Mandates Abdulsalam's Release from Guantanamo.**

Abdulsalam's protracted and punitive detention is a violation of substantive due process. Appellant's Br. 65-67.

The Government asserts that Abdulsalam's detention is "not punitive," but rather "solely protective custody," aimed to prevent Abdulsalam's further participation in hostilities. Br. 54 (citing *Hamdi*, 542 U.S. at 518). But it is risible to suggest that his detention for almost two decades, with no end in sight, and without charge or trial, is "solely protective." Any such suggestion also ignores the cruelty of his detention, including torture by the CIA and deprivation of any visits from his wife, children, or other family members. The Government's

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

confinement of Abdulsalam at Guantanamo, without him ever being charged, tried, or convicted, is manifestly punitive.[11] *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

The true nature of Abdulsalam's detention is made clear when compared to the undeniably punitive, yet significantly shorter, detention of other Guantanamo detainees convicted of material support for terrorism who have long since been released. For example, Salim Ahmed Hamdan received a sentence of five-and-a-half years in connection with his position as a driver for Osama bin Laden, and David Hicks was sentenced to seven years, ultimately reduced to nine months of confinement, related to his training at al Qaeda training camps and taking up arms against coalition forces.[12] Abdulsalam's detention, by contrast, exceeds even the

---

[11] The Government asserts that it has established a board to review periodically the Guantanamo detentions. Br. 55. The process, however, is meaningless. Under President Trump, the board has cleared no detainees for release, and several that had been cleared during the Obama administration are still detained.

[12] *See* Ofc. of Mil. Comm'ns, "Salim Ahmed Hamdan," http://www.mc.mil/Cases.aspx?caseType=omc&status=4&id=23 (last visited Nov. 20, 2019); Ofc. of Mil. Comm'ns, "David M. Hicks," http://www.mc.mil/Cases.aspx?caseType=omc&status=4&id=10 (last visited Nov. 20, 2019).

maximum fifteen-year sentence for material support crimes for persons who have "provided services to terrorist organizations."[13]

Abdulsalam's lengthy, punitive, and ultimately arbitrary detention is a violation of the Due Process Clause.

## V. The Limited Procedures Provided to Abdulsalam Denied Him the "Meaningful" Hearing Required by *Boumediene* and His Procedural Due Process Rights.

### A. Waiver of Contention

The Government contends that Abdulsalam has waived his procedural due process arguments. *See* Br. 58 (claiming that Abdulsalam's briefing below "make[s] no mention of procedural due process"). In fact, Abdulsalam expressly argued that the Government's ability to submit *ex parte* evidence constituted "a denial of due process." Dkt. 294, at 2; *see also* Dkt. 299, at 2. Moreover, some of Abdulsalam's due process claims arise directly from the district court decisions that he is currently appealing. *See, e.g.*, JA 199-205 (denying Abdulsalam access to the Government's return). Abdulsalam raised these due process violations — which resulted from the *effect* of the district court's decisions — at the first

[13] U.S. Dep't of Justice, et al., *Final Report: Guantanamo Review Task Force* 22, 22 n.21 (2010), *available at* https://justice.gov/sites/default/files/ag/legacy/2010/06/02/guantanamo-review-final-report.pdf.

appropriate opportunity to do so, *i.e.*, in this appeal. *Cf. River v. Superintendent Houtzdale SCI*, 738 Fed. App'x. 59, 63 (3d Cir. 2018) (declining to find waiver of due process claim in proceedings below because plaintiff did not learn of issue until after that proceeding had concluded).

Even where Abdulsalam did not use the exact phrase "due process," he made procedural due process arguments in substance. For example, Abdulsalam contended that the Government's failure to disclose the allegations made against him impeded his — and his counsel's — ability to rebut those allegations and adequately to contest his detention. *See* Dkt. 353, at 3-7. Abdulsalam also repeatedly argued that anonymous hearsay, often in the form of heavily redacted documents, was improper. *See* JA 1283, 1445, 1448, 1454, 1773.

Abdulsalam thus has not waived his arguments regarding the failure to provide him with procedural due process. *See United States v. Williamson*, 806 F.2d 216, 219 (10th Cir. 1986) ("Courts indulge every presumption against the waiver of fundamental constitutional rights.") (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)). In any event, the right to a "meaningful hearing" under the Suspension Clause must provide at a minimum the procedural rights of the Due Process Clause, for it is impossible to consider a hearing to be "meaningful" if it is stripped of due process protections.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

**B. Violation of Rights**

As Abdulsalam has previously explained, several procedures employed by the district court — including the refusal to provide Abdulsalam with the Return and his counsel with certain classified information, as well as the use of multi-level, anonymous hearsay and *ex parte* evidence — violated Abdulsalam's due process rights and did not comply with *Boumediene*'s standards for Guantanamo habeas proceedings. *See* Appellant's Br. 68-75.

The Government contends that *Hamdi* categorically precludes Abdulsalam's arguments. *See* Br. 58-63. Yet *Hamdi* repeatedly emphasized "the importance and fundamental nature of the individual's right to liberty," and recognized that this interest is not "offset by the circumstances of war." *Hamdi*, 542 U.S. at 529-30, 535 (citing *Foucha*, 504 U.S. at 80) (internal quotation marks omitted).

The Government also argues that Abdulsalam was able to "mount[] an extensive case." Br. 60. Abdulsalam's ability to critique the limited evidence that he and his counsel were permitted to see does not cure the underlying deficiencies in process. Abdulsalam's inability to hear the charges against him necessarily affected his capacity to contribute to rebutting the Government's case. The Government's contention that disclosure of the Return — which at this point contains decades-old intelligence — would affect "the foreign relations and

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

activities of the United States in Yemen and elsewhere," Br. 6, is preposterous, and does little to rectify the failure to provide Abdulsalam with a "meaningful opportunity" to demonstrate that his detention is unlawful. *Boumediene*, 553 U.S. at 779.

The district court permitted the Government to present extensive evidence *ex parte*, and it ultimately relied on that evidence to evaluate sources and make credibility determinations. *See, e.g.*, JA 141, 143. Even Abdulsalam's counsel, who possess security clearances, were not permitted to view these materials.

Courts have long recognized that they should "err on the side of protecting the interests of the" non-governmental party when considering questions of access to materials that the Government claims are sensitive. *United States v. Rezaq*, 134 F.3d 1121, 1142 (D.C. Cir. 1998). Courts have also consistently acknowledged the dangers presented by *ex parte* materials and communications. *See, e.g.*, *United States v. Napue*, 834 F.2d 1311, 1318-19 (7th Cir. 1987); *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969). The district court failed to follow these principles

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

when it relied on *ex parte* evidence and when it allowed the Government to provide heavily redacted materials to counsel.

The Government's use of *ex parte* submissions is particularly problematic in light of the fact that the events that allegedly support Abdulsalam's detention occurred approximately twenty years ago. *See United States v. Al-Nashiri*, Mil. Comm'n's Trial Judiciary, Order on AE 400N, *12 (Nov. 7, 2019) (noting concerns with "information the Government seeks to protect [that] is generally between ten and fifteen years old"). The Government's filings in support of its *ex parte* submissions are themselves generally many years old, *see*, *e.g.*, Dkt. 238 (filed Mar. 11, 2010); Dkt. 269 (filed Aug. 13, 2010), and Yemen's geopolitical situation has completely changed since Abdulsalam was last in Yemen, in 2002.[14] The Government has failed to disclose any ongoing need to exclude Abdulsalam's counsel from this twenty-year-old evidence.

The Government's suggestion that Abdulsalam's counsel cannot be trusted with this information is entirely unwarranted. *See* Br. 63. There is no reason to believe that counsel, who have been granted security clearances by the

[14] *See, e.g.*, Middle East: Yemen, Central Intelligence Agency World Factbook, *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/print_ym.html.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Government, would not uphold their obligations to maintain the confidentiality of classified information. *See Al-Nashiri*, Order on AE 400N at *17-18 (requiring showing of a "substantial probability" that specific defense counsel "will abandon their professional integrity and risk their livelihood, their assets, and their freedom by ignoring" their duty of non-disclosure). The district court's decision to allow the Government to present evidence of significance to this case *ex parte*, and heavily to redact other evidence, and to rely on such evidence in denying the writ, denied Abdulsalam a meaningful opportunity to challenge the Government's accusations, and constituted a violation of the Due Process Clause.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

## CONCLUSION

The Court should reverse the judgment below and direct the district court to grant the writ.

Respectfully submitted,

S. William Livingston
Brian E. Foster
Andrew D. Garrahan
Megan O'Neill
Covington & Burling LLP
One City Center
850 10th Street NW
Washington, DC 20001
(202) 662-6000 phone
(202) 662-6291 facsimile

David H. Remes
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508 phone

*Counsel for Petitioner-Appellant*

December 12, 2019

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing reply brief of the Petitioner-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as modified by this Court's order of November 18, 2019 and contains 8,374 words, excluding portions of the brief excluded by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

Andrew D. Garrahan

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

**PROOF OF SERVICE**

I certify that on this 12th day of December, 2019, I caused to be filed with the Court by way of the classified information security officer a true and correct copy of the foregoing reply brief of the Petitioner-Appellant upon counsel of record for the Appellees-Respondents.

Andrew D. Garrahan

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE