**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2021**

**No. 19-5079**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ABDULSALAM ALI ABDULRAHMAN AL-HELA, DETAINEE CAMP DELTA, ALSO KNOWN AS ABD AL-SALAM ALI AL-HILA; ABDULWAHAB ALI ABDULRAHMAN AL-HELA, AS NEXT FRIEND OF ABDULSALAM ALI ABDULRAHMAN AL-HELA,

*Petitioners-Appellants*,

*v.*

JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES; LLOYD J. AUSTIN, III, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE; TIMOTHY C. KUEHHAS, REAR ADMIRAL, COMMANDER JOINT TASK FORCE - GTMO; STEVEN G. YAMASHITA, ARMY COL, COMMANDER, JOINT DETENTION GROUP,

*Respondents-Appellees*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:05-cv-01048-UNA
Before the Honorable Judge Royce C. Lamberth

**BRIEF FOR THE AMERICAN BAR ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER-APPELLANT AND VACATUR**

MARK C. FLEMING
ELIZABETH BEWLEY
SOFIE C. BROOKS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
mark.fleming@wilmerhale.com
elizabeth.bewley@wilmerhale.com
sofie.brooks@wilmerhale.com

PATRICIA LEE REFO
AMERICAN BAR ASSOCIATION
321 North Clark Street
Chicago, IL  60654
(312) 988-5000
abapresident@americanbar.org

July 2, 2021

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* the American Bar Association certifies as follows:

## A.    Parties And *Amici*

Except for the following *amici* in this Court, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Petitioner-Appellant to the en banc Court:  the Commonwealth Lawyers Association and the American Bar Association.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioner-Appellant to the en banc Court.

## C.    Related Cases

Related cases are listed in the Brief for Petitioner-Appellant to the en banc Court.

/s/ Patricia Lee Refo
PATRICIA LEE REFO

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule

26.1, *amicus curiae* the American Bar Association certifies that it is a nonprofit

corporation organized under the laws of the State of Illinois; it has no parent

corporation; and no publicly held company has a 10% or greater interest in the

Association.

/s/ Patricia Lee Refo
PATRICIA LEE REFO

## D.C. CIRCUIT RULE 29(d) STATEMENT

Pursuant to D.C. Circuit Rule 29(d), the American Bar Association ("ABA") states that a separate brief is necessary for its presentation to this Court in order to provide the ABA's unique perspective—as the voice of the legal profession—on issues of liberty and fair process for individuals detained at Guantanamo.  For two decades, the ABA has been actively involved in efforts to ensure fair treatment for individuals deemed "enemy combatants," promulgating policies and participating as *amicus curiae* in a number of circuit and Supreme Court cases.  A joint brief is not feasible because other *amici* have interests and opinions that differ from those of the ABA.


/s/ Patricia Lee Refo
PATRICIA LEE REFO

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES ...................................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

D.C. CIRCUIT RULE 29(d) STATEMENT .......................................... iii

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY ...........................................................................................x

INTEREST OF *AMICUS CURIAE* ..........................................................1

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT ..........................................................................................5

I.      PROCEEDINGS THAT MAY RESULT IN GOVERNMENT DETENTION,
        INCLUDING THOSE INVOLVING ALLEGED "ENEMY COMBATANTS,"
        SHOULD FOLLOW PRINCIPLES OF FUNDAMENTAL FAIRNESS ...........................5

II.     PETITIONER MAY INVOKE DUE PROCESS RIGHTS WHEN CHALLENGING
        HIS SEVENTEEN-YEAR DETENTION AT GUANTANAMO .................................10

III.    DUE PROCESS REQUIRES THAT PETITIONER RECEIVE KEY PROCEDURAL
        PROTECTIONS IN HIS HABEAS PROCEEDINGS..................................................16

        A.      Security-Cleared Counsel Should Be Permitted To View
                Information On Which A Detention Decision Rests ..........................16

        B.      Due Process Principles Also Strongly Disfavor The Use
                Of Multi-Layered, Anonymous Hearsay.............................................24

CONCLUSION .......................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986)...........................14, 17, 19, 21

*Agency for International Development v. Alliance for Open Society International, Inc.*, 140 S. Ct. 2082 (2020) ...............................................14, 15

*Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) ...................................12, 14

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965 (9th Cir. 2012)....................................................19, 20

*Al Hela v. Trump*, 972 F.3d 120 (D.C. Cir. 2020) .................... 13, 14, 15, 21, 27, 28

*al-Marri v. Pucciarelli*, 534 F.3d 213 (4th Cir. 2008)......................................27, 28

*Alabama v. White*, 496 U.S. 325 (1990) ...................................................................26

*Alexandrov v. Gonzales*, 442 F.3d 395 (6th Cir. 2006) .........................................26

*Anim v. Mukasey*, 535 F.3d 243 (4th Cir. 2008)................................................26, 27

*Balzac v. Porto Rico*, 258 U.S. 298 (1922).............................................................11

*Banat v. Holder*, 557 F.3d 886 (8th Cir. 2009)...........................................25, 26, 27

*Boren v. Sable*, 887 F.2d 1032 (10th Cir. 1989)................................................25, 26

\* *Boumediene v. Bush*, 553 U.S. 723 (2008) ................. 4, 8, 10, 11, 12, 14, 15, 18, 19

*Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175 (1968)..........................................................................................................17

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ......................................................25

*Demore v. Kim*, 538 U.S. 510 (2003) ......................................................................18

*DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020) ......................................................15

\* Authorities upon which this brief chiefly relies are marked with asterisks.

*Doe v. Gonzales*, 386 F. Supp. 2d 66 (D. Conn. 2005) ...........................................20

*Downes v. Bidwell*, 182 U.S. 244 (1901) ................................................................11

*Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003).........................................25, 26

*Fares v. Smith*, 901 F.3d 315 (D.C. Cir. 2018)..........................................18, 21, 22

*Fitisemanu v. United States*, 2021 WL 2431586 (10th Cir. June 15, 2021) .....................................................................................................................12

*Fuentes v. Shevin*, 407 U.S. 67 (1972)...................................................................16

*Gardner v. Florida*, 430 U.S. 349 (1977) ..............................................................26

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ....................................................................7

*Greene v. McElroy*, 360 U.S. 474 (1959) ..............................................................17

* *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ......................... 6, 8, 10, 13, 18, 24, 27, 28

*Hickman v. Taylor*, 329 U.S. 495 (1947)...............................................................20

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008)................................................................................19, 20, 22

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)........................................................11

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951).......................................................................................................................7

*Khan v. Obama*, 655 F.3d 20 (D.C. Cir. 2011)......................................................21

*Lankford v. Idaho*, 500 U.S. 110 (1991) .................................................................7

*Latif v. Obama*, 677 F.3d 1175 (D.C. Cir. 2011)..................................................28

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................................13, 17

*Michigan v. Bryant*, 562 U.S. 344 (2011).............................................................25

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ..............................................................7

*National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001).........................................................................22

*Obaydullah v. Obama*, 688 F.3d 784 (D.C. Cir. 2012) ...........................................21

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008)...................................................23

*People's Mojahedin Organization of Iran v. Department of State*,
    327 F.3d 1238 (D.C. Cir. 2003)....................................................22

*Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019) ..................................................15

*Rasul v. Bush*, 542 U.S. 466 (2004).........................................................................14

*Reid v. Covert*, 354 U.S. 1 (1957).............................................................................11

*Singletary v. Reilly*, 452 F.3d 868 (D.C. Cir. 2006) ...................................25, 26, 27

*Tuaua v. United States*, 788 F.3d 300 (D.C. Cir. 2015) .........................................12

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008)..............................21, 23, 24

*United States v. Allen*, 864 F.3d 63 (2d Cir. 2017)..................................................13

*United States v. Camacho*, 2002 WL 31770810 (S.D.N.Y. Dec. 11,
    2002) .......................................................................................21

*United States v. Claudio*, 44 F.3d 10 (1st Cir. 1995)...............................................24

*United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) ..........................................23

*United States v. Salerno*, 481 U.S. 739 (1987)...............................................6, 7, 18

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................13, 15

*Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020)...........................................18

*Willner v. Committee on Character & Fitness*, 373 U.S. 96 (1963) ......................25

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......................................................6, 7, 14, 18

## DOCKETED CASES

*al-Nashiri v. Trump*, No. 16-8966 (U.S.).....................................................................3

*Boumediene v. Bush*, Nos. 06-1195, 06-1196 (U.S.).................................................3

*Hamdi v. Rumsfeld*, No. 03-6696 (U.S.)................................................................3, 9

*Padilla v. Rumsfeld*, Nos. 03-2235, 03-2438 (2d Cir.) ..............................................3

## STATUTES, RULES, AND REGULATIONS

28 C.F.R. § 17.41 ........................................................................................19

18 U.S.C.
§ 798 ................................................................................................20
App. III..........................................................................................22, 24

## OTHER AUTHORITIES

*ABA Commission on Immigration*, https://www.americanbar.org/
groups/public_interest/immigration/ (visited July 2, 2021) ...........................2

*ABA Mission & Goals*, https://www.americanbar.org/about_the_aba/
aba-mission-goals/ (visited July 2, 2021)........................................................1

*ABA Standards for Criminal Justice:  Fair Trial and Public Discourse*
(4th ed. 2013).................................................................................................2

*ABA Standards for Criminal Justice:  Pretrial Release* (3d ed. 2007)..........2, 4, 7, 8

ABA Policy 01M106C, https://www.americanbar.org/content/dam/
aba/directories/policy/midyear-2001/2001_my_106c.pdf
(visited July 2, 2021) ............................................................................7, 8, 16

ABA Policy 02M8C, https://www.americanbar.org/content/dam/
aba/administrative/death_penalty_representation/dp-
policy/2002-my-8c.pdf (visited July 2, 2021) ..........................................9, 18

* ABA Policy 09M10A, https://www.americanbar.org/content/dam/
aba/directories/policy/2009_my_10a.pdf (visited July 2,
2021) .................................................... 3, 9, 16, 18, 23, 24, 25, 28

1 Blackstone, William, *Commentaries on the Laws of England* (1765) ..................6

1 Coke, Edward, *The Second Part of the Institutes of the Laws of
England* (1797) ...............................................................................................6

*Enemy Combatants*, https://www.americanbar.org/advocacy/
governmental_legislative_work/priorities_policy/civil_liberties/
enemy_combatants/ (visited July 2, 2021) ....................................................3

Letter from ABA President William C. Hubbard to U.S. Secretary of
        Homeland Security Jeh Johnson (Mar. 26, 2015), https://www.
        americanbar.org/content/dam/aba/administrative/government_
        affairs_office/family-detention.pdf?logActivity=true ...................................10

Marcus, Martin, *The Making of the ABA Criminal Justice Standards*,
        23(4) Criminal Justice 10 (2009)......................................................................8

4 Weinstein & Berger, *Weinstein's Evidence* (1st ed. 1975)............................25, 26

## GLOSSARY

ABA                     American Bar Association

CIPA                    Classified Information Procedures Act

## INTEREST OF *AMICUS CURIAE*

The American Bar Association ("ABA") is the largest voluntary association of attorneys and legal professionals in the world.  Its members come from all fifty states, the District of Columbia, and United States territories, and include attorneys working in law firms, corporations, nonprofit organizations, government agencies, and prosecutorial and public defender offices, as well as judges, legislators, law professors, and students.[1]

Acting as a voice for legal professionals, the ABA seeks to improve the administration of justice, assist lawyers and judges in their work, and build public understanding of the importance of the rule of law.  Among the ABA's goals is "[a]ssur[ing] meaningful access to justice for all persons."  *ABA Mission & Goals*, https://www.americanbar.org/about_the_aba/aba-mission-goals/.[2]  The ABA also seeks to "[w]ork for just laws, including human rights, and a fair legal process," to "[h]old governments accountable under law," and to "[i]ncrease public

---

[1]  All parties have consented to the filing of this brief.  No counsel for any party authored this brief in whole or in part, and no counsel or party other than the ABA or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.  Neither this brief nor the decision to file it should be interpreted to reflect the views of any judicial member of the ABA.  No member of the Judicial Division Council participated in the adoption of or endorsement of the positions in this brief, nor was it circulated to any member of the Judicial Division Council prior to filing.

[2] All URLs visited July 2, 2021.

understanding of and respect for the rule of law, the legal process, and the role of the legal profession." *Id.* The ABA has long promoted policies that protect the fundamental rights of individuals detained by the government for any purpose— whether in the criminal context, the immigration context, or (as here) at Guantanamo.

Specifically, the ABA has acted to ensure that such individuals have the right to due process. For example, the ABA has adopted Pretrial Release Standards that "provide procedural safeguards to govern pretrial detention proceedings." *ABA Standards for Criminal Justice: Pretrial Release* 10-1.1 (3d ed. 2007) ("*Pretrial Release Standards*"). The ABA's Fair Trial and Public Discourse Standards similarly state the ABA's view that "lawyers and others involved in the criminal justice system have a duty to ensure that criminal cases are conducted fairly." *ABA Standards for Criminal Justice: Fair Trial and Public Discourse* 8-1.1(b)(ii) (4th ed. 2013). Finally, for nearly two decades, the ABA's Commission on Immigration has worked to ensure fair treatment and due process rights for immigrants, asylum seekers, and refugees. *See ABA Commission on Immigration*, https://www.americanbar.org/groups/public_interest/immigration/. These wide-ranging initiatives reflect the organization's commitment to upholding due process in a variety of settings.

After the terrorist attacks of September 11, 2001, the ABA extended these efforts into the antiterrorism context, creating a Task Force on the Treatment of Enemy Combatants to examine the complex questions of statutory, constitutional, and international law and policy raised by the government's detention of individuals declared to be "enemy combatants."  As part of this work, the ABA has advocated to the Executive Branch and to Congress for fair treatment and process for individuals detained at Guantanamo.  *See Enemy Combatants*, https://www.americanbar.org/advocacy/governmental_legislative_work/priorities_policy/civil_liberties/enemy_combatants/.  It also promulgated a policy in 2009 explaining that individuals detained at Guantanamo should have "full due process rights."  ABA Policy 09M10A ("2009 Policy"), https://www.americanbar.org/content/dam/aba/directories/policy/2009_my_10a.pdf.  The ABA filed *amicus curiae* briefs in cases involving the rights of individuals designated as "enemy combatants," including at Guantanamo.  *See* ABA Amicus Br., *al-Nashiri v. Trump*, No. 16-8966 (U.S. May 31, 2017); ABA Amicus Br., *Boumediene v. Bush*, Nos. 06-1195, 06-1196 (U.S. Aug. 24, 2007); ABA Amicus Br., *Hamdi v. Rumsfeld*, No. 03-6696 (U.S. Feb. 23, 2004) ("ABA *Hamdi* Amicus Br."); ABA Amicus Br., *Padilla v. Rumsfeld*, Nos. 03-2235, 03-2438 (2d Cir. July 30, 2003).

The ABA's longstanding interest in the fairness of proceedings that result in detention has led it to consistently oppose prolonged detentions without due

process. *See, e.g., Pretrial Release Standards* 10-1.1, 10-1.2 (arguing for release of defendants pending adjudication of charges unless detention is necessary to ensure a defendant's appearance or the safety of the community). Thus the ABA has a critical interest in ensuring that the issues involved in this case are resolved in a way that protects individual liberty and fairness, while giving proper weight to legitimate concerns such as national security.

## SUMMARY OF ARGUMENT

At its core, the Constitution's protection of liberty secures freedom from governmental imprisonment absent adequate justification and fair process. The Due Process Clause requires the government to provide basic procedural safeguards before depriving an individual of physical liberty in any kind of proceeding—civil or criminal—and particularly before detaining someone for an extended or indefinite period of time. Fundamental fairness demands that those protections extend to persons (whether citizens or not) who have been detained for years at Guantanamo.

Established constitutional doctrine does too. The Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), which held that the Suspension Clause had full effect at Guantanamo, made clear that Guantanamo should be treated as *de facto* U.S. territory for purposes of constitutional adjudication—and that as a result, no bright-line rule can be used to deny constitutional rights to

- 4 -

detainees there. The functional considerations the Supreme Court analyzed in *Boumediene* point to a similar result here: Detainees are entitled to claim the protection of the Due Process Clause.

That protection includes an opportunity to know and respond to the allegations and evidence on which a governmental decisionmaker relies to justify detention. Indeed, the very premise of our adversarial system is that one-sided determinations generally present an intolerably high risk of error. As applied here, due process requires that Petitioner's habeas proceedings include at least two specific procedural protections: the opportunity for his security-cleared counsel to view the evidence on which his detention rests, and the exclusion of unreliable and unchallengeable hearsay evidence. The ABA accordingly believes that the case should be remanded for further proceedings consistent with these due process rights.

## ARGUMENT

I. **PROCEEDINGS THAT MAY RESULT IN GOVERNMENT DETENTION, INCLUDING THOSE INVOLVING ALLEGED "ENEMY COMBATANTS," SHOULD FOLLOW PRINCIPLES OF FUNDAMENTAL FAIRNESS**

Our legal system has long recognized that a decision to deprive any person of physical liberty is a grave action that requires legal justification and fair process. The Fifth Amendment's provision that no "person" should be deprived of liberty without "due process of law"—applicable to citizens and noncitizens alike—traces

- 5 -

its origins to Magna Carta, which stated that "[n]o freeman shall be taken, or imprisoned … but by lawful judgment of his peers, or by the law of the land," 1 Coke, *The Second Part of the Institutes of the Laws of England* 45 (1797); *see id.* at 50 (interpreting "by the law of the land" to mean "by due process of the common law").  Blackstone later warned that "confinement of the person" without "cause" and adequate "process" is a "dangerous engine of arbitrary government." 1 Blackstone, *Commentaries on the Laws of England* 130-133 (1765).  Due process and habeas corpus worked hand-in-hand to prevent unlawful detention: "due process [w]as the right secured" and "habeas corpus [w]as the instrument by which due process could be insisted upon by a citizen illegally imprisoned." *Hamdi v. Rumsfeld*, 542 U.S. 507, 555-556 (2004) (Scalia, J., dissenting).  Those two ideas, "central to Blackstone's understanding" and "well known to the Founders," "found expression in the Constitution's Due Process and Suspension Clauses." *Id.*

More recent authority reaffirms that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Accordingly, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Government detention "violates th[e

Due Process] Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections" or in certain other "special and 'narrow' nonpunitive 'circumstances'" where "strong procedural protections" are provided. *Zadvydas*, 533 U.S. at 690-691 (emphasis omitted).  Detention by the government "is harsh and oppressive, subjects [detainees] to economic and psychological hardship, interferes with their ability to defend themselves, and, in many instances, deprives their families of support." *Pretrial Release Standard* 10-1.1; *accord Gerstein v. Pugh*, 420 U.S. 103, 114 (1975).  Those consequences are particularly severe in cases like this one, where detention is "potentially *indefinite*," *Zadvydas*, 533 U.S. at 691.

One crucial protection is the right to know and respond to the allegations and evidence on which a detention decision rests.  "No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring); *see, e.g.*, *Lankford v. Idaho*, 500 U.S. 110, 121 (1991); *Morrissey v. Brewer*, 408 U.S. 471, 487-489 (1972); *Salerno*, 481 U.S. at 751-752 (noting "extensive" procedural safeguards of the Bail Reform Act, including confrontation rights, in upholding the Act against due process challenge).  ABA policy similarly notes that "the right of each party to examine and confront the evidence against it

is fundamental to a fair legal process." ABA Policy 01M106C, https://
www.americanbar.org/content/dam/aba/directories/policy/midyear-2001/
2001_my_106c.pdf. The ABA's Criminal Justice Standards, which have guided
practitioners, courts, and policymakers for more than fifty years, *see* Marcus, *The
Making of the ABA Criminal Justice Standards*, 23(4) Criminal Justice 10 (2009),
therefore urge that pretrial-detention hearings allow individuals to respond to
adverse testimony, *see Pretrial Release Standard* 10-5.10. Similarly, the ABA has
spoken out against secret evidence in immigration proceedings, urging that "[n]o
person should be deprived of liberty on the basis of evidence kept secret from
them." ABA Policy 01M106C.

Principles of fundamental fairness likewise should apply in cases involving
individuals detained as so-called "enemy combatants" or "law of war detainees."
This has long been the policy of the ABA's diverse membership, and it is
consistent with the Supreme Court's own holdings. Addressing the protections due
to a U.S.-citizen detainee, the Supreme Court "reaffirm[ed] … the fundamental
nature of a citizen's right to be free from involuntary confinement by his own
government without due process of law." *Hamdi*, 542 U.S. at 531 (plurality). Four
years later, the Supreme Court held that non-citizens detained at Guantanamo must
have a "meaningful opportunity" to challenge their detention via habeas
proceedings. *Boumediene*, 553 U.S. at 779.

- 8 -

ABA policy has further recognized that important "public safety and national security concerns" can be safeguarded while complying with "norms of due process" in proceedings involving alleged enemy combatants. ABA Policy 02M8C, https://www.americanbar.org/content/dam/aba/administrative/ death_penalty_representation/dp-policy/2002-my-8c.pdf; *see also* ABA *Hamdi* Amicus Br. 13-24 (due process protections for specific detainees). After *Boumediene*, the ABA advocated for "full due process rights" for Guantanamo habeas petitioners. 2009 Policy. They "should be entitled to the procedural safeguards ordinarily available to other federal habeas petitioners unless the [g]overnment can demonstrate a real need to depart from them." *Id.* Where no concrete, case-specific showing of military exigency has been made, the procedural due process calculus "should decidedly shift in favor of the petitioner and his paramount interest in being free from erroneous or arbitrary detention." *Id.* The protections afforded should include "the right to review and confront the evidence against [the detainee], including potential exculpatory evidence within the government's possession … subject to appropriate conditions as may be set by the court to accommodate the needs of the detainee and the requirements of national security." *Id.*

These ABA policies recognize that, "in the rush to address" legitimate government interests, "the United States cannot abandon the principles of liberty,

fairness, and due process that make this country a beacon of hope … around the world."  Letter from ABA President William C. Hubbard to U.S. Secretary of Homeland Security Jeh Johnson at 4 (Mar. 26, 2015), https://www.americanbar.org/content/dam/aba/administrative/government_affairs_ office/family-detention.pdf?logActivity=true.  As the Supreme Court has recognized, "[i]t is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."  *Hamdi*, 542 U.S. at 532 (plurality).  These principles should be applied in this case, as the balance of this brief shows.

## II.   PETITIONER MAY INVOKE DUE PROCESS RIGHTS WHEN CHALLENGING HIS SEVENTEEN-YEAR DETENTION AT GUANTANAMO

Under a straightforward application of *Boumediene*, Guantanamo detainees are entitled to claim the protections of the Due Process Clause—which, "like the" Suspension Clause, "protects persons as well as citizens," 553 U.S. at 743.  Indeed, that has long been a foundational assumption of ABA policy.  *See supra* pp. 8-10.

In *Boumediene*, the Supreme Court applied functional and practical considerations—rather than a "formalistic" test based on "*de jure* sovereignty"—to determine that the Suspension Clause had "full effect at Guantanamo Bay."  553 U.S. at 762, 765-771.  The Court made clear, moreover, that such functional considerations are "relevant" to determining the extraterritorial reach of other

constitutional provisions too:  It drew its functional analysis from *Johnson v. Eisentrager*, 339 U.S. 763 (1950), "and the reasoning in [the] other extraterritoriality opinions" the Court canvassed, which addressed a range of constitutional provisions—including the Fifth Amendment.  *Boumediene*, 553 U.S. at 766; *see id.* at 755-764 (discussing cases addressing "the Constitution's geographic scope").  In one such case, for example, "the Court took for granted that even in unincorporated Territories"—where parts of the Constitution might not apply—"the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution,'" *id.* at 758 (discussing *Balzac v. Porto Rico*, 258 U.S. 298 (1922)).  Those included the guarantee "that no person could be deprived of life, liberty, or property without due process of law."  *Balzac*, 258 U.S. at 312-313.  One of the best-known *Insular Cases* likewise noted that the right "to be protected in life, liberty, and property" would apply to noncitizens in territory "over which Congress has jurisdiction which is not a part of the 'United States.'"  *Downes v. Bidwell*, 182 U.S. 244, 277, 282-283 (1901).  Similarly, *Reid v. Covert*, 354 U.S. 1 (1957), applied "practical considerations" to conclude that the petitioners there had Fifth Amendment rights, even though they were located in England and Japan.  *Boumediene*, 553 U.S. at 759-761.  If cases addressing the Fifth Amendment supplied the framework for evaluating whether the *Suspension Clause* applies at

Guantanamo, then surely that same framework applies when evaluating whether the Fifth Amendment *itself* applies there.[3]

Such functional considerations lead to the same result for due process as for the Suspension Clause. First, Petitioner's status, like Boumediene's, is "a matter of dispute" and has not been determined in a criminal trial. *Boumediene*, 553 U.S. at 766-767. Second, the United States' control over Guantanamo remains "absolute" and "indefinite." *Id.* at 768. Thus, "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 769. Finally, given the "plenary control the United States asserts over the base," the government can "present[] no credible arguments that the military mission at Guantanamo would be compromised if" courts could "hear [Petitioner's] claims" under the Due Process Clause, nor can it credibly argue that adjudicating his claims "would cause friction with the host government." *Id.* at

---

[3] This Court and others have read *Boumediene*'s functional framework to extend to other constitutional provisions. *See, e.g.*, *Fitisemanu v. United States*, 2021 WL 2431586, at *6, *8 (10th Cir. June 15, 2021) (reasoning that the "standard for determining whether a particular constitutional guarantee is applicable abroad" is whether its application would be "impracticable and anomalous," and applying that standard in evaluating a Citizenship Clause argument); *Tuaua v. United States*, 788 F.3d 300, 307 (D.C. Cir. 2015) (similar); *Al Bahlul v. United States*, 767 F.3d 1, 63, 65-66 n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment in part and dissenting in part) (noting that five of seven judges on the en banc Court "agree[d] in light of *Boumediene* … that the Ex Post Facto Clause applies at Guantanamo").

769-770.  That is particularly so given that the usual test for adjudicating

procedural due process claims *by definition* takes account of any "burdens the

[g]overnment would face in providing" the process a detainee requests "in any

given instance." *Hamdi*, 542 U.S. at 529 (citing *Mathews v. Eldridge*, 424 U.S.

319, 335 (1976)).

Moreover, Petitioner's procedural due process claims take issue with the

process provided in a U.S. district court, not deficiencies of any tribunal operating

abroad.  A "constitutional violation [that] occurs only at trial" in a U.S. court is not

one that "occur[s] solely in" foreign territory; if anything, the violation is "fully

accomplished" here.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264

(1990).  A district court has no more license to deny procedural due process in a

Guantanamo detainee's habeas proceedings than it does to deny a foreign

defendant the "fundamental trial right" of the Fifth Amendment's "privilege

against self-incrimination" in a domestic criminal trial, *id.*; *see United States v.

Allen*, 864 F.3d 63, 90 (2d Cir. 2017) ("[i]f … we are to hale foreign men and

women into the courts of the United States to fend for their liberty we should not

do so while denying them the full protection of a 'trial right' we regard as

'fundamental'" (emphasis omitted)).  At issue is not only individual rights, but also

"the appearance and the reality of fairness in the adjudications of United States

courts." *Abourezk v. Reagan*, 785 F.2d 1043, 1060-1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).

The panel in this case viewed *Eisentrager* (and subsequent Supreme Court precedent) as dictating a "categorical[]" conclusion that the Due Process Clause does not extend to "aliens without property or presence in the United States." *Al Hela v. Trump*, 972 F.3d 120, 138, 149 (D.C. Cir. 2020), *judgment vacated*, Order, No. 19-5079 (D.C. Cir. Apr. 23, 2021). But *Boumediene* made clear that Guantanamo detainees, unlike the detainees in *Eisentrager*, *should* be considered "presen[t] in" U.S. territory for purposes of the Due Process Clause; "[i]n every practical sense Guantanamo is not abroad." 553 U.S. at 763, 768-769. Indeed, the Supreme Court has since noted that *Boumediene* likened the rights of Guantanamo detainees to those of "foreign citizens in the U.S. Territories." *Agency for International Development v. Alliance for Open Society International, Inc.*, 140 S. Ct. 2082, 2086 (2020); *accord Al Bahlul v. United States*, 767 F.3d 1, 65-66 n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment in part and dissenting in part) ("[i]n *Boumediene*, the Court determined that Guantanamo was de facto U.S. territory"). Likewise, none of the post-*Eisentrager* Supreme Court cases on which the panel relied considered the constitutional rights of noncitizens in a territory over which the United States exercises "complete jurisdiction and control," *Rasul v. Bush*, 542 U.S. 466, 480 (2004). *See Zadvydas*, 533 U.S. at 693

(discussing rights of foreign citizens "treated" as having "never entered" U.S. territory); *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (same); *Verdugo-Urquidez*, 494 U.S. at 264, 269.  One case expressly distinguished *Boumediene* on that basis.  *Agency for International Development*, 140 S. Ct. at 2086.[4]

Nor does *Boumediene*'s "emphasi[s]" on "the limited and exceptional nature of its holding" counsel against the relief requested here.  *Al Hela*, 972 F.3d at 142.  The opposite is true:  Even though *Boumediene*'s holding "lack[ed] any precise historical parallel," the Court reasoned that "the lack of a precedent on point is no barrier to our holding," noting the unprecedented "circumstances" of "individuals detained by executive order for the duration of a conflict that … is already among the longest wars in American history," in a "territory … under the complete and total control of our [g]overnment."  553 U.S. at 770-771.  Those "circumstances," *id.*, apply with even greater force after thirteen additional years of detention.

Accordingly, the Court should hold that Guantanamo prisoners may invoke the Due Process Clause in habeas proceedings challenging their detention.

---

[4] Many of the Circuit cases on which the panel relied predated *Boumediene*.  *See Al Hela*, 972 F.3d at 139-140.  And more recent "decision[s] of this [C]ircuit" have not "adopted a categorical prohibition on affording detainees seeking habeas relief any constitutional procedural protections" under the Due Process Clause.  *Qassim v. Trump*, 927 F.3d 522, 524 (D.C. Cir. 2019).

## III.   DUE PROCESS REQUIRES THAT PETITIONER RECEIVE KEY PROCEDURAL PROTECTIONS IN HIS HABEAS PROCEEDINGS

Applying due process principles here, Petitioner was entitled to at least two specific protections in the proceedings below:  the right for his counsel to access the evidence relied upon to justify his lengthy detention, and the right to have unreliable multiple-hearsay evidence excluded from the proceedings.[5]

### A.   Security-Cleared Counsel Should Be Permitted To View Information On Which A Detention Decision Rests

The ABA has long urged that Guantanamo detainees should have the "right to review and confront the evidence against them, … subject to appropriate conditions as may be set by the court to accommodate the needs of the detainee and the requirements of national security."  2009 Policy.  A "fundamental prerequisite of any fair legal system" is that deprivations of liberty may not be "bas[ed] o[n] evidence kept secret" from the affected individual.  ABA Policy 01M106C.

Indeed, the very premise of our adversarial system is that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  The Supreme Court has deemed "immutable" the principle that "where governmental action seriously injures an

---

[5] The ABA's agreement with certain of Petitioner's arguments does not imply disagreement with his remaining contentions; the ABA takes no position on issues not addressed in this brief.

individual, … the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).  Without meaningful adversarial testing—the "fundamental instrument" for a fair adjudicatory process—"there is insufficient assurance of the balanced analysis and careful conclusions," *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968), that are essential when decades-long detention is at stake.  It is therefore the "firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions." *Abourezk*, 785 F.2d at 1061.[6]

The due process balancing framework set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), strongly supports allowing, at the very least, a prisoner's cleared counsel to view evidence relied upon to justify detention.  *See Hamdi*, 542 U.S. at 529 (plurality) (applying that framework).  That familiar inquiry requires consideration of the private interest at stake; the risk of an erroneous deprivation of that interest under the procedures used, as well as the value of the requested additional safeguard; and the government's interest.  *Id.*

---

[6] Different considerations arise when a court inspects evidence *ex parte* "for the limited purpose of determining whether [an] asserted privilege is genuinely applicable." *Abourezk*, 785 F.2d at 1061.  That may lead the court to "*prevent use* of the materials in the litigation," but not to issue "a decision against [a party] based on evidence he was never permitted to see and to rebut." *Id.*; *see infra* pp. 22-24.

- 17 -

Here, the private interest "is the most elemental of liberty interests—the interest in being free from physical detention." *Hamdi*, 542 U.S. at 529 (plurality). The Supreme Court has "always been careful not to 'minimize the importance and fundamental nature'" of that right. *Id.* (quoting *Salerno*, 481 U.S. at 750). The length of the deprivation here heightens the (already critical) private interest, as the Supreme Court noted in flagging the particularly serious consequences of wrongful detention lasting "a generation or more." *Boumediene*, 553 U.S. at 785; *see also Velasco Lopez v. Decker*, 978 F.3d 842, 853-854 (2d Cir. 2020) ("'as the period of … confinement grows,' so do the required procedural protections" (citing *Zadvydas*, 533 U.S. at 701; *Demore v. Kim*, 538 U.S. 510, 532-533 (2003) (Kennedy, J., concurring))).[7]

The risk of wrongful deprivation, meanwhile, is "especially high" when the action is "based on redacted evidence." *Fares v. Smith*, 901 F.3d 315, 323-324 (D.C. Cir. 2018). Indeed, when undisclosed information is used to determine the merits of a case, "[o]ne would be hard pressed to design a procedure more likely to

---

[7] Recognizing the constitutional concerns posed by "preventive detention … of potentially *indefinite* duration," *Zadvydas*, 533 U.S. at 691-692, the ABA has opposed "indefinite pretrial detention" of alleged enemy combatants, ABA Policy 02M8C, and has urged that habeas hearings occur "prompt[ly]," 2009 Policy. And it has argued that a standard of proof "greater than a preponderance" of the evidence is required in proceedings like this one, *id.*, as the "Supreme Court has consistently held" in other situations where physical liberty is at stake, *Velasco Lopez*, 978 F.3d at 856.

result in erroneous deprivations." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012). "[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *Id.* The same "risk of error" is "inherent in any process that … is 'closed and accusatorial,'" including one involving Guantanamo prisoners. *Boumediene*, 553 U.S. at 785. "[P]arty access to the evidence tendered in support of a requested court judgment … preserve[s] … fairness in the adjudications of United States courts," making such access "a hallmark of our adversary system." *Abourezk*, 785 F.2d at 1060-1061.

To be sure, the government has a legitimate interest in safeguarding classified information. But the government's interest in preventing disclosure to *security-cleared counsel* is minimal. Department of Justice regulations, for example, provide that security clearances are granted "only where" an individualized determination has been made that a person's "access to classified information is *clearly consistent* with the national security interests of the United States"—including because the individual has demonstrated a "willingness and ability to abide by regulations governing the use, handling, and protection of classified information"—with "any doubt … resolved in favor of the national security." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 117 n.21 (2d Cir. 2008) (quoting 28 C.F.R. § 17.41(b) (emphasis added)). The grant of

an appropriate security clearance therefore indicates that the cleared individual's review of classified information will not jeopardize national-security interests. *See Al Haramain*, 686 F.3d at 983 ("a lawyer … who has the appropriate security clearance … does not implicate national security when viewing the classified material because, by definition, he or she has the appropriate security clearance"). The prospect of severe penalties provides a strong deterrent against unauthorized disclosure of classified information. *E.g.*, 18 U.S.C. § 798 (criminal penalties).[8]

Moreover, any risk is further reduced when the cleared individual is a lawyer—an officer of the court sworn to uphold the law and "bound to work for the advancement of justice." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Any blanket suggestion that lawyers will not obey restrictions on the receipt of classified information—including any limitations on interaction with their clients—is contrary to that central presumption of the American justice system (and refuted by two decades of Guantanamo litigation). Accordingly, courts have regularly approved the release of sensitive information to cleared counsel as consistent with important national-security interests. *See, e.g., In re Terrorist*

---

[8] To the extent that some materials require a higher security clearance, counsel should be given the opportunity "to obtain the [requisite] security clearance required to review and respond to the classified materials in connection with the resolution of th[e] case." *Doe v. Gonzales*, 386 F. Supp. 2d 66, 71 (D. Conn. 2005).

*Bombings*, 552 F.3d at 120, 127-128; *United States v. Abu Ali*, 528 F.3d 210, 254 (4th Cir. 2008); *cf. United States v. Camacho*, 2002 WL 31770810, at *3 (S.D.N.Y. Dec. 11, 2002).[9]

Neither case on which the panel relied—*Khan v. Obama*, 655 F.3d 20 (D.C. Cir. 2011), and *Obaydullah v. Obama*, 688 F.3d 784 (D.C. Cir. 2012)—considered the due process question presented here. And while the concurrence cited cases addressing the Due Process Clause, none held that the clause permits security-cleared counsel to be denied access to information on which a detention decision rests—and certainly none did so in the context of long-lasting detention. In the most recent of those cases, for example, the Court concluded instead that it may "countenanc[e] the use of summaries" of the underlying classified information to a party *without* an appropriate clearance who is challenging an *asset freeze*—and even then, only "under the most pressing circumstances" and only where the summaries provided are "sufficiently specific," giving "the 'who,' 'what,' 'when' and 'where' of the allegations." *Fares*, 901 F.3d at 324; *see also id.* (discussing

---

[9] Assuming *arguendo* that disclosure even to security-cleared counsel could constitutionally be denied in some case, the government should be required, at the very least, to specifically demonstrate that such a limited disclosure would jeopardize national security, that "an unjust result would eventuate" without *ex parte* evidence, and that it had disclosed "as much of the material as it could divulge without compromising" its privilege, *Abourezk*, 785 F.2d at 1061. The panel did not conduct such an inquiry here. *See Al Hela*, 972 F.3d at 137.

- 21 -

the other asset-freeze cases cited by the concurrence, *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238 (D.C. Cir. 2003), and *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001)).  Indeed, *Fares* expressly noted that the plaintiffs there had not "request[ed] cleared counsel who could review the redacted information on [their] behalf."  *Id.* at 318.

In another case cited by the concurrence, moreover—one that considered an individual's Fifth Amendment rights in the context of a significant liberty deprivation—the court permitted the provision of a summary to the defendant (one that provided "access to all of the relevant facts") only where cleared counsel could access "all classified material arguably relevant to [the] defense."  *In re Terrorist Bombings*, 552 F.3d at 127.  And in any event, the case addressed the government's obligation to provide information *during discovery*; it nowhere approved reliance on evidence withheld from the defense *to decide the merits*.  *Id.* at 120-130; *see supra* p. 17 n.6.

Courts can look to the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, §§ 1-16, and case law interpreting it, as a workable model.  That statute's "animating purpose is to harmonize a criminal defendant's right to obtain and present exculpatory material with the government's" national-security concerns.  *In re Terrorist Bombings*, 552 F.3d at 115-116 (alterations, quotation

marks, and citations omitted).  This Court has already suggested CIPA as a useful guide in resolving questions about access to confidential information in Guantanamo cases, *see, e.g.*, *Parhat v. Gates*, 532 F.3d 834, 849-850 (D.C. Cir. 2008), as has the ABA, *see* 2009 Policy.

Notably, while CIPA permits *ex parte* proceedings for the limited purpose of determining what information must be produced to the defendant, it does "not … authorize" reliance on *ex parte* information to resolve the merits of a case.  *Abu Ali*, 528 F.3d at 255; *see supra* p. 17 n.6.  As the Fourth Circuit put it, "[t]here is a stark difference between *ex parte* submissions from prosecutors which protect the disclosure of irrelevant, nonexculpatory, or privileged information, and situations in which the government seeks to use *ex parte* information in court as evidence to obtain a conviction."  *Abu Ali*, 528 F.3d at 255.  The latter "plainly violates" defendants' rights.  *Id.*; *see United States v. Mejia*, 448 F.3d 436, 459 (D.C. Cir. 2006) (approving an *ex parte* decision to withhold classified information under CIPA, but noting that "because that material was never shown to the jury, 'there is no question here of convictions based upon secret evidence furnished to the factfinder but withheld from the defendants'").  "If the government does not want the defendant to be privy to information that is classified, it may either declassify the document, seek approval of an effective substitute," *Abu Ali*, 528 F.3d at 255— one that "provide[s] the defendant with substantially the same ability to make his

defense as would disclosure of the specific classified information," 18 U.S.C. App. III, § 6(c)—"or forego its use altogether," but it cannot "hide the evidence from the defendant" while allowing the factfinder to rely on it, *Abu Ali*, 528 F.3d at 255; *cf. United States v. Claudio*, 44 F.3d 10, 14 (1st Cir. 1995) (rejecting as "patently absurd" the argument that "safeguards against wide-ranging discovery … would be sufficient to justify a conviction on secret evidence").[10]

### B. Due Process Principles Also Strongly Disfavor The Use Of Multi-Layered, Anonymous Hearsay

Detainees' "right to review and confront the evidence against them" necessitates careful limits on the use of hearsay evidence. 2009 Policy. The ABA has urged that in Guantanamo habeas proceedings, hearsay "should be generally inadmissible unless it falls within an established exception" under the Federal Rules of Evidence. *Id.* At a minimum, the government must establish both the reliability of the statement at issue and the impracticality of producing first-hand evidence without compromising its war effort or national security. *Id.* The hearsay statement must be, at the very least, the government's "most reliable available evidence." *Id.*; *see Hamdi*, 542 U.S. at 534. And if the court admits a

---

[10] Indeed, in *Abu Ali*, the Fourth Circuit concluded that the factfinder could not rely on classified evidence withheld from the defendant himself, even though security-cleared counsel had seen the evidence. 528 F.3d at 254-256. The situation here—where the court relied on classified evidence that was withheld from Petitioner *and* cleared counsel—presents even graver concerns.

hearsay statement, "it should grant the petitioner the opportunity to submit responding affidavits and/or interrogatories." 2009 Policy. These conclusions follow from due process principles.

The Due Process Clause bars reliance on unreliable evidence, approving the admission of evidence only when it is "fundamentally fair." *Banat v. Holder*, 557 F.3d 886, 890 (8th Cir. 2009); *see Michigan v. Bryant*, 562 U.S. 344, 370 n.13 (2011); *Singletary v. Reilly*, 452 F.3d 868, 872 (D.C. Cir. 2006); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003). Relatedly, "procedural due process often requires confrontation … of those whose word deprives a person of" a protected interest. *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 103-104 (1963); *see supra* pp. 7-8. A fair adjudicatory process requires exclusion of evidence when neither the court nor the parties have any way to assess (or challenge) the credibility of its source. *Banat*, 557 F.3d at 892. Rules limiting reliance on hearsay protect these rights by excluding evidence that "lack[s] the conventional indicia of reliability" and cannot be meaningfully confronted. *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).

Multiple hearsay is "even more vulnerable to all the objections which attach to simple hearsay," because "with every increased level of hearsay there is a corresponding decrease in reliability." *Boren v. Sable*, 887 F.2d 1032, 1036-1037 (10th Cir. 1989) (quoting 4 Weinstein & Berger, *Weinstein's Evidence* ¶805[01]

(1st ed. 1975)).  The Fourth Circuit deemed multiple hearsay "particularly problematic":  "where the declarant is steps removed from the original speaker, … the declarant in all likelihood has been unable to evaluate the trustworthiness of the original speaker."  *Anim v. Mukasey*, 535 F.3d 243, 257 (4th Cir. 2008).  Moreover, "[e]very level of hearsay provides another possibility that the facts were inaccurately reported by the declarant, either intentionally or unintentionally, or misunderstood by the person to whom the statement was made."  *Boren*, 887 F.2d at 1036 (quoting *Weinstein's Evidence* ¶805[01]).  Unsurprisingly, then, this Court and others have rejected such evidence as inconsistent with the Due Process Clause's guarantee of fundamental fairness.  *See Singletary*, 452 F.3d at 873-874; *Alexandrov v. Gonzales*, 442 F.3d 395, 407 (6th Cir. 2006); *Banat*, 557 F.3d at 892-893; *Anim*, 535 F.3d at 257; *Ezeagwuna*, 325 F.3d at 406.

Where hearsay is anonymous, additional problems emerge.  Statements from anonymous sources "seldom demonstrate[] the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S. 325, 329 (1990), and "[t]he risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the … judge, is manifest," *Gardner v. Florida*, 430 U.S. 349, 359 (1977) (plurality).  This Court has accordingly rejected "multilayered" hearsay evidence involving anonymous declarants as insufficiently "reliab[le] to ensure fundamental due process rights," observing that the

decisionmaker "had no way of knowing how reliable the [anonymous] informants were and had no real basis on which to resolve the credibility" of the statements. *Singletary*, 452 F.3d at 873-874; *see Anim*, 535 F.3d at 257 (rejecting evidence from an "extended chain of (mostly unidentified) hearsay declarants"). Where such statements are heavily redacted, moreover, an individual's ability to "effectively challenge the contact's credibility," *Banat*, 557 F.3d at 892, is even more limited.

To be sure, the plurality opinion in *Hamdi*—as the concurrence here noted— suggested that hearsay "*may* need to be accepted as the most reliable available evidence from the [g]overnment" in enemy-combatant proceedings. 542 U.S. at 533-534 (emphasis added). But as the panel recognized, that observation "falls short of conclusively allowing the *multiple layers of anonymous hearsay* relied upon in this case." *Al Hela*, 972 F.3d at 145 (emphasis added). Moreover, *Hamdi* "neither said nor implied that normal procedures and evidentiary demands would be lessened in *every* enemy-combatant habeas case, regardless of the circumstances." *al-Marri v. Pucciarelli*, 534 F.3d 213, 268-269 (4th Cir. 2008) (en banc) (Traxler, J., concurring), *vacated as moot sub nom. al-Marri v. Spagone*, 555 U.S. 1220 (2009); *see also id.* at 253 (Motz, J., concurring) (indicating that a majority of the en banc Fourth Circuit joined this aspect of Judge Traxler's opinion). Rather, the *Hamdi* plurality simply suggested that the "normal

evidentiary requirements *might* need to be relaxed to account for the governmental interest in military matters," but only after a case-by-case showing that the "burdens in time of warfare of 'providing greater process'" require such a deviation—and that doing so does not pose too great a "'risk of erroneous deprivation' of the detainee's liberty interest." *Id.* at 269 (Traxler, J., concurring); *see also* 2009 Policy. The panel did not require the government to make such a showing here.[11]

## CONCLUSION

The district court's judgment should be vacated and the case remanded for further proceedings in light of the due process principles discussed herein.

Respectfully submitted,

/s/ Patricia Lee Refo

| | |
|---|---|
| MARK C. FLEMING | PATRICIA LEE REFO |
| ELIZABETH BEWLEY | AMERICAN BAR ASSOCIATION |
| SOFIE C. BROOKS | 321 North Clark Street |
| WILMER CUTLER PICKERING | Chicago, IL 60654 |
| HALE AND DORR LLP | (312) 988-5000 |
| 60 State Street | abapresident@americanbar.org |
| Boston, MA 02109 | |
| (617) 526-6000 | |

July 2, 2021

---

[11] The panel also gave the government's intelligence reports a "rebuttable presumption of regularity." *Al Hela*, 972 F.3d at 136. But that presumption "implies nothing about the truth of the underlying non-government source's statement"; it instead simply "presumes the government official accurately identified the source and accurately summarized his statement." *Latif v. Obama*, 677 F.3d 1175, 1180 (D.C. Cir. 2011).

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,483 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Patricia Lee Refo
PATRICIA LEE REFO

July 2, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ Patricia Lee Refo
PATRICIA LEE REFO